Case No. CIV-08-832-R

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

---

**BRENDA EVERS ANDREW,**

**Petitioner,**

**-vs-**

**MILLICENT NEWTON-EMBRY, Warden,**
**Mabel Basset Correctional Center,**

**Respondent.**

---

### RESPONSE TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

---

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**SETH S. BRANHAM, OBA #18019**
**ASSISTANT ATTORNEY GENERAL**

**313 NE 21ˢᵗ Street**
**Oklahoma City, OK  73105**
**(405) 521-3921; (405) 522-4534 (FAX)**
**fhc.docket@oag.state.ok.us**
**ATTORNEYS FOR RESPONDENT**

---

**NOVEMBER 4, 2009**

## <u>TABLE OF CONTENTS</u>

Page

**RULE 5 STATEMENT AND HISTORY OF THE CASE**.. . . . . . . . . . . . . . . . . . . . . . **1**

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**ARGUMENT AND AUTHORITY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

### I.

**THE OCCA REASONABLY REJECTED PETITIONER'S CONSTITUTIONAL CHALLENGES TO THE TRIAL COURT'S EXCLUSION OF DEFENSE WITNESSES AS SANCTIONS FOR DISCOVERY VIOLATIONS**. . . . . . . . . . . . . . . . **11**

*A.*    *Exhaustion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*B.*    *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*C.*    *Merits – Sgt. Larry Northcutt and Officer Roger Frost*. . . **13**

*D.*    *Merits – Lisa Gisler and Carol Shadid*. . . . . . . . . . . . . . **22**

*E.*    *Merits – Officer Ronald Warren*. . . . . . . . . . . . . . . . . . . . **25**

*F.*    *Merits – Donna Tyra*. . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

### II.

**THE OCCA REASONABLY REJECTED PETITIONER'S HEARSAY CHALLENGES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*A.*    *Exhaustion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*B.*    *Merits*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

i

**III.**

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF OTHER CRIMES OR BAD ACTS EVIDENCE IN THE ABSENCE OF ANY CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT GOVERNING THIS ISSUE**................... **36**

    *A.*    *Exhaustion.*................................... **37**

    *B.*    *Standard of Review.*.............................. **37**

    *C.*    *Merits.*..................................... **39**

**IV.**

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF ALLEGED OPINION TESTIMONY.**................................. **50**

    *A.*    *Exhaustion.*................................... **50**

    *B.*    *Standard of Review.*.............................. **50**

    *C.*    *Merits.*..................................... **51**

**V.**

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF STATEMENTS MADE BY HER CO-CONSPIRATOR IN FURTHERANCE OF THE CONSPIRACY TO KILL ROB ANDREW.**............. **61**

    *A.*    *Exhaustion.*................................... **62**

    *B.*    *Standard of Review.*.............................. **62**

    *C.*    *Merits.*..................................... **63**

**VI.**

**THE OCCA'S REJECTION OF PETITIONER'S TRIAL COUNSEL INEFFECTIVENESS CLAIMS WAS WHOLLY REASONABLE.** ................................. 76

    *A.*    *Exhaustion.* ....................................... 76

    *B.*    *Standard of Review.* ............................... 76

    *C.*    *Merits.* .......................................... 79

        1.    Failure to Provide Adequate Notice of "Critical" Defense Testimony. ................ 79

        2.    Failure to Make Evidentiary Objections. ....... 80

        3.    Failure to Submit Certain Blood Evidence for DNA Testing. .................... 82

        4.    Failure to Call Defense Witnesses. ............. 88

        5.    Failure to Present Defense Handwriting Expert. .................................... 91

        6.    Failure to Advise Petitioner to Surrender to Mexican Authorities.. ...................... 96

**VII.**

**PETITIONER FAILS TO CITE CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT SUPPORTING HER VARIOUS EVIDENTIARY CHALLENGES.** ......................................... 118

    *A.*    *Exhaustion.* ....................................... 118

    *B.*    *Standard of Review.* ............................... 118

    *C.*    *Merits.* .......................................... 119

iii

**VIII.**

**PETITIONER FAILS TO CITE CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT SUPPORTING HER EVIDENTIARY CHALLENGE TO THE ADMISSION OF STATE'S EXHIBITS 28-32 BASED ON ALLEGED LACK OF AUTHENTICATION**

. . . . . . . . . . . . . . . 132

    *A.*   *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

    *B.*   *Standard of Review and Merits.* . . . . . . . . . . . . . . . . . . . 132

**IX.**

**THE OCCA'S REJECTION OF PETITIONER'S CHALLENGE TO THE VOLUNTARINESS OF HER STATEMENT TO POLICE WAS WHOLLY REASONABLE**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

    *A.*   *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

    *B.*   *Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

    *C.*   *Merits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

**X.**

**THE OCCA REASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN FAILING TO CHANGE VENUE**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    *A.*   *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

    *B.*   *Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

    *C.*   *Merits – Presumed Prejudice.* . . . . . . . . . . . . . . . . . . . . . 150

    *D.*   *Merits – Actual Prejudice.* . . . . . . . . . . . . . . . . . . . . . . . 155

**XI.**

THE OCCA REASONABLY REJECTED PETITIONER'S
INSTRUCTIONAL CHALLENGES.......................... 160

    *A.*    *Exhaustion.* ..................................... 161

    *B.*    *Standard of Review and Merits.* .................... 161

**XII.**

THE OCCA REASONABLY REJECTED PETITIONER'S
CHALLENGES TO THE PENALTY-PHASE
INSTRUCTIONS.......................................... 166

    *A.*    *Exhaustion.* ..................................... 167

    *B.*    *Standard of Review.*.............................. 167

    *C.*    *Merits.* ......................................... 167

**XIII.**

THE OCCA'S REJECTION OF PETITIONER'S
PROSECUTORIAL MISCONDUCT CLAIMS WAS
WHOLLY REASONABLE. ............................... 172

    *A.*    *Exhaustion.* ..................................... 172

    *B.*    *Standard of Review.*.............................. 172

    *C.*    *Merits.* ......................................... 173

## XIV.

**PETITIONER'S EVIDENTIARY SUFFICIENCY CHALLENGE TO THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATOR IS UNEXHAUSTED; ALTERNATIVELY, THE OCCA'S REJECTION OF THIS CLAIM WAS WHOLLY REASONABLE.**

**REASONABLE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **179**

    *A.*    *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **179**

    *B.*    *Alternative Merits Analysis.* . . . . . . . . . . . . . . . . . . . . . . **184**

## XV.

**PETITIONER'S CUMULATIVE ERROR CHALLENGE.**

. . . . . . . **188**

    *A.*    *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **188**

    *B.*    *Merits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **188**

## XVI.

**PETITIONER'S FEDERAL CONSTITUTIONAL CHALLENGE TO THE TRIAL COURT'S FAILURE TO INSTRUCT ON OKLAHOMA'S 85% RULE WAS REASONABLY REJECTED BY THE OCCA.**

. . . . . . . . . . . . . . . . . **192**

    *A.*    *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**

    *B.*    *Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **193**

    *C.*    *Merits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **194**

## XVII.

**THE OCCA'S REJECTION OF PETITIONER'S CLAIM, BASED ON *BRADY V. MARYLAND*, THAT THE PROSECUTION WITHHELD MATERIAL AND EXCULPATORY EVIDENCE RELATING TO TERESA SULLIVAN'S TESTIMONY WAS WHOLLY REASONABLE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **197**

    *A.*    *Exhaustion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **198**

    *B.*    *Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **198**

    *C.*    *Merits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **200**

## XVIII.

**PETITIONER IS NOT ENTITLED TO A FEDERAL EVIDENTIARY HEARING ON ANY CLAIM IN HER § 2254 PETITION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **209**

**RESPONSE TO "PRELIMINARY STATEMENT REGARDING EXHAUSTION".** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **210**

**RESPONSE TO "PRELIMINARY STATEMENT CONCERNING PROCEDURAL DEFAULT".** . . . . . . . . . . . . . . . . . . . . . **210**

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **210**

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **211**

## TABLE OF AUTHORITIES

### FEDERAL CASES CITED

**Anderson v. Att'y Gen. of Kan.,**
   425 F.3d 853 (10th Cir. 2005). ............................................................................. 209

**Anderson v. Harless,**
   459 U.S. 4 (1982). ........................................................................... 66, 181, 182

**Andrew v. Oklahoma,**
   __U.S.__, 128 S. Ct. 1889 (2008). .......................................................................... 2

**Arave v. Creech,**
   507 U.S. 463 (1993). .................................................................................. 187

**Aycox v. Lytle,**
   196 F.3d 1174 (10th Cir. 1999). ........................................................................ 72

**Baldwin v. Reese,**
   541 U.S. 27 (2004). .................................................................................... 182

**Banks v. Dretke,**
   540 U.S. 668 (2004). ................................................................................. 199

**Beckwith v. United States,**
   425 U.S. 341 (1976). ................................................................................. 146

**Bell v. Cone,**
   535 U.S. 685 (2002). .......................................................................... 6, 37, 78

**Bell v. Cone,**
   543 U.S. 447 (2005). ............................................................................. *passim*

**Berkemer v. McCarty,**
   468 U.S. 420 (1984). ........................................................................ 138, 144, 146

**Bland v. Sirmons,**
   459 F.3d 999 (10th Cir. 2006). ................................................................... *passim*

**Booth v. Maryland,**
      482 U.S. 496 (1986). ........................................................................ 120

**Bourjaily v. United States,**
      483 U.S. 171 (1987). .................................................................. 63, 65

**Boyd v. Ward,**
      179 F.3d 904 (10th Cir. 1999). ................................................. 88, 170

**Boyle v. McKune,**
      544 F.3d 1132 (10th Cir. 2008). ..................................................... 210

**Brady v. Maryland,**
      373 U.S. 83 (1963). ................................................ 197, 198, 199, 200

**Brecheen v. Reynolds,**
      41 F.3d 1343 (10th Cir. 1994). ......................................................... 70

**Brecht v. Abrahamson,**
      507 U.S. 619 (1993). ................................................................. 49, 190

**Bruton v. United States,**
      391 U.S. 123 (1968). ................................................................. 74, 75

**Buchanan v. Kentucky,**
      483 U.S. 402 (1987). ........................................................................ 115

**Caldwell v. Mississippi,**
      472 U.S. 320 (1985). ........................................................................ 178

**California v. Beheler,**
      463 U.S. 1121 (1983). ...................................................................... 139

**California v. Ramos,**
      463 U.S. 992 (1983). ........................................................................ 194

**Cannon v. Gibson,**
      259 F.3d 1253 (10th Cir. 2001). ................................................. 67, 69

**Chapman v. California,**
      386 U.S. 18 (1967). .................................................. 13, 22, 23, 33, 35

**Coleman v. Thompson,**
     501 U.S. 722 (1991). ..................................................................... 67, 70

**Cone v. Bell,**
     __U.S.__, 129 S. Ct. 1769 (2009). ...................................................... 199

**Cook v. McKune,**
     323 F.3d 825 (10th Cir. 2003). ..................................................... 38, 149

**Cooks v. Ward,**
     165 F.3d 1283 (10th Cir. 1998). ........................................................ 77

**Crawford v. Washington,**
     541 U.S. 36 (2004). ................................................................. *passim*

**Cruz v. New York,**
     481 U.S. 186 (1987). ..................................................................... 75

**Cummings v. Sirmons,**
     506 F.3d 1211 (10th Cir. 2007). .............................. 69, 71, 72, 121, 133

**Cuyler v. Sullivan,**
     446 U.S. 335 (1980). .................................................................... 101

**Danforth v. Minnesota,**
     __U.S.__, 128 S. Ct. 1029 (2008). ...................................................... 29

**Darden v. Wainwright,**
     477 U.S. 168 (1986). ............................................................... 73, 174

**Darks v. Mullin,**
     327 F.3d 1001 (10th Cir. 2003). ...................................................... 189

**Daubert v. Merrell Dow Pharmaceuticals, Inc.,**
     509 U.S. 579 (1993). ............................................................ 52, 53, 54

**Davis v. Washington,**
     547 U.S. 813 (2006). ..................................................................... 28

**DeSilva v. DiLeonardi,**
     181 F.3d 865 (7th Cir. 1999). ......................................................... 103

**Delgadillo v. Woodford,**
 527 F.3d 919 (9th Cir. 2008)....................................................... 29, 32, 64

**Dietsel v. Hines,**
 506 F.3d 1249 (10th Cir. 2007)........................................................ 65

**Donnelly v. DeChristoforo,**
 416 U.S. 637 (1974)............................................................... 173, 182

**Douglas v. Workman,**
 560 F.3d 1156 (10th Cir. 2009)...................................................... 51, 173

**Dowling v. United States,**
 493 U.S. 342 (1990)................................................................. 49, 73

**Duckett v. Mullin,**
 306 F.3d 982 (10th Cir. 2002)........................................................ 49

**Duncan v. Henry,**
 513 U.S. 364 (1995)................................................................. 183

**Dye v. Hofbauer,**
 546 U.S. 1 (2005).................................................................. 182

**Early v. Packer,**
 537 U.S. 3 (2002)............................................................. 38, 149, 167

**Edwards v. Carpenter,**
 529 U.S. 446 (2000)................................................................. 70

**English v. Cody,**
 146 F.3d 1257 (10th Cir. 1999)..................................................... 67, 68

**Estelle v. McGuire,**
 502 U.S. 62 (1991)............................................................... *passim*

**Estes v. Texas,**
 381 U.S. 532 (1965)........................................................... 150, 153, 154

**Fahy v. Horn,**
 516 U.S. 169 (3d Cir. 2008)......................................................... 190

**Fairchild v. Workman,**
    579 F.3d 1134 (10th Cir. 2009)............................................................. 69

**Fry v. Pliler,**
    551 U.S. 112 (2007)...................................................... *passim*

**Gardner v. Galetka,**
    568 F.3d 862 (10th Cir. 2009)............................................................. 209

**Giglio v. United States,**
    405 U.S. 150 (1972)............................................................. 197, 198, 199

**Giles v. California,**
    __U.S.__, 128 S. Ct. 2678 (2008)............................................. 28, 64

**Gipson v. Jordan,**
    376 F.3d 1193 (10th Cir. 2004)............................................................. 37

**Goss v. Nelson,**
    439 F.3d 621 (10th Cir. 2006)............................................. 152, 155

**Hain v. Gibson,**
    287 F.3d 1224 (10th Cir. 2002)............................................................. 177

**Hale v. Gibson,**
    227 F.3d 1298 (10th Cir. 2000)..................................... *passim*

**Hamilton v. Mullin,**
    436 F.3d 1181 (10th Cir. 2006)............................................................. 195

**Harris v. Poppell,**
    411 F.3d 1189 (10th Cir. 2005)............................................. 37, 51, 62

**Hatch v. Oklahoma,**
    58 F.3d 1447 (10th Cir. 1995)............................................. 187, 199

**Hawkins v. Mullin,**
    291 F.3d 658 (10th Cir. 2002)............................................. 68, 181

**Henderson v. Norris,**
    118 F.3d 1283 (8th Cir. 1997)............................................................. 189

**Herring v. New York,**
    422 U.S. 853 (1975). ................................................................ 101

**Hicks v. Oklahoma,**
    447 U.S. 343 (1980). .......................................................... *passim*

**Hiivala v. Wood,**
    195 F.3d 1098 (9th Cir. 1999). ................................................ 183

**Hoffa v. United States,**
    385 U.S. 293 (1966). ................................................................ 161

**Holland v. Jackson,**
    542 U.S. 649 (2004). ........................................................... 86, 87

**Holley v. Yarborough,**
    568 F.3d 1091 (9th Cir. 2009). ........................................... *passim*

**Hooks v. Ward,**
    184 F.3d 1206 (10th Cir. 1999). ............................................... 69

**Hopkins v. Reeves,**
    524 U.S. 88 (1998). ............................................... 162, 164, 165

**House v. Hatch,**
    527 F.3d 1010 (10th Cir. 2008). ......................................... *passim*

**Howell v. Mississippi,**
    543 U.S. 440 (2005). .......................................................... 182, 183

**Irvin v. Dowd,**
    366 U.S. 717 (1961). ................................................................ 151

**Jackson v. Coalter,**
    337 F.3d 74 (1st Cir. 2003). ..................................................... 67

**Jackson v. McKee,**
    525 F.3d 430 (6th Cir. 2008). ................................................... 28

**Johnson v. Mullin,**
    505 F.3d 1128 (10th Cir. 2007). ............................................. 175

xiii

Judd v. Vose,
    813 F.2d 494 (1st Cir. 1987)............................................................... 103

Klein v. Neal,
    45 F.3d 1395 (10th Cir. 1995). .............................................................. 70

Knowles v. Mirzayance,
    __U.S.__, 129 S. Ct. 1411 (2009). ......................................... 6, 78, 150

Koskotas v. Roche,
    931 F.2d 169 (1st Cir. 1991).................................................................. 107

Kyles v. Whitley,
    514 U.S. 419 (1995). ............................................................... 199, 205

Lewis v. Jeffers,
    497 U.S. 764 (1990)...................................................................... *passim*

Lilly v. Virginia,
    527 U.S. 116 (1999). ............................................................................ 74

Lindh v. Murphy,
    521 U.S. 320 (1997)........................................................................ 3, 37

Lisbena v. California,
    314 U.S. 219 (1941). .......................................................................... 120

Lockett v. Ohio,
    438 U.S. 586 (1978)........................................................................... 167

Lockhart v. McCree,
    476 U.S. 162 (1986). .......................................................................... 115

Lorraine v. Coyle
    291 F.3d 416 (6th Cir. 2002)............................................................... 189

Lowder v. Dep't of Homeland Security,
    504 F.3d 1378 (Fed. Cir. 2007). ........................................................... 99

Mahdi v. Bagley,
    522 F.3d 631 (6th Cir. 2008)............................................................... 193

**Massiah v. United States,**
    377 U.S. 201 (1964). ......................................................................... 105

**Matthews v. Price,**
    83 F.3d 328 (10th Cir. 1996). ...................................................... 30, 65

**Matthews v. Workman,**
    577 F.3d 1175 (10th Cir. 2009). ............................................... *passim*

**Mayes v. Gibson,**
    210 F.3d 1284 (10th Cir. 2000). ............................................. 169, 196

**Maynard v. Boone,**
    468 F.3d 665 (10th Cir. 2006). ...................................... 78, 159, 160

**Middleton v. Roper,**
    498 F.3d 812 (8th Cir. 2007). ....................................................... 187

**Miranda v. Arizona,**
    384 U.S. 436 (1966). ............................................................ 137, 138

**Mitchell v. Esparza,**
    540 U.S. 12 (2003). .................................................. 38, 99, 121, 134

**Montana v. Egelhoff,**
    518 U.S. 37 (1996). ........................................................................ 73

**Moore v. Gibson,**
    195 F.3d 1152 (10th Cir. 1999). ................................................... 168

**Moore v. Parker,**
    425 F.3d 250 (6th Cir. 2005). ....................................................... 189

**Moran v. Burbine,**
    475 U.S. 412 (1986). .................................................................... 104

**Murray v. Carrier,**
    477 U.S. 478 (1986). ...................................................................... 70

**Neill v. Gibson,**
    278 F.3d 1044 (10th Cir. 2001). ..................................... 67, 171, 174

**Nguyen v. Reynolds,**
    131 F.3d 1340 (10th Cir. 1997)............................................................. 161

**Ohio v. Roberts,**
    448 U.S. 56 (1980)................................................................... 28, 63

**Oregon v. Mathiason,**
    429 U.S. 492 (1977)..................................................................... 138

**Parker v. Scott,**
    394 F.3d 1302 (10th Cir. 2005)...................................................... 168

**Parr v. Quarterman,**
    472 F.3d 245 (5th Cir. 2006)........................................................ 195

**Patterson v. New York,**
    432 U.S. 197 (1977)...................................................................... 73

**Patton v. Yount,**
    467 U.S. 1025 (1984).................................................................. 148

**Payne v. Tennessee,**
    501 U.S. 808 (1991)............................................................. 120, 177

**Pulley v. Harris,**
    465 U.S. 37 (1984)....................................................................... 65

**Ramdass v. Angelone,**
    530 U.S. 156 (2000).............................................................. 194, 196

**Rideau v. Louisiana,**
    373 U.S. 723 (1963).................................................................. 153

**Ries v. Quarterman,**
    522 F.3d 517 (5th Cir. 2008)........................................................ 66

**Ring v. Arizona,**
    536 U.S. 584 (2002)................................................................ 72, 85

**Saleh v. Fleming,**
    262 Fed. Appx. 802, 804 (9th Cir. 2008)........................................ 39

**Sandoval v. Ulibarri,**
    548 F.3d 902 (10th Cir. 2008). ...................................................... 38, 209

**Schlup v. Delo,**
    513 U.S. 298 (1995). ................................................................... 70

**Schriro v. Landrigan,**
    550 U.S. 465 (2007). ........................................... 88, 95, 96, 118, 208

**Scott v. Jones,**
    915 F.2d 1188 (8th Cir. 1990). ........................................................ 189

**Sellers v. Ward,**
    135 F.3d 1333 (10th Cir. 1998). ...................................................... 88

**Shafer v. South Carolina,**
    532 U.S. 36 (2001). .................................................................... 192

**Sheppard v. Maxwell,**
    384 U.S. 333 (1966). .............................................................. 152, 153

**Simmons v. South Carolina,**
    512 U.S. 154 (1994). .............................................................. 192, 194

**Smallwood v. Gibson,**
    191 F.3d 1257 (10th Cir. 1999). ..................................................... 68

**Smith v. Secretary of New Mexico Dep't of Corrections,**
    50 F.3d 801 (10th Cir. 1995). ........................................................ 199

**Smith v. Workman,**
    550 F.3d 1258 (10th Cir. 2008). .......................................... 67, 117, 193

**Spears v. Mullin,**
    343 F.3d 1215 (10th Cir. 2003). ................................................ 68, 70

**Strickland v. Washington,**
    466 U.S. 668 (1984). ............................................................ *passim*

**Taylor v. Illinois,**
    484 U.S. at 410-18. ................................................................. 12, 17

**Taylor v. McKeithen,**
 407 U.S. 191 (1972). ............................................................. 98

**Teague v. Lane,**
 489 U.S. 288 (1989). ............................................................. 29

**Tennessee v. Street,**
 471 U.S. 409 (1985). ............................................................. 206

**Thompson v. Keohane,**
 516 U.S. 99 (1995). ............................................................. 139

**Thornburg v. Mullin,**
 422 F.3d 1113 (10th Cir. 2005). ................................. 161, 165, 174, 179

**Tillman v. Cook,**
 215 F.3d 1116 (10th Cir. 2000). ................................................ 174

**Trice v. Ward,**
 196 F.3d 1151 (10th Cir. 1999). ................................................ 174

**United States v. Alvarez-Machain,**
 504 U.S. 655 (1992). ............................................................. 106

**United States v. Avila Vargas,**
 570 F.3d 1004 (8th Cir. 2009). ................................................. 75

**United States v. Balsys,**
 524 U.S. 666 (1998). ............................................................. 100

**United States v. Cronic,**
 466 U.S. 648 (1984). ............................................................. 101

**United States v. Garza,**
 165 F.3d 312 (5th Cir. 1999). ................................................. 98

**United States v. Garza,**
 566 F.3d 1194 (10th Cir. 2009). ............................................. 52, 54

**United States v. Gouveia,**
 467 U.S. 180 (1984). ......................................................... 104, 105

**United States v. Hughes,**
  33 F.3d 1248 (10th Cir. 1994). ........................................................... 199

**United States v. Iribe,**
  564 F.3d 1155 (9th Cir. 2009). ........................................................... 107

**United States v. Johnson,**
  581 F.3d 320 (6th Cir. 2009). .............................................................. 75

**United States v. McVeigh,**
  918 F. Supp. 1467 (W.D. Okla. 1996). ................................................ 148

**United States v. Morrison,**
  449 U.S. 361 (1981). ......................................................................... 101

**United States v. Najohn,**
  785 F.2d 1420 (9th Cir. 1986). ........................................................... 107

**United States v. Ramirez,**
  479 F.3d 1229 (10th Cir. 2007). ........................................................... 64

**United States v. Rivera,**
  900 F.2d 1462 (10th Cir. 1990). ........................................................... 49

**United States v. Taylor,**
  800 F.2d 1012 (10th Cir. 1986). ......................................................... 161

**United States v. Wade,**
  388 U.S. 218 (1967). ......................................................................... 105

**United States v. Wright,**
  43 F.3d 491 (10th Cir. 1994). ............................................................ 198

**United States v. Young,**
  470 U.S. 1 (1985). ............................................................................ 174

**United States v. Yousef,**
  327 F.3d 56 (2d Cir. 2003). ............................................................... 103

**Uttecht v. Brown,**
  551 U.S. 1 (2007). ............................................................................ 148

**Wackerly v. Workman,**
    580 F.3d 1171 (10th Cir. 2009)................................................................. 78

**Wainwright v. Goode,**
    464 U.S. 78 (1983)................................................................................. 195

**Walton v. Arizona,**
    497 U.S. 639 (1990)................................................................................. 85

**Washington v. Texas,**
    388 U.S. 14 (1967)................................................................................... 12

**Welch v. Sirmons,**
    451 F.3d 675 (10th Cir. 2006)............................................................. *passim*

**Whorton v. Bockting,**
    549 U.S. 406 (2007)................................................................................. 28

**Williams v. Taylor,**
    529 U.S. 362 (2000)........................................................................... 3, 4, 5

**Williamson v. United States,**
    512 U.S. 594 (1994)................................................................................. 75

**Wilson v. Sirmons,**
    536 F.3d 1064 (10th Cir. 2008)............................................................. 187

**Wilson v. Workman,**
    577 F.3d 1284 (10th Cir 2009)............................................. 85, 94, 95, 98, 199

**Woodford v. Visciotti,**
    537 U.S. 19 (2002)................................................................................... 37

**Workman v. Mullin,**
    342 F.3d 1100 (10th Cir. 2003)............................................................. 187

**Yarborough v. Alvarado,**
    541 U.S. 652 (2004)..................................................................... 6, 138, 146

**Young v. Sirmons,**
    551 F.3d 942 (10th Cir. 2008)....................................................... 171, 190

# STATE CASES CITED

**Anderson v. State,**
    130 P.3d 273 (Okla. Crim. App. 2006). ...................................................... 192, 197

**Andrew v. State,**
    164 P.3d 176 (Okla. Crim. App. 2007). ........................................................ *passim*

**Banks v. State,**
    728 P.2d 497 (Okla. Crim. App. 1986). ...................................................... 115

**Cummings v. State,**
    968 P.2d 821 (Okla. Crim. App. 1998). ...................................................... 164

**Davis v. State,**
    103 P.3d 70 (Okla. Crim. App. 2004). ........................................................ 180

**DeLozier v. State,**
    991 P.2d 22 (Okla. Crim. App. 1999). ........................................................ 206

**DeRosa v. State,**
    89 P.3d 1124 (Okla. Crim. App. 2004). .................................... 172, 180, 186, 187

**Eizember v. State,**
    164 P.3d 208 (Okla. Crim. App. 2007). ...................................................... 195

**Ellis v. State,**
    1992 OK CR 45, 867 P.2d 1289. .................................................................. 200

**Hain v. State,**
    919 P.2d 1130 (Okla. Crim. App. 1996). .................................................... 148

**Haney v. State,**
    850 P.2d 1087 (Okla. 1993). ...................................................................... 114

**Harris v. State,**
    84 P.3d 731 (Okla. Crim. App. 2004). ........................................................ 195

**Howerton v. State,**
    640 P.2d 566 (Okla. Crim. App. 1982). ...................................................... 114

**Huckaby v. State,**
    804 P.2d 447 (Okla. Crim. App. 1990). ............................................................ 206

**Johnson v. State,**
    95 P.3d 1099 (Okla. Crim. App. 2004). ............................................................ 195

**Ocampo v. State,**
    778 P.2d 920 (Okla. Crim. App. 1989). ............................................................ 112

**Pavatt v. State,**
    159 P.3d 272 (Okla. Crim. App. 2007). ............................................................ 168

**People v. Salcido,**
    186 P.3d 437 (Cal. 2008). ............................................................ 109

**Plantz v. State,**
    876 P.2d 268 (Okla. Crim. App. 1994). ............................................................ 168

**Primeaux v. State,**
    88 P.3d 893 (Okla. Crim. App. 2004). ............................................................ 16

**Proctor v. Ayers,**
    2007 WL. 1449720 (E.D. Cal. May 15, 2007). ............................................................ 115

**Shrum v. State,**
    991 P.2d 1032 (Okla. Crim. App. 1999). ............................................................ 164

**State ex rel Oklahoma Bar Ass'n v. Bolton,**
    904 P.2d 597 (Okla. 1995). ............................................................ 113

**State ex rel. Oklahoma Bar Ass'n v. McGee,**
    48 P.3d 787 (Okla. 2002). ............................................................ 115

**State v. Hall,**
    976 S.W.2d 121 (Tenn. 1998). ............................................................ 109

**State v. Longo,**
    148 P.3d 892 (Or. 2006). ............................................................ 109, 110

**State v. Sanders,**
    648 So. 2d 1272 (La. 1994). ............................................................ 107, 108

**In re Trester,**
   172 P.3d 31 (Kan. 2007)..................................................................... 112

**Welch v. State,**
   2 P.3d 356 (Okla. Crim. App. 2000). ........................................... 94, 95

## FEDERAL STATUTES CITED

28 U.S.C. § 2254.............................................................................. *passim*

## FEDERAL RULES CITED

Fed. R. Evid. 702. .............................................................................. 52

Fed. R. Evid. 801(d)(2)...................................................................... 63

## OTHER FEDERAL AUTHORITY CITED

U.S. Const. amend. VI. ..................................................................... 101

**Extradition Treaty,**
   U.S.-Mexico, May 4, 1978, 31 U.S.T. 5059...................................... 106

## STATE STATUTES CITED

Okla. Stat. tit. 12, § 2404. ................................................................ 36

Okla. Stat. tit. 12, § 2701. ............................................................ 56, 59

Okla. Stat. tit. 12, § 2702. ................................................................ 52

Okla. Stat. tit. 12, § 2801. ......................................................... 61, 206

Okla. Stat. tit. 21, § 701.11. ........................................................... 181

Okla. Stat. tit. 21, § 701.12. ......................................................... 2, 167

Okla. Stat. tit. 21, § 701.13. ........................................................... 181

Okla. Stat. tit. 22, § 952. ................................................................ 198

**Okla. Stat. tit. 22, § 1089.** ................................................................................ **67**

**Okla. Stat. tit. 22, § 2002 (Supp. 2002).** ......................................................... **15**

## STATE RULES CITED

**Rule 1.6, Comment,** *Oklahoma Rules of Professional Conduct,*
    **Title 5, Ch. 1, App. 3-A (1993).** .......................................................... **112**

**Rule 1.7,** *Oklahoma Rules of Professional Conduct,*
    **Title 5, Ch. 1, App. 3-A (1988).** .......................................................... **115**

**Rule 3.8,** *Oklahoma Rules of Professional Conduct,*
    **Title 5, Ch. 1, App. 3- A (1997).** .......................................................... **114**

**Rule 8.4(d),** *Oklahoma Rules of Professional Conduct,*
    **Title 5, Ch. 1, App. 3-A (1988).** .......................................................... **112**

**Rule 9.7(D),** *Rules of the Oklahoma Court of Criminal Appeals,*
    **Title 22, Ch. 18, App. (2008).** .............................................................. **97**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

BRENDA EVERS ANDREW,            )
                                )
            Petitioner,         )
                                )
v.                              )       Case No.  CIV-08-832-R
                                )
MILLICENT NEWTON-EMBRY,         )
Warden, Mabel Basset            )
Correctional Center,            )
                                )
            Respondent.         )

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW the Attorney General of Oklahoma, W.A. Drew Edmondson, by and through Seth S. Branham, Assistant Attorney General, appearing on behalf of the Respondent, Millicent Newton-Embry, Warden of the Mabel Bassett Correctional Center, and submits this response to the *Petition for Writ of Habeas Corpus* filed on Petitioner's behalf in this case.  Doc. 26.

## RULE 5 STATEMENT AND HISTORY OF THE CASE

1.      Petitioner, Brenda Evers Andrew, an inmate in state custody at the Mabel Bassett Correctional Center, McCloud, Oklahoma, was tried for the murder of Rob Andrew in Case No. CF-2001-6189 in the District Court of Oklahoma County, State of Oklahoma, before the Honorable Susan Bragg, District Judge.  A state jury found Petitioner guilty of Count One: First Degree (Malice Aforethought) Murder; and Count Two: Conspiracy to Commit First Degree (Malice Aforethought) Murder.  *Andrew v. State*, 164 P.3d 176, 184 (Okla. Crim. App. 2007).

2.      During a separate penalty phase, the jury found the existence of two statutory aggravating circumstances on the murder count, namely, that: (1) the murder was committed for remuneration or the promise of remuneration; and (2) the murder was especially heinous, atrocious or cruel.  *Id.* (citing Okla. Stat. tit. 21, § 701.12).  Based on these aggravators, Petitioner was sentenced to death on the murder count.  As for the conspiracy count, the jury sentenced Petitioner to ten years imprisonment plus a $5,000 fine.  *Id.* at 276.  The trial court thereafter sentenced Petitioner in accordance with the jury's recommendations.  *Id.*

3.      Petitioner's convictions and sentences, including her death sentence, were thereafter affirmed on direct appeal by the Oklahoma Court of Criminal Appeals (OCCA) in a published opinion.  *Id.* at 206.  Rehearing was also denied but the OCCA corrected its opinion.  *Andrew v. State*, 168 P.3d 1150 (Okla. Crim. App. 2007).  On April 14, 2008, Petitioner's conviction became final when the United States Supreme Court denied certiorari review.  *Andrew v. Oklahoma*, __U.S.__, 128 S. Ct. 1889 (2008).

4.      The OCCA thereafter denied Petitioner's original application for state post-conviction relief in an unpublished decision.  *Andrew v. State*, No. PCD-2005-176 (Okla. Crim. App. Jun. 17, 2008).  *See* Doc. 26-3.

5.      The claims presented in this petition are exhausted, except as otherwise noted below.

6.      Respondent has filed a motion with the OCCA to cause the state court record, including trial transcripts, to be transmitted to this Court.  Respondent is unaware of any proceedings that have been recorded but not transcribed.

## STANDARD OF REVIEW

Petitioner's petition for federal habeas corpus relief was filed with this Court on June 8, 2009, and is therefore governed by the amended provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which includes the standard of review provisions of 28 U.S.C. § 2254(d).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under amended 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2).  Moreover, state court determinations of fact "shall be presumed correct" unless the defendant rebuts that presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The Supreme Court has construed the review standard set forth in subsection (d)(1).  *See Williams v. Taylor*, 529 U.S. 362 (2000).  When applying subsection (d)(1), the Court stated the threshold question is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time the conviction became final.[1]  *See id.*

---

[1]     This clause "refers to the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision."  *See Williams*, 529 U.S. at 412 (O'Connor, J., writing for the Court).

at 390 (Stevens, J., writing for the Court).  *See also House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (reiterating that "[w]hether the law is clearly established is *the* threshold question under § 2254(d)(1)").  This threshold inquiry is "analytically dispositive" of the § 2254(d) analysis.  *Id.* at 1017.  "That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law."  *Id.*  Recent decisions from the Supreme Court establish "that Supreme Court holdings–the exclusive touchstone for clearly established federal law–must be construed narrowly and consist only of something akin to on-point holdings."  *Id.* at 1015.  As explained by the Tenth Circuit, "clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context."  *Id.* at 1016.

If clearly established Supreme Court precedent governs the claim at issue, the reviewing court must then proceed to a bifurcated inquiry.  *Williams,* 529 U.S. at 404-05 (O'Connor, J., writing for the Court) (subsection (d)(1) "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court").  The reviewing court must first determine whether the state court's decision was contrary to clearly established Federal law. The "contrary to" clause of subsection (d)(1) is fulfilled where the state court applied a rule that was "diametrically different [from], opposite in character or nature, or mutually opposed" to a maxim of law as

stated by the Supreme Court. *Id.* at 404-06. The "contrary to" clause is also satisfied where the state court is confronted with a set of facts which are "materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.*

The reviewing court must next ask whether the state court's determination involved an unreasonable application of clearly established Federal law. *See id.* at 406-07. The "unreasonable application" clause of subsection (d)(1) applies in two scenarios: first, where the "state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,"; second, where the "state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *Id.* at 407. *See also House*, 527 F.3d at 1018. In either scenario the reviewing habeas court must determine whether the state court's application of Supreme Court precedent to the case at bar was "reasonable." *See Williams,* 529 U.S. at 409-10.

The Supreme Court refrained from defining the term "reasonable" as it is used in AEDPA, other than to note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.* at 410. The Court did instruct that the reasonableness determination is an objective inquiry, not a subjective one. *See id.* at 409-10. Thus, the fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court

5

decision "reasonable."    Further, the Supreme Court "stressed in *Williams* that an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Therefore, a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly".  *Id*.  According to the Tenth Circuit, "the AEDPA's conception of objective unreasonableness lies 'somewhere between *clearly* erroneous and unreasonable to all reasonable jurists." *House*, 527 F.3d at 1019 (quoting *Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)).  Thus, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.* (quoting *Maynard*, 468 F.3d at 671).

Finally, where a state court applies a general standard to a set of facts, "doubly deferential judicial review" applies on habeas as the state court "has even more latitude to reasonably determine that a defendant has not satisfied that standard."    *Knowles v. Mirzayance*, __U.S.__, 129 S. Ct. 1411, 1420 (2009) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations")).

## STATEMENT OF FACTS

The OCCA provided a summary of facts for Petitioner's case in its published opinion on direct appeal. *Andrew*, 164 P.3d at 184-87.  The State incorporates that discussion here,

cognizant that the OCCA's factual determinations are presumed correct under AEDPA (*See*

28 U.S.C. 2254(e)(1)):

> ¶ 3 [Petitioner's] husband Robert ("Rob") Andrew was shot to death at their Oklahoma City home sometime around 7:00 p.m. on November 20, 2001. [Petitioner] was also shot in the arm during this incident.

> ¶ 4 The Andrews were separated at the time and Rob Andrew was at the home to pickup the two minor children for visitation over the Thanksgiving holiday. The custom was that [Petitioner] would bring the children out to the car and Rob would take them from there. However, on this night, [Petitioner] asked Rob Andrew to come into the garage to light the pilot light on the furnace because it had gone out.

> ¶ 5 [Petitioner's] version of the events from that point on was that as Rob was trying to light the furnace, two masked men entered the garage. Rob turned to face the men and was shot in the abdomen. He grabbed a bag of aluminum cans to defend himself and was shot again. [Petitioner] was hit during this second shot.

> ¶ 6 Undisputed facts showed that after that, [Petitioner] called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. [Petitioner] had also suffered a superficial gunshot wound to her arm. The Andrew children were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

> ¶ 7 [Petitioner] was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.

> ¶ 8 Rob Andrew was shot twice with a shotgun. A spent 16-gauge shotgun shell was found in the garage on top of the family

7

van. Rob Andrew owned a 16-gauge shotgun, but had told several friends that [Petitioner] refused to let him take it when they separated. Rob Andrew's shotgun was missing from the home. One witness testified to seeing [Petitioner] at an area used for firearm target practice near her family's rural Garfield County home eight days before the murder and he later found several 16-gauge shotgun shells at the site.

¶ 9 [Petitioner's] superficial wound was caused by a .22 caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance. About a week before the murder, Pavatt purchased a .22 caliber handgun from a local gun shop. Janna Larson, Pavatt's daughter testified that, on the day of the murder, Pavatt borrowed her car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but Larson found one round of .22 caliber rimfire ammunition on the floorboard. In a conversation later that day, Pavatt told Larson never to repeat that [Petitioner] had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the .22 round she found in her car.

¶ 10 Police searched the home of Dean Gigstad, the Andrews' next-door neighbor, after the Gigstads reported finding suspicious things in their home. Police found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16 gauge shotgun shell was found on the bedroom floor, and several .22 caliber rounds were found in the attic itself. There were no signs of forced entry into the Gigstad home. Gigstad and his wife were out of town when the murder took place, but [Petitioner] had a key to their home. The .22 caliber round found in Janna Larson's car was of the same brand as the three .22 caliber rounds found in the Gigstads' attic; the .22 caliber bullet fired at [Petitioner] and retrieved from the Andrews' garage appeared consistent with bullets in these unfired rounds. These rounds were capable of being fired from the firearm that Pavatt purchased a few weeks before the murder; further testing was not possible because that gun was never found. The 16 gauge shotgun shell found in the Gigstads' home was of the same brand as the 16 gauge shell found in the Andrews' garage. Ballistics comparison showed similar

markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16-gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun remains missing.

¶ 11 Within days after the shooting, before Rob Andrew's funeral, [Petitioner], James Pavatt and the two minor children left the State and crossed the border into Mexico. They were apprehended while attempting to re-enter the United States in late February 2002.

¶ 12 [Petitioner] and Pavatt met while attending the same church. At some point they began teaching a Sunday school class together. [Petitioner] and Pavatt began having a sexual relationship.[FN3] Around the same time, Pavatt, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy through Prudential worth approximately $800,000. In late September 2001, Rob Andrew moved out of the family home, and [Petitioner] initiated divorce proceedings a short time later.

[FN3. The State presented evidence that the Andrews' marriage had been strained for several years, and that (Petitioner) had had a number of extramarital affairs.]

¶ 13 Janna Larson, Pavatt's adult daughter, testified that in late October, Pavatt told her that [Petitioner] had asked him to murder Rob Andrew. On the night of October 25-26, 2001, someone cut the brake lines on Rob Andrew's automobile. The next morning, Pavatt persuaded his daughter to call Rob Andrew from an untraceable phone and claim that [Petitioner] was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police. The next day, [Petitioner] told Rob that she read in the newspaper that someone cut his brakes, but no media coverage of this event had occurred.

9

¶ 14 One contentious issue in the Andrews' relationship was control over the insurance policy on Rob Andrew's life. After his brake lines were cut, Rob Andrew inquired about removing [Petitioner] as beneficiary of his life insurance policy. Rob Andrew spoke with Pavatt's supervisor about changing the beneficiary. He also related his suspicions that Pavatt and [Petitioner] were trying to kill him. At trial, the State presented evidence that in the months preceding the murder, [Petitioner] and Pavatt actually attempted to transfer ownership of the insurance policy to [Petitioner] without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001. [FN4]

[FN4. According to one witness, (Petitioner) had told her husband that she could sign his name "better than he could." Among other evidence, the State presented recordings of telephone conversations from (Petitioner) and Pavatt to the insurance company's home office, inquiring about the status of the policy and attempting to persuade them that a legitimate ownership change had been made.]

¶ 15 In the days following the murder, Pavatt obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, [Petitioner] and Pavatt asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for his children to travel with [Petitioner] out of the country. [Petitioner] also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson might wire them money after they left town.

¶ 16 [Petitioner] did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

¶ 17 After her apprehension, [Petitioner] came into contact with Teresa Sullivan, who was a federal inmate at the Oklahoma County jail. Sullivan testified that [Petitioner] told her that she

and Pavatt killed her husband for the money, the kids, and each other. [Petitioner] also told her that Pavatt shot her in the arm to make it look as if she was a victim.

¶ 18 Expert testimony opined that the wound to [Petitioner's] arm was not self-inflicted, but was part of a scheme to stage the scene to make it look like she was a victim, just like her husband. Additional facts will be discussed as relevant to [Petitioner's] propositions of error.

*Andrew*, 164 P.3d at 184-87.

Additional facts will be presented below as necessary.

## ARGUMENT AND AUTHORITY

### I.

### THE OCCA REASONABLY REJECTED PETITIONER'S CONSTITUTIONAL CHALLENGES TO THE TRIAL COURT'S EXCLUSION OF DEFENSE WITNESSES AS SANCTIONS FOR DISCOVERY VIOLATIONS.

In Ground I, Petitioner complains that her conviction must be vacated because the trial court excluded defense testimony from witnesses Ron Northcutt, Roger Frost, Lisa Gisler, Carol Shadid, Ronald Warren and Donna Tyra. This testimony was disallowed because the trial court found Petitioner failed to provide adequate notice of their testimony prior to the discovery deadline. Petitioner argues that disallowance of this testimony deprived her of the right to present a defense in violation of the Sixth, Eighth and Fourteenth Amendments. Doc. 26 at 26-50.

### A.     Exhaustion.

Petitioner raised these claims on direct appeal and the OCCA rejected them on the merits. *Andrew*, 164 P.3d at 196-98. Thus, Petitioner's Ground I claim is exhausted for purposes of habeas review.

### B.     Standard of Review.

Petitioner implicitly concedes that AEDPA applies to the OCCA's merits adjudication of these claims, arguing that the OCCA's decision for each was based on an unreasonable determination of the facts or was otherwise contrary to, or an unreasonable application of, clearly-established Supreme Court precedent. In rejecting these claims, the OCCA cited to state cases expressly discussing the federal due process right to compulsory process and the Sixth Amendment right to present a defense. *Id.* at 196. These state cases expressly cited to *Washington v. Texas*, 388 U.S. 14 (1967) and *Taylor v. Illinois*, 484 U.S. 400 (1988). *Andrew*, 164 P.3d at 196 (citing *Rojem v. State*, 130 P.3d 287, 297 (Okla. Crim. App. 2006); *White v. State*, 973 P.2d 306, 311 (Okla. Crim. App. 1998)). In addressing the federal due process standard governing Petitioner's claims, the OCCA recognized that "[t]he right to call witnesses to present a defense is a fundamental element of due process" and that "[t]he exclusion of evidence might be the appropriate sanction for a discovery code violation in the most severe cases, where the violation is 'willful and motivated by a desire to obtain a tactical advantage. Alternative sanctions are appropriate in other cases." *Id.* This is consistent with the Supreme Court's discussion of this same issue in *Taylor v. Illinois*, 484 U.S. at 410-18.

Additionally, the OCCA applied the harmless error standard from *Chapman v. California*, 386 U.S. 18, 24 (1967) in addressing those instances where it found the trial judge either abused, or possibly abused, its discretion in disallowing defense testimony. *Andrew*, 164 P.3d at 197 ("[e]ven though an abuse of discretion occurred, we find the error was harmless beyond a reasonable doubt"); *id.* ("[t]his excluded evidence was largely cumulative; therefore, the exclusion was harmless beyond a reasonable doubt"); *id.* at 198 ("[a]ny error in the failure to allow Tyra to testify was harmless beyond a reasonable doubt"). In addition to expressly applying the standard, the OCCA cited state authority expressly citing *Chapman*. *Id.* (citing *Hooks v. State*, 19 P.3d 294, 307 n.15).

Thus, there is no question that the state court understood and considered the merits of Petitioner's federal claim. Further, the state court provided extended analysis of each sub-claim contained in Petitioner's Ground I claim. The OCCA's adjudication rests on substantive, not procedural, grounds. AEDPA deference clearly applies to the state court's adjudication of these issues. *Matthews v. Workman*, 577 F.3d 1175, 1180 (10th Cir. 2009) ("[a]n adjudication on the merits [for purposes of AEDPA] occurs when the state court resolves the case on substantive grounds, rather than procedural grounds").

### C.    *Merits – Sgt. Larry Northcutt and Officer Roger Frost.*

Petitioner complains that the trial court erred in disallowing testimony from Sgt. Larry Northcutt and Officer Roger Frost. The prosecution objected to Petitioner calling Sgt. Northcutt during the defense case-in-chief based on inadequate pre-trial notice. Petitioner's final witness list, filed on May 21, 2004, stated only that Northcutt "will testify regarding

information previously provided to OCPD" (O.R. 2440). This final witness list was filed in response to the trial court's May 18, 2004, order that Petitioner provide prosecutors a witness list containing adequate witness summaries. The prosecutor noted at a pre-trial hearing that Petitioner's initial witness list did not provide sufficient notice for the testimony of as many as forty-eighty proposed defense witnesses (5/18/04 Tr. 130-32). When the defense called Sgt. Northcutt as a witness in its case-in-chief, however, they had not remedied the deficiency in the defense witness list and the State objected for lack of notice (Tr. 3326).

Defense counsel argued that Northcutt was an off-duty security officer at the Lansbrook addition and that Petitioner asked him for increased patrols by off-duty security because she was afraid the victim, Rob Andrew, would come around her residence. The trial court sustained the State's objection, finding inadequate notice of Northcutt's proposed testimony in Petitioner's final witness list (Tr. 3325-31). Northcutt was allowed, however, to testify to limited information concerning his employment as off-duty security at the housing addition where Petitioner lived (Tr. 3332-36).

Petitioner next called Officer Roger Frost who testified during the State's case-in-chief. Petitioner attempted to elicit from Frost that she asked Northcutt to provide increased patrols around the Andrew residence around the time of the Andrew divorce proceedings. The trial court sustained the prosecution's hearsay objection to this particular testimony (Tr. 3338-43). Frost was allowed to testify, however, that he and several other police officers provide off-duty security for Petitioner's neighborhood. Frost further testified that this off-duty security was "random" in that it depended wholly upon the schedule that the officers

could work.  In other words, Frost explained, there are no set time periods for the security.

Frost also testified that Northcutt had received a request for extra security at Lansbrook from

a resident prior to Rob Andrew's murder.  Frost was not, however, allowed to testify that

Petitioner made that particular request (Tr. 3337-38, 3343-46).

The trial court correctly disallowed testimony from Northcutt and Frost about

Petitioner's request for extra security patrols by the off-duty officers.   The Oklahoma

Discovery Code, Title 22, O.S.Supp.2002, § 2002, required Petitioner to provide, *inter alia*,

"the names and addresses of witnesses which the defense intends to call at trial, together with

their relevant, written or recorded statement, if any, or if none, significant summaries of any

oral statement".  Okla. Stat. tit. 22, § 2002 (Supp. 2002).  Petitioner wholly failed to provide

this information regarding Northcutt.  Instead, Petitioner provided a list of 339 witnesses to

the prosecution that did not provide a significant summary of Northcutt's proposed testimony

and then waited until a month after the start of trial–the very day Petitioner called Northcutt

as a witness–to provide an adequate summary of the proposed testimony (O.R. 2428-61).

Petitioner admits that Northcutt's proposed testimony "was not specifically information that

the State would have been familiar with."  Doc. 26 at 38.

Petitioner's attempt to elicit hearsay testimony from Frost regarding Petitioner's

request for additional security was also appropriately disallowed.  The OCCA correctly

found that this testimony was hearsay because it was offered to prove the truth of the matter

asserted.  *Andrew*, 164 P.3d at 196-97.  Indeed, the ultimate truth of the matter asserted by

the proposed testimony was that Petitioner requested extra patrols of her home by off-duty

15

security in her neighborhood, knew that off-duty police officers would be watching her house and thus, she would not possibly conspire to murder the victim in the Andrew family home. *Id.* ("counsel wanted to elicit this testimony to show that [Petitioner] requested extra patrols to show that she was not a calculating murderer.   This testimony was hearsay..."). Petitioner's statement is not being offered to show why Northcutt and Frost did something. Nor is Petitioner's statement significant in its own right.  Rather, it was offered to show the truth of the matter asserted, namely, that *Petitioner* requested stepped-up security patrols and therefore she would not participate in a murder that would occur where she requested the stepped-up security.  *Primeaux v. State*, 88 P.3d 893, 902 (Okla. Crim. App. 2004) ("if the purpose of offering the statement is to establish any assertion made by the challenged evidence, it is hearsay").

In this sense, the only issue is whether the sanction for exclusion of Northcutt's testimony was too severe.  Recognizing that "[n]ot until the day that Northcutt was to testify, did [Petitioner] provide a summary of his testimony", *Andrew* 164 P.3d at 196, the OCCA found that "[n]o good reason existed for this other than to attempt to gain a tactical advantage; therefore, the trial court did not abuse its discretion in precluding this testimony." *Id.*

The OCCA's conclusions were based on a reasonable determination of the facts. While the trial court made no specific finding that Petitioner's failure to comply with an adequate witness summary was calculated gamesmanship or otherwise in bad faith, the record leads to that inescapable conclusion.  Petitioner's offer of proof shows why.

16

Petitioner's counsel stated that Northcutt would not only testify that Petitioner requested stepped-up security patrols around the Andrew residence, but also that Northcutt encountered Petitioner in the lobby of defense counsel's office building in downtown Oklahoma City and observed that Petitioner was "apprehensive and scared of what...Rob Andrew might do with regard to trying to come around the home and/or get into the home and obtain things from the home" and based on this fear, Petitioner requested the stepped-up security patrols (Tr. 3784). The prosecutor noted that none of this information was contained in Northcutt's report, that "the State has never heard of any of that stuff concerning Mr. Northcutt...It's a total surprise to me" (Tr. 3785). The trial court found that none of it had been turned over. *Andrew*, 164 P.3d at 196.

In this sense, the trial court did not abuse its discretion in disallowing Northcutt's testimony. Petitioner's total failure to provide adequate notice of the proposed testimony and the state court's finding of bad faith by the defense allowed for such a result. *Taylor*, 484 U.S. at 415. The OCCA's decision in this regard was neither contrary to, nor an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case. 28 U.S.C. § 2254(d).

Assuming *arguendo* it was error to suppress Northcutt's proposed testimony, any error was harmless. As noted by the OCCA, "the jury was well aware that extra patrols were requested. The only information that was kept from the jury was that [Petitioner] had requested those patrols." *Andrew*, 164 P.3d at 197; (Tr. 1783-84, 1866-67, 3332-38, 3343-46). And while the jury was not told that Petitioner had requested stepped-up patrols, the

jury was aware that Officer Frost had stopped a car an hour before the murder in front of Petitioner's residence for a routine traffic violation and that he had been patrolling that particular area at that particular time because of the detour of traffic from a nearby closed bridge (Tr. 1787-90, 1871). This evidence alone suggests Petitioner was aware of the police presence around her neighborhood.

Further, as noted by the OCCA, the jury could just as easily have believed "[t]hat her request for extra patrols took place during the planning stage of this murder, and the request was just another method of deflecting suspicion away from her." *Id.* Considering the overwhelming evidence presented to support her convictions for conspiracy to commit murder and for commission of the actual murder itself, this conclusion is inescapable. This evidence can be summarized as follows: (1) Petitioner's repeated statements in Fall 2001 that she wished Rob Andrew would die so she could get his life insurance money and go on with her life, that she "would see him dead" and that she told Rob she was going to "fucking have you killed" (Tr. 256-57, 607, 994-97); (2) Petitioner's extramarital affair with Pavatt during Fall 2001 (Tr. 2958, 3130-37, 3150; State's Exhibits 185-86, 188-91, 193-94); (3) evidence that Pavatt believed he and Petitioner would be married and have a child (Tr. 2959-60, 2980); (4) Pavatt's statement to Janna Larson in late October 2001 that Petitioner asked him to murder Rob (Tr. 2966); (5) Rob's repeated expressions in Fall 2001 that he was afraid of Petitioner and Pavatt and believed they would murder him over the insurance policy (Tr. 131-32, 191-92, 204-05, 208-10, 498, 538-39, 554-55, 881-82, 1065, 1180, 1203, 1207); (6) Petitioner's anger and obsession in Fall 2001 over ownership of the $800,000 life insurance

policy on Rob's life (Tr. 269, 363-66, 433-34, 1039-40, 1184-86, 1188-89, 1266); (7) evidence that Petitioner and Pavatt cut Rob's brake lines on October 26, 2001, and attempted to murder Rob by luring him to Norman with sabotaged brakes under the ruse of a hospital emergency involving his wife (Tr. 713-23, 726-41, 773-74, 804-05, 813-14, 882, 886-93, 2967-70; State's Exhibits 14-22, 297-300); (8) evidence that Petitioner and Pavatt engaged in a scheme in Fall 2001 to fraudulently change ownership of the $800,000 life insurance policy from Rob to Petitioner by [a] forging Rob's signature; [b] on a backdated change of ownership form; and [c] attempting to convince the insurance company of the validity of that change (Tr. 589-92, 597, 1263-64, 1277-82, 1321-22, 1327, 1332-33, 1339-54, 1358-65, 1392-95, 1477, 1483-84, 1562-1604, 1991-92, 2021-24, 2306; State's Exhibits 24, 28-33, 47-47c, 241); (9) Petitioner's statement that she could sign Rob's signature as well as he could and direct evidence that she signed Rob's signature on documents (Tr. 583, 602-03); (10) Pavatt's refusal to turn over Rob's insurance file to Rob's divorce attorney and  Pavatt's anger at Rob's attempt to get Pavatt fired (Tr. 1203, 1251-54, 2970); (11) Pavatt's threats and anger towards Rob (Tr. 177, 188-89, 446, 528); (12) Pavatt's statements in Fall 2001 that his stint in the Special Forces required him to kill people and his statement in Petitioner's presence that it was "easy to kill someone.  It's no big deal" (Tr. 660, 2656-57); (13) evidence that Petitioner had Pavatt following Rob in early October 2001 (Tr. 2851); (14) Petitioner's anger in November 2001 over Rob having custody of the Andrew children over the Thanksgiving holiday (Tr. 262-63, 592-93); (15) Petitioner's possessiveness over the Andrew children and the fact she did not want Rob to visit the children (Tr. 2659-60, 2850);

19

(16) evidence that Pavatt was at Petitioner's house more than once a day every day the week before the murder (Tr. 2852-53); (17) Petitioner's statement, referring to Rob, that "I hate him. I hate him. I hate him" at 10:30 p.m. the night before the murder (Tr. 2660, 2662-64); (18) Petitioner's very calm demeanor at the crime scene and in the hours immediately following the murder (Tr. 1801, 1826-29, 1958-59, 2030, 2404); (19) evidence that Petitioner did not inquire about her husband's condition shortly after the shooting (Tr. 1814, 1820, 1828, 1842, 2031, 2277, 2285); (20) evidence that Petitioner's children were located in a room furthest away from the garage with the television turned up very loud (Tr. 1813-17, 1881); (21) evidence that the murder was staged (Tr. 3208-09, 3232-35, 3269-72, 3633-34, 3667-69); (22) evidence that it would not be possible for Petitioner's gunshot wound to be self-inflicted (Tr. 3268, 3635); (23) Petitioner and Pavatt's exchange of a large number of cell phone calls both the day Rob's brake lines were cut and the day before the murder (Tr. 688-90; State's Exhibits 12-13); (24) Pavatt's unannounced use of Janna Larson's car the day of the murder (Tr. 2971-72); (25) Larson's discovery of a live .22 caliber bullet on the floorboard of her car after Pavatt returned the vehicle (Tr. 2973-75); (26) Petitioner's chipper demeanor with Pavatt at the emergency room the day after the murder (Tr. 2710-25); (27) Petitioner's total "non interest" in planning her husband's funeral and her statement to the pastor coordinating it that she missed "nothing" about her dead husband (Tr. 2581-82); (28) Pavatt's stated interest shortly after the murder in fleeing to Argentina to avoid arrest and prosecution for Rob's murder (Tr. 3121-22); (29) evidence that Pavatt and Petitioner manufactured documents bearing Rob Andrew's forged signature purportedly granting her

20

permission to take the Andrew children out of the United States (Tr. 2976-78, 3162); (30) evidence of Petitioner's flight to Mexico with Pavatt and the Andrew children the day before Rob's funeral, just five days after the murder (Tr. 2304-05, 2319-23, 2336-41, 2359-62, 2521-22, 2978-79, 2983-84, 3020-24; State's Exhibits 175-80, 309-19); (31) failure of Petitioner, Pavatt and the Andrew children to attend Rob's funeral (Tr. 2615-18, 3088); (32) discovery of three .22 caliber bullets and a spent shotgun shell in the Gigstad attic and spare bedroom, all in a next-door residence with no signs of forced entry to which Petitioner had a key (Tr. 2658, 2840, 2854, 2861-78, 2914-23, 2936-41); (33) ballistics evidence that the spent shotgun shells found at the crime scene and in Gigstad's spare bedroom were fired from the same shotgun and were 16 gauge shells (Tr. 2091-93, 2113-16, 2118, 3185-87; State's Exhibit 43, 60-62, 137); (34) ballistics evidence that the live round recovered from Larson's car was a .22 caliber bullet consistent in several respects with the .22 caliber projectile found in the Andrew's garage door (Tr. 2108-2110, 3070, 3090-91, 3188-89; State's Exhibits 171, 183); (35) Pavatt's purchase of a .22 caliber revolver six days before the murder that was capable of firing the bullets used to shoot Petitioner and the live round found in Larson's car (Tr. 2804-12, 2816, 3088, 3188-89, 3193; State's Exhibit 116); (36) Petitioner's possession and knowledge of Rob's 16 gauge shotgun after Rob moved out in September 2001, Petitioner's statement to police she had not seen the gun since January 2001 and the fact that the shotgun has never been found (Tr. 270-71, 486-88, 2260-62, 2526-27); (37) Pavatt's familiarity with Rob's 16 gauge shotgun (Tr. 2264-65); (38) Pavatt's handwritten "confession" to the murder of Rob Andrew (Tr. 1531-39; State's Exhibit 222);

(39) evidence that Pavatt used Petitioner's credit card on August 6, 2001 to buy an airplane ticket to send Pavatt's wife back to South Korea because of his alleged special military mission (Tr. 613-15, 619, 627, 2324-29; State's Exhibit 158-59); (40) Pavatt's statement to his wife that he would "get quite a bit of money from the duty that he was doing" and he would use that money to pay off his vast credit card debt (Tr. 627, 665); (41) Pavatt's initiation of divorce proceedings from his wife after she was back in South Korea (Tr. 615-16, 618-19); and (42) Petitioner's admission to Teresa Sullivan, a fellow inmate at the county jail, that she and Pavatt murdered Rob (Tr. 2742-46).

This evidence shows beyond a reasonable doubt that Petitioner is in fact a calculating murderer. Nothing about Northcutt's proposed testimony overcomes this overwhelming evidence. Hence, even if disallowing Northcutt's testimony represented error, any error was harmless as its omission did not have a substantial and injurious effect or influence in determining the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (*Brecht* harmless error standard applies on habeas review regardless of whether the state court recognized a constitutional error and reviewed it for harmlessness under *Chapman*). All things considered, habeas relief is unwarranted on this claim.

### D.    *Merits – Lisa Gisler and Carol Shadid.*

Petitioner next complains that the trial court abused its discretion in disallowing testimony from Lisa Gisler and Carol Shadid, neighbors of Petitioner, regarding what they heard the night of the murder. "These witnesses heard noises, which [Petitioner] describes as a 'loud noise' (Gisler) or 'three shotgun blasts' and a scream (Shadid). [Petitioner] claims

this testimony would corroborate her story of the events and rebut the staging theory espoused by the State." *Andrew*, 164 P.3d at 197. The OCCA found that the trial court abused its discretion in disallowing testimony from these two witnesses because "[t]heir statements were contained in police reports that were in the custody of the State. Defense counsel made an offer of proof indicating that their testimony would be consistent with their statements to police." *Id.* While no summary of their expected testimony was provided to the State on the defense pre-trial witness list, the OCCA found disallowing their testimony "was too harsh a sanction" in light of the "limited nature of their testimony." *Id.*

Applying *Chapman*, the OCCA nonetheless found this error harmless beyond a reasonable doubt. The OCCA held that "[d]espite [Petitioner's] claim, evidence that there were three shots is consistent with the State's theory of two shots fired from a shotgun and one fired from a .22 caliber handgun. The testimony is inconsistent with [Petitioner's] story that she heard only two shots fired. Furthermore, both reconstruction experts, prosecution and defense, testified that [Petitioner's] gunshot wound was evidence of a staged event." *Id.*

Petitioner fails to show that omission of testimony from Gisler and Shadid had a substantial or injurious influence or impact on the verdicts. Gisler's testimony, at best, would have demonstrated that she heard "a loud noise" around the time of the shooting (Tr. 3770) (defense offer of proof). Gisler clearly heard one of the gunshots that occurred when Rob was murdered. Such testimony, however, is at best cumulative of other evidence and, at worst, totally irrelevant as there was no dispute at trial that Rob and Petitioner were shot around the same time. Gisler's proposed testimony therefore has little probative value.

Carol Shadid's testimony is equally inconsequential.  At best, Shadid would testify that around the time of the murder "she thought she heard three shots.  She said she would describe them as concussions, that's what made her believe they came from a shotgun.  She said she heard a woman scream after the shots" (Tr. 3771) (defense offer of proof).  Petitioner urges this testimony was critical because it tends to corroborate her statements to police that the gunshots to her and Rob occurred in quick succession.  This, Petitioner contends, would have "rebutted the *State's* theory of staging."  Doc. 26 at 37 (emphasis added).  Petitioner ignores, however, that even if the gunshots were in quick succession, **both the prosecution and defense crime scene reconstruction experts** testified that Petitioner's gunshot wound was evidence the murder was staged (Tr. 3208-09, 3232-35, 3269-72, 3633-34, 3667-69).  In this sense, one would expect the gunshot wounds to be fired in somewhat rapid succession considering both Petitioner's knowledge of the police presence in and around her neighborhood and home (discussed above in sub-part C) and the fact that the murder occurred at a time of day when many residents of her close-knit neighborhood would be home.  *See* Doc. 26 at 27.  Petitioner herself told Officer Frost at the crime scene just minutes after the murder that there were basically two groups of shots in quick succession (Tr. 1874-75).  The omitted testimony therefore does not tend to exonerate Petitioner.  In light of the benign nature of this proposed testimony and the mass of evidence supporting the convictions, described above in sub-part C, any error in exclusion of Shadid's testimony was harmless; Petitioner simply did not suffer actual prejudice.  *Fry*, 551 U.S. at 121-22.

All things considered, habeas relief in unwarranted for this claim.

### E.       Merits – Officer Ronald Warren.

Next, Petitioner complains that exclusion of Officer Ronald Warren's testimony warrants habeas relief.  The defense urges that Officer Warren's testimony was critical because it would show Petitioner "was attentive to her husband" and that she "probably picked up from Warren's reactions" that the victim was dead, thus explaining her failure to inquire at the hospital or the police station about her husband's condition.  Doc. 26 at 33. The OCCA found that the trial court abused its discretion in disallowing this testimony but that this error was harmless.  *Andrew*, 164 P.3d at 197.  The state appellate court correctly noted that "defense counsel was able, through another witness, to elicit the same evidence; evidence that [Petitioner] was kneeling over obviously deceased Rob Andrew attempting to aid him, while disregarding her own gunshot injury.  This evidence was largely cumulative; therefore, the exclusion was harmless beyond a reasonable doubt."  *Id.*

The record confirms the OCCA's observations.  Officer James Ramsey, another defense witness, testified that he was one of the first officers to arrive at the murder scene, that upon arrival he observed Rob "laying on the ground" and Petitioner "kneeling over the top of him [while] on the phone" talking to police dispatch (Tr. 3403-04).  Ramsey also testified that Rob "was deceased and had been shot" at that moment (Tr. 3407) and that Petitioner was not holding her wound (Tr. 3408).  An ambulance report was introduced into evidence showing that Petitioner asked about the status of her husband at the scene (Tr. 3418; Defense Exhibit 84).  Officer Warren's proposed testimony was therefore largely cumulative of this evidence; its omission therefore did not have a substantial and injurious effect or

influence in determining the jury's verdict.  Petitioner did not suffer actual prejudice.  *Fry*, 551 U.S. at 121-22.  Habeas relief must therefore be denied.

### F.    Merits – Donna Tyra.

Finally, Petitioner contends that the trial court's exclusion of testimony from Donna Tyra, a jailer at the county jail, warrants habeas relief.  Defense counsel wished her to testify to rebut prosecution witness Teresa Sullivan's testimony about Petitioner's jailhouse confession.  Petitioner contends that Tyra's testimony was critical because she "would have testified that [Teresa] Sullivan was not allowed to have contact with Petitioner and that Petitioner could not have talked to Sullivan through the door or by notes."  Doc. 26 at 43.  Thus, Petitioner reasons, Tyra's testimony would undermine the credibility of Teresa Sullivan's testimony that Petitioner confessed the murder to her while they were both housed in the protective custody unit of the Oklahoma County Jail.    The OCCA found any error from exclusion of this defense testimony harmless beyond a reasonable doubt in light of defense witness Angela Burk's testimony.  *Andrew*, 164 P.3d at 198.  Burk, who was housed in the protective housing unit with Petitioner and Sullivan at the time in question, testified that the inmates in that unit communicated by talking to each other "either in a letter or hollering underneath the [cell] door" (Tr. 3491).  Burk admitted to communicating with Sullivan through the cell door in this manner (Tr. 3502). Burk also testified that on occasion the inmates in that unit were allowed to be out together in the pod, contrary to jail policy (Tr. 3502).  This testimony corroborated Sullivan's claims regarding her ability to communicate with Petitioner (Tr. 2744-45).  Considering that Petitioner's own witness contradicted Tyra's

proposed testimony, and that Sullivan was thoroughly impeached (Tr. 2748-63, 3492, 3495-96, 3498-3500), any error in disallowing Tyra's testimony was clearly harmless as Petitioner did not suffer actual prejudice. *Fry*, 551 U.S. at 121-22. Habeas relief is therefore unwarranted.

## II.

### THE OCCA REASONABLY REJECTED PETITIONER'S HEARSAY CHALLENGES.

In Ground II, Petitioner complains that inadmissible hearsay introduced at her capital murder trial warrants federal habeas relief. To summarize, she alleges violations of the federal Confrontation Clause, the federal due process clause as well as a violation of Oklahoma's hearsay rules. To the extent trial counsel did not object to certain instances of alleged hearsay, Petitioner claims that trial counsel was ineffective. Doc. 26 at 50-77.

### A. *Exhaustion.*

This ground was raised in Proposition II of Petitioner's direct appeal brief and the OCCA rejected it on the merits. *Andrew*, 164 P.3d at 188-90. Petitioner's Ground II claim is therefore exhausted for purposes of federal habeas review.

### B. *Merits.*

Petitioner identifies in her Ground II claim only one category of challenged statements–the victim's statements to Officer Mike Klika and Detective Barry Niles, Doc. 26 at 62-63--as being testimonial for purposes of *Crawford v. Washington*, 541 U.S. 36 (2004). *Id.* at 50-53, 68 (discussing meaning of "testimonial" statements). Thus, there is no

27

federal constitutional basis for Petitioner's counsel to challenge the balance of testimony identified in this ground for relief because the Supreme Court has made clear that the Confrontation Clause does not prevent the admission of non-testimonial hearsay. *Id.* at 68. *See also Giles v. California*, __U.S.__, 128 S. Ct. 2678, 2692-93 (2008) (noting, in context of domestic violence prosecutions, that "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by [state] hearsay rules", not the federal Confrontation Clause); *Jackson v. McKee*, 525 F.3d 430, 437-38 (6th Cir. 2008) (citing *Davis v. Washington*, 547 U.S. 813, 823-26 (2006)) (noting that Supreme Court has made clear that the Confrontation Clause does not prevent admission of non-testimonial hearsay)).

Petitioner nonetheless complains that "[n]on-testimonial hearsay offends the Confrontation Clause unless it bears an adequate indicia of reliability by falling within a firmly rooted hearsay exception or bearing particularized guarantees of trustworthiness." Doc. 26 at 55. In other words, she reverts to the old mode of analysis endorsed by *Ohio v. Roberts*, 448 U.S. 56 (1980) that *Crawford* overruled. Clearly-established Supreme Court precedent undermines her argument. *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (referring to "*Crawford's* elimination of Confronation Clause protection against the admission of unreliable out-of-court nontestimonial statements. Under [*Ohio v.*] *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits

their admission even if they lack indicia of reliability"). Indeed, *Crawford* may be applied by a state court retroactively on collateral review, without regard to *Teague v. Lane*, 489 U.S. 288 (1989) considerations. *Danforth v. Minnesota*, __U.S.__, 128 S. Ct. 1029 (2008); *Delgadillo v. Woodford*, 527 F.3d 919, 924-26 (9th Cir. 2008).

Thus, under any view of the law, Petitioner's attempt to resurrect *Ohio v. Roberts* for use on federal habeas is doomed. Here, the OCCA applied *Crawford* on direct appeal to Petitioner's hearsay challenges. *See Andrew*, 164 P.3d at 189. *Crawford* is the clearly-established federal law, as determined by the Supreme Court's decisions, governing Petitioner's Ground II claim--not *Roberts*. *Cf. Delgadillo*, 527 F.3d at 926 (state habeas court's application of *Crawford* on collateral review was not error under *Danforth* and, therefore, the clearly-established federal law governing hearsay challenges on habeas was *Crawford*). Accordingly, the question is whether the OCCA unreasonably applied *Crawford*, or reached a decision contrary to *Crawford*, in denying relief based on admission of the various statements.

Petitioner employs another tactic to avoid application of *Crawford* to the non-testimonial hearsay challenges tendered in her Ground II claim. She argues that the OCCA decided all of her claims, except her challenges to the testimonial statements, i.e., the victim's statements to Officer Klika and Detective Niles, on pure state law grounds. Thus, Petitioner reasons, there is no "adjudication on the merits" of her federal claim for § 2254 purposes, AEDPA does not apply and, therefore, *Ohio v. Roberts* governs the non-testimonial statements. Doc. 26 at 52-55. Assuming *arguendo* the state court proceeded exactly as

29

Petitioner theorizes: (a) an analysis on pure state law grounds of the non-testimonial statements is precisely what *Crawford* mandates; (b) the clearly-established Supreme Court precedent governing even a *de novo* review by this federal habeas court would be *Crawford* (not *Roberts*) considering that the OCCA rejected her many hearsay challenges on direct appeal, in 2007, well after *Crawford* was decided; and (c) the discussion above makes clear that federal confrontation clause analysis has no applicability to non-testimonial statements under *Crawford*.

In light of the OCCA's express application of *Crawford* to the testimonial statements in her Ground II claim, and considering the non-applicability of the federal confrontation clause to her various non-testimonial challenges, there is no valid argument that the OCCA did not adjudicate the merits of Petitioner's federal challenges. The OCCA need not use any magical words in adjudicating the various challenges. Its express application of the revised federal confrontation clause analysis under *Crawford* to the testimonial challenges, with its corresponding evaluation of the non-testimonial challenges under state hearsay principles without express reference to federal law, is exactly what one would expect after *Crawford*.

To the extent Petitioner attempts to secure review of the non-testimonial statements using state hearsay rules, such claims are simply not cognizable on federal habeas review. *Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)) ("it is well established that 'federal habeas corpus relief does not lie for errors of state law'"); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (on federal habeas review "the presence or absence of a state law violation is largely beside the point").

Petitioner's attempts to cloak her bare hearsay challenges as federal due process violations also fail to state a claim upon which federal habeas relief is available. "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law" as laid out by the Supreme Court." *Holley*, 568 F.3d at 1101. The absence of clearly-established Supreme Court precedent requiring independent review of the state court's hearsay rulings here is analytically dispositive. *Id.* (declining federal due process review of state evidentiary rulings in the absence of clearly-established Supreme Court precedent; noting that "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process"). *See also House v. Hatch*, 527 F.3d 1010, (10th Cir. 2008). "Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed." *Holley*, 568 F.3d at 1097 (citing *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006)).

In summary, the question here is whether the OCCA's rejection of Petitioner's confrontation clause challenges found in her Ground II claim was either contrary to, or an unreasonable application of, *Crawford*. 28 U.S.C. § 2254(d). Petitioner finds federal constitutional error in several different categories of evidence, namely, testimony regarding: (1) the victim's description of his unsuccessful attempts to retrieve his 16 gauge shotgun from Petitioner; (2) the victim's statements to non-law enforcement about the October 26, 2001, brake line incident; (3) the victim's statements to law enforcement officers; (4) the victim's statements about his attempts to change the beneficiary of the $800,000 life

31

insurance policy; (5) the victim's statements regarding James Pavatt; (6) the victim's statement that Petitioner told him she could sign his name better than he could; (7) the victim's statements about Petitioner's infidelity, the separation and resulting divorce action, marital assets and her allegations that Rob had a girlfriend and/or homosexual relationship; and (8) the victim's journal recovered by police from his laptop computer. Doc. 26 at 55-56, 60-75.

As discussed earlier, only one category of challenged statements in Petitioner's Ground II claim constitute testimonial statements, i.e., the victim's statements to Officer Klika and Detective Niles. None of the other categories of statements, which involve statements to friends, family members and personnel of the Prudential Insurance company, constitute testimonial statements. The OCCA, in addressing these categories of statements, implicitly concluded that they were nontestimonial. *Andrew*, 164 P.3d at 188-90. *See also Delgadillo*, 527 F.3d at 927. "Although *Crawford* did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" *Id.* (quoting *Crawford*, 541 U.S. at 51). Statements by the victim to customer service representatives at the Prudential Insurance hotline, to friends and family members, and to his own lawyer are nontestimonial under *Crawford*. *Id.* (state court reasonably concluded that victim's statements to co-workers were nontestimonial

in light of *Crawford*).  Thus, they do not establish federal constitutional error.  The OCCA's

rejection of Petitioner's federal challenges to these claims was therefore wholly reasonable

and habeas relief is unwarranted.

The victim's statements to Officer Klika and Detective Niles, however, do constitute

testimonial statements.   The OCCA rejected Petitioner's request for relief based on

admission of these statements:

> ¶ 31 [Petitioner] also claims that Rob's statements to the police
> that he believed that [Petitioner] and Pavatt were responsible
> [for the brake line incident] were testimonial in nature, and thus,
> in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct.
> 1354, 158 L. Ed. 2d 177 (2004).  *Crawford* held that testimonial
> hearsay violates the confrontation clause. *Id.* at 51-52, 124 S. Ct.
> at 1364.  Rob's belief was supported by the evidence in this case.
> The jury would have reached the same conclusion absent this
> testimony.  The introduction of this testimony was harmless
> beyond a reasonable doubt, considering the mountain of
> evidence leading to the conclusion that [Petitioner] was
> responsible, in part, for the brake line incident. *Chapman v.*
> *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d
> 705, 710-711 (1967). The inclusion of this evidence also showed
> the inadequacy of the police in their ability to stop [Petitioner]
> and Pavatt before they actually carried out their plan to kill Rob
> Andrew.  *Crawford* does not bar the use of testimonial
> statements for purposes other than establishing the truth of the
> matter asserted. *Crawford,* 541 U.S. at 59, fn. 9, 124 S.Ct. at
> 1369, fn. 9, *citing Tennessee v. Street,* 471 U.S. 409, 414, 105
> S. Ct. 2078, 2081-82, 85 L. Ed. 2d 425 (1985). The inclusion of
> this testimony does not require reversal.

*Andrew*, 164 P.3d at 189.

The OCCA's adjudication of this particular issue was wholly reasonable considering

the record evidence.  Testimony from Officer Klika and Detective Niles at transcript pages

801, 803-804, 814, and 879-882 was not admitted to prove the truth of the matters asserted. Rather, it appears to have been introduced to show why these officers proceeded in the manner they did with the investigation into the cutting of the victim's brake lines. This was particularly important because of the extreme delay between the filing of the original police report on October 26, 2001, with Officer Klika and the follow-up interview with Detective Niles on November 19, 2001, *the day before the murder* (Tr. 876-77). The prosecutor elicited much testimony from these two witnesses concerning the procedures involved in a regular criminal investigation, how Rob Andrew's police report about the cut brake lines was treated differently and why no action was taken on his police report for nearly three weeks (Tr. 798-806, 813-14, 869-900).

The victim's description of what occurred to both Klika and Niles was an integral part of explaining why these officers proceeded in the manner they did and helped provide some explanation other than incompetence for the police taking so long to act on Rob's police report. This testimony also helped prevent a defense claim of general police incompetence in the investigation or that the police did not believe the brake cutting incident was a serious threat by Petitioner and Pavatt. Thus, no hearsay or confrontation issues arise under *Crawford* from this challenged testimony because it was properly admitted for a non-hearsay purpose.

Assuming *arguendo* admission of this testimony was error, Petitioner is still not entitled to relief. Properly admitted evidence, independent of Klika and Niles's testimony, established Petitioner's connection to the cutting of the victim's brake lines on October 26th.

Janet Larson testified that she called the victim on the morning of October 26th at Pavatt's request and told Rob to go to Norman Regional Hospital to pick up his wife.  Larson identified her voice on the taped calls introduced into evidence at trial reflecting these calls. Shortly thereafter, Petitioner appeared at Larson's bank in Norman and asked her about a call she may have had with Rob (Tr. 2967-70, 3012).  Larson further testified that Pavatt told her that Petitioner asked him to murder Rob in late October 2001, shortly before the victim's brake lines were cut (Tr. 2966).  There is no question that Petitioner was having an affair with Pavatt on October 26th, no question that Rob's brake lines were intentionally cut on that date shortly before Larson's calls, no question that Petitioner called Pavatt thirty-four (34) times that day and no question that Pavatt called Petitioner forty-eight (48) times that day–a dramatic increase from their usual phone calls to each other (Tr. 688-89, 780, 790-91, 2958-60, 2966).

This properly admitted evidence, standing alone, connected Petitioner to the cutting of the victim's brake lines.  *See Andrew*, 164 P.3d at 191.  This evidence, along with the additional evidence of Petitioner's guilt discussed above in response to Ground I, shows that any error in admission of the challenged statements was, under any circumstances, harmless as they did not have a substantial and injurious effect or influence in determining the jury's verdict.  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (*Brecht* harmless error standard applies on habeas review regardless of whether the state court recognized a constitutional error and reviewed it for harmlessness under *Chapman*).

35

All things considered, habeas relief is unwarranted for Petitioner's Ground II claim.

Relief must be denied.  28 U.S.C. § 2254(d).

## III.

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF OTHER CRIMES OR BAD ACTS EVIDENCE IN THE ABSENCE OF ANY CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT GOVERNING THIS ISSUE.**

In Ground III, Petitioner complains that the admission at her trial of other crimes or bad acts evidence under Okla. Stat. tit. 12, § 2404(b) warrants federal habeas relief as it allegedly denied her a fundamentally fair trial, in violation of due process.  Specifically, Petitioner claims the trial court improperly admitted the following evidence:  (1) evidence that Petitioner and Pavatt cut the victim's brake lines; (2) evidence of Petitioner's extramarital affairs with Rick Nunley and Tracy Higgins; (3) evidence that Petitioner hit on Higgins's adult sons; (4) evidence of Petitioner's behavior and dress during a dinner with David Ostrowe; (5) evidence that Petitioner changed her hair color to the one preferred by Ronnie Stump; (6) evidence of Petitioner interrupting the victim at work and accusing him of having an affair in front of co-workers; (7) evidence that Petitioner threatened to kill her plumber; (8) evidence of Petitioner's cold demeanor and non-interest during a funeral planning session with William Burleson; (9) Petitioner's statement to Cynthia Balding about hiding money from Rob; (10) evidence that Petitioner used Tricity's puppy to undermine the Andrew children's relationship with their father; (11) testimony by Janna Larson that she told Pavatt that she did not believe Petitioner's claim of only having sex with Rob and Pavatt; and

36

(12) Larson's testimony that Pavatt told her the Andrew children would not tell Rob about Pavatt and Petitioner's extramarital affair because Petitioner had the children "well trained". Petitioner contends that this evidence was irrelevant and represents mere character assassination by the State.  Doc. 26 at 77-96.

### A.    Exhaustion.

These claims were raised in Proposition III of Petitioner's direct appeal brief and the OCCA rejected these claims on the merits.  *Andrew*, 164 P.3d at 190-93.  Petitioner's Ground III is therefore exhausted for purposes of federal habeas review.

### B    Standard of Review.

The OCCA's decision rests on substantive, not procedural, grounds.  Although the OCCA expressly cited and discussed only state law in denying relief on these claims, AEDPA deference nonetheless applies.  As the Supreme Court has recognized, "§ 2254(d) dictates a 'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).  Where "there is no indication suggesting that the state court did *not* reach the merits of a claim, [the Tenth Circuit] ha[s] held that a state court reaches a decision 'on the merits' even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion".  *Harris v. Poppell*, 411 F.3d 1189, 1195-96 (10th Cir. 2005) (quoting *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004)).  "Federal courts are not free to presume that a state court did not comply with constitutional dictates

on the basis of nothing more than a lack of citation." *Bell*, 543 U.S. at 455. *See also Cook v. McKune*, 323 F.3d 825, 830-31 (10th Cir. 2003) (citing *Early v. Packer*, 537 U.S. 3 (2002)) (applying AEDPA deference where state court relied solely upon Kansas law in rejecting federal confrontation claim, noting Supreme Court has held that "failure to discuss or even to be aware of federal precedent does not in itself render a state court's decision contrary to federal law").

Here, the cases and statutes applied by the OCCA are consistent with the constitutional standards applied to a fundamental fairness due process analysis "in that they acknowledge the prejudice associated with the admission of other crimes evidence and place strict limitations on the admission of such evidence." *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006). More importantly, in determining the threshold question of whether there even exists clearly-established Supreme Court precedent against which to judge the state court's decision (discussed more thoroughly below), a federal habeas court is not limited by the actions of the state court. *See Bell*, 543 U.S. as 455; *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Applying the benefit of the doubt to the state court's decision as this Court must in determining standard of review, *Bell*, 543 U.S. at 455, AEDPA deference clearly applies to the OCCA's merits adjudication of this claim. *See Sandoval v. Ulibarri*, 548 F.3d 902, 908, 911 (10th Cir. 2008) (applying AEDPA deference to state court's rejection of ineffective assistance claim without any reference or analysis of *Strickland*; "[w]e owe deference to the state court's *result*, even if its reasoning is not expressly stated").

### C.     Merits.

Applying AEDPA's deferential standard, Petitioner is not entitled to habeas relief. The Supreme Court has not "directly address[ed] the constitutionality of a trial court admitting evidence of a defendant's other crimes, particularly during the first or second stages of a capital murder case." *Welch*, 451 F.3d at 687-88. *See also Saleh v. Fleming*, 262 Fed. Appx. 802, 804 (9th Cir. 2008) (unpublished) (quoting *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001)) ("[t]he Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without [a limiting instruction]"). Rather, the Supreme Court has expressly declined to address this question. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991).

Under AEDPA, this Court can only grant relief if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court or was otherwise based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). Because the Supreme Court has expressly reserved consideration of the issue at hand, habeas relief is unwarranted. The

absence of clearly-established Supreme Court precedent on this issue is dispositive under §
2254(d)(1).  *Id.* at 1017-18.

Additionally, it is clear that one of the assumptions behind Petitioner's claim is that
the admission of irrelevant evidence, be it alleged other crimes or character evidence,
automatically rises to a federal due process violation.  However, the Supreme Court has left
open that very issue.  *Estelle*, 502 U.S. at 70 ("[c]oncluding, as we do, that the prior injury
evidence was relevant to an issue in the case, we need not explore further the apparent
assumption of the Court of Appeals that it is a violation of the due process guaranteed by the
Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial").
Thus, to the extent Petitioner relies upon this premise in her Ground III claim, she fails to
identify clearly-established Federal law, as articulated by the Supreme Court, to support it.
*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) ("[t]he
Supreme Court has made very few rulings regarding the admission of evidence as a violation
of due process.  Although the Court has been clear that a writ should be issued when
constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear
ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process
violation sufficient to warrant issuance of the writ").  *See generally House*, 527 F.3d at 1016-
18.

Under these circumstances, Respondent submits that no clearly-established Supreme
Court precedent exists by which to judge this particular issue.  Again, when applying §
2254(d)(1), the threshold question is whether the petitioner seeks to apply a rule of law that

was "clearly established" by the Supreme Court at the time the conviction became final. *House*, 527 F.3d at 1015 (reiterating that "[w]hether the law is clearly established is *the* threshold question under § 2254(d)(1)"). This threshold inquiry is "analytically dispositive" of the § 2254(d)(1) analysis. *Id.* at 1017. "That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law." *Id.*

Recent decisions from the Supreme Court establish "that Supreme Court holdings–the exclusive touchstone for clearly established federal law–must be construed narrowly and consist only of something akin to on-point holdings." *Id.* at 1015. It is no longer enough for Petitioner to cite circuit precedent in order to obtain review of her claims. "Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed." *Holley*, 568 F.3d at 1097 (citing *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006)).

In the instant case, Petitioner essentially asks this Court to engage in supervisory review over the state court's application of state evidentiary principles. That she cloaks these claims in terms of the federal due process clause does not change this fact. The Supreme Court has made clear that such an analysis is not proper on habeas. *Estelle*, 502 U.S. at 70 (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)) ("[c]ases in this Court have long proceeded on the premise that the Due Process Clause guarantees fundamental elements of fairness in a criminal trial...But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure"). Without clearly-established Supreme Court precedent, the instant claim ends where it begins: it is

nothing more than a garden-variety state evidentiary challenge which this Court has no power to entertain. *Holley*, 568 F.3d at 1101. The OCCA's rejection of Petitioner's challenge to the alleged other crimes or bad acts evidence introduced at her capital murder trial was not contrary to, or an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case. Habeas relief must therefore be denied. 28 U.S.C. § 2254(d).

Alternatively, even if this claim were cognizable under § 2254 based solely on federal due process principles, Petitioner would still not be entitled to relief. The OCCA's opinion makes clear that much of the challenged evidence was relevant to the State's case and therefore properly admitted.

**Brake Lines.** Evidence concerning the brake line incident was properly admissible as the res gestae of the conspiracy to commit first degree murder and, for that matter, the res gestae of the first degree murder count itself. *Andrew*, 164 P.3d at 191. Evidence that Petitioner and Pavatt engaged in a scheme three weeks before the murder to cut the victim's brake lines, then lure him into high-speed travel with several phone calls telling him to pick his wife up at Norman Regional Hospital, showed the on-going conspiracy between Petitioner and Pavatt to murder Rob. It was necessary to give the jury a complete understanding of the crimes charged, was central to the chain of events and formed part of the entire transaction of the crimes charged. It was therefore admissible as res gestae evidence and does not constitute improper character evidence as alleged by Petitioner.

Petitioner's complaint that insufficient evidence was presented to connect Petitioner to the brake line incident lacks merit. As shown in response to Grounds I and II above, evidence of: [a] Pavatt's and Janna Larson's phone calls shortly after the victim discovered his cut brake lines; [b] the large number of phone calls between Petitioner and Pavatt that day; [c] along with evidence that at the end of October 2001 Petitioner had asked Pavatt to murder the victim; and [d] the charade Petitioner and Pavatt engaged in to fraudulently secure Petitioner as owner and beneficiary of the life insurance policy around the same time, established circumstantially that Petitioner was involved in the cutting of Rob's brake lines. *Id.* This evidence was therefore substantively admissible as evidence of Petitioner's guilt for both the murder and conspiracy counts.

Petitioner's attempt to explain away the large number of phone calls between herself and Pavatt on October 26th, Doc. 26 at 83, ignores the large number of phone calls made between Pavatt and Petitioner on October 25th and before noon on October 26th (Tr. 678, 679; State's Exhibits 12-13). Petitioner's admission in her habeas petition that she appeared at Larson's office in Norman "shortly after Larson made the calls to Robert Andrew" and "ask[ed] about telephone communications that Larson could have been having with Robert Andrew", Doc. 26 at 85, only establishes Petitioner's participation in the plot. This is especially so considering that Petitioner lived in far northwest Oklahoma City, had no apparent business in Norman that day, and the calls placed to Rob anonymously told him to hurry to the Norman hospital to pick up his wife. This fact alone establishes a guilty knowledge of the anonymous phone calls being made to Rob and, by extension, the cutting

43

of his brake lines. Petitioner's assertion that Rob's brake lines were "probably cut", Doc. 26 at 81, ignores the undisputed testimony from the certified Nissan mechanic who inspected the victim's car the morning of October 26th that the victim's brake lines were definitely cut by a human being (Tr. 712-13, 780, 790-91). Petitioner's speculative assertions simply do not undermine the integrity of this evidence.

**Petitioner's Extramarital Affairs with Higgins and Nunley.** Petitioner next complains that reversible error occurred when testimony was presented concerning her extramarital affairs with Rick Nunley and Tracy Higgins. Doc. 26 at 89-91. This evidence was relevant to show a consciousness of guilt by Petitioner when she repeatedly denied having any extramarital affair during Detective Garrett's questioning several hours after the murder. Considering her affair with Pavatt at the time of the murder, Petitioner's denial of the affairs with Higgins and Nunley suggests an attempt to deflect attention from herself as a possible suspect in her husband's murder (Tr. 2297-99; State's Exhibit 204A). Likewise, evidence of Petitioner's affairs with Higgins and Nunley only bolstered the State's evidence that Petitioner hated her husband and wanted him dead so she could collect the insurance money and start a new life. This evidence was also relevant to explain how Petitioner knew Higgins and Nunley and why she would make incriminating statements to them (such as wanting Rob dead and that she had hid large sums of money from Rob). The State also relied upon this evidence to illustrate Petitioner's assertiveness when dealing with, and her ability to manipulate and control, men (Tr. 246-55. 258-59, 267, 273-78). This evidence helped the State explain creation of Pavatt's "confession" letter (Tr. 3894-95). It also

44

showed any potential bias as to Higgins's and Nunley's substantive testimony, much of which did not focus on Petitioner's infidelity (Tr. 245-78, 359-92).

This evidence was therefore admissible for multiple legitimate purposes at Petitioner's trial.  As noted by the OCCA, "[Petitioner] shared with both of these men her hatred for Rob Andrew and her wish that he was dead.  Her co-defendant was just the last in a long line of men that she seduced; however, this last man shared the same hatred of Rob and was willing to kill for [Petitioner].  The evidence of [Petitioner's] affairs proved motive and intent in this case."  *Andrew*, 164 P.3d at 192.  Petitioner was not deprived of a fundamentally fair trial in violation of due process from this evidence.  Her convictions and death sentence are more reliable, not less, for this evidence having been admitted.

**Additional Claims of Other Crime or Bad Acts Evidence.**  Petitioner's remaining claims largely do not present error: (1) **Barbara Murcer-Green's** testimony that Petitioner barged into a meeting at the victim's workplace and started a fight with the victim after Rob and Petitioner's separation (Tr. 581-82) was relevant to show the level of Petitioner's anger and hatred towards Rob, show her state of mind, illustrate how Petitioner might be capable of murdering her husband, and establish motive.  *Andrew*, 164 P.3d at 192; (2) Murcer-Green's testimony that she received a photograph of her husband in the mail that had been cut-up (Tr. 582-83) was admissible for similar reasons considering that Petitioner "belly butted" her and told her to "watch [your] back" as Murcer-Green attempted to escort Petitioner out of Rob's office, *id.*; (3) Murcer-Green's testimony that Petitioner stalked the victim prior to his death (Tr. 585-86) was based on her personal observations of Petitioner

and was therefore admissible as part of the res gestae of the crimes because it showed the level and extent of Petitioner's hatred towards the victim, *id.*; (4) testimony that Petitioner threatened to kill her plumber, **David Head**, was relevant to show how Petitioner was capable of murdering her husband and was admissible as part of the res gestae.  Head's testimony illustrated Petitioner's attitude towards men whom she could not control.  Recall that her threat to kill Head arose during a dispute over a plumbing bill.  Head's testimony also showed the extent of Pavatt's relationship with Petitioner as he identified Pavatt as the person who broke up the fight (Tr. 997-98).  Regardless, Head's description of Petitioner's threat to kill him was clearly overshadowed by his account of Petitioner telling Rob that she was going to "fucking have you killed" (Tr. 996); (5) **William Burleson's** testimony regarding Petitioner's "non-interest" in planning Rob's funeral, his testimony that Petitioner said there was "nothing" she missed about the victim, and his description of Petitioner as being "[c]old. Flat. Unemotional" (Tr. 2580-84, 2601), was clearly admissible.  Petitioner's total callousness towards the murder of her husband tended to rebut her claim that she was a victim herself by providing circumstantial evidence of guilt for the homicide.  *Id*. at 193 ("[Petitioner's] demeanor at the funeral home was relevant to show a consciousness of guilt, and as such is not considered 'other crimes' evidence'").  This is especially so considering evidence that Petitioner fled the country with Pavatt instead of attending Rob's funeral; (6) Petitioner's statement to **Cynthia Balding** that "she had pulled a big one on Rob.  He's going crazy looking for some money that I've moved around" was relevant and admissible as part of the res gestae of the crime because Balding's testimony referred to the approximately

$80,000 Petitioner moved into an account at the bank where Janna Larson worked and was the same money Petitioner attempted to have Larson funnel to her and Pavatt while on the run in Mexico (Tr. 2960-61, 2975-77, 2982-84, 3020-24); *id.* at 193 ("[t]he evidence concerning the money was relevant to show motive, and the money provided the source which [Petitioner] was to utilize while on the run in Mexico, thus it was relevant as part of this criminal episode"); (7) **Petitioner's statement to Tricity Andrew** in Balding's presence the night before the murder that Tricity's puppy was "a baby and it needs to be with its mother" (Tr. 2660-61) was relevant res gestae evidence demonstrating Petitioner's hostility towards the victim, her possessiveness of the Andrew children, her open hostility towards the children spending the Thanksgiving holiday with the victim and her attempt to manipulate or prevent the victim from having a relationship with his children. All of this provides a motive for the murder and was clearly admissible, *id.* at 192-93; (8) **Janna Larson's** testimony that she expressed disbelief to Pavatt when he relayed Petitioner's statement that she had only "slept" with Pavatt and Rob (Tr. 2958) was relevant to Petitioner's ability to lie and influence Pavatt, *id.* at 193; (9) **Pavatt's statement to Larson** that he was not worried the Andrew children would expose his affair with Petitioner because the children were "well trained" (Tr. 2959) was relevant and admissible. This testimony illustrated Petitioner's control over the children, the extent to which she attempted to conceal her affair with Pavatt and, by extension, the conspiracy she engaged in with Pavatt to murder the victim, *id.*; (10) any error in admitting **Tracy Higgins's** testimony that Petitioner had come on to his sons when they were building a deck at the Andrew residence (Tr. 278) was

47

harmless considering the overwhelming evidence presented of Petitioner's guilt and Higgins's admission that his only basis for this testimony was hearsay. Petitioner was not deprived of a fundamentally fair trial based on this evidence, *id.* at 192; (11) **David Ostrowe's** testimony regarding his dinner date with Rob and Petitioner six to eight weeks before the murder was relevant to show the strained relationship between the victim and his killer in the weeks leading up to the murder. Petitioner's statement during this dinner that "she loved her workmen and they were doing a great job" on the Andrew deck and that she "spent a lot of time with them" at her house while Rob was working (Tr. 325) corroborated Higgins's description of his inappropriate relationship with Petitioner and her hatred towards the victim; (12) **Ronnie Stump's** testimony that Petitioner changed her hair color after consulting with Stump's wife concerning his favorite hair color on women was irrelevant considering the lack of time frame presented for this event (Tr. 498-99). However, any error was harmless and did not deprive Petitioner of a fundamentally fair trial in light of Stump's admission that he previously described Petitioner as a "good mother" who seemed to be loving and caring towards her children's needs (Tr. 529-30) and the overwhelming evidence of Petitioner's guilt for the charged offenses, discussed in response to Ground I above. *Id.*

Based on the foregoing, any possible error in the challenged testimony was harmless as it did not substantially and injuriously effect or influence the jury's verdict in this case. *See Fry v. Pliler*, 551 U.S. 112, 119-20, 121-22 (2007). The vague federal basis of Petitioner's claim–a due process violation premised on the denial of a fair trial--standing alone suggests that relief is unwarranted. "'[B]ecause a fundamental-fairness analysis is not

subject to clearly definable legal elements,' when engaged in such an endeavor a federal court must 'tread gingerly' and exercise 'considerable self-restraint.'" *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990)). The Supreme Court has cautioned federal courts to bear in mind its previous admonition that it "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.*

Petitioner's Ground III claim is driven by the alleged misapplication of state evidentiary principles. As noted by the Supreme Court:

> The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence. Direct review is the principal avenue for challenging a conviction. "When the process of direct review–which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari–comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials."

*Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (internal citations omitted).

All things considered, Respondent urges that habeas relief is unwarranted here, regardless of the precise mode of analysis employed. Petitioner's Ground III claim should therefore be denied.

**IV.**

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF ALLEGED OPINION TESTIMONY.**

In Ground IV, Petitioner presents a litany of instances where she believes improper opinion testimony was admitted at her trial.  Petitioner alleges that some of the testimony constituted improper opinions of her guilt, thus improperly invading the province of the jury on an ultimate issue.  Petitioner also challenges testimony from two police officers as improperly admitted expert testimony.  Petitioner urges that admission of this testimony violated state law as well as the federal due process guarantee of a fundamentally fair trial.  Doc. 26 at 97-108.

**A.    Exhaustion.**

These claims were raised in Proposition IV of Petitioner's direct appeal brief and were rejected on the merits by the OCCA.  *Andrew*, 164 P.3d at 195-96.  Petitioner's Ground IV claim is therefore exhausted for purposes of federal habeas review.

**B.    Standard of Review.**

Petitioner contends that the OCCA reviewed this claim only in terms of state law and therefore did not decide the merits of her federal claims.  Doc. 26 at 99.  The State incorporates here by reference its discussion in response to Ground III above.  Simply put, the state court was not required to cite to, or be aware of, controlling Supreme Court precedent in adjudicating a claim for AEDPA deference to apply so long as neither the reasoning nor result contradict that same precedent.  *See, e.g.*, *Welch v. Sirmons*, 451 F.3d

50

675, 687, 696-97 (10th Cir. 2008); *Harris v. Poppell*, 411 F.3d 1189, 1195-96 (10th Cir. 2005). Here, there is no indication the OCCA did not adjudicate the federal claim tendered in support of her challenge to alleged opinion testimony in this case. Indeed, some of these challenges were reviewed for plain error which the Tenth Circuit has found consistent with federal due process principles and thus, subject to AEDPA deference. *See Douglas v. Workman*, 560 F.3d 1156, 1177-79 (10th Cir. 2009) (and cases cited therein) (AEDPA deference applies to substantive merits review of federal claims under Oklahoma's plain error rule). A federal court may not presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation. *Bell v. Cone*, 543 U.S. 447, 455 (2005). The OCCA's adjudication of the challenges raised in Petitioner's Ground IV claim therefore represents an adjudication on the merits of her federal claims warranting applicability of AEDPA.

### C.    Merits.

Petitioner's claims can be divided into two broad categories: (1) challenges to opinion testimony by police officers; and (2) opinion testimony by lay and law enforcement witnesses of their respective opinions as to Petitioner's guilt.

**Opinion Testimony by Police Officers.** In the first category, Petitioner cites testimony from **Sgt. Roger Frost** and **Technical Investigator Teresa Bunn**. Doc. 26 at 103-05, 106. After briefly discussing Oklahoma law regarding the admission of expert opinion testimony, specifically the rule that "police officers are allowed to give opinion

testimony based on their training and experience", *Andrew*, 164 P.3d at 196, the OCCA

summarized the challenged testimony from Frost and Bunn and found it properly admitted:

> ¶ 81 Sgt. Frost testified that it was "very strange" that
> [Petitioner] could not remember the words spoken by her
> alleged attackers. He also testified that she was unusually calm
> and he felt it unusual that she did not ask about her husband
> while at the hospital. Technical Investigator Teresa Bunn
> testified similarly. We find that the trial court did not abuse its
> discretion in allowing this testimony as it was properly based on
> their perceptions in conjunction with their training and
> experience.

*Id.*

Petitioner urges that this particular testimony was improper expert opinion evidence

because it does not satisfy the reliability criteria specified by *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). But Petitioner's argument does not even satisfy

circuit precedent, let alone clearly-established Supreme Court precedent on this topic. In

*United States v. Garza*, 566 F.3d 1194 (10th Cir. 2009), the Tenth Circuit reaffirmed its pre-

*Daubert* precedents which held that police officers can acquire specialized knowledge of

criminal practices through experience and training, such as expertise to opine on the use of

firearms in the drug trade, and held that *Daubert* and its progeny, including the 2000

amendment to Fed. R. Evid. 702, did not require rigid application of the four *Daubert*

reliability factors to such testimony. *Garza*, 566 F.3d at 1199. This is because Rule 702, like

Okla. Stat. tit. 12, § 2702, "authorizes opinion testimony by experts with 'scientific,

technical, or other specialized knowledge.' That specialized knowledge can be acquired

through 'experience' and 'training.'" *Id.* (quoting Fed. R. Evid. 702). Further, "the reliability

criteria enunciated in *Daubert* are not to be applied woodenly in all circumstances.  As the Supreme Court has explained, '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Here, Sgt. Frost testified that it "was very strange" that Petitioner could not remember the words spoken by the people she said shot herself and Rob (Tr. 1799-1800).  The prosecutor established that Frost had served almost eighteen years as a police officer, that he had training and experience as a police officer dealing with victims of violent crimes, people who have just witnessed traumatic and violent events and people who were in shock (Tr. 1778-79).  Frost testified that he had worked "[s]everal hundred" cases in which he had come into contact with people who have either witnessed or been victimized by violent crimes (Tr. 1779-80).  Frost's description of Petitioner's failure to remember what the purported perpetrators of the shooting said as "very strange" was based upon his experience and training as a police officer.

Sgt. Teresa Bunn provided similar testimony concerning the unusual nature of Petitioner's demeanor at the hospital (Tr. 2030-31).  Bunn testified that she had processed several hundred crime scenes and that, as part of her duties, she takes pictures of crime victims at the hospital "all the time" (Tr. 2030).  Bunn's description of the typical behavior of crime victims she has observed–"usually they're very emotional, very distraught.  It's hard to interview them because they're just so frantic and excited and disturbed about the violent

acts that have just occurred to them"–was highly relevant and admissible under Section 2702 based on her training and, particularly, her established experience in these situations as a police officer. Indeed, Bunn testified on cross that she received specialized training in the Army every year for nineteen years on how to treat people who are in shock, specifically how "to identify the symptoms, psycho symptoms of shock as well as the proper way of treating for shock" (Tr. 2157-58).

The OCCA's rejection of Petitioner's challenges to this particular testimony was neither contrary to, nor an unreasonable application of, *Daubert* and its progeny to the facts of this case. Their testimony was based on their perceptions arising from their training and experience. *Andrew*, 164 P.3d at 196. Because their testimony was not scientific, rigid application of, and compliance with, the *Daubert* reliability criteria was unnecessary. *Garza*, 566 F.3d at 1199. Petitioner's challenge to this testimony therefore amounts to nothing more than a garden-variety state law evidentiary challenge. As discussed above in response to Ground III, however, such challenges are not cognizable on habeas. No clearly-established Supreme Court precedent governs this issue; thus, it is not enough that Petitioner relies upon general due process grounds in arguing that she was denied a fundamentally fair trial. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). And an alleged misapplication of a state court's own evidence rules is not cognizable on habeas review. The State incorporates here by reference its previous discussion from Section III above in arguing that habeas relief is unwarranted in light of the absence of clearly-established Supreme Court precedent governing this claim.

The same is true regarding Petitioner's challenge to testimony from Sgt. Frost that it was significant that Petitioner was shot at close range. Doc. 26 at 104. Petitioner cites no clearly-established Supreme Court precedent governing this claim and none is apparent; this too is nothing more than a challenge on state law grounds to the state courts' evidentiary rulings. Under AEDPA, that is the end of the analysis. And, in any event, the claim fails miserably on the merits. No further explanation was provided by Sgt. Frost as to this challenged statement. Any possible error was harmless "due to the overwhelming evidence that [Petitioner] was indeed shot at close range." *Andrew*, 164 P.3d at 196. This included testimony from a defense crime scene reconstruction expert who agreed that Petitioner was shot at very close range, that her gunshot wound was evidence of staging and that she cannot be excluded as having been involved in that staging (Tr. 2055, 3191-93, 3219, 3232-33, 3269-70, 3667-69). The OCCA's rejection of this claim was therefore neither contrary to, nor an unreasonable application of clearly-established Federal law as articulated by the Supreme Court, regardless of the precise mode of analysis employed. That is especially so in light of the very limited review that a fundamental fairness merits analysis provides on habeas as discussed in response to Ground III above. Respondent incorporates here by reference that discussion.

Petitioner's challenge to Bunn's testimony that she believed it was unusual that Petitioner could not say how close the gunman was to Petitioner (Tr. 2055) lacks merit. Doc. 26 at 104-05. This testimony resembles mere lay opinion testimony which was certainly admissible under Oklahoma law. *See Andrew*, 164 P.3d at 195 (discussing admissibility

55

requirements of lay opinion testimony under Okla. Stat. tit. 12, § 2701). Again, no clearly-established Supreme Court precedent governs this claim. And in any event, this claim has no substantive merit; this particular testimony was rationally based on Bunn's perceptions of Petitioner's responses and the fact that she had suffered a close contact gunshot wound. The OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly-established Federal law as articulated by the Supreme Court.

Petitioner challenges purported opinion testimony from **Detective Roland Garrett** at transcript page 2569. Doc. 26 at 105. As noted by the OCCA, "[t]he questioning regarded what Pavatt was doing the day of the murder. Garrett testified that Pavatt was moving his washer and dryer into the Andrew home. The prosecutor asked, 'Moving in?' Garrett answered 'Yes.'" *Andrew*, 164 P.3d at 196. The trial court sustained an objection to this testimony but did not admonish the jury as requested. *Id.* The trial court did announce, however, in response to defense counsel's objection, that the testimony was speculation. *Id.*

No clearly-established Supreme Court precedent governs this garden-variety state law evidentiary challenge. Moreover, the OCCA's finding that "the trial court's actions cured this error as an admonishment would have merely magnified the possibility of prejudice" was wholly reasonable. Any error in Detective Garrett's challenged testimony was therefore harmless as it did not substantially and injuriously effect or influence the jury's verdict in this case, especially in light of the overwhelming evidence of guilt supporting Petitioner's convictions as discussed in Section I above. *See Fry v. Pliler*, 551 U.S. 112, 119-20, 121-22 (2007).

Petitioner's challenge to testimony from **Officer Mike Klika** is also not supported by clearly-established Federal law as determined by the Supreme Court. Doc. 26 at 105. Nor does it have any substantive merit. As noted by the OCCA, Officer Klika "was allowed to testify that he believed that [Petitioner] was involved in the cutting of Rob Andrew's brake lines." *Andrew*, 164 P.3d at 196. Petitioner did not object to this testimony. *Id.* Reviewing for plain error, the OCCA found that "this testimony does not rise to the level of plain error based on the context of the testimony as rebuttal to defense counsel's cross-examination regarding a link between [Petitioner] and the brake line incident." *Id.* The record supports this conclusion. Klika's challenged testimony was elicited only for purposes of rehabilitation in response to defense counsel's suggestion on cross that Klika had no evidence Petitioner was involved in cutting Rob's brake lines or in the murder (Tr. 835-47, 851-57). This testimony was therefore proper and not error, let alone federal constitutional error as revealed by clearly-established Supreme Court precedent.

**Alleged Opinions as to Guilt.** The second category of statements challenged by Petitioner represent alleged opinions as to her guilt by several prosecution witnesses, including both lay witnesses and police officers. Doc. 26 at 100-03. The OCCA reviewed these claims and rejected them on the merits:

> ¶ 75 Ron Stump and Rod Lott both gave testimony indicating that they believed that [Petitioner] was responsible for killing Rob Andrew. Officer Mike Klinka, Michael Fetters and Mark Sinor testified that Rob Andrew relayed to them that he believed that [Petitioner] was trying to kill him.

¶ 76 The questioning of Rod Lott came during re-direct after defense counsel was allowed to ask if Rod Lott liked [Petitioner], and defense counsel's questioning of Lott's motivation for testifying. The prosecutor asked why he did not like her. Rod Lott answered, "I believe she's responsible for his death." This testimony was properly admitted because [Petitioner] opened the door on cross-examination, so that the prosecution could delve into Lott's motivation.

¶ 77 Stump's initial opinion, that [Petitioner] and Pavatt killed Rob Andrew, and his testimony that he knew of no one that had a motive to kill Rob Andrew other than [Petitioner] and Pavatt was not met with an objection. We review for plain error here, and we find none.

¶ 78 Mike Klinka's, Michael Fetters' and Mark Sinor's testimony was admitted to show Rob Andrew's state-of-mind as explained above. There is no reason to rehash this argument here.

*Andrew*, 164 P.3d at 195.

As with the earlier challenges, Petitioner presents no clearly-established Supreme Court precedent to support these claims. Instead, she relies upon the more general fairness provisions of the due process clause for support. For all the reasons discussed above, that standing alone is enough to deny relief. Further, the individual challenges fail even under a fundamental fairness analysis.

Petitioner's claim that **Rod Lott** improperly testified that "he dislikes Petitioner because he believes she is responsible for Robert Andrew's death", Doc. 26 at 101, ignores that the source of this testimony was Petitioner, not the State. The prosecutor elicited Lott's challenged testimony on re-direct *only after* the following exchange on cross-examination: "Q. (By Mr. McCracken) Do you dislike Ms. Andrew, sir? A. Yes. Q. And that's the reason

you're testifying, isn't it, sir?  Q. No, I'm testifying for Rob" (Tr. 1095).  As found by the OCCA, Petitioner opened the door on re-direct for the prosecutor to set the record straight as to *why* the witness disliked Petitioner–i.e., solely because Lott felt Petitioner was responsible for his murder and not some hatred that predated the murder (Tr. 1096-97).  No error, let alone federal constitutional error, stems from this testimony and Petitioner was not denied a fundamentally fair trial from it.

**Ronnie Stump's** challenged testimony at transcript page 496 does not present opinion testimony at all.  Defense counsel made no objection to this testimony and it was offered only to show why Stump immediately traveled to the crime scene and told Detective Garrett that Petitioner and Pavatt should be considered suspects in the murder, not to provide substantive evidence of Petitioner's guilt (Tr. 496-98).  Stump's challenged testimony at transcript pages 501-502 also lacks merit.  Petitioner did not object to this questioning on the grounds now asserted.  Further, this entire line of questioning was elicited in anticipation that defense counsel would ask Stump, as he had asked many previous witnesses, whether Stump had any evidence to show Petitioner was involved in Rob's murder (Tr. 333, 357, 415, 501).  Stump's testimony that Petitioner hated Rob was rationally based on his observation of Petitioner and Rob's interactions in the months leading up to the murder (Tr. 441-44, 446-49, 452-58, 483, 488-92, 494-95, 500; State's Exhibit 281-84) and was specifically based on Petitioner's statement in Stump's presence that she hated Rob (Tr. 500).

This aspect of Stump's testimony was clearly admissible under Okla. Stat. tit. 12, § 2701.  Stump's testimony that he did not know anyone else in the world with motive to

murder Rob, and his testimony that Petitioner wanted custody of the children and the life insurance money was likewise based on Stump's perception of Rob and Petitioner's interaction in the months leading up to the murder. Stump testified that he heard Petitioner say she stayed with Rob "for the money" (Tr. 500) and also described the possessiveness he saw Petitioner assert over the Andrew children (Tr. 489-92) and that he knew Petitioner and Rob were having "a big battle" about custody during the separation (Tr. 492). The OCCA reasonably rejected Petitioner's challenges to Stump's testimony. *Andrew*, 164 P.3d at 195.

Petitioner was not denied a fundamentally fair trial in violation of due process, even if this claim were cognizable on habeas review. As discussed in response to Ground I above, overwhelming evidence separate and apart from this challenged testimony was presented at trial. And, in any event, the challenged testimony was properly admitted.

Petitioner's remaining challenges to **State's Exhibits 28 through 29** and **testimony from Stump, Officer Mike Klika, Michael Fetters and Mark Sinor** lacks merit. Doc. 26 at 102. As noted by the OCCA, the challenged testimony from Klika, Fetters and Sinor was properly admitted state of mind evidence (not opinion testimony) which, even under pre-*Crawford* circuit precedent was admissible. *Welch*, 451 F.3d at 697. But as discussed in response to Ground II above, no reversible error arises from this testimony under a post-*Crawford* analysis. The same is true for admission of State's Exhibit 28 and 29, audiotapes of the victim's conversations with customer service representative at the Prudential Insurance helpline. This was non-testimonial in nature and therefore, the federal confrontation clause did not bar admission. And it was relevant for multiple legitimate reasons. *Andrew*, 164

P.3d at 189 ("this evidence was introduced to show Rob Andrew's state-of-mind.  His fear

of [Petitioner] and Pavatt, and the motive for this killing: the insurance money...").

All things considered, Petitioner fails to show any legitimate basis for relief with her

litany of state evidentiary challenges.  The OCCA's rejection of the issues raised in

Petitioner's Ground IV claim was neither contrary to, nor an unreasonable application of,

clearly-established Federal law as determined by the Supreme Court.  Nor was it based on

an unreasonable determination of the facts.  Relief must therefore be denied.  28 U.S.C. §

2254(d).

## V.

### THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSION OF STATEMENTS MADE BY HER CO-CONSPIRATOR IN FURTHERANCE OF THE CONSPIRACY TO KILL ROB ANDREW.

In Ground V, Petitioner challenges admission into evidence during her capital murder

trial of co-conspirator statements.  Petitioner contends that Janna Larson's testimony that

James Pavatt told her at the end of October 2001 that Petitioner  "asked him if he would kill

her husband or if he knew someone that could do it" represents inadmissible hearsay (Tr.

2966).  Petitioner urges that this testimony does not satisfy Okla. Stat. tit 12, § 2801(B)(2)(e),

Oklahoma's evidentiary rule allowing admission of statements offered against a party and

made by her coconspirator during the course of and in furtherance of their conspiracy.

Petitioner argues that Pavatt's statement was not made during the course of a conspiracy, was

not made in furtherance of a conspiracy and that no evidence of an agreement to commit a

crime exists.  This, Petitioner claims, violated her Sixth Amendment right to confrontation.

Doc. 26 at 108-34.

A.    *Exhaustion.*

Except for one aspect of this claim (Petitioner's due process liberty interest challenge premised on *Hicks v. Oklahoma*, 447 U.S. 343 (1980)) discussed below, Petitioner's federal challenges in the instant ground for relief were raised in Proposition V of her state direct appeal brief.  The OCCA denied merits relief.  *Andrew*, 164 P.3d at 190.  Hence, except as noted below, this claim is exhausted for purposes of federal habeas review.

B.    *Standard of Review.*

The OCCA's opinion disposing of this issue cites only state law.  *Id.*  However, as discussed in Sections III and IV above, the state court was not required to cite to, or be aware of, controlling Supreme Court precedent in adjudicating a claim for AEDPA deference to apply so long as neither the reasoning nor result contradict that same precedent.  *See*, *e.g.*, *Welch v. Sirmons*, 451 F.3d 675, 687, 696-97 (10th Cir. 2008); *Harris v. Poppell*, 411 F.3d 1189, 1195-96 (10th Cir. 2005).  Here, there is no indication the OCCA did not adjudicate the federal claims tendered in support of Petitioner's challenge to the co-conspirator statements.  A federal court may not presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.  *Bell v. Cone*, 543 U.S. 447, 455 (2005).  Respondent incorporates by reference the discussions in this regard from Sections III and IV above in support.  The OCCA's adjudication of the challenges raised in Petitioner's Ground

V claim therefore represents an adjudication on the merits warranting applicability of AEDPA.

### C.    *Merits.*

Petitioner's primary complaint is that admission of the challenged testimony violated her Sixth Amendment right to confrontation because it did not satisfy Oklahoma's co-conspirator hearsay exception.  Petitioner reasons that: (1) Oklahoma's hearsay exception mirrors Fed. R. Evid. 801(d)(2)(E)'s requirements for admission of similar evidence as interpreted in *Bourjaily v. United States*, 483 U.S. 171 (1987); (2) absent  satisfying these state law requirements, her federal confrontation rights were violated because the co-conspirator testimony did not fall into a firmly-established hearsay exception; and (3) the challenged testimony has no indicia of reliability as required by *Ohio v. Roberts*, 448 U.S. 56 (1980); thus, admission of this evidence was contrary to, or an unreasonable application of, clearly-established Federal law, as determined by the Supreme Court.

Petitioner's analysis of this claim ignores the applicability of *Crawford v. Washington*, 541 U.S. 36 (2004) to her case.  The Supreme Court decided *Crawford* well before Petitioner's trial in June and July 2004.  Indeed, as discussed in Section II above, the OCCA actually applied *Crawford* to Petitioner's hearsay challenges.  *See Andrew*, 164 P.3d at 189. Petitioner's lengthy analysis in Ground V is undermined by *Crawford*, a point she fails to recognize.  As discussed in Section II above, *Crawford* and its progeny make clear that the federal confrontation clause has no applicability to nontestimonial statements.  Petitioner's attempt to resurrect *Ohio v. Roberts* for use on federal habeas, in connection with her various

hearsay challenges, is doomed for failure. *Crawford* is the clearly-established Supreme Court precedent governing Petitioner's Ground V claim, not *Roberts*. Respondent incorporates here by reference the previous discussion in Section II on this issue.

The Tenth Circuit has recognized that statements made in furtherance of a conspiracy are non-testimonial. *United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007). That holding is based on the Supreme Court's own pronouncement in *Crawford* that "statements in furtherance of a conspiracy" present an "example" of "statements that by their nature [a]re not testimonial." *Id.* (quoting *Crawford*, 541 U.S. at 56). *See also Giles v. California*, __U.S.__, 128 S. Ct. 2678, 2691 n.6 (2008) (plurality opinion noting that incriminating statements in furtherance of a conspiracy "would probably never be [ ] testimonial" and therefore not violate Confrontation Clause).

The statements at issue here, made by James Pavatt to his daughter, are nontestimonial. "Although *Crawford* did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" *Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) (quoting *Crawford*, 541 U.S. at 51). Statements by Pavatt to his daughter are simply not testimonial for purposes of *Crawford. Id.* (state court reasonably concluded that victim's statements to co-workers were nontestimonial in light of *Crawford*).

64

In this sense, Petitioner's Sixth Amendment claim, premised on a violation of federal confrontation rights, fails on the merits. The OCCA's rejection of Petitioner's challenges to this testimony was therefore neither contrary to, nor an unreasonable application of, clearly-established Federal law, as articulated by the Supreme Court. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

To the extent Petitioner argues that the OCCA misapplied state law, habeas relief is unavailable. *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law"). Further, whether the OCCA's interpretation of its own evidence rules are consistent with, or otherwise based on, the federal courts' interpretation of a similar federal rule of evidence is irrelevant in the federal habeas context. *Dietsel v. Hines*, 506 F.3d 1249, 1281 (10th Cir. 2007) (Lucero, J., concurring); *Matthew v. Price*, 83 F.3d 328, 332 (10th Cir. 1996). And decisions of a lower federal court applying Supreme Court precedent are not determinative under AEDPA. *Bland v. Sirmons*, 459 F.3d 999, 1014 (10th Cir. 2006). Thus, to the extent Petitioner provides extended analysis of Oklahoma law dealing with admission of co-conspirator statements in light of *Bourjaily* and other federal cases addressing federal evidentiary provisions, he is not entitled to relief.

Petitioner attempts to "federalize" this claim by citing *Hicks v. Oklahoma*, 447 U.S. 343, 344-47 (1980) for the proposition that "[w]hen a State court decides to ignore state statutes when affirming a criminal conviction, it denies the defendant's due process liberty interests guaranteed under the Fourteenth Amendment." Doc. 26 at 125. Notably, no such

argument was advanced in state court, *see* 2/21/06 Brief of Appellant (No. D-2004-1010) at 49-54, and this particular claim is therefore unexhausted.

Exhaustion is a statutory obligation on petitioners who seek federal habeas relief to present and pursue all claims in state court prior to requesting federal collateral relief. 28 U.S.C. § 2254(b). "A claim has been exhausted when it has been 'fairly presented' to the state court.'" *Bland*, 459 F.3d at 1011. A habeas petitioner must provide the state court "with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Anderson v. Harless*, 459 U.S. 4, 6 (1982)  "'Fair presentation' requires more than presenting 'all the facts necessary to support the federal claim to the state court or articulating a 'somewhat similar state-law claim.'" *Id*. "'Fair presentation' means that the petitioner has raised the 'substance' of the federal claim in state court.'" *Bland,* 459 F.3d at 1011 (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971)). While a habeas petitioner need not cite "book and verse on the federal constitution,", he or she cannot assert entirely different arguments from those raised in state court. *Id.* (quoting *Daughtry v. Gladden*, 257 F.3d 750, 758 (9th Cir. 1958)). The exhaustion requirement is not satisfied where the petitioner presents new legal theories or factual claims in the § 2254 petition. *E.g.*, *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir. 2008). "The exhaustion inquiry...is necessarily case and fact specific." *Id.* (quoting *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005)).

"[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be

presented face-up and squarely; the federal question must be plainly defined." *Jackson v. Coalter*, 337 F.3d 74, 86 (1ˢᵗ Cir. 2003). Petitioner in the instant case fails to satisfy this standard. She did not give the state court a fair opportunity to rule on this particular aspect of her challenge to the co-conspirator statements contained in her Ground V claim. It should therefore be deemed unexhausted. 28 U.S.C. § 2254(b)(1). This Court may not grant relief on an unexhausted claim. However, it may deny an unexhausted claim. 28 U.S.C. § 2254(b)(2).

This Court also has the option of finding that it would be futile for Petitioner to return to state court and exhaust state remedies. Were Petitioner to return to state court and exhaust this aspect of her Ground V claim, the OCCA would unquestionably deem it procedurally barred. *Bland*, 459 F.3d at 1012 (discussing consequences for failure to exhaust under Oklahoma's post-conviction act); Okla. Stat. tit. 22, § 1089(D). This Court may not consider issues raised in a habeas petition "that have been defaulted in state court on an independent and adequate procedural ground[ ] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody*, 146 F.3d 1257, 1259 (10ᵗʰ Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991)). Tenth Circuit decisions have consistently concluded that Oklahoma's bar to claims raised on post-conviction review that could have been raised on direct appeal is both independent and adequate, *Smith v. Workman*, 550 F.3d 1258, 1267 (10ᵗʰ Cir. 2008) (and cases cited therein); *Neill v. Gibson*, 278 F.3d 1044, 1057 (10ᵗʰ Cir. 2001); *Cannon v. Gibson*, 259 F.3d 1253, 1266-69 (10ᵗʰ Cir. 2001); *Hale v. Gibson*, 227 F.3d 1298, 1330 n.15 (10ᵗʰ Cir. 2000). That is especially so in

the context of a claim like that presented here where trial and appellate counsel differ and the claim can be resolved upon the trial record alone. *English*, 146 F.3d at 1264.

The Tenth Circuit has also found Oklahoma's bar to claims that could have been, but were not, raised in an initial state post-conviction relief application independent and adequate. *See*, *e.g.*, *Spears v. Mullin*, 343 F.3d 1215, 1253-55 (10th Cir. 2003). Indeed, this bar has been found independent and adequate even with respect to non-record ineffective assistance of counsel claims. *See*, *e.g.*, *id.* (finding bar independent and adequate to preclude ineffectiveness claims raised by habeas petitioner in second post-conviction application during pendency of § 2254 petition); *Hawkins v. Mullin*, 291 F.3d 658, 669-70 (10th Cir. 2002) (finding bar independent and adequate to preclude habeas review of unexhausted ineffective assistance claim based on failure to investigate and present mitigating evidence during penalty phase); *Smallwood v. Gibson*, 191 F.3d 1257, 1267-69 (10th Cir. 1999) (same).

In a section at the end of her petition styled "Preliminary Statement Concerning Procedural Default", Petitioner offers several general challenges to the validity of Oklahoma's procedural default rules. Doc. 26 at 325-26. The gist of Petitioner's arguments in this section is that no procedural default asserted by Respondent should result in a federal procedural bar. Petitioner's challenges to application of procedural bar in her case fall into two general categories, namely, that: (1) the OCCA rule regarding presentation of non-record ineffectiveness claims constitutes a more onerous standard than *Strickland,* Doc. 26 at 325; and (2) Oklahoma's procedural default rules are not applied evenhandedly, and are not applied independent of federal law. Doc. 26 at 326.

Petitioner's first challenge to procedural bar, based on the purported inadequacy of procedural mechanisms in Oklahoma to litigate extra-record ineffectiveness claims, is of no consequence. Petitioner's *Hicks v. Oklahoma* claim is not an ineffectiveness claim; nor is it dependent on extra-record evidence. Rather, it can be resolved solely on the existing trial record. This particular adequacy challenge is therefore of no consequence. *See Cummings v. Sirmons*, 506 F.3d 1211, 1224 (10th Cir. 2007) (recognizing that procedural default of ineffective assistance claims that can be resolved on the trial record alone do not require showing of adequate procedural mechanism for development of extra-record ineffectiveness claims on direct appeal); *Cannon v. Mullin*, 259 F.3d 1253, 1268 (10th Cir. 2001) ("the test of a procedural bar's adequacy is whether the state court's 'actual application of the particular procedural default to all similar claims has been evenhanded in the vast majority of cases"). To the extent Petitioner makes conclusory independence and adequacy challenges to application of any procedural default, his arguments are defeated with the discussion of case law set forth above. Thus, the State has met its burden of providing a specific response to Petitioner's adequacy challenges and, in the process, proving the adequacy and independence of the applicable procedural default rules. *See Fairchild v. Workman*, 579 F.3d 1134, 1143 (10th Cir. 2009) (citing *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999)) (scope of State's burden in proving adequacy of state procedural default rule is measured by the specific claims of inadequacy set forth by habeas petitioner).

"A petitioner may overcome the procedural bar only if [she] can 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will results in a fundamental miscarriage of justice.'" *Bland*, 459 F.3d at 1012 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Because Petitioner has not asserted cause and prejudice excusing this default,[2] nor suggested that this Court must review the merits of her *Hicks v. Oklahoma* claim to avoid a miscarriage of justice,[3] this aspect of Petitioner's Ground V claim is procedurally barred from review. *Id.*

This Court may nonetheless deny an unexhausted claim on the merits and such would be proper in this case. "[T]he United States Supreme Court has suggested that, in rare circumstances, a determination of state law can be 'so arbitrary or capricious as to constitute

---

[2] Petitioner cannot assert ineffective assistance of appellate counsel to overcome this default as such a claim would itself be unexhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective assistance claim asserted to excuse default must not be procedurally barred itself); *Murray v. Carrier*, 477 U.S. 478, 489 (1986) (ineffective assistance claim asserted to excuse procedural default must itself be exhausted). Further, ineffective assistance of post-conviction counsel may not serve as cause to overcome a procedural default of a claim. *Spears*, 343 F.3d at 1255 (citing 28 U.S.C. § 2254(i) & *Coleman*, 501 U.S. at 752-53) ("ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default").

[3] A federal court may proceed to the merits of a procedurally defaulted claim if the inmate establishes that a failure to consider the claim would result in a fundamental miscarriage of justice. *See Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir. 1995); *Brecheen v. Reynolds*, 41 F.3d 1343, 1353 (10th Cir. 1994). To come within this "very narrow exception," *Klein*, 45 F.3d at 1400, the petitioner must supplement his habeas claim with a colorable showing of actual innocence. *See id.* Such a showing does not in itself entitle the petitioner to relief but instead serves as a " 'gateway' " that then entitles the petitioner to consideration of the merits of his claims. *Brecheen*, 41 F.3d at 1357 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). In this context, actual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In light of the overwhelming evidence discussed in Section I above establishing Petitioner's guilt for Rob Andrew's murder, not to mention the conspiracy to murder him, any attempt by Petitioner to satisfy the miscarriage of justice exception is doomed to fail.

an independent due process...violation.'" *Cummings*, 506 F.3d at 1237 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).   No such violation occurred in Petitioner's case, especially considering that the Supreme Court has recognized that the federal confrontation clause has no independent applicability to non-testimonial statements of the type relayed through Janna Larson's testimony.  *Id.*  At best, Petitioner alleges a mere misapplication of Oklahoma's evidentiary rule for admission of co-conspirator statements.  But just as it is not enough to allege a mere misapplication of a properly narrowed aggravating circumstance to the facts of a capital murder case--such a claim according to the Supreme Court amounts to mere allegation of state law error, *see Jeffers*, 497 U.S. at 780, neither should a habeas petitioner be allowed to allege misapplication of a properly defined evidentiary rule to the facts of his case as a basis for establishing an independent due process violation.  Such a practice cannot stand because it "would essentially allow state criminal defendants to convert all state law issues raised on direct appeal into constitutional claims cognizable in federal habeas proceedings.  In other words, it would require federal habeas courts to review the merits of all state law determinations that were resolved against a state criminal defendant on direct appeal."  *Cummings*, 506 F.3d at 1237.

Here, the OCCA reasonably concluded, based on the record evidence, that the State established the existence of a conspiracy prior to Pavatt's statements to Janna Larson. *Andrew*, 164 P.3d at 190.  This constituted a good-faith effort by the state court to apply Oklahoma's co-conspirator hearsay rule to the facts; there was nothing arbitrary or capricious about it.  More importantly, the type of claim here–an alleged misapplication of state

71

evidentiary rules–pales in comparison to a conviction or death sentence obtained with no evidence supporting the essential elements of the offense or an aggravator, *Jeffers*, 497 U.S. at 781-82, or a criminal defendant being arbitrarily deprived of the state-created right to sentencing by a jury, *Hicks*, 447 U.S. at 346, both situations where the Supreme Court has found existence of independent due process violations. The alleged misapplication of state evidentiary rules alleged here simply is not arbitrary in the constitutional sense, that is, it does not "shock the judicial conscience." *Aycox v. Lytle*, 196 F.3d 1174, 1180 (10th Cir. 1999). There is nothing universally shocking to the sense of justice from the OCCA's application here of this rule.

That is particularly so considering that the Confrontation Clause has no applicability to nontestimonial statements of the type at issue here. *Cf. Cummings*, 506 F.3d at 1237-38. Indeed, *Crawford's* emphasis on the fundamental importance of juries, not judges, determining the reliability of evidence, *Crawford*, 541 U.S. at 67-68–a notion wholly consistent with the core holdings in *Hicks* and *Jeffers*–confirms that the alleged misapplication of state evidentiary rules at issue here does not implicate the type of concerns necessary to arise to the magnitude of an independent due process violation. *See Ring v. Arizona*, 536 U.S. 584, 607-08 (2002) (capital murder defendant has Sixth Amendment right to jury finding of aggravating circumstances; "the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free"). Here, Petitioner's jury made the ultimate reliability determinations as to the

facts--albeit over a defense claim that inadmissible evidence was presented–including credibility determinations regarding the co-conspirator statements at issue here.

In light of this discussion, nothing about the OCCA's alleged misapplication of its own evidentiary rules dealing with co-conspirator statements violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. *Dowling v. United States*, 493 U.S. 342, 353 (1990). The Due Process Clause has limited operation beyond the specific guarantees enumerated in the Bill of Rights. *Id.* at 352. The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id*. Petitioner fails to meet her burden to show that application of the state evidence rules at issue here in any way violate due process or contemporary notions of fundamental fairness in light of our history. *See Montana v. Egelhoff*, 518 U.S. 37, 47 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)) (noting that defendant, not the State, "must show that the principle of procedure violated by the rule (and allegedly required by due process) is 'so rooted in the traditions and conscience of our people as to be ranked as fundamental'").

All things considered, Petitioner's due process liberty interest claim fails. Petitioner alternatively attempts to save this state evidentiary challenge (Doc. 26 at 133) by resorting to the more general principle that "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair..." *Welch*, 451 F.3d at 688 (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). *See also id.* (citing *Darden v. Wainwright*, 477 U.S.

168, 179-83 (1986)).  But, as discussed in response to Ground II above, Petitioner's attempts to cloak her bare hearsay challenges as federal due process violations must fail.  "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law' as laid out by the Supreme Court."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  The absence of clearly-established Supreme Court precedent requiring independent review of the state court's hearsay rulings on non-testimonial evidence is analytically dispositive.  *Id.* (declining federal due process review of state evidentiary rulings in the absence of clearly-established Supreme Court precedent; noting that "the Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process").  "Circuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed."  *Id.* at 1097 (citing *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006)).  *See generally House v. Hatch*, 527 F.3d 1010, 1015-18 (10th Cir. 2008).  Petitioner therefore fails to gain any traction with this alternative line of attack.

To the extent Petitioner invokes *Bruton v. United States*, 391 U.S. 123, 126-28 (1968) and its progeny, she is also not entitled to relief.  Doc. 26 at 128-29.  In *Lilly v. Virginia*, 527 U.S. 116 (1999), one of the cases cited by Petitioner, the Court rejected the argument later accepted in *Crawford*, i.e., that the Sixth Amendment confrontation guarantee was historically concerned with the admission of testimonial statements.  *Id.* at 124.  Further, *Lilly* recognized that the statements at issue there, which involved the admission of a non-testifying accomplice's out-of-court confession *to police* inculpating the defendant, *id.* at

74

121-22, involved testimonial statements in any event. *Id.* at 125. Thus, the Court applied the test from *Ohio v. Roberts* in determining the reliability of this testimony, ultimately concluding that such evidence did not fall within a firmly-rooted hearsay exception and was too unreliable for admission in light of the Sixth Amendment confrontation guarantee. *Id.* at 124-25, 134, 137-40. *Bruton* itself involved admission of a non-testifying co-defendant's admission to a postal inspector implicating the defendant during a joint trial, and *Williamson v. United States*, 512 U.S. 594 (1994) and *Cruz v. New York*, 481 U.S. 186 (1987), also cited by Petitioner, relied upon similar testimonial evidence. *Williamson*, 512 U.S. at 596-98; *Cruz*, 481 U.S. at 188-89.

Thus, Petitioner's resort to the rule in *Bruton* and its progeny are of no consequence. "Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements." *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) (and cases cited therein). *Bruton* does not prohibit admission of co-conspirator statements made in furtherance of a conspiracy because they are generally non-testimonial. *See, e.g., United States v. Avila Vargas*, 570 F.3d 1004, 1008-09 (8th Cir. 2009). As discussed earlier, the clearly-established Supreme Court precedent governing this issue is *Crawford*. Pavatt's statements to Janna Larson simply do not fall within the ambit of the factual circumstances addressed by *Bruton*, i.e., admission at trial of out-of-court admissions to police by an accomplice inculpating a criminal defendant. The OCCA's decision is therefore wholly reasonable in light of *Crawford*. 28 U.S.C. § 2254(d). *See, e.g., House*, 527 F.3d at 1015-18 (10th Cir. 2008); *Bland*, 459 F.3d at 1013-14.

All things considered, Petitioner is not entitled to habeas relief based on any of her challenges to the co-conspirator statements admitted at her trial.    Habeas relief must be denied.

## VI.

### THE OCCA'S REJECTION OF PETITIONER'S TRIAL COUNSEL INEFFECTIVENESS CLAIMS WAS WHOLLY REASONABLE.

In Ground VI, Petitioner tenders a litany of trial counsel ineffectiveness claims raised on both direct appeal and in her state post-conviction proceedings.  Doc. 26 at 134-218.

### A.    Exhaustion.

Petitioner's challenge to counsel's advice while she was a fugitive in Mexico was raised on state post-conviction review.  *See* Doc. 26-3; *Andrew v. State*, (No. PCD-2005-176) at 2-5 (Okla. Crim. App. June 17, 2008).  The balance of her ineffectiveness claims in this ground for relief were raised on direct appeal.  *Andrew*, 164 P.3d at 198-99.  Thus, all of the ineffectiveness claims raised in her Ground VI claim are exhausted for purposes of federal habeas review.

### B.    Standard of Review.

To establish ineffective assistance of counsel, Petitioner must show that counsel's performance was constitutionally deficient *and* that counsel's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To prove deficient performance, Petitioner must overcome the strong presumption that counsel's conduct was constitutionally effective.  Specifically, she "must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. It is not enough that counsel's decisions were wrong in hindsight; they must fall below "an objective standard of reasonableness," evaluated from counsel's perspective at the time the decision was made. *Id.* at 688, 689. Further, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. A reviewing court must take every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Thus, a reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

To establish prejudice, Petitioner must show that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 694. If the alleged ineffective assistance occurred during the guilt-innocence stage, this Court determines whether there is a reasonable probability absent the errors the jury would have had reasonable doubt respecting guilt. *Id.* at 695. In assessing prejudice, this Court looks at the totality of the evidence, not just the evidence helpful to Petitioner. *See Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir. 1998). If the alleged ineffectiveness occurred during the sentencing phase, this Court considers whether there is a "reasonable probability

that, absent the errors, the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. *See also Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009).

For those claims adjudicated on the merits by the OCCA under *Strickland*, additional deference applies as the claim must be viewed through AEDPA's "forgiving lens." *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009). Where AEDPA applies to a state court's adjudication on the merits, a habeas petitioner must show that the state court's rejection of his or her claim was objectively unreasonable, a determination that requires more than merely showing the decision was incorrect. *Bell v. Cone*, 535 U.S. 685, 694 (2002); *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008). The petitioner must show that the state court's decision falls into the category of the most serious misapplication of Supreme Court precedent. *Id.* at 1019 (quoting *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006) ("only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254"). That is especially so considering that *Strickland* is a general standard. *Knowles v. Mirzayance*, __U.S.__, 129 S. Ct. 1411, 1420 (2009). Where a state court applies a general standard to a set of facts, a "doubly deferential" judicial review applies on habeas as the state court "has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

The State will address below, in connection with its discussion of each individual ineffectiveness claim, the applicability of AEDPA's deferential provisions.

### C.    Merits.

### 1.    Failure to Provide Adequate Notice of "Critical" Defense Testimony.

Revisiting the alleged error set forth in her Ground I claim, Petitioner argues that trial counsel was constitutionally ineffective for failing to provide adequate pre-trial notice of three witnesses, namely, police officers Ron Northcutt and Roger Frost and jailer Donna Tyra. This is an alternative argument to Petitioner's substantive Ground I complaint that the trial court erred in disallowing what she describes as "critical" defense testimony from these three witnesses based upon inadequate pre-trial witness summaries on the defense witness list. Petitioner urges that if this Court rejects her Ground I claim challenging the trial court's rulings, then trial counsel was ineffective for failing to provide more complete summaries of testimony for these three witnesses. Doc. 26 at 138-44.

Applying *Strickland*, the OCCA rejected this claim on the merits, relying upon its previous rejection of Petitioner's substantive challenges to omission of this testimony. *Andrew*, 164 P.3d at 198 ( "[i]n our discussion of proposition one, we held that, where error occurred in the prohibition of this testimony, the error was harmless beyond a reasonable doubt. We further find that defense counsel's failure to provide adequate witness summaries did not prejudice [Petitioner], thus, the second prong of *Strickland* is not satisfied. Counsel cannot be defined as ineffective"). The OCCA's decision constitutes an adjudication on substantive, not procedural, grounds. *See Matthews*, 577 F.3d at 1180 ("[a]n adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather

79

than procedural grounds"). The OCCA expressly applied *Strickland* to the facts of the claim. AEDPA deference therefore applies to the OCCA's decision, a fact confirmed by Petitioner's implicit concession of this point. Doc. 26 at 143 ("[t]he OCCA's decision that counsel's actions did not prejudice Petitioner is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court").

Petitioner fails to show that the OCCA's adjudication of this claim was contrary to, or an unreasonable application of, *Strickland* to the facts of her case or was otherwise based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). For the reasons discussed above in response to Ground I, omission of this evidence was not outcome determinative. The omitted testimony was largely cumulative of other evidence or otherwise did not have the exculpatory value Petitioner claims. *See Andrew*, 164 P.3d at 196-98. The State incorporates here by reference its previous discussions from Section I above to support this claim. All things considered, the OCCA's rejection of this particular ineffectiveness claim was wholly reasonable.

### 2.    Failure to Make Evidentiary Objections.

Petitioner contends that trial counsel was ineffective for failing to object to several of the evidentiary challenges set forth in her Ground II and Ground IV claims. These grounds for relief relate to alleged inadmissible hearsay and opinion testimony. Doc. 26 at 144-49. Applying *Strickland*, the OCCA rejected this ineffectiveness claim. The state court relied upon its previous discussions of Petitioner's substantive challenges to this evidence in finding no reasonable probability of a different outcome at trial based on counsel's failure

to object.  *Andrew*, 164 P.3d at 198.  Petitioner implicitly concedes that AEDPA deference applies here.  Doc. 26 at 147, 149.  As with sub-part 1 above, the OCCA's decision rests on substantive, not procedural, grounds.  The state court expressly cited *Strickland*.  There really is no dispute that the OCCA's decision constitutes an adjudication on the merits for purposes of § 2254(d) subject to AEDPA deference.

The OCCA's rejection of this claim was wholly reasonable.  As shown in response to Ground II above, no federal confrontation violation stems from the admission of the vast majority of instances of alleged hearsay claimed by Petitioner.  Respondent incorporates by reference that discussion here.  As discussed there, all but the victim's statements to Officer Mike Klika and Detective Barry Niles were nontestimonial.  Additionally, also discussed in response to Ground II, the victim's statements to Officer Klika and Det. Niles were offered for non-hearsay purposes and, in any event, were overshadowed by overwhelming other evidence establishing Petitioner's responsibility for both the cutting of the victim's brake lines and his murder.  To the extent Petitioner suggests trial counsel was ineffective for failing to object to these statements on state hearsay grounds, she also fails to persuade.  The OCCA either rejected Petitioner's hearsay challenges to these particular claims or otherwise found their admission harmless.  *Andrew*, 164 P.3d at 188-90.  Petitioner therefore fails to show prejudice in the *Strickland* sense.  Even had Petitioner objected to the alleged hearsay, there was no reasonable probability of a different outcome at trial.

The same is true with Petitioner's claim that trial counsel was ineffective for failing to object to alleged improper opinion testimony.  As discussed in response to Ground IV

above, the admission of this evidence did not violate clearly-established Federal law as dictated by Supreme Court precedent.  And Petitioner's individual challenges to the opinion testimony of the lay and law enforcement witnesses fails on the merits under state law. *Andrew*, 164 P.3d at 195-96.  Thus, no reasonable probability of a different outcome exists had trial counsel registered meritless objections to the challenged testimony.  The State incorporates here by reference its discussion in response to Ground IV above to support this claim.  The OCCA's rejection of this aspect of Petitioner's ineffectiveness claim was therefore also wholly reasonable.

### 3.    Failure to Submit Certain Blood Evidence for DNA Testing.

Petitioner complains that trial counsel was ineffective for failing to challenge the prosecution's blood pattern evidence by submitting for DNA testing blood stains found on her jeans.  The OCCA's summary of this claim is instructive:

> ¶ 102 The blood pattern evidence deals with the defense expert who testified that [Petitioner] had high velocity blood spatter on her jeans.  In closing the prosecution turned this evidence against [Petitioner] by arguing that she received this spatter by firing the second shot and getting blow back blood spatter from Rob.  However, this blood spatter had never been tested to determine its source.  Now, during the pendency of this Appeal, [Petitioner] provided DNA analysis which she argues shows that the blood stains were from her alone...

*Andrew*, 164 P.3d at 198-99.

Petitioner's entire discussion of this issue is premised on the notion that post-verdict DNA testing shows that all of the blood found on the jeans was her own.  Doc. 26 at 158-74. Setting aside for a moment Petitioner's discussion of why she thinks AEDPA does not apply

here, Doc. 26 at 173-74, it is clear that habeas relief is unwarranted on this ineffectiveness

claim regardless of the standard of review applied.  This is best illustrated by the balance of

the OCCA's discussion of this issue:

> The State's response points out that the blood is a mixture: the
> major component from [Petitioner] and the minor component
> being from an unknown male (arguably the victim because the
> tester cannot exclude the victim as the source of the blood).
> [Petitioner] claims that utilizing a defense expert without first
> determining the source of these stains led to the theory that she
> fired the second shot, making her more culpable and allowing
> the jury to more easily give her the death penalty.   The
> prosecutor could have made this argument by stating that the
> unknown (minor component) blood spatter came from the
> victim, forming the basis for the same argument.

*Id.*

Notably, Petitioner's extended merits discussion omits any mention that Kyla

Marshall's DNA testing identified blood stain Item #21-5c as a mixture, with the major

component matching Petitioner's DNA profile and the contributor to the minor component

being "an unknown male."  Doc. 26-4, Exhibit A pp.2.[4]  The DNA testing conducted on

direct appeal by Kyla Marshall therefore does not exclude Rob Andrew as a contributor to

the blood stains found on the lower portion of the jeans worn by Petitioner the night of the

killing.  Indeed, Ms. Marshall cannot exclude any male in the population, including the

victim, as having contributed the minor component of this particular blood stain.  Doc. 26-4,

Marshall Aff. at ¶ 5.  Petitioner does not contend that Ross Gardener should have been

---

[4]  Kyla Marshall's affidavit and report were presented to the OCCA on direct appeal as part
of Petitioner's February 21, 2006, Application for Evidentiary Hearing.

omitted as a defense witness; she acknowledges that "[t]he overall purpose of Gardner's testimony had been to show that the evidence at the crime scene was consistent with the version of events that Petitioner had provided to the police." Doc. 26 at 160.

Hence, trial counsel could not have prevented the prosecutor from arguing that Petitioner fired the second gunshot blast into the victim because the new DNA results leave that possibility open. The State would further submit that whether Petitioner actually shot the victim is largely irrelevant to the guilt and penalty phase determinations. Petitioner would still have been found guilty for the murder as a non-shooter under Oklahoma's aiding and abetting principles and the overwhelming evidence of guilt presented as discussed in Section I of the State's response brief in this case. *Cf. Slaughter v. Mullin*, 68 Fed. Appx. 141, 153 (10th Cir. 2003); (O.R. 2808). Further, whether Petitioner actually shot the victim does not diminish the strong evidence presented to show this murder was for remuneration and that the victim endured conscious physical suffering prior to his death. Thus, even applying de novo review to this claim, there is no reasonable probability that the outcome of Petitioner's trial would have been different had the post-verdict DNA results been presented to Petitioner's jury. *Strickland*, 466 U.S. at 687 & 694.

Regarding the appropriate standard of review, it is clear that the OCCA applied Rule 3.11(B) in resolving this particular ineffectiveness claim. *Andrew*, 164 P.3d at 198 n.11. Indeed, the OCCA's treatment of this particular claim, in which it expressly refers to the "clear and convincing" evidence standard, stands in sharp contrast to its discussion earlier in the opinion of the ineffective assistance claims that could be resolved solely on the record.

The OCCA expressly discussed and applied *Strickland* to those particular claims. *Id.* at 198. The State maintains, as it did in *Wilson v. Workman*, 577 F.3d 1284 (10th Cir 2009) (en banc), that Rule 3.11 is a less demanding standard than *Strickland*. *See id.* at 1297-99 (majority opinion), 1303-08 (Tymkovich, J., dissenting). Recall that the majority's decision in *Wilson* was based on the absence of any state decision expressly clarifying that Rule 3.11 was a less difficult standard for defendants to satisfy than *Strickland*. *Id.* at 1298-99. Respondent anticipates a decision from the OCCA well before this habeas action is concluded clarifying that very issue in the State's favor and ultimately resolving the issue. *Id.* at 1313-14 (Tymkovich, J., dissenting). Respondent will file leave to supplement with such authority when it is handed down by the OCCA. *Cf. Ring v. Arizona*, 536 U.S. 584, 603 (2002) (overruling in part *Walton v. Arizona*, 497 U.S. 639 (1990) based on the Supreme Court's erroneous interpretation of Arizona law as explained by a decision subsequent to *Walton* from the Arizona Supreme Court; "the Arizona court's construction of the State's own law is authoritative"); *See also Wilson,* 577 F.3d at 1323 (Gorsuch, J., dissenting) ("the OCCA can simply tell us tomorrow what Rule 3.11 means (or revise it, or repeal it), and we will then be obliged to follow its understanding, regardless of our court's interpretation today...Given all this, the shelf life of the majority's construction of state law could be short indeed"). Where, as here, the OCCA expressly discusses and considers the non-record evidence supporting an ineffectiveness claim as part of a Rule 3.11 analysis, there is really no question that the state court's decision constitutes an adjudication on the merits to which AEDPA deference should apply.

Respondent recognizes, however, that AEDPA's applicability is complicated by the specific language used by OCCA in its opinion denying this particular ineffectiveness claim. In finding no prejudice, the OCCA wrote in the concluding sentence for this issue that "[t]his evidence does not show by clear and convincing evidence that the outcome would have been different; consequently, no evidentiary hearing is necessary." *Andrew*, 164 P.3d at 199. Petitioner urges that the OCCA failed to correctly apply in her case the Rule 3.11 state-law standard for evidentiary hearing. Doc. 26 at 153-54. The more reasonable explanation for this specific language, however, is that the OCCA simply utilized a form of short-hand in applying the Rule 3.11 standard. Indeed, in the concluding paragraph of the section of the opinion dealing with the non-record ineffectiveness claims, the OCCA expressly recited the Rule 3.11 standard while also invoking its previous short-hand reference to the "clear and convincing" evidence standard:

> ¶ 111 [Petitioner's] application for evidentiary hearing shall be denied. She has not presented clear and convincing proof to this Court that counsel was ineffective for failing to present this evidence, thus entitling her to an evidentiary hearing on this extra-record evidence and to have the record supplemented with the evidence. See Rule 3.11 ("the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective.")

*Andrew*, 164 P.3d at 199.

The Supreme Court has commanded that state-court decisions are to be given the benefit of the doubt. *Holland v. Jackson*, 542 U.S. 649, 655 (2004). The OCCA's short-hand reference to "clear and convincing" evidence of prejudice is permissible where, as here,

the full Rule 3.11 standard is expressly recited elsewhere in the opinion. *Cf. id.* at 654 (citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)) (when state court conducts *Strickland* prejudice analysis, "use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited"). The OCCA's shorthand reference to the Rule 3.11 standard, without use of the term "strong possibility" may perhaps be imprecise, but in light of its express citation and application of the full Rule 3.11 standard, the OCCA's decision is fairly described as application of the full Rule 3.11 standard to Petitioner's non-record ineffectiveness claims.

Petitioner's argument makes no effort to reconcile the OCCA's express recitation of the full Rule 3.11 standard, let alone acknowledge the context in which the OCCA's analysis arises, i.e., in the course of denying an application for evidentiary hearing based on extra-record material supporting an ineffectiveness claim. The OCCA's unquestionably accurate citation to, and discussion of, the *Strickland* standard at the beginning of its discussion of Petitioner's ineffectiveness claims standing alone forecloses any notion that the Court would apply a "clear and convincing" burden of proof to the legal question of whether Petitioner was prejudiced by alleged deficient performance.

All things considered, AEDPA deference applies to the OCCA's rejection of this particular ineffectiveness claim. The state court's adjudication was neither contrary to, nor an unreasonable application of, clearly-established Federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). And alternatively, as shown above, Petitioner is not entitled to relief even utilizing a de novo review.

To the extent Petitioner requests a federal evidentiary hearing on this claim, that requested relief must also be denied. First, Petitioner fails to show what additional facts she would adduce in support of this claim at a federal evidentiary hearing, thus counseling against granting such a request. *Boyd v. Ward*, 179 F.3d 904, 925 (10th Cir. 1999). Second, she fails to satisfy the pre-AEDPA standard for an evidentiary hearing which applies since she requested a hearing on this claim in state court. *Id.* She fails to show that the allegations supporting the claim, if true and not contravened by the existing factual record, would entitle her to relief under *Strickland*. *Id.* Thus, her request for a federal evidentiary hearing must be denied. *See also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). To the extent she complains that the state court's application of the state standard for evidentiary hearings warrants some form of relief on habeas, her claim also lacks merit. *Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998) (claim that state court misapplied a state post-conviction statute procedurally defaulting a claim does not state a basis for federal habeas relief; "[a]ssuming the contention is correct and the Oklahoma court mistakenly construed the statute, the error is one of state law not cognizable in habeas corpus because 'federal habeas corpus relief does not lie for errors of state law'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Relief must be denied.

### 4.    Failure to Call Defense Witnesses.

Petitioner complains that trial counsel was ineffective for failing to call a variety of witnesses on behalf of the defense at trial. This includes testimony from Petitioner's neighbors (B.J. Garrison, Rose Jones and Lisa Gisler) and two of her relatives (brother-in-

law James Bowlin and sister Kim Bowlin).  Doc. 26 at 174-82.  Respondent incorporates by reference the discussion in sub-part 3 above regarding the appropriate standard of review for this particular claim.   The OCCA rejected this claim on the merits by applying the Rule 3.11 standard for obtaining an evidentiary hearing on non-record ineffectiveness claims. *Andrew*, 164 P.3d at 199.  AEDPA deference should apply for the reasons discussed earlier.

Even considering these claims de novo, Petitioner is still not entitled to relief.  Her complaint that trial counsel was ineffective for failing to present testimony from neighbors like B.J. Garrison to establish the rapid nature of the shots fired during the murder lacks merit.   As discussed above in Section I, sub-part D, even the defense crime scene reconstruction expert acknowledged that Petitioner's gunshot wound was evidence the murder was staged.  One would therefore expect the gunshot wounds to be fired in somewhat rapid succession, especially considering both Petitioner's knowledge of the police presence in and around her home, also discussed in Section I, and the fact that the murder occurred at a time of day when most residents of her close-knit neighborhood would be home.  These facts do not tend to exonerate Petitioner.  Omission of this testimony was therefore not outcome determinative.  *Strickland*, 466 U.S. at 687 & 694.

Trial counsel's failure to present James and Kim Bowlin as defense witnesses at trial also does not constitute ineffective assistance of counsel.  Petitioner urges that James Bowlin could have corroborated James Pavatt's "confession" letter.  But even if Pavatt made the statement reported by Bowlin, it does not exonerate Petitioner.  Such a statement does not eliminate the overwhelming evidence inculpating Petitioner on the conspiracy and murder

counts.  Moreover, a verbal confession by the writer of State's Exhibit 222 does nothing to corroborate the matters asserted in the letter.  Such a statement would reflect little more than Petitioner's coercion of Pavatt into taking the fall for the murder, the very same type of control that resulted in the "confession" letter being written in the first place.  It is also significant that Bowlin is Petitioner's brother-in-law, someone the State would paint as hopelessly biased.  This is especially so considering that Mr. Bowlin and Petitioner's sister were present at the border to help Petitioner and Pavatt make their way back into the United States.  No reasonable probability of a different outcome at trial exists had this evidence been presented.  *Id.*

Petitioner's complaint that Kim Bowlin should have been called as a witness to refute Herman Roggow's testimony lacks merit.  Trial counsel reasonably declined to present her testimony.  The record does not show Roggow to be a particularly effective prosecution witness.  Further, Kim Bowlin is Petitioner's sister and, again, would be considered hopelessly biased.  Failure to call the Bowlins as defense witnesses was not constitutionally ineffective assistance of trial counsel.  *Id.*

The OCCA's rejection of these particular ineffectiveness claims was therefore wholly reasonable.  Even applying de novo review, relief is unwarranted.  Trial counsel was not ineffective.  In this same sense, Petitioner also fails to satisfy the pre-AEDPA standard for a federal evidentiary hearing discussed more thoroughly in the previous sub-part.  Habeas relief is therefore unwarranted.

### 5.    Failure to Present Defense Handwriting Expert.

Petitioner complains that trial counsel was ineffective for failing to present testimony from her retained handwriting experts that the signatures found on State's Exhibit 24, the change of ownership form for the $800,000 life insurance policy on Rob Andrew's life, were cut and pasted from Defense Exhibits 184A and 184B, Prudential annuity applications allegedly executed by the victim and Petitioner in June 2001. This, Petitioner reasons, would undermine the State's theory that she forged the victim's signature on State's Exhibit 24. Doc. 26 at 182-95.

According to Ernie Smith's affidavit, which was attached to Petitioner's Rule 3.11 application on direct appeal, trial counsel was aware during Petitioner's trial of Smith's "cut and paste" theory for the signatures on State's Exhibit 24 and Defense Exhibits 184A & 184B. Smith Aff. at ¶ 5.[5] Trial counsel clearly made a strategic decision not to present Smith's theory. *Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Petitioner's counsel argued during guilt-stage closing statements that the identical nature of the signatures on Defense Exhibits 184A & 184B represented evidence that the victim's signature on State's Exhibit 24 was genuine. Trial counsel argued that David Parrett, the State's document examiner, was not presented these documents for examination because they contradicted the prosecution theory that State's Exhibit 24 was a forgery (Tr. 3973-78). In

---

[5] This document was attached as Exhibit 5 to Petitioner's February 21, 2006, Motion for Evidentiary Hearing filed with the OCCA on direct appeal.

turn, the prosecutor argued in his closing statement that Defense Exhibits 184A & 184B were not analyzed because they were not authenticated and that the identical nature of the signatures on State's Exhibit 24 and Defense Exhibit 184B suggested fraud because the signatures were too identical (Tr. 4052-57).

Trial counsel's strategy is understandable considering Petitioner's repeated representations in Fall 2001 that State's Exhibit 24 was a genuine document. Indeed, Petitioner represented this document as authentic to a state district judge handling the Andrew divorce case during the November 1, 2001, temporary order hearing. She also represented it as genuine to her former lover Rick Nunley around the time she filed for divorce on October 1, 2001, as well as to the Prudential Insurance Company as she furiously attempted to get ownership of the policy changed over to her name (Tr. 362-65, 369, 1184, 1186-90, 1195-96, 1258-59, 1263, 1350-52; State's Exhibits 28-29). The purpose of all this, of course, was so Petitioner could collect a payout on the $800,000 insurance policy on Rob's life.

Petitioner's current theory conflicts with her past repeated assertions that the signatures on State's Exhibit 24 were genuine and would undermine her claim to this money, a claim that apparently still existed at time of trial (Tr. 1212-21). Thus, the success of Petitioner's current "cut and paste" strategy is highly doubtful because it would undermine her credibility even further with the jury and would only confirm the prosecution's theory that the victim's signature *was* a forgery. The viability of this defense is even more dubious considering the total absence from Petitioner's extra-record materials of an affidavit by

Petitioner or her trial counsel describing exactly what she told them about the signatures on State's Exhibit 24. This information would be critical to the defense strategy. *Id.*, 466 U.S. at 691 ("[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information").

The above considerations aside, and assuming Petitioner could prove that the signatures had been cut and pasted onto State's Exhibit 24, it would not lessen her culpability under Oklahoma's aiding and abetting principles. *Cf. Slaughter*, 68 Fed. Appx. at 153. The jury could simply infer that Petitioner had Pavatt cut and paste the signatures onto the documents in light of the overwhelming evidence, discussed in response to Ground I above, of her obsession with owning and collecting on the life insurance policy. All things considered, even if Petitioner presented Smith's "cut and paste" theory to the jury, there is no reasonable probability of a different outcome during either stage of trial. *Strickland*, 466 U.S. at 687 & 694.

The OCCA rejected this claim on the merits, finding as follows:

> ¶ 104 Next, [Petitioner] claims that new evidence regarding the signatures on a change of ownership application (State's exhibit 24) for the $800,000.00 life insurance policy shows that she did not forge the signature of Rob Andrew, but that Pavatt could have copied the signatures from other documents and pasted them to this document; a "cut and paste" theory of forgery.

¶ 105 [Petitioner] had retained an expert in this area for trial, Ernie Smith. He told counsel of his "cut and paste" theory regarding Robert D. Andrew's signature. He was not called to testify. This was a sound strategic decision, based on the evidence.

¶ 106 [Petitioner] maintained that the change of ownership document was genuine in conversations with the judge handling the divorce, a close friend, and the Prudential Insurance Agency. [Petitioner] and Pavatt were working together to find some way that [Petitioner] would receive the proceeds of the life insurance policy. No clear and convincing evidence exists for the holding of an evidentiary hearing, because in any event the documents were forged by [Petitioner] and Pavatt working together.

*Andrew*, 164 P.3d at 199.

As shown above, the OCCA's rejection of this claim is fully supported by the record. Even considering this issue de novo, Petitioner is not entitled to relief. Respondent nonetheless urges that AEDPA deference applies to the OCCA's treatment of this particular ineffectiveness claim. First, Respondent incorporates by reference her previous arguments that Rule 3.11 is a less demanding standard than *Strickland*. Second, the OCCA here discussed the non-record evidence in determining the claim and invoked phrasing consistent with the *Strickland* standard, i.e., "[t]his was a sound strategic decision, based on the evidence." The state court's analysis here is similar to that in *Welch v. State*, 2 P.3d 356, 376-77 (Okla. Crim. App. 2000), which the en banc Tenth Circuit in *Wilson* cited as an example of an adjudication on the merits of a *Strickland* claim warranting AEDPA deference. *Wilson*, 577 F.3d at 1292. In *Welch*, as here, the OCCA expressly cited and applied the Rule 3.11 standard for evidentiary hearing. *Welch*, 2 P.3d at 376-77. But in denying the

underlying *Strickland* claim, the OCCA provided extended discussion of the non-record evidence then rejected the defendant's ineffectiveness claim based on the conclusion that "counsel's decision could be considered sound trial strategy" and "[t]his Court will not second-guess trial strategy through the distorting effects of hindsight", thus, an evidentiary hearing was unwarranted. *Id.* at 377. On habeas review, the Tenth Circuit panel extended AEDPA deference to the OCCA's rejection of this particular ineffectiveness claim. *Welch v. Sirmons*, 451 F.3d 675, 704, 708-09 (10th Cir. 2006). The en banc Tenth Circuit specifically approved of that action. *Wilson*, 577 F.3d at 1292.

Unlike *Wilson*, the OCCA did not "den[y] relief solely by reference to the record evidence." *Id.* at 1292. Rather, as in *Welch*, the OCCA "render[ed] an alternative holding that the petitioner[ ] would not be entitled to relief even if the proffered evidence were admitted and considered." *Id.* Thus, the OCCA's rejection of this particular ineffectiveness claim constitutes an adjudication on the merits to which AEDPA deference applies in light of *Wilson*. Thus, Petitioner cannot obtain relief unless she shows that the state court's adjudication was either contrary to, or an unreasonable application of, *Strickland*, to the facts of this case or was otherwise based on an unreasonable determination of the facts. This she cannot do. The state court's adjudication was wholly reasonable. Considering the deferential AEDPA provisions that govern this claim, *Schriro*, 550 U.S. at 473-74, Petitioner is also not entitled to a federal evidentiary hearing on this claim. Petitioner's allegations, if true and proven at the evidentiary hearing would not entitle her to habeas relief for the

reasons shown above. *Id*. at 474. Simply put, this claim is meritless. All things considered, Petitioner is not entitled to any form of relief based on this claim.

### 6. Failure to Advise Petitioner to Surrender to Mexican Authorities.

Petitioner next advances the ineffectiveness claim tendered in her state post-conviction relief application, i.e., that trial counsel was ineffective for failing to advise her, while she was a fugitive in Mexico, to surrender to Mexican authorities. The gist of her argument is this: Petitioner states in an affidavit that she returned to the United States on February 22, 2002, with her co-defendant, James Pavatt, in order to surrender to Oklahoma authorities, "face the [murder] charges and tell my side of the story." Petitioner states that while on the run in Mexico she had numerous conversations with Greg McCracken, the same attorney who later represented her at trial. Petitioner claims that McCracken never suggested she surrender to Mexican authorities and that she in fact would have had she known that the Republic of Mexico would not extradite her back to Oklahoma to face capital murder charges. Based on these purported events, Petitioner claims she received constitutionally ineffective assistance of counsel based on McCracken's failure to advise her to surrender to Mexican authorities. Petitioner further complains that her appellate counsel was constitutionally ineffective for failing to raise this issue on direct appeal. Doc. 26 at 195-218.

**Standard of Review.** This issue was raised in Petitioner's state post-conviction relief application and was denied on the merits by the OCCA. See Doc. 26-3 at 2-6 (OCCA opinion denying post-conviction relief). It is therefore exhausted for purposes of federal habeas review. Petitioner complains that AEPDA deference does not apply to the OCCA's

rejection of her trial and appellate counsel ineffectiveness claims.  She complains that the OCCA did not expressly discuss in its opinion denying relief the non-record evidence offered in support of the post-conviction relief application.  Petitioner alternatively argues that, regardless of the OCCA's analysis in its opinion denying state post-conviction relief, there can be no adjudication on the merits sufficient to trigger AEDPA deference because of application of a state procedural rule applicable to her claim.  In turn, Petitioner complains that AEDPA deference should not apply to the state court's rejection of her appellate counsel ineffectiveness claim because the court did not adjudicate the merits of her trial counsel ineffectiveness claim.  Doc. 26 at 214-15, 218.

The OCCA expressly cited, and applied, *Strickland*, in its analysis rejecting this particular trial counsel ineffectiveness claim.  Doc. 26-3 at 3, 4, 5.  The court's extended analysis focused on the U.S-Mexican extradition treaty, a document submitted as part of the materials supporting Petitioner's post-conviction application.   Specifically, the court discussed what the extradition treaty does, and does not, require.  This was the thrust of the materials submitted to the OCCA to support Petitioner's post-conviction relief application. This analysis was consistent with Rule 9.7(D), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2008), which makes clear that "[t]he record on capital post-conviction shall consist of the original application for post-conviction relief, the [trial record], and any affidavits and evidentiary material filed along with the original application" and that said non-record material "will be reviewed" to determine whether additional fact finding in relation to the claim is required.

Here, the OCCA expressly applied *Strickland* in adjudicating this claim in light of the entire post-conviction record as required by the court's own rules. That is all that is required for application of AEDPA deference. *Cf. Wilson*, 577 F.3d at 1297 (AEDPA deference would apply to OCCA's Rule 3.11 determination if Rule 3.11 standard was less difficult for defendants to meet than *Strickland*; "Rule 3.11, after all, requires the OCCA to consider the non-record evidence that the defendant has proffered"). Where the OCCA expressly applied *Strickland* in adjudicating the merits of an ineffectiveness claim, whether it be a straightforward rejection of the merits of the claim, or a mere rejection of the request for evidentiary hearing, there is no question that the state court's decision constitutes an adjudication on the merits for § 2254 purposes. *Id.* at 1292. In such cases, AEDPA deference unquestionably applies because the state court did not apply a standard more onerous than *Strickland* in adjudicating the claim and its own court rules require consideration of the non-record evidence.

Here, the OCCA's decision was based on substantive, rather than procedural, grounds thus resulting in an adjudication on the merits. *Matthews*, 577 F.3d at 1180. Nothing in AEDPA's text or clearly-established Supreme Court precedent supports the position that a state court must use any special words in reaching its decision. Appellate courts "have wide latitude in their decisions of whether or how to write opinions." *Taylor v. McKeithen*, 407 U.S. 191, 194 n.4 (1972). Thus, "[a] litigant's right to have all issues fully considered and ruled on by the appellate court does not equate to a right to a full written opinion on every issue raised." *United States v. Garza*, 165 F.3d 312, 314 (5th Cir. 1999). "The failure to

discuss particular contentions in a case [ ] does not mean that the tribunal did not consider them in reaching its decision.  All that it means is that the author of the opinion, for whatever reasons, did not deem it necessary or appropriate specifically to discuss those points.  The author of an opinion has broad discretion to determine what the opinion should contain and in what detail." *Lowder v. Dep't of Homeland Security*, 504 F.3d 1378, 1383 (Fed. Cir. 2007) (internal citations omitted).  Petitioner's cramped reading of the OCCA's analysis on post-conviction review of her ineffectiveness claim ignores these principles and the express language of the state court's opinion.  Hence, there is no question that AEDPA deference applies to the state court's treatment on post-conviction review of Petitioner's trial and appellate counsel ineffectiveness claims.

**Absence of Clearly Established Federal Law.**  The above discussion, however, is somewhat academic considering one of Respondent's main arguments in opposition to this claim, i.e., that no clearly-established Supreme Court precedent supports Petitioner's trial counsel ineffectiveness claim.  The Tenth Circuit recently clarified that the absence of clearly-established federal law as determined by the Supreme Court is analytically dispositive of the § 2254(d)(1) analysis.  "That is, without clearly established federal law, a habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law." *House*, 527 F.3d at 1017.  This determination is not governed, or otherwise limited, by the actions of the state court.  *See Bell v. Cone*, 543 U.S. 447, 455 (2005); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).  In other words, if there is no clearly established federal law governing a petitioner's claim, then nothing the state

court did could possibly be contrary to, or an unreasonable application of, nonexistent law. *See House*, 527 F.3d at 1017.

The Supreme Court has yet to consider a factual scenario analogous or similar to that presented here. Petitioner cites *Strickland* as the clearly established federal law governing this claim. *Strickland*, however, involved purported ineffective representation by counsel at trial. *Strickland*, 466 U.S. at 675-78, 698-700. Petitioner was certainly not entitled to the effective assistance of counsel under *Strickland* as a fugitive from justice in a foreign land. On November 29, 2001, the State filed an Information in Oklahoma County District Court charging Petitioner and James Pavatt with Rob Andrew's murder (O.R. 1). Shortly thereafter, a federal unlawful flight to avoid prosecution warrant was issued for both defendants and the FBI actively worked with Mexican authorities to secure their capture (Tr. 3023-26). Petitioner essentially urges that, under *Strickland*, she was entitled to the effective assistance of counsel concerning the advice she received from her attorney on an extradition matter while evading capture by U.S. and Mexican authorities. Neither *Strickland*, nor any other Sixth Amendment decision from the Supreme Court, supports this conclusion.

The Supreme Court has recognized that the Sixth Amendment itself "clearly applies only to domestic criminal proceedings". *United States v. Balsys*, 524 U.S. 666, 672 (1998). The Sixth Amendment states in pertinent part that:

> [i]n all criminal prosecutions, the accused shall enjoy the right
> to a speedy and public trial, by an impartial jury of the State and
> district wherein the crime shall have been committed...and to be
> informed of the nature and cause of the accusation; to be
> confronted with the witnesses against him; to have compulsory

> process for obtaining witnesses in his favor, and to have the
> Assistance of Counsel for his defense.

U.S. Const. amend. VI.  All of these rights pertain to the defense of criminal charges in the

adversarial setting of a trial, a fact recognized by *Strickland* and its progeny.  "The substance

of the Constitution's guarantee of the effective assistance of counsel is illuminated by

reference to its underlying purpose."  *United States v. Cronic*, 466 U.S. 648, 655 (1984).

Discussing this purpose, the Supreme Court held:

> "The very premise of our adversary system of criminal justice
> is that partisan advocacy on both sides of a case will best
> promote the ultimate objective that the guilty be convicted and
> the innocent go free."  *Herring v. New York*, 422 U.S. 853, 862
> (1975).  It is that "very premise" that underlies and gives
> meaning to the Sixth Amendment.  It "is meant to assure
> fairness in the adversary criminal process."  *United States v.
> Morrison*, 449 U.S. 361, 364 (1981).  Unless the accused
> receives the effective assistance of counsel, "a serious risk of
> injustice infects the trial itself."  *Cuyler v. Sullivan*, 446 U.S.
> 335, 343 (1980).

*Id.*, 466 U.S. at 655-56 (footnotes omitted).

   *Strickland* holds that counsel's function under the Sixth Amendment "is to make the

adversarial testing process work in the particular case", *Strickland*, 466 U.S. at 690, and that

"the purpose of the effective assistance guarantee of the Sixth Amendment...is simply to

ensure that criminal defendants receive a fair trial."  *Id.* at 689.  The *Strickland* court

therefore spoke of counsel's duty to conduct reasonable investigations in order to form

strategic decisions with respect to the defendant's trial, *id.* at 691, which is consistent with

the Court's holding that "[t]he purpose of the Sixth Amendment guarantee of counsel is to

ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. The "ultimate focus of inquiry" for an ineffective assistance claim is "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial testing process that our system counts on to produce just results." *Id.* at 696.

Thus, under clearly established federal law, Petitioner had no constitutional right to the effective assistance of counsel while on the run in Mexico because her actions in fleeing Oklahoma foreclosed the very adversarial testing process envisioned by the Sixth Amendment. There could be no adversarial testing process during Petitioner's voluntary absence from the United States because Petitioner refused to subject herself to the jurisdiction of any court, instead evading capture by U.S. and Mexican authorities. Petitioner's current claim is therefore more akin to an ineffective-assistance-of-counsel-during-extradition-proceedings claim. The Supreme Court has never extended *Strickland* to this context. This fact is analytically dispositive of Petitioner's habeas claim. "[C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." *House*, 527 F.3d at 1016.

Even if AEDPA's restrictions did not apply, Petitioner would still not be entitled to relief. The lower federal courts have held that the Sixth Amendment right to effective counsel does not apply to a typical international extradition proceeding, that is, where the

United States extradites an individual to another country for foreign prosecution.  *See, e.g., United States v. Yousef*, 327 F.3d 56, 142 n.66 (2d Cir. 2003); *DeSilva v. DiLeonardi*, 181 F.3d 865, 868 (7th Cir. 1999).  *See also Judd v. Vose*, 813 F.2d 494, 497 (1st Cir. 1987) (and cases cited therein) (holding in context of domestic extradition proceeding that extradition hearing has a "modest function" not involving question of guilt or innocence and therefore is not a "criminal proceeding" within meaning of Sixth Amendment).  By extension, there is no compelling reason why the Sixth Amendment right to effective counsel extends to an American fugitive in a foreign country seeking legal advice on an extradition matter.  Again, *Strickland* does not so hold.

"Extradition is related to criminal proceedings because it determines where a person will be tried.  Yet there is no rule that everything related to a criminal case is itself a 'criminal prosecution' for purposes of the Sixth Amendment."  *DeSilva*, 181 F.3d at 868.  Nothing involved in the advice Petitioner did or did not receive from her attorney concerning extradition could affect the reliability of the adversarial testing process that occurred at her 2004 trial.  As explained by the Seventh Circuit, "[e]xtradition is handled under the civil rules.  No jury will sit, no elements of the offense will be adjudicated in a speedy and public trial, the accused will not be confronted by the witnesses against them, jeopardy does not attach...and so on."  *DeSilva*, 181 F.3d at 868 (citing *Collins v. Loisel*, 262 U.S. 426 (1923)).  Nor can Petitioner assert Sixth Amendment protections based on charges, or other proceedings, arising in a foreign nation.  *Id.*  Again, the Sixth Amendment "clearly applies only to domestic criminal proceedings".  *Balsys*, 524 U.S. at 672.

The decision whether to surrender to Mexican authorities–or for that matter whether to waive extradition itself–and the advice informing that decision has no bearing on the reliability of the guilt-innocence or penalty determination rendered at Petitioner's 2004 trial. McCracken's advice to Petitioner on this subject, or lack thereof, did not impact what evidence was ultimately admissible at her capital murder trial. Nor did it lead to an incriminating statement that could be used against her. In fact, it did not influence a single aspect of the trial process itself. The issue of extradition, had it been invoked by Petitioner while in Mexico, would be wholly collateral to the actual trial of her guilt-innocence and punishment for Rob Andrew's murder. Hence, her counsel's advice, or lack thereof, on the issue of extradition does not implicate the core values underlying the Sixth Amendment right to effective counsel. Petitioner's interpretation of the Sixth Amendment forecloses the very adversarial process envisioned by that amendment. Petitioner invokes the Sixth Amendment to destroy the core protection it guarantees.

Petitioner may attempt to invoke in her reply brief *Moran v. Burbine*, 475 U.S. 412 (1986), for the proposition that her Sixth Amendment right to counsel attached when the State filed charges on November 29, 2001–well before she was ultimately captured by U.S. border agents. Petitioner ignores, however, that *Moran* and its progeny are premised on the "core purpose" of the Sixth Amendment counsel guarantee discussed in connection with *Strickland*, namely, "to protect the accused during trial-type confrontations with the prosecutor". *United States v. Gouveia*, 467 U.S. 180, 190 (1984). *See also id.* at 188-89 (quoting *United States v. Ash*, 413 U.S. 300, 309 (1973)) ("[w]e have recognized that the

'core purpose' of the counsel guarantee is to assure aid at trial, 'when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor'"). While the Supreme Court has "extended an accused's right to counsel to certain 'critical' pretrial proceedings, [it has] done so recognizing that at those proceedings, 'the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both.' in a situation where the results of the confrontation 'might well settle the accused's fate and reduce the trial itself to a mere formality.'" *Id.* at 189 (quoting *Ash*, 413 U.S. at 310) (internal citations omitted in quote).

The scenario presented by Petitioner's intentional absence from the United States--which she admits was designed to avoid arrest and prosecution for Rob Andrew's murder, Doc. 26-15 at ¶ 2 (3/26/07 *Affidavit of Brenda Evers Andrew*)--foreclosed the possibility of any adversarial proceeding on the murder charges during her absence.  There could be no confrontation between Petitioner and law enforcement officials of *any* country because Petitioner refused to subject herself voluntarily to the authority of either U.S. or Mexican officials.  Hence, there was no "critical" pretrial proceeding at which her fate could be sealed and reduce her 2004 trial to a mere formality.  Law enforcement officials did not extract a confession from, or otherwise interrogate, Petitioner while she was in Mexico.  Nor did police conduct a lineup using her presence to solidify its case, or for that matter, anything else in her presence that would arguably implicate the Sixth Amendment right to counsel. *See United States v. Wade*, 388 U.S. 218, 235-36 (1967); *Massiah v. United States*, 377 U.S.

201, 205 (1964).  Again, Petitioner was a fugitive, on the run from both U.S. and Mexican authorities, and was unavailable for consultation, or any other interaction, with the police.

In summary, Petitioner had no Sixth Amendment right to effective assistance of counsel under clearly-established federal law, as articulated by the Supreme Court, while a fugitive in a foreign country seeking advice from counsel on an extradition matter.  Relief may be denied on this ground alone.

**OCCA's Specific Findings.**  Again, assuming *arguendo* Petitioner could still obtain analysis of her ineffectiveness claim in the absence of clearly-established federal law as determined by the Supreme Court, she would still not be entitled to relief.  This is because, as found by the OCCA, her argument rests on several faulty premises.  "Her first assumption is that Mexico would have invoked the provisions of the treaty had Oklahoma authorities refused to agree to not seek the death penalty."  Doc. 26-3 at 3-4.  Petitioner cites Article 8 of the 1978 Extradition Treaty between the United States of America and the United Mexican States.  "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."  *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). Petitioner ignores that Article 8 states merely that "extradition *may* be refused unless the requesting Party furnishes such assurances...that the death penalty shall not be imposed, or, if imposed, shall not be executed."  Extradition Treaty, U.S.-Mexico, May 4, 1978, 31 U.S.T. 5059 (emphasis added).[6]  In other words, the plain language of the treaty allows the Mexican government to withhold extradition without assurances that a prisoner will face the death

---

[6]  Available on Westlaw at 1980 WL 309106.

penalty but it does not prohibit such extradition.  *State v. Sanders*, 648 So.2d 1272, 1278 (La. 1994).

This is a critical point considering that extradition proceedings are grounded in principles of international comity, implicate the foreign policy interests of each nation and are therefore typically left to the sole discretion of the executive branch of government.  *See Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991).  In this sense, Petitioner's claim that the Mexican government would have prohibited her extradition absent assurances that she would not face the death penalty in Oklahoma amounts to utter speculation.  This speculation is most pronounced when one considers that "nations are authorized, notwithstanding the terms of an extradition treaty, to voluntarily render an individual to the other country on terms completely outside of those provided in the treaty." *Alvarez-Machain*, 504 U.S. at 667.  *See also United States v. Iribe*, 564 F.3d 1155, 1159 (9th Cir. 2009) (quoting *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986)) ("[a] criminal defendant is protected under an extradition treaty 'only to the extent that the surrendering country wishes.'  An extradition treaty 'does not purport to limit the discretion of the two sovereigns to surrender fugitives for reasons of comity, prudence, or even as a whim").  In other words, Petitioner's ineffective assistance claim is highly dependent upon what the government of Mexico would do at any given time in an unpredictable and unstable geo-political environment.

American capital murder suspects have been returned to the United States by Mexican authorities without resort to the formal diplomatic process and without assurances that they would not face the death penalty upon return.  In *State v. Sanders*, 648 So.2d 1272 (La.

1994), the Louisiana Supreme Court rejected a challenge by a death row inmate that the

Louisiana state courts were without jurisdiction to try him because of an alleged violation of

Article 8 of the 1978 U.S.-Mexican Extradition Treaty. After committing a double-homicide

in Terrebonne Parish, Louisiana:

> [Sanders] then fled, first to Baton Rouge, and then to El Paso,
> Texas, and Juarez, Mexico. Acting on a tip, Terrebonne Parish
> Sheriff's Department officers contacted the FBI, who contacted
> agents of the police of the State of Chihuahua, Mexico.
> Chihuahua state police agents arrested defendant in Juarez. The
> defendant orally confessed to the crime at the scene of his arrest
> and later signed a written confession while in custody of the
> Chihuahua police. The defendant was transferred to FBI
> custody at El Paso and returned to Houma for trial, where the
> jury found him guilty of two counts of first degree murder
> and...recommended a sentence of death, which the trial court
> imposed.

*Sanders*, 648 So.2d at 1277. In rejecting Sanders's claim, the Louisiana Supreme Court

noted that:

> [i]n this case, the transfer of custody of the defendant was
> accomplished by informal, consensual cooperation between a
> low-level FBI office, in El Paso, Texas, and local police officials
> in Juarez, Mexico, not through "the diplomatic channel" as
> specified in Article 10 of the treaty.

*Id.* at 1278. Relying upon the Supreme Court's observation in *Alvarez-Machain* that the

U.S.-Mexico Extradition Treaty does not purport to specify the only way in which either

country may gain custody of a prisoner for purposes of prosecution, the Louisiana Supreme

Court correctly found that "[n]othing in the treaty prohibits such a transfer of custody or

prohibits prosecution after transfer of custody by such means." *Id.*

In *State v. Hall,* 976 S.W.2d 121 (Tenn. 1998), the defendants were arrested in Juarez, Mexico, by Mexican authorities and were subsequently transferred to American authorities on the international bridge linking El Paso, Texas to Mexico. *Id.* at 130. No formal proceedings of any kind (extradition, deportation, etc.) were used to accommodate this transfer of custody. *Id.* at 160-61. The defendants were thereafter sentenced to death by a Tennessee state jury for two murders. *Id.* at 123, 132. The Tennessee court rejected challenges on appeal to the death sentences imposed based on the failure of Mexican and U.S. officials to afford them any formal extradition proceedings. *Id.* at 161.

In *People v. Salcido*, 186 P.3d 437 (Cal. 2008), the Mexican government allowed officials from Sonoma County, California, to return to the United States with a capital murder defendant after informal negotiations resulted in the defendant being expelled from Mexico. *Id.* at 461-62. No formal extradition proceedings were sought by Sonoma County authorities. *Id.* at 461. The defendant was thereafter convicted of capital murder and sentenced to death by a California state jury. *Id.* at 459. On appeal, the California Supreme Court rejected the defendant's claim, based on the U.S.-Mexican Extradition Treat, that his death sentence should be vacated. *Id.* at 462-64. The Court recognized that Mexico "willingly, if not enthusiastically" accommodated the defendant's return to the United States, thus, there was no possible violation of the treaty. *Id.* at 464.

In *State v. Longo*, 148 P.3d 892 (Or. 2006), a capital murder defendant was arrested in January 2002 in Mexico. The defendant was advised by a local FBI agent of the three options available to him: "extradition, deportation or voluntary return." *Id.* at 897. After the

defendant stated he did not want to spend any time in a Mexican jail, local Mexican police were informed and, the next morning, the defendant–accompanied by the FBI agent–returned to the United States where he was arrested and tried for capital murder.  *Id.*  An Oregon state jury thereafter sentenced him to death.  *Id.* at 894.  The Oregon Supreme Court rejected the defendant's challenge to his death sentence based on the U.S.-Mexican Extradition Treaty, finding that "[n]othing in the treaty makes formal extradition the sole means by which fugitives may be returned to the United States."  *Id.* at 898.

More recently, in April 2006, Michael Paul Astorga fled to Juarez, Mexico, after murdering a New Mexico deputy sheriff.  According to a press release from New Mexico Governor Bill Richardson's office:

> Astorga had apparently fled to Juarez, Mexico where early Monday he was arrested by the Chihuahua State Judicial Police. Monday morning Governor Richardson had numerous conversations with high ranking Mexican officials asking for their help in returning Astorga to the United States as quickly as possible.  Last evening federal and state officials in Juarez, Chihuahua, Mexico decided to deport Astorga and early this morning turned him over to U.S. officials at the border in El Paso.

Press Release, State of New Mexico, Office of Governor, *Governor Bill Richardson Urges DA to Pursue Death Penalty for Deputy Murder* (April 4, 2006) (attached to State's post-conviction brief as "Exhibit A").[7]  In that same press release, Governor Richardson urged the Bernalillo County District Attorney to seek the death penalty for Astorga.  A press release from the FBI Office in Albuquerque further described the negotiations to secure Astorga's

---

[7]  Available at http://www.governor.state.nm.us/press/2006/april/040406_02.pdf.

transfer of custody to U.S. officials.  Press Release, FBI Field Office-Albuquerque, *Capture of Top Ten Fugitive* (April 7, 2006) (attached to State's post-conviction brief as "Exhibit B").[8]  According to local media reports, Astorga awaits trial on capital murder charges in Albuquerque and the District Attorney is seeking the death penalty.  *See, e.g.,* Joline Gutierrez Krueger, *Death Penalty Battle to Begin*, Albuquerque Journal, Mar. 10, 2008 (attached to State's post-conviction brief as Respondent's Exhibit C); Scott Sandlin, *Case May Test Death Penalty*, Albuquerque Journal, Dec. 27, 2007, at A1 (attached to State's post-conviction response as "Exhibit D").[9]

The above cases are not intended to provide an exhaustive listing of every capital murder fugitive returned by Mexican authorities to face trial in the United States.  But these cases make clear that it is less than certain that had Petitioner surrendered to, or been captured by, Mexican authorities while a fugitive that the Oklahoma County District Attorney would have had to agree to not seek the death penalty against her by virtue of the 1978 Extradition Treaty.  As pointed out by OCCA, assuming Petitioner surrendered to Mexican authorities who then refused to extradite without assurances that the death penalty would be sought, "Oklahoma authorities could have simply remained patient and not sought extradition, planning instead on some other means of rendition...The result would be that she would both be released from Mexican custody and be faced with the possibility of life on the lamb in Mexico, or the Mexican authorities could simply deport her to the United States as

---

[8]  Available at http://albuquerque.fbi.gov/pressrel/2006/capture040706.htm.
[9]  Available at http://www.abqjournal.com/news/metro/292369metro03-10-08.htm and 2007 WLNR 25507330 on Westlaw.

an illegal alien.  With deportation, there is no triggering of the extradition treaty."  Doc. 26-3 at 4.  Hence, assuming *arguendo* Petitioner was entitled to the effective assistance of counsel in dealing with these extradition issues while a fugitive in Mexico, she can hardly prove a reasonable probability of a different outcome in light of the uncertainties attendant to the extradition process.

Petitioner also ignores the ethical prohibition to the advice she now claims her attorney should have provided.  "The lawyer is part of a judicial system charged with upholding the law."  Rule 1.6, Comment, *Oklahoma Rules of Professional Conduct*, Title 5, Ch. 1, App. 3-A (1993).  "*All* lawyers, by virtue of their licenses, enjoy the status of officers of the court.  That status brings with it the responsibility to refrain from conduct unbecoming such officers, to uphold the rule of law, and to enhance public confidence in that rule and the legal system set up to safeguard it."  *In re Trester*, 172 P.3d 31, 39 (Kan. 2007) (emphasis in original).  "Attorneys are officers of the court before having their first client and are deemed to have responsibilities as such which precede their duties to a client." *Ocampo v. State*, 778 P.2d 920, 923 (Okla. Crim. App. 1989).  For Petitioner's attorney to expressly counsel her to surrender to Mexican authorities, as opposed to U.S. authorities, while she was a fugitive on the run in Mexico on the stated premise that such action would result in the death penalty being taken off the table, amounts to, at the least, a violation of Rule 8.4(d), *Oklahoma Rules of Professional Conduct*, Title 5, Ch. 1, App. 3-A (1988) as conduct prejudicial to the administration of justice.

The death penalty is a lawful penalty option for first degree murder in the State of Oklahoma, prescribed by state statutes enacted by the Oklahoma Legislature. Petitioner's counsel had one obligation, namely, to counsel her to return to Oklahoma to face the murder charges filed against her. Petitioner's counsel did not ethically have the option to advise her to surrender to Mexican authorities and invoke diplomatic and political back-channels as a litigation strategy to thwart Oklahoma's ability to bring her to justice for the Andrew murder under Oklahoma law. Such action is no different than a defense attorney telling a client, present in Oklahoma, who has not yet been apprehended on a state murder warrant to immediately travel to Mexico and surrender to Mexican authorities so the death penalty (and possibly life without parole) will no longer be an option.

A defense attorney may not aid and abet his client in nullifying Oklahoma's capital sentencing laws in this manner or otherwise evading the jurisdiction of this state's courts. Again, such is, at the least, conduct prejudicial to the administration of justice. *Cf. State ex rel Oklahoma Bar Ass'n v. Bolton*, 904 P.2d 597, 599-600, 601-02 (Okla. 1995) (attorney's advice discouraging burglary victim from immediately contacting police concerning individual who claimed to know location and possessor of stolen property constituted conduct prejudicial to the administration of justice where it interfered with successful police investigation of burglary case). "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *Cronic*, 466 U.S. at 656 n.19.

Petitioner claims the Oklahoma County District Attorney engaged in "misconduct" by failing to tell Petitioner's attorney about the Mexican Extradition Treaty and its supposed

benefits for fugitive murder defendants while Petitioner was on the run in Mexico. Petitioner argues this alleged fact--for which she cites not a single source---warrants habeas relief on this claim. Doc. 26 at 206. At bottom, Petitioner's theory is supported not by affidavit or any other documentary support but rather mere speculation and conjecture. Petitioner presents nothing to establish the content of any discussions between the Oklahoma County District Attorney's Office and Greg McCracken during this time frame.

Assuming *arguendo* the truth of Petitioner's factual exposition, she would still not be entitled to relief. Petitioner cites no authority–and certainly not clearly established Supreme Court authority--suggesting that state prosecutors have a duty, at any stage of a case, to advise criminal defendants of the best ways to avoid imposition of a State's capital sentencing laws. The District Attorney in this case represented the State of Oklahoma and, after making the appropriate probable cause determination, had a duty to prosecute Petitioner. "A district attorney represents the State of Oklahoma to enforce its criminal laws. His first and foremost duty is to represent the State in criminal proceedings, and, he cannot represent a defendant where the State of Oklahoma is the opposing party." *Howerton v. State*, 640 P.2d 566, 567 (Okla. Crim. App. 1982). "[A] district attorney represents the public interest, not the interests of private individuals." *Haney v. State*, 850 P.2d 1087, 1092 (Okla. 1993).

The District Attorney had no legal or ethical duty to advise Petitioner, or her attorney, on the law or otherwise suggest ways in which Petitioner could thwart the State's prosecution. *See* Rule 3.8, *Oklahoma Rules of Professional Conduct*, Title 5, Ch. 1, App. 3-

114

A (1997) (describing special responsibilities of the prosecutor). Such would give rise to an obvious conflict of interest and would undermine the prosecutor's duty of loyalty to his client, the State of Oklahoma. Rule 1.7, *Oklahoma Rules of Professional Conduct*, Title 5, Ch. 1, App. 3-A (1988). *See also State ex rel. Oklahoma Bar Ass'n v. McGee*, 48 P.3d 787, 793 (Okla. 2002) (referring to "a lawyer's fundamental duty of loyalty to one's client"). This non-sense aspect of Petitioner's claim should be denied as such. Certainly clearly-established federal law as determined by the Supreme Court does not support any such theory for relief.

Petitioner's proposed remedy for this claim also requires brief comment. Petitioner claims that *both* her convictions and death sentence should be invalidated based on purported attorney error surrounding extradition advice. Her reasoning is as follows: "[b]ecause the jury [upon retrial] would not be death-qualified, there is a likelihood that she could be acquitted of malice aforethought murder. Therefore a new trial should not be limited to the penalty stage." Doc. 26 at 216. Petitioner provides no support for the proposition that death qualified juries are prone to convict or return sentences of death. The Supreme Court has rejected relief based on this very proposition. *Buchanan v. Kentucky*, 483 U.S. 402, 414-20 (1987); *Lockhart v. McCree*, 476 U.S. 162, 177-84 (1986). *See also Proctor v. Ayers*, 2007 WL 1449720, at **15-18 (E.D. Cal. May 15, 2007) (unpublished); *Banks v. State*, 728 P.2d 497, 502 (Okla. Crim. App. 1986).

Finally, one of the contentions underlying this particular ineffectiveness claim is that, at the time of her apprehension, Petitioner had decided to return to Oklahoma to defend

against the murder charges.  Doc. 26-15 at ¶ 7 (3/26/07 Affidavit of Brenda Andrew).  But the evidence simply does not support this assertion.  Had Petitioner truly been interested in facing the charges at that time, she would have presented herself for surrender to U.S. border agents at the first possible moment.  But that is not what happened.  Petitioner and Pavatt were captured when border agents recognized the pair as fugitives.  The pair did not voluntarily surrender to police (Tr. 3083-84); Doc. 26-15 at ¶ 9.  Existence of a Kansas title and registration for a 1997 Dodge SD, and a window sticker for a 2000 Dodge Caravan, recovered from the 1992 Baretta in which Petitioner and Pavatt were apprehended, suggests they intended to switch vehicles with the Bowlins (who were a few cars back with the children) to avoid detection once inside the United States.  *Andrew*, 164 P.3d at 193-94; (Tr. 3065-68).

These facts are inconsistent with Petitioner's claim that she was willing to surrender to authorities "and face charges and tell my side of the story".  Petitioner and Pavatt were out of money and were being strung along by Janna Larson, Pavatt's daughter, with small amounts of cash each time they asked her to wire money to Mexico from Petitioner's account for their use (Tr. 2975-76, 2983-84, 3021-24); *Andrew*, 164 P.3d at 186 & 193.  The evidence at trial suggests that Petitioner and Pavatt intended to switch cars once inside the United States and avoid detection so they could gain access to the cash Larson refused to send.  Considering Pavatt's research prior to fleeing to Mexico as to what countries extradited fugitives to the United States, as well as information obtained by Pavatt for Argentine banks (Pavatt believed Argentina would not extradite and "that would be a place he would be

interested and may want to go to") (Tr. 3121-22); *id.*, 164 P.3d at 186, it is clear that neither Petitioner nor Pavatt were the surrendering type, and that if they had not run out of money while in Mexico, they would never have returned to the United States.

All things considered, the totality of circumstances supports the proposition that Petitioner had no intentions of ever surrendering to authorities on either side of the border and that the pair were simply caught slipping back into the United States. Considering that Petitioner has wholly failed to provide a corroborating affidavit from the very attorney she had repeated contact with during the months leading up to her capture--and whom she now claims was ineffective--Petitioner's claims are especially suspect. Assuming *arguendo* clearly-established federal law, as determined by the Supreme Court, existed to support her claim that the Sixth Amendment right to effective counsel extended to American fugitives in foreign countries, there is no reasonable probability of a different outcome at trial because the record shows Petitioner had no intention of ever surrendering to authorities, regardless of her attorney's advice.

All things considered, habeas relief is unwarranted under any possible view of the appropriate standard of review or the evidence. Appellate counsel was not ineffective for failing to raise this meritless trial counsel ineffectiveness claim on direct appeal. *Smith v. Workman*, 550 F.3d 1258, 1268 (10th Cir. 2008) (appellate counsel need not raise meritless issues). The OCCA's rejection of Petitioner's trial and appellate counsel claims raised in this sub-part of Petitioner's Ground VI claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Petitioner's request for federal evidentiary hearing should be denied.  As shown above, her trial and appellate counsel ineffectiveness claims based on counsel's advice to her while she was a fugitive in Mexico do not warrant relief.  Petitioner's allegations, if true and proven at the evidentiary hearing, would not entitle her to habeas relief.  She therefore fails to satisfy the pre-AEDPA standard for evidentiary hearing.  *Schriro*, 550 U.S. at 473-74.  This requested relief should also be denied.

## VII.

### PETITIONER FAILS TO CITE CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT SUPPORTING HER VARIOUS EVIDENTIARY CHALLENGES.

In Ground VII, Petitioner alleges a litany of evidentiary errors by the trial court.  In summary, Petitioner contends that "the jury was inundated with so much irrelevant, highly prejudicial evidence that her convictions and death sentence must be reversed.  Doc. 26 at 218-32.

### A.    *Exhaustion.*

Petitioner raised these various evidentiary challenges on direct appeal and the OCCA rejected them on the merits.  *Andrew*, 164 P.3d at 193-94.  Her Ground VII claim is therefore exhausted for purposes of habeas review.

### B.    *Standard of Review.*

Petitioner implicitly concedes that AEDPA applies to the OCCA's treatment of this claim.  Doc. 26 at 232 ("[t]he decision was contrary to, or an unreasonable application of,

clearly established federal [sic] as determined by the Supreme Court"). The OCCA's extended discussion of Petitioner's evidentiary challenges rests on substantive, not procedural, grounds. The OCCA applied Oklahoma's relevancy and unfair prejudice provisions in resolving this claim--evidentiary rules the Tenth Circuit has held are consistent with the general constitutional principles governing a fundamental fairness evaluation under the due process clause. *See Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006). AEDPA deference therefore clearly applies. *See Matthews*, 577 F.3d at 1180 ("[a]n adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather than procedural grounds").

### C.    Merits.

The above discussion about standard of review is somewhat academic considering that no clearly-established Supreme Court precedent exists to support what amounts to garden-variety state law evidentiary challenges by Petitioner. While Petitioner argues she was denied a fundamentally fair trial by the admission of this evidence, that does not save her claim because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

It is clear that one of the assumptions behind Petitioner's claim is that the admission of irrelevant evidence automatically rises to a federal due process violation. However, the Supreme Court has left open that very issue. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991) ("[c]oncluding, as we do, that the prior injury evidence was relevant to an issue in the case,

we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial").  Thus, to the extent Petitioner relies upon this premise to support her claim, she fails to identify clearly-established Federal law, as articulated by the Supreme Court, to support it.  *Holley*, 568 F.3d at 1101 (internal citation omitted) ("[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that the admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ").

The only Supreme Court decisions Petitioner cites are *Lisbena v. California*, 314 U.S. 219 (1941) and *Payne v. Tennessee*, 501 U.S. 808 (1991), neither of which address alleged federal due process violations based on the admission of evidence during the guilt stage of a capital murder trial.  *Payne* overruled *Booth v. Maryland*, 482 U.S.  496 (1986) to allow the admissibility of victim impact testimony during the penalty phase of a capital murder trial, *Payne*, 501 U.S. at 811, 817-30, and *Lisbena* expressly rejected a number of state-law evidentiary challenges on the premise that "[w]e do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."  *Lisbena*, 314 U.S. at 228.  Indeed, *Lisbena* is best known for its pronouncements on the inadmissibility of coerced confessions in state criminal trials.  *Id.* at 236-41.  Neither of these cases therefore address the factual scenario at issue here, i.e., supervisory review of a state

trial judge's evidentiary rulings.  Petitioner's citation to state law and lower federal court decisions also does not supply clearly established federal law for purposes of AEDPA. *Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007).

Under these circumstances, Respondent submits that no clearly-established Supreme Court precedent exists by which to judge this particular issue.  When applying § 2254(d)(1), the threshold question is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time the conviction became final.  *House*, 527 F.3d at 1015 (reiterating that "[w]hether the law is clearly established is *the* threshold question under § 2254(d)(1)").  This threshold inquiry is "analytically dispositive" of the § 2254(d)(1) analysis.  *Id.* at 1017.  "That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law."  *Id.*  Further, this determination is not governed, or otherwise limited, by the actions of the state court.  *See Bell v. Cone*, 543 U.S. 447, 455 (2005); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

Recent decisions from the Supreme Court establish "that Supreme Court holdings–the exclusive touchstone for clearly established federal law–must be construed narrowly and consist only of something akin to on-point holdings."  *House*, 527 F.3d at 1015.  "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context."  *Id.* at 1016.

In the instant case, Petitioner cites authority from lower federal courts or Supreme Court decisions that do not address the issue at hand. She essentially asks this Court to engage in supervisory review over the state court's application of state evidentiary principles. That she cloaks these claims in terms of the federal due process clause does not change anything. The Supreme Court has made clear that such an analysis is not proper on habeas. *Estelle*, 502 U.S. at 70 (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)) ("[c]ases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial...But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure"). Without clearly-established Supreme Court precedent, the instant claim ends where it begins: it is nothing more than a garden-variety state law evidentiary challenge which this Court has no power to entertain. *Holley*, 568 F.3d at 1101. Thus, the OCCA's rejection of Petitioner's various challenges to the admission of evidence at her capital murder trial was not contrary to, or an unreasonable application of, clearly-established federal law as articulated by the Supreme Court to the facts of this case.

Assuming *arguendo* this Court could consider the substantive merits of Petitioner's claim, she would still not be entitled to relief. Evidence that Pavatt named Petitioner as beneficiary of two insurance policies on his life, "whether valid or not, was evidence of the extent of their relationship and provided support for the fact that, at least Pavatt, intended to make their relationship permanent at some point." *Andrew*, 164 P.3d at 193. State's 303 is an August 27, 2001, letter reflecting that Pavatt named Petitioner beneficiary. State's 304

is a September 24, 2001, confirmation of benefits letter provided to Pavatt by his employer which lists Petitioner as beneficiary of another insurance policy on Pavatt's life. Both of these documents list Petitioner's relationship to Pavatt as "Friend". State's 305 is an application for life insurance policy change, filled out by Pavatt on November 2, 2001, in which he applies to purchase two life insurance policies naming Petitioner as beneficiary. Pavatt lists his relationship to Petitioner on this document as "Fiancé" (Tr. 1395-1405; State's Exhibits 303-05).

This evidence was relevant to demonstrate the extent of the relationship between Pavatt and Petitioner. It also provided circumstantial evidence of Petitioner's control over men in general and Pavatt in particular (Tr. 1396-97, 1402-05). This was particularly important considering Petitioner's defense that: (1) Pavatt, not Petitioner, carried out Rob's murder; (2) Pavatt, not Petitioner, was the controlling half of their relationship; and (3) Pavatt's obsession over Petitioner led to the murder and the couple's subsequent flight to Mexico. *See*, *e.g.*, (Tr. 3931-39, 4000-14, 4026-27) (closing argument). The jury could infer, given the nature of Petitioner's relationship with Pavatt, the timing of Pavatt's purchase of the life insurance policies, and Petitioner's obsession with Rob's life insurance policy, that Petitioner not only was aware of Pavatt's new policies but that she convinced Pavatt to buy the policies with money she originally hid from Rob and maintained until she fled to Mexico (Tr. 269, 363-66, 433-34, 1039-40, 1184-86, 1188-89, 1266, 2960-61, 2976-77). The challenged evidence also corroborated testimony concerning Pavatt's statements in Fall 2001 that he and Petitioner were going to get married (Tr. 2959-60). The evidence was clearly

relevant and more probative than prejudicial.  It was therefore admissible and did not deny

Petitioner a fundamentally fair trial.

"The tape recordings of the conversations [between Tricity and the victim] show the

way [Petitioner] used Tricity to get Rob Andrew to come over to the house alone." *Andrew*,

164 P.3d at 193.  State's 285A, a recording of telephone conversations in the days leading

up to the murder between Petitioner and the victim, was sponsored on re-direct through

Detective Gary Damron who testified that he recovered it from Rob Andrew's apartment (Tr.

3054).  State's 285A was sponsored primarily to rebut Petitioner's suggestion on cross-

examination, and through other witnesses, that investigators ignored evidence that Petitioner

intended to reconcile with the victim shortly before the murder (Tr. 299, 3072-73, 3103-04,

3114-15).  State's 285A was relevant for other purposes, including illustrating the

relationship between the parties in the weeks before the murder, corroborating Ronnie

Stump's testimony regarding the incident with Tricity's puppy the night before the murder

and demonstrating Petitioner's manipulation of the children (Tr. 488-92, 3114-20).  The

prosecutor's comments during closing argument on State's 285A represent fair comment on

the evidence, not the prosecutorial misconduct suggested by Petitioner (Tr. 4059-63).

Considering defense counsel's statements during closing argument that State's 285A did not

reveal Petitioner to be "mean and ugly and spiteful and vengeful or anyone that Rob was

afraid of or scared of.  You heard conversations on there about the skating and about what

the child, the children needed.  They were nice conversations", and his comment that the 911

call made November 17th, also depicted on State's 285A, showed Rob was not afraid of

Petitioner (Tr. 4013-14), it is difficult to envision how this particular tape constitutes error, let alone reversible error.  This evidence was admissible as it was relevant and not unfairly prejudicial.

Evidence that Petitioner had two Agatha Christie books entitled "Murder is Easy" and "Sparkling Cyanide" in her possession while in Mexico was also properly admitted.  "The evidence of the books, considering all of the circumstances, was just one more piece of the puzzle, relevant to show [Petitioner's] role in the children's life to rebut the claim that she was a 'good mother.'"  *Id.*  The handwritten book reports by Parker and Tricity, and the novels upon which they were based, were found in the contents of the luggage admitted into evidence (Tr. 2348-49; State's Exhibits 213-16).  The prosecutor's reference to these particular items was offered in response to Petitioner's suggestion on cross-examination of Rick Nunley that Petitioner was a "[g]ood mother" who was not the type of person who could be involved in the victim's murder (Tr. 414).  This evidence was properly admitted in light of Petitioner raising the issue of her alleged good character (Tr. 2344-48).

Petitioner challenges admission of the Kansas title and registration for a 1997 Dodge SD, and a window sticker for a 2000 Dodge Caravan, recovered from the 1992 Baretta (Tr. 3065-68). The car ownership papers were "relevant to support the State's theory that Pavatt and [Petitioner] intended to switch cars with the Bowlins at some point in order to avoid detection while in the United States (after returning from Mexico).  The admissibility was not dependent on the fact that the papers may have never made it into the Beretta while in the possession of [Petitioner].  The Bowlins took these documents with them so that a vehicle

exchange could be made." *Id.* at 193-94. This evidence was clearly relevant and properly admitted.

Petitioner's challenge to the birthday card to Pavatt from Petitioner, photos of Petitioner, Pavatt and the Andrew children on a trip to Texas, evidence of Pavatt's infatuation with Petitioner and the contents of Petitioner's luggage, including her thong underwear, were also properly admitted. "All of this evidence was introduced to show the extent of the nature and relationship between Pavatt and [Petitioner], and their intentions in fleeing to Mexico–not as a grieving widow but as a free fugitive living large on a Mexico beach." *Id.* at 194.

Curtis Jones's challenged testimony about Pavatt's "[t]witterpatted" demeanor once he started seeing Petitioner was relevant to demonstrate the depth to which he could be manipulated by Petitioner (Tr. 3131-32). This is especially so considering the time frame Jones established–September and October 2001--as when he started noticing this particular behavior in Pavatt (Tr. 3132-33). Jones also established that Pavatt turned over photographs of himself, Petitioner and the Andrew children a few days before he fled the United States. Pavatt told Jones not to give the photographs to the police "because they would incriminate him" (Tr. 3134). This testimony, like the photographs themselves, were relevant to illustrate not only the depth of Pavatt's relationship with Petitioner, but also with the Andrew children (Tr. 3134-37; State's Exhibits 185-86, 188-91, 193-94). Jones's testimony also established a guilty knowledge on Pavatt's part of the murder in relation to the photographs.

126

Admission of State's Exhibit 157, the birthday card to Pavatt, was relevant for similar reasons. The card was signed by "Tricity, Parker and Mommy". Not "Brenda", but "mommy" (Tr. 2308-09). This card again establishes not only the depth of the relationship between Petitioner and Pavatt, but also Petitioner and the Andrew children. This was probative of Pavatt's and Petitioner's motive and state of mind in committing the murder.

The prosecutor's reference during closing argument to Petitioner's thong underwear, found in her luggage, represents reasonable comment on properly admitted evidence. As discussed above, the contents of the luggage was properly admitted. Further, testimony was presented that Petitioner said she loved the beaches of Mexico (Tr. 324). The prosecutor's challenged comments were therefore reasonable inference based on the evidence, specifically, the sexually provocative nature of Petitioner's underwear, her sexual relationship with Pavatt, her hatred of Rob and evidence that Pavatt and Petitioner fled to Mexico after murdering the victim in cold blood (Tr. 4101-03).

"As this trial was primarily about the motive and intent of [Petitioner] to kill her husband with the aid of Pavatt, this evidence was highly relevant and its probative value was not outweighed by any dangers [of unfair prejudice]." *Id.* The above evidence was properly admitted. Petitioner fails to show a constitutional violation based on it.

Petitioner's challenge to admissibility of State's Exhibit 288, the letter written by the victim to Ronnie Stump, lacks merit. As noted by the OCCA, "[t]his evidence...was relevant to show the victim's state-of-mind and to provide an explanation of the motive." *Id.* This evidence, *inter alia*, corroborated Stump's testimony that the victim had ruled out

127

reconciliation with Petitioner the night before the murder because he "[j]ust didn't want to take the chance of going back through all this pain again. He had had enough" (Tr. 499). It showed the increasing fatigue inflicted on the victim in the weeks leading up to the murder that caused him to rule out reconciliation. As discussed earlier, a critical component of the defense theory was that Pavatt murdered the victim because he was emotionally distraught over the reconciliation between Petitioner and the victim. *See*, *e.g.*, (Tr. 3931-39, 4010-14, 4026-27). State's 288 is just another piece of evidence refuting that claim.

Petitioner challenges admission of State's 281, 282, 283 and 284, four audio recordings containing phone calls made between herself and the victim. She contends that this evidence was irrelevant because it "had no relevance to the issues at trial, but cast Robert Andrew in a sympathetic light." Doc. 26 at 227. Petitioner ignores, however, that these tapes were relevant to corroborate testimony introduced about her stated belief that the victim was not supporting her against the church leader who asked her and Pavatt to stop teaching Sunday school because of their affair. This was one of the many events that led to Petitioner and Rob's separation as well as Petitioner's and Pavatt's open hostility towards the victim (Tr. 125-32, 441-46, 448). These tapes also illustrate in Petitioner's own words the hatred she exhibited towards the victim in the months leading up to the murder and demonstrate her obsession over custody of her children. In this sense, they were absolutely relevant and admissible. Any danger of unfair prejudice was outweighed by the highly probative value of the evidence. *Id.*

Petitioner's suggestion that the tapes were irrelevant because the State "never argued that Petitioner killed her husband in an emotional rage", and that someone as calculating as Petitioner would never allow herself to be recorded in a 911 call, Doc. 26 at 228-29, ignores that the State has always argued that part of Petitioner's motive to kill was her uncontrolled hatred of her husband and her obsession with preventing him from having a relationship with the Andrew children.  It is not surprising that Petitioner's planning and commission of her husband's murder was driven by multiple motives–i.e., hatred of Rob, possessiveness of the children, sexual affair with Pavatt, collection on the $800,000 life insurance policy, etc. "Although she did not kill in a fit of rage, she did use her hatred as a possible 'I'll be better off with him dead' self justification for the murder."  *Id.*  It is not surprising that Petitioner, in an uncontrolled rage, showed up at the victim's apartment to steal away the children.  Such was simply part of the complex, petty and maniacal personality that is Petitioner.  The challenged evidence was relevant to show "the real Brenda Andrew" to the jury so they could decide whether her motives and actions were so mixed as to be implausible.

Petitioner complains about the admission of State's Exhibit 205, computer files recovered from the victim's personal computer.  Petitioner argues this exhibit was "utterly irrelevant to the fact issues in this case" and were introduced "solely to stir up sympathy for the victim and inflame the jury against Petitioner."  Doc. 26 at 229.  Petitioner ignores, however, that defense counsel actually discussed portions of the victim's computer journal during opening statement.  Defense counsel argued that Rob wrote in his journal that Petitioner was "a great mom" who "takes care of the children" and is "the spiritual leader of

the home.  She's the one that he looks to" (Tr. 62).  Defense counsel made this reference during opening argument to bolster Petitioner's alleged good character.  Further, defense counsel questioned prosecution witnesses about portions of Rob's journal prior to State's Exhibit 205 being admitted into evidence (Tr. 152, 176, 822).  At one point, defense counsel began reading portions of the journal to the jury but the trial court admonished him to stop because it had not yet been admitted into evidence (Tr. 840-43).  He also questioned the State's computer expert about the entries after State's 205 was admitted (Tr. 3176-77, 3180-82).

During guilt-stage closing arguments, defense counsel read large portions of Rob's journal to the jury in support of the defense theory that Petitioner and Rob were going to reconcile, that Rob was not afraid of Petitioner and did not suspect her in the brake line incident, and that Petitioner's perceptions that Rob was having an affair had some merit. Defense counsel also cited Rob's journal to support the defense theory that Pavatt committed the murder, not Petitioner, and that the police investigation was fatally flawed because of a "rush to judgment" that Petitioner was guilty (Tr. 3948-51, 3955-67, 3969-71, 3994-95, 4013).

In this sense, Petitioner can hardly allege reversible error, especially considering defense counsel's admission that Rob's journal was largely cumulative of previously admitted evidence (Tr. 3157).  The document itself makes clear that Rob's journal, along with the correspondence between Rob and his attorney Craig Box, was based simply on Rob's view and opinion of events.  The jury was fully apprised that Rob's journal was

written in the middle of a nasty divorce and reflected only one side of the events described (Tr. 3175, 3181-82). This fact alone mitigates any potential prejudicial effect. Further, the overwhelming evidence of Petitioner's guilt for Rob's murder overshadowed any writing contained in State's Exhibit 205. As discussed in Section I above and throughout this response brief, the State presented overwhelming evidence of Petitioner's guilt on the murder and conspiracy count.

In light of the foregoing, the OCCA reasonably rejected Petitioner's challenge to the admission of State's Exhibit 205. *Andrew*, 164 P.3d at 190. The state court recognized that Petitioner's counsel put the information in Rob's journal at issue, as described above, and therefore Petitioner cannot complain about its admission now. The information contained therein was wholly relevant. *Id.* All things considered, the OCCA's rejection of this claim was wholly reasonable.

In summary, the OCCA's rejection of Petitioner's various evidentiary challenges in this ground for relief was wholly reasonable. No clearly established federal law as articulated by the Supreme Court supports Petitioner's request for relief. Habeas relief is unwarranted. 28 U.S.C. § 2254(d).

## VIII.

## PETITIONER FAILS TO CITE CLEARLY-ESTABLISHED SUPREME COURT PRECEDENT SUPPORTING HER EVIDENTIARY CHALLENGE TO THE ADMISSION OF STATE'S EXHIBITS 28-32 BASED ON ALLEGED LACK OF AUTHENTICATION.

In Ground VIII, Petitioner contends that the State did not adequately authenticate audio recordings depicting her and Pavatt's many calls to the Prudential Insurance Company customer service line that were admitted into evidence as State's Exhibits 28-32. She argues that "[n]o person who knew Robert Andrew, [Petitioner] or James Pavatt testified that the voices on State's Exhibits 28-32 sounded like the voices of James Pavatt and [Petitioner] and Robert Andrew. No party to any of the conversations testified that the conversations on the tape recordings sounded like the ones in which they had participated." Petitioner relies primarily upon state law to advance this claim, but urges here, as she did in state court, that admission of this particular evidence "depriv[ed] her of due process of law", in violation of *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Doc. 26 at 232-38.

### A.    *Exhaustion.*

Petitioner raised this claim on direct appeal and the OCCA rejected it on the merits. *Andrew*, 164 P.3d at 194. Her Ground VIII claim is therefore exhausted for purposes of habeas review.

### B.    *Standard of Review and Merits.*

Petitioner urges that AEDPA deference does not apply because the OCCA "adjudicated a state claim, but did not adjudicate Petitioner's federal claim..." Doc. 26 at

237.  Petitioner ignores, however, that her Ground VIII claim does not truly implicate the federal constitution, that it amounts essentially to a state law claim that has *Hicks v. Oklahoma* tacked on as a mere afterthought.   Petitioner fails to present any clearly-established federal law, as articulated by Supreme Court case law, establishing an independent due process violation arising from the admission at a criminal trial of unauthenticated evidentiary materials or otherwise authorizing the type of supervisory review Petitioner envisions here.   *Hicks* involved a state appellate court's arbitrary denial of a defendant's right to jury resentencing.   *Hicks*, 447 U.S. at 346-47.   That case does not address the factual scenario at issue here, i.e., supervisory review of a state trial judge's evidentiary rulings.   Garden-variety evidentiary rulings of the type here do not implicate the possible magnitude of error suggesting the type of independent due process violations found in the Supreme Court's decisions.   *See Lewis v. Jeffers*, 497 U.S. 764, 780-83 (1990) (arbitrary and capricious imposition of death penalty based upon jury's irrational finding of aggravating circumstance supported by insufficient evidence).   Petitioner's citation to state law and lower federal court decisions also does not supply clearly established federal law for purposes of AEDPA.   *Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007).

"Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law' as laid out by the Supreme Court."   *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).   The absence of clearly-established Supreme Court precedent requiring independent review of the state trial court's authenticity

ruling for evidence is analytically dispositive. *Id.* (declining federal due process review of state evidentiary rulings in the absence of clearly-established Supreme Court precedent; noting that "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process"). Further, this determination is not governed, or otherwise limited, by the actions of the state court. *See Bell v. Cone*, 543 U.S. 447, 455 (2005); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

All things considered, Petitioner is not entitled to review of this claim because she fails to present clearly-established federal law, as articulated by the Supreme Court, which governs the issue. Nothing the OCCA did in its substantive rejection of this claim could therefore possibly be contrary to, or an unreasonable application of, clearly-established federal law as articulated by the Supreme Court. 28 U.S.C. § 2254(d). Habeas relief should therefore be denied on this ground alone.

Alternatively, even if this Court could review the claim de novo, Petitioner would still not be entitled to relief. The OCCA correctly found that the challenged audio tapes were properly authenticated, noting that authentication may be proved by direct or circumstantial evidence and that "[a] voice on a recording may be authenticated if the witness's opinion is based on hearing the voice at any time in circumstances which connect the voice with the alleged speaker." *Andrew*, 164 P.3d at 194. As for Petitioner's and Pavatt's voices:

> Craig Box, Rob Andrew's divorce attorney, listened to all of the tapes and testified that the voice on the tapes was that of [Petitioner]. Furthermore, [Petitioner] gives her name, address and policy number over the phone. [Petitioner] also allows Pavatt to converse with the Prudential Insurance office, and she

> identifies Pavatt as her insurance agent.  Pavatt's voice was
> authenticated by his actions during the call.  He gave his
> company authentication code.

*Id.*  As for the victim's voice, the OCCA correctly noted that:

> Rob Andrew's voice was identified by Ron Stump on other
> tapes introduced earlier in the trial.  Although Stump did not
> identify the voice on these particular tapes as those of Rob
> Andrew, the jury had similarly authenticated tapes from which
> to determine the voice was that of Rob Andrew.

*Id.*

The record confirms the state court's findings.  Lawrence Frotten, the custodian of

records for Prudential Insurance Company, testified that State's Exhibits 28-32 were audio

recordings of calls made to Prudential's customer service line that were generated in the

course of the company's normal business.  Frotten described the process of recording

customer calls that are transferred between call center offices (Tr. 1339-42, 1350-51).

Frotten testified that he had listened to all of the tapes at James Pavatt's trial and that the

tapes represent true and accurate copies of Prudential's records (Tr. 1351).  Frotten testified

that the notations attached to each tape refer to the Prudential employee who took each call,

the running time of the each call and the date and time of each call (Tr. 1353-54, 1360-61).

Prior to Frotten taking the stand, Craig Box, the victim's divorce attorney, testified that he

became personally acquainted with Petitioner's voice during negotiations at the November

1, 2001, temporary order hearing in Oklahoma County District Court (Tr. 1208-11).  Box

testified that he had heard all of the audio recordings "with [Petitioner] talking with

representatives of Prudential or identifying herself as Brenda Andrew and the voice being

similar to what I recall her voice being on those other occasions" (Tr. 1211). Box testified that there was no doubt in his mind that the voices on the Prudential tapes are that of Petitioner (Tr. 1211-12).

This evidence standing alone was sufficient to authenticate State's Exhibits 28 through 32. In addition, the State presented evidence prior to admission of these recordings establishing Petitioner's address and the policy number of Rob's life insurance policy. The State also established that Petitioner was relying upon an alleged March 22, 2001, change of ownership form to support her claim that the victim had transferred ownership of the life insurance policy to Petitioner (Tr. 1184, 1186-90, 1206-07; State's Exhibit 24). Petitioner is heard to give, *inter alia*, her home address and the policy number of the disputed life insurance policy (State's Exhibit 29). During at least one of the calls, Petitioner and Pavatt alternate during the same call in speaking with the customer service representative. Petitioner identifies the man on her end of the call as her insurance agent, a man who identifies himself as James Pavatt and whom the Prudential customer service representative authenticates as being Petitioner's insurance agent by providing a company authentication code (State's Exhibit 28). The State presented evidence that Pavatt was the Andrew family insurance agent (Tr. 1274-75, 1277-78, 1344, 1483-87, 1991-92, 2021-24; State's Exhibit 26 & 47). Petitioner herself, along with the Prudential customer service representative, therefore authenticated Pavatt's voice on the recordings.

Additionally, both Petitioner's and Rob Andrew's voices were authenticated by Ronnie Stump's testimony identifying their voices on State's Exhibits 281 through 284

which were played for the Court and the jury (Tr. 456-58, 481-83). Stump testified before the Prudential customer service tapes were admitted into evidence. Stump's testimony therefore provided evidence allowing the jury to determine the authenticity of Rob's and Petitioner's purported voices on the Prudential insurance tapes by comparing them with the properly authenticated State's Exhibits 281 through 284.

All things considered, this claim is meritless. The prosecution presented sufficient evidence to demonstrate that State's Exhibit 28 through 32 were what the State purported them to be, namely, audio recordings of Petitioner, Pavatt and the victim speaking with Prudential Insurance customer service representatives. Regardless of the standard of review ultimately applied, habeas relief is wholly unwarranted for this claim.

## IX.

### THE OCCA'S REJECTION OF PETITIONER'S CHALLENGE TO THE VOLUNTARINESS OF HER STATEMENT TO POLICE WAS WHOLLY REASONABLE.

In Ground IX, Petitioner contends that the trial court erred in admitting State's Exhibit 204A, a videotape of her statement to police. Petitioner argues she was subjected to custodial interrogation when she gave her statement but was never administered the warnings mandated by *Miranda v. Arizona*, 384 U.S. 368 (1964). Doc. 26 at 238-44.

### A.    *Exhaustion.*

This claim was raised on direct appeal and the OCCA rejected it on the merits. *Andrew*, 164 P.3d at 194-95. It is therefore exhausted for purposes of federal habeas review.

137

B.    *Standard of Review.*

Petitioner implicitly concedes that AEDPA deference applies to the state court's treatment of this claim.  Doc. 26 at 244 ("[t]he decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court").  Here, the OCCA expressly cited, and applied, *Miranda v. Arizona*, 384 U.S. 436 (1966), *Berkemer v. McCarty*, 468 U.S. 420 (1984) and *Oregon v. Mathiason*, 429 U.S. 492 (1977) in rejecting what it recognized was a federal constitutional claim.  *Andrew*, 164 P.3d at 194-95.  These cases represent the clearly-established federal law, as articulated by the Supreme Court's decisions, which govern this claim.  *Yarborough v. Alvarado*, 541 U.S. 652, 660-63 (2004).  AEDPA therefore unquestionably applies to the OCCA's rejection of this claim.

C.    *Merits.*

The OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly-established federal law as determined by the Supreme Court.  Nor was it based on an unreasonable determination of the facts.  *Miranda* set forth the rules of police procedure applicable to "custodial interrogation."  *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).  A custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  However, "[p]olice officers are not required to administer *Miranda* warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place

in the station house, or because the questioned person is the one whom the police suspect." *Mathiason*, 429 U.S. at 495. Rather, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Court summarized the *Miranda* custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Id.* at 112 (quoting *Beheler*, 463 U.S. at 1125).

In the instant case, the OCCA evaluated the circumstances surrounding Petitioner's interview and applied the objective test mandated by Supreme Court case law in resolving whether Petitioner was in custody. The OCCA emphasized the following facts in its analysis:

> 1. Petitioner admitted at the *Jackson-Denno* hearing that she spoke with the police "because she wanted to help the police catch those responsible for shooting her husband";
>
> 2. Petitioner was driven to the police station from the hospital to be interviewed by Detective Garrett, who considered her a witness, not a suspect;
>
> 3. Petitioner was not handcuffed, shackled or placed in any kind of restraint that night, nor was she arrested;

139

4.  She was given a ride by Sgt. Frost to the home of a friend after the interview with Detective Garrett concluded;

5.  Petitioner was the only living eyewitness to the crime;

6.  Eyewitnesses to crimes are routinely taken to the police station for questioning.

*Andrew*, 164 P.3d at 195.  The OCCA concluded that "[u]nder the circumstances of this case, a reasonable person in the same position would not conclude that he or she was in custody." *Id*.

The record confirms the OCCA's factual findings and its conclusion that Petitioner was not in custody.  In the instant case, the trial court held a pre-trial *Jackson-Denno* hearing on the issue of the knowing and voluntary nature of Petitioner's statement.  The evidence showed that Sgt. Roger Frost, one of the original responding officers, followed Petitioner from the crime scene to Baptist Hospital.  Petitioner was taken to the hospital by ambulance for treatment of her gunshot wound (6/7/04 Tr.  55, 108, 136-37).  Petitioner was met at the hospital by Officer Teresa Bunn, a police technical investigator, who collected evidence pertinent to the murder investigation.  Bunn testified that she spoke with Petitioner and, with Petitioner's consent, took swabs of her hands, collected her clothing and took photographs (6/7/04 Tr. 85, 90-91, 93-94, 102-03).  Petitioner never asked Bunn for clothes and never stated to her that she did not want to go to police headquarters for an interview (6/7/04 Tr. 97-98).

Detective Roland Garrett appeared at the hospital and obtained search waivers from Petitioner who freely signed them (6/7/04 Tr. 152).  Petitioner admitted at the *Jackson-*

*Denno* hearing that she voluntarily signed these search waivers because "I was trying to help" (6/7/04 Tr. 155). Sgt. Frost spoke with Petitioner at the hospital and "was asking questions about the case to see if she'd give me more information about the suspects, anything like that at the scene...as a victim" (6/7/04 Tr. 110). Sgt. Frost also told Petitioner that a detective "wanted to interview her some more about trying to get more information in reference to the homicide that just occurred" (6/7/04 Tr. 110, 121). Once Petitioner's treatment at the hospital was concluded, she was escorted by Sgt. Frost to OCPD headquarters where she was taken to an interview room in the homicide office (6/7/04 Tr. 52). Petitioner never told Sgt. Frost that she did not want to go to police headquarters and sit for an interview (6/7/04 Tr. 128). Petitioner was never placed under arrest that night, never handcuffed and was at all times free to leave (6/7/04 Tr. 52-53, 67, 87, 92, 94, 98, 109, 128). A warrant for her arrest was not even issued until four or five days after the murder–after Petitioner fled to Mexico with James Pavatt and the Andrew children (6/7/04 Tr. 53).

Det. Garrett testified that the purpose of the interview "was to obtain any information we could in reference to finding out who the suspects were and trying to make an arrest" (6/7/04 Tr. 52). Det. Garrett testified that he "didn't know who the suspect was at the time. I just have to conduct a thorough investigation" (6/7/04 Tr. 68). Det. Garrett did not consider Petitioner a suspect at the time of the interview but merely a witness to Rob Andrew's murder and her own shooting (6/7/04 Tr. 52). Garrett testified that Petitioner was free to leave at any time during the interview because she was not a suspect and was not under

arrest.  Petitioner never told Garrett she did not want to speak with him (6/7/04 Tr. 70).

Garrett did not mirandize Petitioner because he did not consider her a suspect.  Once the

interview ended, Petitioner was taken by Sgt. Frost to the home of her friend, Cynthia

Balding.  None of Petitioner's friends or relatives came to police headquarters to pick her up

(6/7/04 Tr. 53, 69).  Petitioner was taken to Balding's house because police were still

processing the crime scene and conducting their search of the premises and the Andrew

children were at Balding's house (6/7/04 Tr. 66, 110).

Petitioner admitted at the *Jackson-Denno* hearing that she spoke with the police

officers because "I wanted to help him and I told them what had happened.  I wanted to do

that" because she wanted to help the police catch the people who shot her husband (6/7/04

Tr. 151).  Petitioner admitted that she "was cooperating" with the police that night (6/7/04

Tr. 149).  Petitioner further admitted that she understood the meaning of the *Miranda*

warnings (6/7/04 Tr. 141) ("Q. Do you know what *Miranda* means?  A.  Yes, I do") and that

she was never informed by police that night that she was a suspect (6/7/04 Tr. 142).

Based upon this evidence, the trial court found that Petitioner's statement to Det.

Garrett was not the product of custodial interrogation but was in fact an interview of

Petitioner and that the statement was knowingly and voluntarily made (6/7/04 Tr. 156).  The

trial court's finding that Petitioner was subjected to an interview, and not a custodial

interrogation, is clearly supported by the record.  Testimony from the three police officers

who made contact with Petitioner the night of the shooting testified that they did not consider

her to be in custody and that she was free to leave at any time both at the hospital and the

142

interview at police headquarters. Further, the record established that, while Frost and Bunn believed Petitioner exhibited bizarre behavior that night for the victim of a violent crime whose husband was gunned down in her presence, the police clearly considered her a victim of a shooting and witness to her husband's murder that night, not a suspect in the homicide. Petitioner's admission that she voluntarily signed search waivers and cooperated with police to assist them in capturing the alleged perpetrators of the murder only highlights the non-custodial nature of the interview. Petitioner was not in custody at any point that evening. Nor were her movements restrained to the point that she was deprived of her freedom of action in any significant way.

Petitioner's complaint that the police denied her requests to call her children and to wash her hands is supported only by her own testimony (6/7/04 Tr. 139). Indeed, Sgt. Frost testified that he did not recall telling Petitioner she could neither wash her hands nor call her children (6/7/04 Tr. 109). He did tell her, however, that her children were at a different address and that he would take her there as soon as the interview was concluded (6/7/04 Tr. 109-10). Det. Garrett testified that he did not recall telling Petitioner she could not call her children (6/7/04 Tr. 57). Petitioner's complaint that she was not allowed to get clothes from her home ignores that Sgt. Frost and Det. Garrett told her that the police were still processing the crime scene and searching the premises and that she would not be allowed back on the property until they were finished. Further, she was clothed in two hospital gowns that completely covered her body (6/7/04 Tr. 128).

Petitioner's complaint that she felt like the police were "watching me" at the hospital, that she could not leave the room and that she "had to go with them" is of no consequence. The standard of review is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 420. The totality of the circumstances show that a reasonable person in Petitioner's position would have considered themselves as being treated like a witness to a homicide whom the police were interested in questioning as part of a thorough murder investigation designed to solve the crime, not a suspect or someone in custody.

The same is true with the balance of her complaints. Petitioner ignores the totality of the circumstances, including her own admissions that she voluntarily cooperated with police. At best, Petitioner's many complaints refer to the general environment surrounding police interviews. The mere fact that Petitioner's interview took place at police headquarters and that she was driven there by a uniformed officer driving a marked scout car, or that she was required to ride in the back seat of that scout car, is simply not dispositive, or even particularly persuasive, on the instant issue under clearly-established Supreme Court precedent. *Mathiason*, 429 U.S. at 495.

Petitioner claims, in a footnote, that Det. Garrett admitted during his trial testimony "that he would not let her go when she asked to leave to see her children because he wanted more information." Doc. 26 at 241 n.73 (citing Tr. 2396-97). Review of the cited transcript passage, however, does not support this claim:

Q.   (By Mr. Miskovsky, III) Now, Brenda Andrew was not under arrest?

A.  No, she wasn't.

Q.  And was not in custody?

A.  No.

Q.  Did you at any time have her handcuffed?

A.  No.

Q.  There are several points in the interview where Ms. Andrew ask to go and see her kids, and says she wants to go, correct sir?

A.  Yes.

Q.  And you don't let her go, do ya?

A.  No.

Q.  Any particular reason why?

A.  I was trying to obtain as much information as I could so we could find the people responsible for killing her husband.

(Tr. 2396-97).  This is not the same as an admission that Petitioner was forcefully prevented from leaving the interview or that she was otherwise in custody as she now suggests.  Rather, it shows that Det. Garrett simply continued with the interview so he could obtain more information – precisely what the videotape of the interview itself shows.

Petitioner claims that the police viewed her as a suspect that night, thus she was in custody.  Doc. 26 at 242.  But, again, no one told Petitioner she was a suspect that night (6/7/04 Tr. 142).   Whether the officers who responded to the hospital, or even the

145

interviewing detective, believed Petitioner was a suspect at that time is quite irrelevant. *Berkemer*, 468 U.S. at 442 ("[a] policeman's unarticulated plan has no bearing on the question whether the suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"); *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) ("[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial interrogation").

The OCCA's rejection of this claim was therefore wholly reasonable. That is especially so where, as here, a doubly deferential judicial review applies to the state court's application of a general rule. *Yarborough*, 541 U.S. at 664, 665. Habeas relief must therefore be denied.

## X.

### THE OCCA REASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN FAILING TO CHANGE VENUE.

In Ground X, Petitioner complains that habeas relief is warranted because the trial court erred in failing to change venue for her capital murder trial. Petitioner relies primarily upon the evidence presented at the change of venue hearing and the record of voir dire. She urges that extensive pre-trial media coverage of the Rob Andrew murder, warrants a presumption of prejudice entitling her to habeas relief. Doc. 26 at 245-53.

### A.    Exhaustion.

Petitioner raised this claim on direct appeal and the OCCA rejected it on the merits. *Andrew*, 164 P.3d at 187. This claim is therefore exhausted for purposes of federal habeas and may be reviewed on the merits.

### B.    Standard of Review.

Petitioner implicitly concedes that AEDPA deference applies to the OCCA's rejection of this claim. Doc. 26 at 253 ("[t]his decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court"). In denying this claim, the OCCA identified and applied the basic federal standard articulated by the Supreme Court for change of venue challenges–i.e., whether Petitioner was guaranteed her right to a fair and impartial trial by unbiased jurors in light of the extensive media coverage surrounding the murder and subsequent judicial proceedings leading to trial. *See, e.g., Andrew*, 164 P.3d at 187 ("[w]e consider all relevant evidence to determine whether a fair trial was possible at that particular place and time, keeping in mind the ultimate issue: whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused"); *id.* ("[o]ur chief concern is not how, or how often, the case played in the media, but whether, at the end of the day, the trial court was able to empanel twelve fair and impartial jurors"); *id.* ("nowhere in her brief does [Petitioner] claim, much less demonstrate, that any juror actually seated was biased against her due to adverse pretrial publicity"). The OCCA specifically rejected Petitioner's claim that prejudice should be presumed. *Id.* ("[Petitioner] invites this Court to hold that, because of extensive media

coverage, prejudice should be presumed.  We decline that invitation and hold that the trial court did not abuse its discretion in denying a change of venue").  Additionally, the OCCA specifically cited, and discussed, *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996), a federal case which recites the basic constitutional standards for change-of-venue claims.  The state cases cited by the OCCA in its treatment of this claim provide in-depth discussion of the federal constitutional standards for change of venue.  *Andrew,* 164 P.3d at 187 (citing *DeRosa v. State*, 89 P.3d 1124 (Okla. Crim. App. 2004); *Hain v. State*, 919 P.2d 1130 (Okla. Crim. App. 1996)).

The OCCA also correctly applied an abuse of discretion standard to the trial court's resolution of credibility determinations regarding juror answers during voir dire on the issue of whether they had opinions, based on pre-trial publicity, that disqualified them from jury service.  *Andrew*, 164 P.3d at 187 (citing *Harris v. State*, 84 P.3d 731 (Okla. Crim. App. 2004)).  *See Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984) (presumption of correctness applies on habeas to trial court's credibility determinations on juror's statements regarding partiality; "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'"); *Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000) (same).  *Cf. Uttecht v. Brown*, 551 U.S. 1, 16-17 (2007) (state court's identification of *Wainwright-Witt* standard in its analysis of death qualification claim, along with recognition that deference was warranted for trial court's ruling on for-cause challenge and application of abuse of discretion standard warranted AEDPA deference).

It is therefore clear the OCCA understood the federal nature of the claim advanced by Petitioner relating to her change of venue request. *Cf. Welch v. Sirmons*, 451 F.3d 675, 687 (10th Cir. 2006) (AEDPA deference applied where OCCA, although relying exclusively upon its own precedent in resolving federal claim, acknowledged in its opinion that Petitioner alleged denial of a fair trial based on admission of evidence at trial); *Cook v. McKune*, 323 F.3d 825, 830-31 (10th Cir. 2003) (citing *Early v. Packer*, 537 U.S. 3 (2002)) (applying AEDPA deference where state court relied solely upon Kansas law in rejecting federal confrontation claim, noting Supreme Court has held that "failure to discuss or even to be aware of federal precedent does not in itself render a state court's decision contrary to federal law"). The OCCA's extended analysis of this issue clearly rests on substantive, not procedural, grounds and therefore constitutes an adjudication on the merits under 28 U.S.C. § 2254(d). Thus, AEDPA deference applies to the OCCA's decision on this issue. *Cook*, 323 F.3d at 831 (noting AEDPA deference applies to state court decisions made on substantive, not procedural, grounds). The issue before the Court then is whether the OCCA's adjudication of this claim was either contrary to, or an unreasonable application of, clearly-established Supreme Court precedent in light of the record evidence or was otherwise based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). A habeas petitioner attempting to show a due process violation because of a state trial judge's failure to grant a change of venue motion "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently lacking in due process.'"

149

*Hale*, 227 F.3d at 1332 (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)).  Because this amounts to a general standard, additional deference relating to the state court's decision is warranted.  Where a state court applies a general standard to a set of facts, a "doubly deferential" judicial review applies on habeas as the state court "has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Knowles v. Mirzayance*, __U.S.__, 129 S. Ct. 1411, 1420 (2009).

### C.    Merits – Presumed Prejudice.

Petitioner's motion for change of venue cited the large number of television and print media stories about the case that appeared in the Oklahoma City Designated Market Area (DMA) and in national media.  Her motion also referred to a telephone poll conducted by the University of Oklahoma political science department indicating a high degree of recognition about the case amongst citizens of Oklahoma County (O.R. 771-78).  On January 9th & 21st, 2003, the trial court held a hearing on both motions for change of venue.  Defense testimony from four witnesses was presented in support of the change of venue motions.

While recognizing the large amount of media coverage that followed the case, the trial court denied a change of venue.  The trial court stated that the real issue was whether the jurors who are summoned can set aside any media coverage they have heard and base a verdict only on the law and evidence presented to them at trial.  The trial court further noted that: "I don't think we're going to know that until such time as we bring in a large panel, put them up in the jury box and voir dire them.  It's unfortunate but that's actually the only way we can, my opinion, that you can make that determination" (1/21/03 Tr. 104-08).

150

The standards governing a change of venue ultimately derive from the due process clause of the Fourteenth Amendment which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "A fair trial in a fair tribunal is a basic requirement of due process." *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). A juror's verdict in a criminal trial "must be based on the evidence developed at the trial...' The theory of the law is that a juror who has formed an opinion cannot be impartial'" *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 155 (1878)). Petitioner initially urges that prejudice should be presumed because of pre-trial media accounts. However, the Supreme Court has cautioned against presuming juror bias due to familiarity with news reports:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. **It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.**

*Id.* at 722-23 (emphasis added).

In order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community." *Hale*, 227 F.3d at 1332 (quoting *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994)). "Simply showing that

all the potential jurors knew about the case and that there was extensive pretrial media publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." *Id.* Presumed prejudice is "rarely invoked and only in extreme circumstances." *Id.* This explains why the Supreme Court has presumed prejudice "in only a small number of cases." *Id.* As explained by the Tenth Circuit, "[i]n those cases where the Court has presumed prejudice, however, 'the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings,'...and created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial." *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 799 (1975)). *See also Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006).

"The Supreme Court has found presumed prejudice based on pretrial publicity in only three cases, all dating from the 1960s." *Id.* In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court concluded that a due process violation occurred when the state trial judge ignored the effects of prejudicial pretrial publicity and failed to restrain disruptive influences in the courtroom. Sheppard was accused of bludgeoning to death his pregnant wife, and "[f]or months the virulent publicity about Sheppard and the murder had made the case notorious...Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people." *Id.* at 354. The Court noted that both the prosecutor and judge were running for judgeships in the upcoming election. *Id.* Even so, the Court was hesitant to require venue change based on pretrial publicity alone: "we cannot say

that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone..." *Id.* Only when the Court also considered "the setting in which the trial was held" and the fact that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial" did it conclude that the conviction had to be reversed. *Id.* at 355.

In *Rideau v. Louisiana*, 373 U.S. 723 (1963), the residents of the small town where Rideau was tried repeatedly "saw on their television sets [a motion picture of] Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Id.* at 724, 725. This motion picture had been created and distributed over the airwaves "with the active cooperation and participation of the local law enforcement officers," *id.*, and two local deputy sheriffs later were seated on Rideau's trial jury for what the Court denounced as "kangaroo court proceedings". *Id.* at 725, 726.

In *Estes v. Texas*, 381 U.S. 532 (1965), the Court presumed prejudice based on pretrial and trial media coverage that resulted in a disruptive and circus-like atmosphere in the courtroom. In that case, the press was allowed to sit within the bar of the court and to overrun it with television equipment. *Id.* at 545-51. The case had already incurred one venue change–500 miles from another county--because of extensive pre-trial publicity in what was described as a case bearing "national notoriety." *Id.* at 535. Pre-trial hearings were carried live by both television and radio; news photography was permitted throughout. At least twelve different cameramen were engaged in covering the pre-trial hearings with cords

and wires snaked throughout the courtroom.   It was conceded that the news crews and photographers caused considerable disruption of the hearings.  *Id.* at 536.  For the trial, an actual booth was built into the back of the courtroom in which television cameras and newsreel photographers were restricted when filming or telecasting.  *Id.* at 537.  While live telecasting of the trial was, for the most part, prohibited, cameras nonetheless intermittently recorded various parts of the trial for broadcast on regularly-scheduled news shows.  *Id.*  On one occasion during the trial, videotapes of the pre-trial hearings were rebroadcast on television in place of the "late movie".  *Id.* at 538.

The media coverage in the instant case does not even approach that found in *Sheppard*, *Rideau* and *Estes*–all cases where the Supreme Court presumed prejudice based on pre-trial media coverage.  As noted by the OCCA, Petitioner's case unquestionably received considerable media attention.  However, the mere fact the jury was exposed to a "'defendant's prior convictions or to news accounts of the crime with which he is charged' cannot alone demonstrate that the defendant was denied due process."  *Hale*, 227 F.3d at 1333 (quoting *Murphy*, 421 U.S. at 799).  Petitioner fails to demonstrate either a lynch mob mentality or a circus-like atmosphere surrounding her trial.  The record does not reflect an irrepressibly hostile attitude pervaded the community or that the influence of the news media pervaded the proceeding as in *Sheppard*, *Rideau* and *Estes*.  This is not surprising considering that Petitioner's case was tried not in a small rural community but rather in a largely urban county of approximately 660,000 people (1/9/03 Tr. 262).

154

Nor has Petitioner shown that any particular article appearing in the media was not a factual account or that they were somehow invidious or inflammatory in nature. In that sense, Petitioner fails to show that the OCCA's rejection of this claim was either contrary to, or an unreasonable application of, clearly-established Supreme Court precedent to the facts of her case. Petitioner's case simply does not represent one of the rare, extreme cases where presumed prejudice should be invoked in relation to a change of venue claim based on the direct precedent of the Supreme Court. *See Goss*, 439 F.3d at 629 (citing *Yount*, 467 U.S. at 1029-30) (noting Supreme Court rejected presumed prejudice in case where pretrial publicity revealed inadmissible information such as defendant's prior conviction for the murder at issue and his confession, over three quarters of potential jurors admitted they would carry an opinion as to defendant's guilt into jury box and 8 of 14 jurors and alternates had formed an opinion as to the defendant's guilt). Habeas relief is therefore clearly unwarranted on Petitioner's theory of presumed prejudice. The OCCA's rejection of this claim was wholly reasonable in light of the Supreme Court's decisions applying the presumed prejudice doctrine.

### D.        *Merits – Actual Prejudice.*

Having failed to demonstrate that prejudice must be presumed, this Court must evaluate the totality of the circumstances surrounding Petitioner's trial in order to determine whether, in fact, she was tried before a fair and impartial jury. *Hale*, 227 F.3d at 1333. "Due process requires that the accused receive a fair trial by an impartial jury free from outside influences." *Id.* (quoting *Sheppard*, 384 U.S. at 362). "The trial court has broad discretion

in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." *Id.*

Petitioner does not dispute that each and every one of the jurors who tried her case said during voir dire that they could be fair and impartial. *Andrew*, 164 P.3d at 187 ("[n]owhere in her brief does [Petitioner] claim, much less demonstrate, that any juror actually seated was biased against her due to adverse pretrial publicity"). Indeed, no individual sat on the jury who expressed opinions they could not set aside.

The trial court conducted individual voir dire and asked each prospective juror about any pre-trial publicity to which they may have been exposed. The trial court conducted thorough voir dire regarding the last time a prospective juror read or heard anything about the case, whether they had formed an opinion, and whether the information they read or heard might influence their ability to be fair and impartial, *See, e.g.* (VD Tr. 31-32, 56-60, 88-90, 142-44, 162-64, 180, 201-10, 216, 220-21, 233-35, 238-41, 253-54, 286-90, 318-21, 327-29, 347-48, 362-64, 366-67, 387-89, 391-93, 397, 416-17, 448-57, 460-63, 467-68, 472-73, 500-03, 508-10, 535-38, 541-42, 570-74, 580-82, 608, 614-15, 638-39, 660-61, 693-96, 706-10, 721-23, 728-29, 756-57, 784-88, 792-93, 819-24, 831, 865-67, 936-42, 946-49, 960, 1008-10, 1033-34, 1056-59, 1063-56, 1068, 1085-86, 1108-1111, 1118-20, 1145, 1166-68, 1171-72, 1181-83, 1188, 1214, 1245-46, 1264-65, 1292-94, 1296-99, 1303-04, 1314-16, 1320-22, 1358, 1375-76, 1384-86, 1392-95, 1400-01, 1406, 1411-12, 1418-19, 1522-25, 1533-36, 1542-43, 1559-60, 1607-09, 1614-16, 1620-23, 1633-40, 1645-46, 1651-53, 1658-60). Potential jurors who expressed reservations about his or her ability to be fair and

156

impartial were dismissed for cause. *See*, *e.g.* (VD Tr. 63, 204-05, 229, 235, 250, 321, 364, 389, 450, 454, 462-63, 506, 538, 574, 702, 788, 824, 942, 1065, 1111, 1168, 1172, 1293-94, 1299, 1316, 1386, 1396, 1413, 1527, 1537, 1609, 1616, 1641, 1646-47, 1653) (prospective jurors stricken based on exposure to media coverage or pre-trial facts).

Both the prosecutor and defense counsel conducted extensive voir dire as to whether the prospective jurors could set aside anything they had heard in the media and reach a verdict based solely on the law, evidence and argument presented in open court. *See*, *e.g.* (VD Tr. 60-62, 145, 222-26, 247-50, 255-56, 297-99, 504-06, 851-52, 1151-52, 1215-16, 1570-72, 1661-62, 1665-66) (prosecution questioning); (VD Tr. 36-41, 99-106, 150-54, 169-72, 189-90, 228-29, 261-63, 299-306, 352-55, 372-76, 405-07, 421-27, 479-82, 515-19, 550-54, 593-95, 669-72, 700-02, 734-37, 770-72, 799-804, 851-54, 891-92, 986-88, 1041-44, 1074-77, 1097-1100, 1125-33, 1153-54, 1162, 1194-98, 1209-10, 1224-27, 1251-55, 1266-67, 1273-79, 1335-41, 1365-67, 1426-33, 1572-79, 1666-74) (defense questioning).  Some prospective jurors had heard nothing about the case (VD Tr. 180, 189-90, 216, 580-82, 608, 639, 831, 960, 1145, 1214, 1358, 1406).  The jurors who sat on Petitioner's jury indicated that they had heard about her case to varying degrees although most had heard very little about it.  However, they all indicated that they could set aside anything they heard and base their verdict on the evidence and law presented to them in court (VD Tr. 89) (Graf); (VD Tr. 162-63) (Naylor); (VD Tr. 253-54) (Riggs); (VD Tr. 286-90) (Richards); (VD Tr. 397, 405-07) (Welch); (VD Tr. 510, 518-19) (Norwood); (VD Tr. 542) (Rogers); (VD Tr. 660-61, 672)

(Patty); (VD Tr. 728-29) (Berenburg); (VD Tr. 1068) (Kostiuk); (Tr. 1214, 1224-27) (Dalton); (VD Tr. 1245-46) (Herring).

Petitioner does not claim that any particular juror who sat on her jury should have been struck for cause.  Review of voir dire in this case simply does not support a finding that Petitioner was actually prejudiced from pre-trial publicity.  *Hale*, 227 F.3d at 1333 (quoting *Yount*, 467 U.S. at 1035) (stating that the relevant inquiry is whether the jurors at Petitioner's trial "had such fixed opinions that they could not judge impartially the guilt of the defendant").  That is especially true when one considers the atmosphere within the community as reflected by the news media.  There is no doubt that there existed widespread coverage in the media of the case.  However, Petitioner does not prove that widespread pre-trial media coverage resulted in a community hopelessly prejudiced against her.  Petitioner points to no particular news story or newspaper article that she believes resulted in actual prejudice.  Instead, Petitioner's argument is premised on the idea that the widespread media coverage itself was sufficient to require change of venue.  But the record on voir dire refutes Petitioner's premise.  As discussed above, it is well settled that an accused is not entitled to a jury who knows nothing about his or her case.  The record of voir dire in Petitioner's case does not support the claim that her jury was not fair and impartial.

Petitioner's criticism of some comments by the trial judge during voir dire is of no consequence.  Doc. 26 at 246-47, 249-50.  Petitioner states that "the atmosphere [during voir dire] is punctuated by the comments of the trial judge which approach that of a circus." *Id.* at 246.  Review of the record, however, shows no such thing.  None of the challenged

comments, summarized by Petitioner in her habeas appendix, see Doc. 26-25, are unprofessional or otherwise suggest a "circus atmosphere" during voir dire. Indeed, all of the comments attributed to the trial judge in Doc. 26-25 occurred outside the presence of prospective jurors during individual voir dire while the court and parties were waiting for the next prospective juror to come into the room. Most of them amounted to simple two or three word rulings in which the trial court denied defense counsel's motion for change of venue. Further, the State submits that review of the entire voir dire record, not mere snippets of statements Petitioner believes are beneficial to her cause is the appropriate manner of assessing voir dire. Under these circumstances, and considering the benign nature of the comments in any event, no circus-like atmosphere pervaded the courtroom proceedings or otherwise prejudiced the venire against Petitioner. As mentioned above, the trial judge conducted a thorough individual voir dire examination on the issue of publicity and death qualification. Relief is unwarranted on this particular aspect of Petitioner's challenge.

Considering the doubly deferential judicial review that applies to the OCCA's denial of this claim, *Knowles*, 129 S. Ct. at 1420, and the deference that applies to the trial court's conduct of voir dire, habeas relief is unwarranted. Petitioner fails to show that the OCCA's adjudication of this claim was in any way unreasonable. Petitioner wholly fails to show that the OCCA's decision on this issue falls into the category of the most serious misapplication of Supreme Court precedent. *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006)) ("only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254"). Again,

an unreasonable application of clearly established federal law is different than an incorrect application of such law. *Id.* ("[i]n addressing the unreasonableness standard, we have determined that the AEDPA's conception of objective reasonableness lies 'somewhere between *clearly* erroneous and unreasonable to all reasonable jurists'"). Petitioner's arguments fail to show that the state court's adjudication here was unreasonable. At best, her arguments raise the possibility of an *erroneous* application of federal law, something more properly advanced on direct review.

Thus, it cannot be said that the OCCA's adjudication of this claim was either contrary to, or an unreasonable application of, clearly-established Supreme Court precedent to the facts of this case. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Habeas relief must therefore be denied.

## XI.

### THE OCCA REASONABLY REJECTED PETITIONER'S INSTRUCTIONAL CHALLENGES.

In Ground XI, Petitioner advances the guilt-stage instructional challenges she raised on direct appeal. This includes challenges to the trial court's failure to provide: (1) a state law cautionary instruction on jailhouse informant testimony; (2) a lesser-related offense instruction on accessory after the fact; and (3) cautionary instructions on the use of other crimes or bad acts evidence. Petitioner also claims the trial court erred in instructing the jury on the doctrine of flight. Doc. 26 at 253-66.

160

### A.    Exhaustion.

Petitioner raised all of these claims on direct appeal and the OCCA rejected them on the merits.  *Andrew*, 164 P.3d at 199-201.  Petitioner's Ground XI claim is therefore exhausted for purposes of federal habeas review.

### B.    Standard of Review and Merits.

Petitioner presents no clearly-established federal law, as established by the Supreme Court's decisions, to support these challenges.  No Supreme Court decision requires cautionary instructions on jailhouse informant testimony or other crimes or bad acts evidence.  Indeed, no clearly-established federal law, as determined by the Supreme Court's cases, even addresses the use of other crimes or bad act evidence, *Welch v. Sirmons*, 451 F.3d 675, 687-88 (10th Cir. 2006), and the Supreme Court has rejected constitutional challenges to the use of government informant testimony in light of  established safeguards at trial available through cross examination and general instructions relating to credibility of witnesses.  *Hoffa v. United States*, 385 U.S. 293, 310-12 (1966).  *See also United States v. Taylor*, 800 F.2d 1012, 1015-16 (10th Cir. 1986).  Nor has the Supreme Court held that flight instructions are prohibited by the federal constitution (the same is true, incidentally, for Tenth Circuit precedent, *see Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997)).  As Petitioner failed to request at trial a lesser-related offense instruction on accessory after the fact, *Andrew*, 164 P.3d at 200, clearly-established federal law mandates that no federal constitutional violation arises from the absence of such an instruction.  *Thornburg v. Mullin,* 422 F.3d 1113, 1126-27 (10th Cir. 2005).  As discussed more fully below, clearly-established

federal law, as articulated by the Supreme Court's decisions, also makes clear that Petitioner had no federal constitutional right to lesser-related offense instructions on accessory after the fact because that crime is not, under Oklahoma law, a lesser-included offense of first degree malice murder. *Hopkins v. Reeves*, 524 U.S. 88, 97-98 (1998); *Andrew*, 164 P.3d at 200-01 n.14.

The absence of clearly-established Supreme Court precedent supporting these issues marks the end of Petitioner's Ground XI claim. Respondent incorporates here by reference from Section VII above her previous discussion of the threshold question governing this issue. *See generally House v. Hatch*, 527 F.3d 1010, 1015-18 (10th Cir. 2008). In short, "[t]o demonstrate that the law is clearly established, [Petitioner] must do more than identify a generalized legal principle." *Id.* at 1022. Petitioner's citation to *Hicks v. Oklahoma,* in an attempt to federalize this claim for purposes of habeas review, is of no consequence. *Hicks* does not address purported instructional error during guilt stage (or any stage of a capital murder trial, for that matter) and thus, is factually distinguishable from the issues arising in Petitioner's Ground XI claim.

Thus, Petitioner's instructional challenges present nothing more than alleged state law error which, of course, is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief"). Habeas relief should be denied on this ground alone.

Alternatively, even if this Court could conduct de novo review of these state law instructional claims, Petitioner would still not be entitled to relief. Petitioner was not entitled

to a limiting instruction on jailhouse informant testimony because, as noted by the OCCA, "[t]he possibility that [Teresa] Sullivan was a jailhouse informant was not supported by the evidence presented to the trial court." *Andrew*, 164 P.3d at 200. Oklahoma's jailhouse informant instruction "is to be given when a witness is a 'professional jailhouse informant.'" *Id.* Sullivan, a prisoner in federal custody at all times relevant to the instant case, accurately testified that she was made no promises by state prosecutors in exchange for her testimony against Petitioner (Tr. 2739-42, 2748). Sullivan repeatedly denied defense counsel's claim on cross-examination that she was a "known snitch" at the Oklahoma County Jail and the Fort Worth Federal Correctional Facility (Tr. 2748-49). She also denied defense counsel's claim on cross-examination that she was testifying in exchange for better medical treatment for herself and her husband (Tr. 2751). Sullivan also denied telling anyone at the Oklahoma County Jail that she would get early release in exchange for her testimony, thus refuting fellow inmate Angela Burk's testimony (Tr. 2757, 3498-99). "She did not seek out authorities with which to share her story." *Andrew*, 164 P.3d at 200. Rather, she was contacted by detectives to see if she had information relevant to the case. *Id.*; (Tr. 2748).

Petitioner's complaint that the trial court erred in instructing the jury on the doctrine of flight as it relates to consciousness of guilt lacks merit. As noted by the OCCA, Petitioner "explained to Sullivan that she left for Mexico to get the kids away from everything, for a little vacation. Her statement explaining her act of departure warranted the giving of the flight instructions" under Oklahoma law. *Id.*; (Tr. 2746).

163

Petitioner was not entitled to instructions on the crime of accessory after the fact under clearly-established federal law as determined by Supreme Court decisions. The OCCA has consistently held that Accessory after the Fact is merely a "lesser related" offense to first degree murder and is a separate substantive crime from first degree murder. *Cummings v. State*, 968 P.2d 821, 834 (Okla. Crim. App. 1998). To be sure, after *Shrum v. State*, 991 P.2d 1032 (Okla. Crim. App. 1999), the OCCA requires instruction on all "lesser related" offenses supported by the evidence; *Shrum* allows the OCCA to reverse convictions where evidence of the charged offense was lacking and there was some evidence of a "lesser related" offense. *Andrew*, 164 P.3d at 200 n.14 (citing *Glossip v. State*, 29 P.3d 597 (Okla. Crim. App. 2001)). However, *Shrum* does not alter that Accessory after the Fact is not a lesser-included offense of First Degree Murder under Oklahoma law.

Thus, a challenge to the absence of instructions on Accessory after the Fact in a first degree murder case is fatally flawed under *Beck*, which requires instructions only on those *lesser-included crimes* under state law that are supported by the record evidence. In *Hopkins v. Reeves*, 524 U.S. 88 (1998), the Supreme Court considered "whether *Beck* requires state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under state law," *id.* at 90, and concluded that "such instructions are not constitutionally required." *Id.* at 91. The *Hopkins* court rejected a state death row inmate's claim that the trial court's refusal to instruct on second degree murder and manslaughter constituted *Beck* error even though those crimes were not lesser-included offenses of first degree felony murder under Nebraska law. *Id.* at 91-92, 95-96. Even though Nebraska law

recognized no lesser-included offenses for first degree felony murder, the Supreme Court

reversed the Eighth Circuit's grant of habeas relief under *Beck*:

> The Court of Appeals in this case...required in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some *other* offense–what could be called a "lesser related offense"–when no lesser included offense exists. Such a requirement is not only unprecedented, but also unworkable....The Court of Appeals apparently would recognize a constitutional right to an instruction on any offense that bears a resemblance to the charged crime and is supported by the evidence. Such an affirmative obligation is unquestionably a greater limitation on a State's prerogative to structure its criminal law than is *Beck's* rule that a State may not erect a capital-specific, artificial barrier to the provision of instructions on offenses that actually are lesser included offenses under state law.

*Id.* at 97-98.

Making matters worse, as mentioned above, Petitioner did not request instructions on

accessory, thus waiving any possible *Beck* claim. *Thornburg*, 422 F.3d at 1126-27. Worse

yet, the evidence at trial did not even support instructions on accessory after the fact. As

noted by the OCCA, "[h]er defense was that she did not know who killed her husband. She

did not claim that she knew Pavatt killed her husband, so she helped him flee to Mexico to

avoid capture..." *Andrew*, 164 P.3d at 200. Further, the State's evidence showed Petitioner

was an active co-conspirator in the killing, not an accessory (recall, at the least, her

participation in the brake line incident, *see id.*, 164 P. 3d at 191). *See* Section I above. Thus,

insufficient evidence was presented to support this instruction under Oklahoma law.

The trial court's failure to administer limiting instructions relating to other crimes or bad acts evidence also fails to show any legitimate prejudice to Petitioner.  Much of the challenged evidence was properly admitted res gestae evidence and therefore no limiting instruction was required.  *Andrew*, 164 P.3d at 191 n.7, 192, 193 & 201.  *See also* Section III.  Further, any error in the trial court's failure to administer the requested limiting instruction for consideration of the remaining evidence was harmless considering, as discussed in Section I above, the great weight of the properly admitted evidence establishing her guilt.

All things considered, even if these state law claims could be considered de novo, Petitioner would still not be entitled to relief.  The OCCA's rejection of this ground for relief was wholly reasonable.  Habeas relief is therefore unwarranted.

## XII.

### THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE PENALTY-PHASE INSTRUCTIONS.

In Ground XII, Petitioner advances the penalty-phase instructional challenges she raised on direct appeal.  This includes challenges to: (1) the Oklahoma uniform instruction on the murder for remuneration aggravator; (2) the trial court's supplemental instruction, in response to a jury question, regarding the meaning of the life without possibility of parole sentencing option; and (3) the Oklahoma uniform instruction defining mitigating circumstances.  Doc. 26 at 266-76.

166

**A.    Exhaustion.**

Petitioner raised these claims on direct appeal and the OCCA rejected them on the merits. *Andrew*, 164 P.3d at 201-02. Petitioner's Ground XII claim is therefore exhausted for purposes of federal habeas review.

**B.    Standard of Review.**

AEDPA deference applies to the OCCA's rejection of the constitutional claims contained within Petitioner's Ground XII claim. With respect to the OCCA's rejection of Petitioner's challenge to the uniform Oklahoma instruction defining mitigating circumstances, the state court cited *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), thus signaling its recognition of the federal nature of this claim. *Andrew*, 164 P.3d at 202. Although the OCCA did not expressly cite federal authority in discussing its rejection of the balance of Petitioner's penalty-phase instructional challenges, AEDPA deference nonetheless applies. The Supreme Court has made clear that failure to discuss or even to be aware of federal precedent does not in itself render a state court's decision contrary to federal law. *Early v. Packer*, 537 U.S. 3, 8 (2002). The OCCA's decision rests on substantive, not procedural, grounds. AEDPA deference therefore applies to the OCCA's rejection of these claims. *Matthews*, 577 F.3d at 1180 ("[a]n adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather than procedural grounds").

**C.    Merits.**

Petitioner's challenge to the uniform Oklahoma instruction defining the murder for remuneration aggravating circumstance lacks merits. Title 21, Okla. Stat. § 701.12(3)

defines this aggravating circumstance as follows:  "[t]he person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."  *Pavatt v. State*, 159 P.3d 272, 295 n.19 (Okla. Crim. App. 2007).  Petitioner's jury was instructed on this aggravator solely with the statutory language defining it (O.R. 2830).  "The traditional application for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder."  *Plantz v. State*, 876 P.2d 268, 281 (Okla. Crim. App. 1994).  "However, murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy."  *Id.* (citing *Johnson v. State*, 665 P.2d 815, 824 (Okla. Crim. App. 1982); *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex. Crim. App. 1979)).

Petitioner's complaint boils down to her claim that the instructions did not accurately reflect Oklahoma law defining this aggravator.  The OCCA rejected this claim, however, finding that the uniform murder for remuneration instruction given to Petitioner's jury accurately states the law.  *Andrew*, 164 P.3d at 202.  This claim therefore implicates an issue of state law not cognizable on habeas.  *Moore v. Gibson*, 195 F.3d 1152, 1176 (10th Cir. 1999).  A federal habeas court is bound by the state court's pronouncements on state law. *Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005).  Petitioner presents no clearly-established federal law, as determined by the Supreme Court's decisions, providing a basis for this Court to grant relief on this claim.  Habeas relief is therefore unauthorized for this particular claim under 28 U.S.C. § 2254(d).

Petitioner's complaint that the trial court did not fully or accurately respond to the jury's question during penalty phase deliberations about the meaning of the life without possibility of parole sentencing options fares no better. The jury sent a note to the trial judge during penalty phase deliberations asking whether life without parole means incarceration in prison until Petitioner's natural death. The trial court instructed the jury that "life without the possibility of parole is self-explanatory." Petitioner did not object to the answer provided by the trial court to this particular question (Tr. 4505). Circuit precedent applying clearly-established federal law as determined by Supreme Court decisions forecloses relief based on the trial court's response to the jury's question. *Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir. 2000).

Petitioner nonetheless speculates that the jury was confused about the meaning of the life without possibility of parole sentencing option because it returned a death sentence thirty-five minutes later (Tr. 4505-06). This time period, however, in no way indicates that the jury was confused by the definitions set forth in the instructions after the trial court's explanation. Indeed, the trial court's answer is roughly the equivalent of telling the jury to accept the plain and literal meaning of the instructions. The speculative nature of this claim makes clear that Petitioner has failed to show constitutional error, especially considering the nature of Oklahoma's triple-option sentencing scheme under which her jury was properly instructed (O.R. 2827). The trial court provided Petitioner's jury accurate information. All things considered, the OCCA's rejection of this claim was wholly reasonable.

Finally, Petitioner's challenge to the Oklahoma uniform instruction defining mitigating circumstances lacks merit.  Instruction No. 9 provided in pertinent part:

> Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame.  The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

(O.R. 2835).  Petitioner complains that this wording from the instruction, along with the prosecutor's argument, prevented her jury from considering the mitigating evidence she presented during penalty phase.

The Tenth Circuit has previously rejected constitutional challenges to the language from this particular instruction.  *Boyd v. Ward*, 179 F.3d 904, 923-24 (10th Cir. 1999).  It should also be noted that Instruction No. 10 told Petitioner's jury that "[e]vidence has been introduced as to the following mitigating circumstances:" and was then followed by a list of eleven separate mitigating circumstances.  The jury was instructed that "[i]n addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well" (O.R. 2836).  The jury was also instructed that they could consider sympathy or sentiment for Petitioner in deciding whether to sentence her to death (O.R. 2840).  Habeas relief is therefore unavailable based on Petitioner's challenge to the wording of this instruction.  There is no reasonable likelihood that Petitioner's jury applied the challenged instruction in a way that prevented consideration of her mitigating evidence.  *Id.* (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Petitioner's challenge to the prosecutor's argument also does not afford her relief. "While [Petitioner] has the right to have the jury consider any constitutionally relevant mitigating evidence [s]he presents, '[t]he prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors.'" *Neill v. Gibson*, 278 F.3d 1044, 1058 (10th Cir. 2001) (internal citations omitted). Nothing in the prosecutor's argument prevented the jury from considering Petitioner's mitigating circumstances. References to moral culpability in considering the weight of proposed mitigating circumstances is wholly proper. *See Young v. Sirmons*, 551 F.3d 942, 968 (10th Cir. 2008) (in course of reweighing aggravating and mitigating circumstances, Tenth Circuit found that proposed mitigating evidence did not "substantially reduce Young's 'moral culpability' for the two murders"). The prosecutor did nothing more than discuss the evidence presented from the State's perspective (Tr. 4391-4400). While the prosecutor took issue with each of Petitioner's mitigating circumstances, she did not tell the jury to ignore that evidence. Further, the trial court here specifically instructed the jury that it was their duty to determine what circumstances were mitigating. *Id.*; (O.R. 2835).

Petitioner cites no Supreme Court decision finding the type of arguments made by the prosecutor here improper. The OCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court's decisions. Habeas relief is therefore unwarranted.

## XIII.

## THE OCCA'S REJECTION OF PETITIONER'S PROSECUTORIAL MISCONDUCT CLAIMS WAS WHOLLY REASONABLE.

In Ground XIII, Petitioner advances the prosecutorial misconduct claims she raised on direct appeal. These challenges focus on argument made by the prosecutor during penalty phase closing argument. These challenged comments were so shocking that Petitioner's counsel failed to object to most of them. Doc. 26 at 276-83.

### A.    Exhaustion.

These particular prosecutorial misconduct claims were raised on direct appeal and were rejected by the OCCA. *Andrew*, 164 P.3d at 202-04. Petitioner's Ground XIII claim is therefore exhausted for purposes of habeas review.

### B.    Standard of Review.

The OCCA reviewed Petitioner's individual prosecutorial misconduct claims on substantive grounds, not procedural grounds. In the concluding paragraph of its prosecutorial misconduct analysis, the OCCA expressly held that "[Petitioner] has failed to show either that her trial was so infected by misconduct as to violate due process, or that her death sentence was improperly or unconstitutionally obtained." *Id.* at 204. Following this sentence, the OCCA cited to a passage from *DeRosa v. State*, 89 P.3d 1124, 1149 (Okla. Crim. App. 2004) which also expressly cites the Eighth Amendment, further showing the state court's awareness, and express rejection of, Petitioner's federal claim. *See Welch v. Sirmons*, 451 F.3d 675, 687 (10th Cir. 2006). Many of Petitioner's prosecutorial misconduct

172

challenges were reviewed for plain error which the Tenth Circuit has found consistent with federal due process principles and thus, subject to AEDPA deference. *See Douglas v. Workman*, 560 F.3d 1156, 1177-79 (10th Cir. 2009) (and cases cited therein) (AEDPA deference applies to substantive merits review of federal claims under Oklahoma's plain error rule).

A federal court may not presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation. *Bell v. Cone*, 543 U.S. 447, 455 (2005). Petitioner implicitly concedes that AEDPA deference applies to the state court's treatment of this claim. Doc. 26 at 283 ("[t]he OCCA's decision in denying relief on this claim was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court"). All things considered, the OCCA's adjudication of the challenges raised in Petitioner's Ground XIII claim represents an adjudication on the merits of her federal claims warranting applicability of AEDPA. *Matthews*, 577 F.3d at 1180 ("[a]n adjudication on the merits occurs when the state court resolves the case on substantive grounds, rather than procedural grounds").

C.    *Merits.*

Under clearly-established federal law as determined by the Supreme Court's decisions, a prosecutor's improper remarks generally require reversal of a state conviction only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 & 645 (1974). Inquiry into fundamental fairness requires examination of the entire proceedings, including

the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase. *Id.* at 643. Any cautionary steps such as instructions to the jury, offered by the court to counteract improper remarks, may also be considered. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986). Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment. *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999). Defense counsel's conduct, as well as the prosecutor's response, is relevant in assessing the totality of circumstances in which the alleged prosecutorial misconduct occurs. *United States v. Young*, 470 U.S. 1, 12-13 (1985). It is not enough that the prosecutor's remarks were undesirable or even universally condemned. *Darden*, 477 U.S. at 181 (quotation marks omitted). Ultimately, the reviewing court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct. *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000).

Review of the record shows that the challenged comments are not prosecutorial misconduct at all but rather the typical sort of comments made during the normal course of closing argument that fall within the broad parameters of effective advocacy. *See Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005) ("[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial"); *id.* at 1135 ("a prosecutor is entitled to argue that under the facts and law, capital punishment is appropriate"); *Neill v. Gibson*, 278 F.3d 1044, 1058 (10th Cir. 2001) (internal citations omitted) ("[w]hile [Petitioner] has the right to have the jury consider any constitutionally relevant mitigating evidence [s]he presents, '[t]he prosecutor is permitted to comment upon and to argue the appropriate weight

to be given mitigating factors.'"). Petitioner's jury was not so inflamed by the prosecutor's argument that it was unable to reject the continuing threat aggravator (O.R. 2844), a factor relevant to the reasonableness of the state court's assessment of these prosecutorial misconduct claims, *Cf. Johnson v. Mullin*, 505 F.3d 1128, 1159-60 (10th Cir. 2007):

> **(1)** Petitioner's challenge to the prosecutor's comment regarding Tricity Andrew not begging for her mother's life and whether the jurors would put their 15-year-old niece on the stand to beg for their life does not represent error (Tr. 4478, 4485). These comments were based on the evidence, drew no objections and were proper. The prosecutor questioning Petitioner's method of begging for her life were fair game as was comment on Tricity Andrew's failure to beg for her mother's life. Indeed, defense counsel utilized this same tactic by arguing that the victim's family did not ask during victim impact testimony for the death penalty to be imposed (Tr. 4468, 4472). The OCCA reasonably rejected this claim. *Andrew*, 164 P.3d at 202-03;

> **(2)** the prosecutor's argument that a good mother would not "bring men into her house with her children there and her husband at work" (Tr. 4394) was reasonably based on evidence presented that she had the children around Pavatt and Higgins at the Andrew home and in public during Petitioner's adulterous affairs (Tr. 248, 251-55, 278, 325-26, 2655-57, 2851-53, 2907-10, 3134) and responded to the list of mitigating circumstances presented in the jury's instructions (O.R. 2836). *Andrew*, 164 P.3d at 203. Thus, there was nothing objectionable about this comment, no doubt the reason trial counsel registered no objection to it;

> **(3)** the prosecutor's passing argument regarding the victim's family wishing to visit him in prison drew no objection (Tr. 4396). Even if error, this comment did not deprive Petitioner of a fundamentally fair sentencing trial in light of the strong evidence supporting both aggravators, *see* Sections I & XIV; *Andrew*, 164 P.3d at 201. The OCCA's rejection of this claim was wholly reasonable. *Id.* at 203;

(4)   the prosecutor's challenged comments at transcript page 4402 were reasonable comments on the evidence presented, not improper requests for victim sympathy amounting to plain error. *See*, *e.g.* (Tr. 132-33, 449-50, 3157; State's Exhibit 205–"Marriage Wonderful"). This is especially so considering defense counsel's admission during closing statements that Rob "was a good person and he was a good man. He was a good father and he didn't deserve to die" (Tr. 4429). All things considered, the OCCA's rejection of this claim–which included consideration of the fact that no objection was registered--was wholly reasonable. *Id.*;

(5)   the prosecutor's challenged comment at transcript page 4480 was not a personal attack but rather a response to defense counsel's argument that if the jury chose death "it might feel good today based on the emotions but it's a decision you've got to live with. It can't be changed tomorrow when it might not feel so good" (Tr. 4430). The prosecutor appropriately argued that the jury should not "feel good" about imposing the death penalty but it was nonetheless their job in the State's view to impose it based on the facts of the case. This was proper argument, directly responsive to the defense closing arguments. That is why no objection was lodged by defense counsel to it. The OCCA reasonably rejected this complaint. *Id.* at 203, 204;

(6) the prosecutor's reference to Petitioner as a "cold-blooded, heartless killer", which drew no objection (Tr. 4494), was not a personal attack amounting to the denial of a fundamentally fair trial but, rather, reasonable comment on the evidence from the State's perspective that Petitioner deserved the death sentence. The OCCA reasonably rejected it. *Id.*

(7)   the prosecutor's challenged comments at transcript page 4492 were reasonable inferences based on Petitioner's statement to the 911 operator that the victim was trying to talk as he lay bleeding to death in his own garage along with the undisputed evidence discussed above that he loved his wife and kids (Tr. 1773-75; State's Exhibit 34), not error depriving Petitioner of a fundamentally fair sentencing proceeding. These comments drew no objection. The OCCA reasonably rejected this claim under the circumstances. *Id.*;

**(8)** the prosecutor's statement at transcript page 4409 that the victim's mother "could not come to this witness stand" was based on facts before the jury considering that the mother was referenced during victim impact testimony but did not testify (Tr. 4186, 4189-90). Regardless, any error did not deprive Petitioner of a fundamentally fair trial in light of the properly admitted evidence in support of aggravation and the properly admitted victim impact testimony presented. The trial court's admonishment a few lines after this challenged comment, reminding the jury that "nothing the attorneys say is evidence" (Tr. 4410), served to cure any error, thus bolstering the reasonableness of the state court's rejection of this claim. *Id.*

**(9)** the prosecutor's statement that the victim impact witnesses did not expressly request the death penalty because "[t]hey're prohibited by law from asking for a specific punishment" (Tr. 4484) is an accurate statement of the Tenth Circuit's interpretation and application of *Payne v. Tennessee*, 501 U.S. 808 (1994) to Oklahoma death penalty cases. *See Welch,* 451 F.3d at 701-04; *Hain v. Gibson*, 287 F.3d 1224, 1236-39 (10th Cir. 2002). There was nothing inaccurate about the challenged comment and it was a direct response to defense counsel's argument that the victim impact witnesses did not ask for the death penalty (Tr. 4468, 4472); *Andrew*, 164 P.3d at 203. This is unquestionably why it drew no defense objection. *Id.* Indeed, the State's comment during closing reflected the precise defense position advanced during motion hearings regarding victim impact recommendations as to appropriate punishment (5/18/04 Tr. 58; O.R. 2035-38);

**(10)** the prosecutor's argument at transcript page 4484 that the victim impact witnesses conveyed that they wanted the death penalty, even though they were not able expressly to say it, represents reasonable comment on the victim impact testimony and, again, was a direct response to defense counsel's argument that the victim's family did not ask for the death penalty. This is undoubtedly why the challenged comment drew no defense objection. The OCCA's rejection of this claim, like the immediately preceding related claim, was wholly reasonable. *Id.*;

177

**(11)** the balance of challenged comments at transcript pages 4475 and 4479 as well as the prosecutor's argument that justice demanded the death penalty in this case, most of which drew no objection, all represent proper argument as to appropriate punishment based on the facts of the case and did not deprive Petitioner of a fundamentally fair sentencing proceeding. No error stems from these comments. The OCCA reasonably rejected these challenges. *Id.*

All things considered, the OCCA's rejection of Petitioner's prosecutorial misconduct claims was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court's decisions. Nor was it based on an unreasonable determination of the facts. Considered individually, or cumulatively, *see Andrew*, 164 P.3d at 204, the challenged comments did not deprive Petitioner of a fundamentally fair sentencing proceeding. Nor did they, as Petitioner urges, prevent the jury from considering the mitigating evidence, Doc. 26 at 281, or otherwise lead the jury to believe that responsibility for determining the appropriateness of Petitioner's death sentence lies somewhere else–a proposition Petitioner implicitly advances with her misplaced citation to *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Doc. 26 at 283.

The prosecutor's arguments squarely addressed the mitigating evidence by questioning the weight it should be given. As discussed above, the evidence supporting Petitioner convictions and death sentence was "overwhelming." *Id.* at 206 (Lumpkin, J., concurring in result). "[Petitioner] was convicted and sentenced to death based upon the facts and circumstances of this case, rather than any improper remarks by the prosecutor." *Id.* at 204. As the OCCA found during its mandatory sentencing review, "the jury's verdict

was not born under the influence of passion, prejudice or any other arbitrary factor" either

from the prosecutor's argument or any other purported trial error. *Id.* at 205. Considering

this Court's "very limited" role on habeas review, *Thornburg*, 422 F.3d at 1129, along with

the application of AEDPA's "forgiving lens", *Matthews*, 577 F.3d at 1186, habeas relief is

unwarranted. 28 U.S.C. § 2254(d).

## XIV.

### PETITIONER'S EVIDENTIARY SUFFICIENCY CHALLENGE TO THE ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL AGGRAVATOR IS UNEXHAUSTED; ALTERNATIVELY, THE OCCA'S REJECTION OF THIS CLAIM WAS WHOLLY REASONABLE.

In Ground XIV, Petitioner alleges that insufficient evidence was presented at trial to

support the jury's finding of the especially heinous, atrocious or cruel aggravator. Doc. 26

at 283-87.

### A.    *Exhaustion.*

Petitioner raised a claim in Proposition XIV of her direct appeal brief challenging the

sufficiency of the evidence supporting the jury's finding of the especially heinous, atrocious

or cruel aggravating circumstance. 2/21/06 Brief of Appellant (No. D-2004-1010) at 99.

This proposition of error, which amounts to about half a page of argument, urged that the

evidence was insufficient to establish conscious physical suffering by the victim. The only

legal authority cited are three state cases in which the OCCA struck a jury's finding of the

heinous, atrocious or cruel aggravator based on an insufficient showing of conscious physical

suffering of the victim.  Petitioner did not refer to any provision of the federal constitution in this proposition of error or otherwise label this claim as "federal".  Nor did she cite a state case relying upon, or otherwise invoking, *Lewis v. Jeffers*, 497 U.S. 764, 781-83 (1990)–the clearly established federal law governing this issue--or, for that matter, any other federal case.

The OCCA rejected this particular claim on substantive, not procedural grounds by applying a standard consistent with the *Lewis v. Jeffers* evidentiary sufficiency standard.  *See Andrew*, 164 P.3d at 201 ("[w]hen the sufficiency of the evidence supporting an aggravator is challenged on appeal, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt").  Tracking the precise arguments contained in Petitioner's claim, however, the state court did not cite any federal authority for this proposition or otherwise label the claim as "federal".  Instead, the OCCA cited passages from two state decisions, *Derosa v. State*, 89 P.3d 1124, 1153 (Okla. Crim. App. 2004) and *Davis v. State*, 103 P.3d 70, 81 (Okla. Crim. App. 2004), which do not expressly invoke *Jeffers* or any other federal authority.  Indeed, the cited passage in *Davis* addresses the specific requirements under state law for the heinous, atrocious or cruel aggravator; the passage from *Derosa* simply recites the generic sufficiency of the evidence standard employed by the OCCA.

Because Petitioner did not assert a federal constitutional basis for this claim, her current federal claim, to the extent it relies upon federal constitutional law, is unexhausted.

In short, Petitioner did nothing to identify for the OCCA a federal basis for this claim. The OCCA's use of the generic sufficiency of the evidence standard applied here is consistent with vindication of Petitioner's state law right to be sentenced to death based only upon aggravators that are supported by sufficient evidence. *See* Okla. Stat. tit. 21, § 701.11. Indeed, the OCCA, as part of its mandatory sentencing review under state statute, has an independent obligation to review whether the evidence supports the jury's finding of statutory aggravating circumstances. Okla. Stat. tit. 21, § 701.13(C)(2).

"A state prisoner generally must exhaust available state-court remedies before a federal court can consider a habeas corpus petition." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (citing 28 U.S.C. § 2254(b)(1)(A); *Hawkins v. Mullin,* 291 F.3d 658, 668 (10th Cir.2002)). "A claim has been exhausted when it has been 'fairly presented' to the state court." *Id.* (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). "'Fair presentation' requires more than presenting 'all the facts necessary to support the federal claim' to the state court or articulating a 'somewhat similar state-law claim.'" *Id.* (quoting *Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam)). "'Fair presentation' means that the petitioner has raised the 'substance' of the federal claim in state court." *Id.* (quoting *Picard,* 404 U.S. at 278). While the habeas petitioner need not cite " 'book and verse on the federal constitution,' " *id.* (quoting *Daugharty v. Gladden,* 257 F.2d 750, 758 (9th Cir.1958)), the petitioner cannot assert entirely different arguments from those raised before the state court. *Id.*

Recently, the Supreme Court concluded that a habeas petitioner had failed to exhaust available state remedies when he referenced the Sixth Amendment in relation to his claim

that *trial counsel* was ineffective, but failed to reference it again with respect to his separate claim for ineffective assistance of *appellate counsel*. *Baldwin v. Reese*, 541 U.S. 27, 30-33 (2004). The Court noted that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at 32.

In a later case, *Dye v. Hofbauer*, 546 U.S. 1, 3-4 (2005), the Supreme Court rejected an exhaustion challenge to a state prisoner's § 2254 petition where the argument header for his prosecutorial misconduct claim referred to the alleged denial of due process and a fair trial and the text of the argument under this argument heading cited the Fifth and Fourteenth Amendments to the United States Constitution as well as federal cases concerning alleged violations of federal due process rights in the context of prosecutorial misconduct, including *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).

In a slightly different context (the Supreme Court's scope of review on certiorari), the Court found that a petitioner's brief in the Mississippi Supreme Court did not properly present his claim as one arising under federal law. The Court noted he did not cite the federal constitution "or even any cases directly construing it, much less any of this Court's cases", but instead relied upon a "daisy chain" of state-law cases that only obliquely mentioned federal law. *Howell v. Mississippi*, 543 U.S. 440, 443-44 (2005). In *Anderson v. Harless*, the Supreme Court found a federal due process instructional challenge unexhausted where only a similar state-law argument was advanced in state court and the

only authority cited was a state case interpreting and applying state law. *Anderson*, 459 U.S. at 7.

In the instant case, Petitioner's treatment of the evidentiary sufficiency challenge to the heinous, atrocious or cruel aggravator stands in stark contrast to the argument and authority she presented in virtually every other proposition of error in her direct appeal brief to alert the OCCA of the purported federal nature of those claims. *See, e.g.*, 2/21/06 Brief of Appellant (No. D-2004-1010) at 12, 16, 21, 22, 32, 33, 35, 42, 48, 49, 53, 54, 62, 69, 73-74, 76-79, 89, 93-95. Petitioner's argument and authority in Proposition XIV of her direct appeal brief highlights that her evidentiary sufficiency challenge relied entirely on state law grounds and did not implicate any aspect of the federal constitution. "The mere similarity between a claim of state and federal error is insufficient to establish exhaustion." *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)). "Moreover, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion." *Id.* (citing *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)). *See also Howell*, 543 U.S. at 444 n.2 (and cases cited therein). The same should be true of general appeals to the "sufficiency of the evidence".

While much of her discussion focuses on Oklahoma's requirements for the especially heinous atrocious or cruel aggravator, Petitioner also asserts in her § 2254 petition purported violations of the Eighth and Fourteenth Amendments to the federal constitution. Doc. 26 at 286-87. Petitioner cites several Supreme Court cases to support this claim (however, she

does not cite *Lewis v. Jeffers*–more on this later). These citations of authority were not advanced on direct appeal by Petitioner to support this claim. Nor did she even bother to label the claim "federal". The OCCA, when presented on appeal with Petitioner's claim of error under Oklahoma law, understandably confined its analysis to the application of state law. *Andrew*, 164 P.3d at 201. Thus, the instant claim should be deemed unexhausted. 28 U.S.C. § 2254(b)(1). This Court may not grant relief on an unexhausted claim. However, it may deny an unexhausted claim. 28 U.S.C. § 2254(b)(2).

This Court also has the option of finding that it would be futile for Petitioner to return to state court and exhaust state remedies. Were Petitioner to return to state court to exhaust the federal aspect of this claim in a second state post-conviction relief application, the OCCA would unquestionably deem it procedurally defaulted for the reasons set forth previously in Section V. This claim could have been raised as early as direct appeal since it can be resolved entirely on the existing trial record. Respondent submits that this unexhausted claim is procedurally barred on independent and adequate state law grounds for the reasons set forth above in response to Ground V. Petitioner has not asserted either cause and prejudice or a miscarriage of justice to overcome this procedural default rule and no legitimate basis for asserting either exception is apparent. The instant claim should therefore be deemed unexhausted and procedurally barred from federal review.

### B.    *Alternative Merits Analysis.*

Alternatively, even if this Court deemed the instant claimed exhausted--the position taken by Petitioner, Doc. 26 at 283–she would still not be entitled to relief. AEDPA

deference would apply to the OCCA's rejection of this claim because it applied a standard consistent with that mandated by *Lewis v. Jeffers*, i.e., whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Matthews v. Workman*, 577 F.3d 1175, 1183 n.2 (10th Cir. 2009). *See also Bland*, 459 F.3d at 1012-13 (AEDPA deference applies to alternative merits analysis of unexhausted claim where habeas petitioner contends the state court squarely addressed his constitutional claim; if habeas petitioner is correct, then the state court rejected this claim on the merits). Applying that standard here, there unquestionably was sufficient evidence to support the jury's finding of the especially heinous, atrocious or cruel aggravator.

The State presented evidence at trial that the victim was conscious before, during and after infliction of the two shotgun wounds. Petitioner placed two separate 911 calls to police after the shooting. Both calls totaled approximately six minutes and thirty seconds. Ten seconds separated the calls. Petitioner told the 911 operator during the second call that her husband was breathing, conscious and trying to talk to her after being shot (Tr. 1773-75; State's Exhibit 34). *See also Andrew*, 164 P.3d at 201. The victim suffered two shotgun wounds to the neck and chest. The medical examiner testified that the victim was hit with multiple shotgun pellets from the shotgun blasts. The first shotgun wound was fired from three to fourteen feet away while the second shot was much closer when fired, approximately three to four feet away (Tr. 2222-27, 2248-49, 3229-31). The victim could have continued living after being shot for "[l]ess than ten" minutes (Tr. 2246). Death would not have been

185

instantaneous (Tr. 2245). Even though both shotgun wounds were independently fatal, the victim could have remained conscious after receiving either one of them (Tr. 2243-44). The maximum time according to the medical examiner for the victim to remain conscious after being shot would have been "minutes" (Tr. 2255). "When emergency personnel arrived, [the victim] was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to shield himself from being shot, or attempted to ward off his attacker." *Andrew*, 164 P.3d at 201; (Tr. 1810, 1823-24, 2123; State's Exhibits 41, 66, 73). The medical examiner testified that the shotgun wounds would have been painful (Tr. 2246).

This evidence, taken in the light most favorable to the State, represents sufficient evidence to establish serious physical abuse and, in particular, conscious physical suffering by the victim. *See DeRosa*, 89 P.3d at 1156; (O.R. 2831). Petitioner's own words to the 911 operator show that the victim suffered far more than "the momentary pain of being shot to death" she now claims. Doc. 26 at 284. Petitioner's account was plausible according to the medical examiner's testimony. The OCCA's rejection of this claim was therefore wholly reasonable in light of the evidence. Relief is unwarranted for this evidentiary sufficiency challenge. 28 U.S.C. § 2254(d).

Petitioner's evidentiary sufficiency challenge in this case, focused as it is on the Eighth Amendment concept of properly narrowed aggravators and the OCCA's previous limitations placed on this aggravator, Doc. 26 at 285-86, resembles a claim that the aggravator itself has become overbroad or unconstitutional based on the manner in which it has been applied here. But an aggravator does not become unconstitutionally overbroad

simply because a state court applies it in a manner with which death row inmates, or even federal judges, disagree. *See Arave v. Creech*, 507 U.S. 463, 476-77 (1993) ("the question whether state courts properly have applied an aggravating circumstance is separate from the question whether the circumstance, as narrowed, is facially valid"); *Jeffers*, 497 U.S. at 779 ("if a State has adopted a constitutionally narrow construction of a vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the 'fundamental constitutional requirement' of 'channeling and limiting...the sentencer's discretion in imposing the death penalty'...has been satisfied"). Petitioner essentially seeks some form of proportionality review, something not authorized on habeas. *Id. See also Middleton v. Roper*, 498 F.3d 812, 821 (8th Cir. 2007); *Hatch v. Oklahoma*, 58 F.3d 1447, 1466-67 (10th Cir. 1995). The Tenth Circuit has consistently upheld the constitutionally of this aggravator. *Workman v. Mullin*, 342 F.3d 1100, 1115-16 (10th Cir. 2003). Considering that Petitioner's jury was specifically instructed on the requirement of conscious physical suffering using an amended uniform instruction, *see* (O.R. 2831); *Derosa*, 89 P.3d at 1156, her constitutional challenge is plainly meritless. *Cf. Wilson v. Sirmons*, 536 F.3d 1064, 1108 (10th Cir. 2008) (rejecting petitioner's claim that absence of "conscious physical suffering" requirement in heinous, atrocious or cruel instruction rendered this aggravator unconstitutional as applied).

It should also be noted that this aspect of Petitioner's Ground XIV claim, which essentially challenges the constitutionally of Oklahoma's heinous, atrocious or cruel aggravator, was not even suggested by the arguments she made to the OCCA in Proposition

XIV of her direct appeal brief.  Indeed, if Petitioner's Proposition XIV claim in state court can be distilled into any form of federal constitutional challenge, it is merely a straightforward evidentiary sufficiency challenge based on *Jeffers* – not a claim that the OCCA's application of the especially heinous, atrocious or cruel aggravator in this case renders the aggravator unconstitutionally overbroad.  Thus, this aspect of Petitioner's Ground XIV claim is unexhausted and procedurally barred from habeas review for the very reasons previously discussed.

All things considered, habeas relief should be denied on Petitioner's Ground XIV claim.

## XV.

## PETITIONER'S CUMULATIVE ERROR CHALLENGE.

Finally, Petitioner claims that she is entitled to federal habeas relief based on alleged cumulative error.  Doc. 26 at 288-91.

### A.    *Exhaustion.*

Petitioner alleged cumulative error on direct appeal and the OCCA rejected this claims on the merits.  *Andrew*, 164 P.3d at 205.  Petitioner's Ground XV claim is therefore exhausted for purposes of federal habeas review.

### B.    *Merits.*

Because the OCCA rejected Petitioner's cumulative error argument on the merits, AEDPA applies.  The issue before the Court is whether the OCCA's rejection of this claim was either contrary to, or an unreasonable application of, clearly-established Supreme Court

precedent to the facts of this case or was otherwise based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

First, the State submits that no authority from the United States Supreme Court recognizes "cumulative error" as a separate violation of the federal constitution or as a separate ground for federal habeas relief.  *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief").  *See also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("Moore claims he is entitled to relief because of cumulative trial errors.  But we have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (quoting *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990)) ("cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own").  The OCCA's rejection of Petitioner's cumulative error arguments can therefore not be contrary to, or an unreasonable application of, clearly established Federal law as set forth by the Supreme Court at the time of the state court's decision.  Recent Supreme Court decisions have emphasized that the absence of clearly-established Supreme Court precedent is analytically dispositive under AEDPA of any claim raised on habeas.  28 U.S.C. § 2254(d); *House v. Hatch*, 527 F.3d 1010, 1016-18 (10th Cir. 2008).  *See Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003) (declining to address whether cumulative error may represent a free-standing constitutional violation or is otherwise cognizable as a separate ground for relief).

Assuming *arguendo* that cumulative error claims are cognizable on habeas review, Petitioner is still not entitled to relief.  Under circuit precedent (again, *not* clearly-established Supreme Court precedent), cumulative error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.  *Young v. Sirmons*, 551 F.3d 942, 972-73 (10th Cir. 2008).  Cumulative error analysis on habeas extends only to cumulative federal constitutional errors, *id.*, not statutory or state-law rights.  Thus, under a cumulative error theory, a habeas petitioner must show that the cumulative effect of trial errors had a substantial and injurious effect or influence in determining the jury's verdict.  *Fahy v. Horn*, 516 U.S. 169, 205 (3d Cir. 2008) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Thus, a habeas petitioner would not be entitled to relief under a cumulative error theory unless he or she can establish actual prejudice.  *Id.  See also Fry v. Pliler*, 551 U.S. 112 (2007).

Here, Petitioner argues that "[t]his is a case that cries out for cumulative error relief." Doc. 26 at 288.  Yet Petitioner present no specific argument addressing the purported synergistic effect of any specific constitutional errors.  Instead, she proceeds as though each and every claimed error raised in her § 2254 petition is valid.  As shown throughout the instant response brief, however, that is clearly not the case.  Indeed, many of Petitioner's grounds for relief invoke mere state law error, *see* Grounds II (in part), III, IV, V, VII, VIII, XI, XII (in part), so they are not properly considered in a cumulative error analysis on habeas.  *Young, supra.*  As discussed previously, a portion of Petitioner's Ground V claim,

along with her entire Ground XIV claim, are unexhausted and procedurally barred. Thus, these unexhausted claims are also not properly considered in any cumulative error analysis.

Of those grounds for relief alleging cognizable federal claims, error (or possible error) was found by the OCCA in Grounds I and II relating to the disallowance of certain defense testimony based on discovery violations and the admission of testimonial statements through Detective Niles and Officer Klika. No synergistic effect arises assuming *arguendo* error from these particular claims. As shown in Section II above, Petitioner's participation in the brake line incident was firmly established through properly admitted evidence separate and apart from the victim's statements to police. *See Andrew*, 164 P.3d at 189, 191.

As for the disallowance of certain defense testimony discussed above in Section I, as shown there any error was harmless because the omitted testimony from Petitioner's neighbors regarding hearing gunshots was consistent with the State's theory of the killing. Further, Petitioner's own crime scene reconstruction expert established her gunshot wound was evidence of a staged event. The omitted testimony therefore would not help her. *Id.* at 197. Any error stemming from omission of jailer Donna Tyra's testimony was harmless because it was largely cumulative of testimony from another defense witness. *Id.* at 197-98.

Petitioner fails to show any possible greater prejudicial effect flowing from these errors when considered cumulatively as opposed to individually. That is especially so considering the mountain of evidence at trial establishing Petitioner's guilt for the murder and conspiracy and supporting imposition of the death sentence. See Section I. Thus, no basis for relief arises under Petitioner's cumulative error theory. All things considered, the

OCCA's rejection of Petitioner's cumulative error claim, *see id.* at 205, was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court's decisions. Nor was it based on an unreasonable determination of the facts. Habeas relief is therefore unwarranted. 28 U.S.C. § 2254(d).

## XVI.

### PETITIONER'S FEDERAL CONSTITUTIONAL CHALLENGE TO THE TRIAL COURT'S FAILURE TO INSTRUCT ON OKLAHOMA'S 85% RULE WAS REASONABLY REJECTED BY THE OCCA.

Citing *Simmons v. South Carolina*, 512 U.S. 154 (1994) and *Shafer v. South Carolina*, 532 U.S. 36 (2001), Petitioner complains in Ground XVI that reversible error stems from the trial court's failure to instruct the jury during penalty-phase deliberations, consistent with *Anderson v. State*, 130 P.3d 273 (Okla. Crim. App. 2006), that Petitioner would be required to serve 85% of any straight life sentence imposed by her jury. The gist of Petitioner's argument is that without such an instruction, her jury was left with an erroneous impression as to the meaning of the life *without* possibility of parole sentencing option. Doc. 26 at 291-95.

### A.    Exhaustion.

This claim was raised in Petitioner's state post-conviction relief application and the OCCA denied it on the merits under the rubric of appellate counsel ineffectiveness. *See* Doc. 26-3 at 5-6. Thus, this claim is exhausted for purposes of federal habeas review.

192

## B.    Standard of Review.

The OCCA found this substantive claim procedurally defaulted because it could have been, but was not, raised on direct appeal.  *Id.*  However, the state court reviewed it on the merits by adjudicating the merits of Petitioner's alternative claim that appellate counsel was ineffective for failing to raise this claim on direct appeal.  *Id.*  Applying *Strickland*, the OCCA rejected Petitioner's appellate counsel ineffectiveness claim, finding that her underlying substantive challenge to the absence of an instruction to the jury on the 85% Rule was meritless.  *Id.*

This is the appropriate analysis when a court considers whether appellate counsel was ineffective for failing to raise some issue on direct appeal.  *See Smith v. Workman*, 550 F.3d 1258, 1268 (10th Cir. 2008) ("[i]n order to evaluate appellate counsel's performance, 'we look to the merits of the omitted issue'").  *See also Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) ("Mahdi's contentions that both his trial counsel and appellate counsel were ineffective are analytically linked.  Mahdi claims that his appellate counsel was ineffective for not appealing the ineffectiveness of his trial counsel.  Thus, each claim relies on the underlying argument that Mahdi's trial counsel were ineffective"). The OCCA here therefore rejected the merits of Petitioner's substantive instructional challenge, despite the court's preliminary procedural bar ruling.   Thus, the OCCA's rejection of this substantive instructional claim rests on substantive, not procedural, grounds and therefore constitutes an adjudication on the merits to which AEDPA deference applies.  *See Matthews v. Workman*, 577 F.3d 1175, 1180 (10th Cir. 2009).

C.    **Merits.**

The state court's rejection of this claim was wholly reasonable.  The Supreme Court has held that whether or not to inform a sentencing jury of information regarding parole or executive clemency generally amounts to nothing more than a state law issue.  *Simmons v. South Carolina*, 512 U.S. 154, 168 (1994) (citing *California v. Ramos*, 463 U.S. 992, 1014 (1983)).  Petitioner's argument is torpedoed by *Ramdass v. Angelone*, 530 U.S. 156 (2000).  In *Ramdass*, the Supreme Court rejected a *Simmons* claim under § 2254 where the petitioner was not ineligible for parole at the time his capital sentencing jury deliberated his sentence.  A plurality of justices, in an opinion written by Justice Kennedy, found that habeas relief under AEDPA was unwarranted because "[w]e have not extended *Simmons* to cases where parole ineligibility has not been established as a matter of state law at the time of the jury's future dangerousness deliberations in a capital case."  *Id.* at 165.  As recognized by the *Ramdass* plurality, "[t]he premise of the *Simmons* case was that, under South Carolina law, the capital defendant would be ineligible for parole if the jury were to vote for a life sentence."  *Id*.  Justice O'Connor provided the fifth vote in *Ramdass* to deny habeas relief "[f]or the reasons explained in the plurality opinion".  *Id.* at 180.  She stated that "[w]hether a defendant is entitled to inform the jury that he is parole ineligible is ultimately a question of federal law, but we look to state law to determine a defendant's parole status."  *Id.*

Petitioner's case is distinguishable from *Simmons* and its progeny in at least one very critical respect.  Petitioner would not have been parole ineligible if the jury sentenced him to a straight life sentence, a fact made obvious by the three-option sentencing scheme

194

Petitioner's jury faced. *Hamilton v. Mullin*, 436 F.3d 1181, 1191 (10th Cir. 2006). Indeed, the only "confusion" regarding sentence identified by Petitioner here does not involve the life without parole sentencing option at all but instead the straight life sentence. *See Parr v. Quarterman*, 472 F.3d 245, 259 (5th Cir. 2006) (rejecting argument that life imprisonment with parole eligibility after 40 years should be treated identically to life imprisonment without possibility of parole for purposes of *Simmons*). Thus, the OCCA's decision was not contrary to, or an unreasonable application of Supreme Court precedent in light of *Ramdass*. There is no clearly-established Supreme Court precedent supporting this claim. *See also House v. Hatch,* 527 F.3d 1010, 1015-18, 1024 (10th Cir. 2008).

At the time of Petitioner's trial, OCCA decisions held that it was reversible error to inject evidence, argument or instructions relating to the inner workings of the parole system or executive clemency into a capital murder trial. *See, e.g., Johnson v. State*, 95 P.3d 1099, 1101-03 (Okla. Crim. App. 2004) (executive clemency); *Harris v. State*, 84 P.3d 731, 755 & 757 (Okla. Crim. App. 2004) (parole and facility placement within Department of Corrections). It is little wonder then that the OCCA stated in *Eizember v. State,* a capital case tried *after* Petitioner's trial, that "[t]he record suggests the trial court did not sua sponte issue an instruction during voir dire on the 85% Rule because at the time of the trial in this case, the long standing rule was that the trial court should not comment or instruct the jury on parole eligibility." *Eizember*, 164 P.3d 208, 229 (Okla. Crim. App. 2007). State courts are the final arbiters of state law and this Court is bound by the OCCA's pronouncement of it. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) (per curiam).

Nothing in clearly-established Supreme Court precedent required the trial judge to instruct the jury on the 85% Rule.  The plurality in *Ramdass* noted that state courts remained free to go beyond the minimum requirements of the federal constitution and provide juries with accurate statements regarding the inner workings of the state parole system where non-capital sentencing options provided for the opportunity for parole.  *Ramdass*, 530 U.S. at 177-78.  It emphasized that "[t]he States are entitled to some latitude in this field" and that a State could legitimately conclude that a jury might well be distracted from other vital issues in the case with the injection of such evidence or information into the capital sentencing phase.  *Id.* at 169.  At bottom, however, "the Constitution does not require the instruction that [Petitioner] now requests."  *Id.* at 178.

The OCCA's prejudice assessment, in which it relied upon the jury's imposition of the most severe penalty option available–a punishment to which release on parole is irrelevant--is therefore wholly consistent with Supreme Court precedent.  Doc. 26-3 at 6. The life without parole sentencing option is self-explanatory and means exactly what it says. *Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir. 2000).  Nothing in this regard has changed. Because Petitioner's jury was instructed that one option for punishment was life without the possibility of parole and the jurors still chose to recommend a death sentence (O.R. 2827, 2829, 2833, 2837, 2840), and the trial court–with defense counsel's consent and in response to the jury's question–told the jury that the meaning of life without parole is "self explanatory" (Tr. 4505), there is no possibility that their sentence recommendation on the capital murder count was "round[ed] up" "in an attempt to account for their uninformed

guesses about the impact of parole." *Anderson*, 130 P.3d at 282. Habeas relief is unwarranted on this claim.

**XVII.**

> **THE OCCA'S REJECTION OF PETITIONER'S CLAIM, BASED ON *BRADY V. MARYLAND*, THAT THE PROSECUTION WITHHELD MATERIAL AND EXCULPATORY EVIDENCE RELATING TO TERESA SULLIVAN'S TESTIMONY WAS WHOLLY REASONABLE.**

Citing *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), Petitioner complains that the prosecution withheld material and exculpatory evidence relating to the testimony of Teresa Sullivan. Sullivan, who was a federal inmate housed in the same pod at the Oklahoma County Jail as Petitioner, "testified that [Petitioner] told her that she and Pavatt killed her husband for the money, the kids, and each other. [Petitioner] also told her that Pavatt shot her in the arm to make it look as if she was a victim." *Andrew*, 164 P.3d at 186-87. Petitioner complains that the State failed to disclose that Sullivan's defense attorney, during a phone conversation with the prosecutor on or around April 28, 2004, stated that he might ask her to write a letter to federal prosecutors concerning Sullivan's testimony after she testified at Petitioner's trial. This, Petitioner claims, could be used to show the jury that Sullivan had expectations of benefits in exchange for her testimony and that this was material impeachment evidence which, if introduced, gives rise to a reasonable probability of a different outcome at trial. Petitioner also argues that a new trial is warranted under *Brady* and *Giglio* because the State did not disclose that

the lead prosecutor in Petitioner's case wrote a letter to federal prosecutors after her testimony at Petitioner's trial which resulted in a favorable reduction of her federal sentence and resulted in her release from federal custody in November 2004.  Doc. 26 at 295-323.

### A.    Exhaustion.

Petitioner raised this claim in a motion for new trial filed with the OCCA on September 21, 2005, as part of her direct appeal proceedings.  The OCCA rejected this claim on the merits.  *Andrew*, 164 P.3d at 204-05.  It is therefore exhausted for purposes of federal habeas review.

### B.    Standard of Review.

The OCCA applied a standard consistent with *Brady* and *Giglio* in rejecting this claim, namely, the statutory standard for new trial based on newly discovered evidence set forth in Okla. Stat. tit. 22, § 952.  That standard assesses whether the State withheld material and exculpatory evidence which, had it been presented at trial, would have created a reasonable probability of a different outcome at trial.  *Andrew*, 164 P.3d at 204.  That is the essence of the *Brady/Giglio* standard.  As the Tenth Circuit has summarized:

> If a defendant requests evidence from the government, the prosecution's suppression of that evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that the due process protection announced in *Brady* includes evidence that undermines the credibility of the prosecution's witnesses. *Id.* at 154; *see also United States v. Wright*, 43 F.3d 491, 495 (10th Cir. 1994).  To show a *Brady* or *Giglio* violation, the petitioner must establish "1) that the prosecution suppressed

> evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material." *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994); *see also Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995).

*Hatch v. Oklahoma*, 58 F.3d 1447, 1469 (10th Cir. 1995). "[E]vidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, __U.S.__, 129 S. Ct. 1769, 1783 (2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). *See also Banks v. Dretke*, 540 U.S. 668, 698-99 (2004). The test applied here by the OCCA embodies these standards.

The OCCA's rejection of Petitioner's *Brady/Giglio* claim thus represents a decision on substantive, not procedural, grounds. *Matthews v. Workman*, 577 F.3d 1175, 1180 (10th Cir. 2009) (an adjudication on the merits for § 2254 purposes occurs when the state court resolves the claim on substantive, not procedural, grounds). The state court's application of a standard consistent with *Brady* and *Giglio*, and its full consideration of Petitioner's non-record evidence, requires application of AEDPA deference. *Cf. Wilson v. Workman*, 577 F.3d 1284, 1292 (10th Cir. 2009). Petitioner implicitly concedes that AEDPA deference applies to the OCCA's merits decision on this issue. Doc. 26 at 323 ("[t]his decision was contrary to or an unreasonable application of federal law as determined by the Supreme Court"). All things considered, AEDPA deference applies.

C.    **Merits.**

Reviewing this claim through AEDPA's "forgiving lens", *Matthews*, 577 F.3d at 1186, Petitioner is not entitled to any form of relief on her *Brady* claim. The OCCA reasonably found this evidence was not material, i.e., that the new evidence creates no reasonable probability of a different outcome at trial:

> ¶ 140 [Petitioner] filed a motion for new trial with this Court on September 21, 2005. [Petitioner's] motion is brought pursuant to 22 O.S.2001, §§ 952 and 953, alleging newly discovered evidence. The State filed a response on June 21, 2006.
>
>> The test for whether a motion for a new trial should be granted based upon newly discovered evidence is: (1) whether the evidence is material; (2) whether the evidence could not have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome.
>
> *Ellis v. State*, 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303.
>
> ¶ 141 The motion contains information that Teresa Sullivan, who testified against [Petitioner], received a reduction of her federal sentence due to her cooperation with the Oklahoma County District Attorney's office in this case. Sullivan testified that she had twenty-two (22) months left on her sentence; however, a new sentence was given by the federal court after she testified, which basically allowed her release just five (5) months after testifying. The documents indicate that Sullivan was granted the early release because of her cooperation in this case.
>
> ¶ 142 Information attached to the motion also indicates that Sullivan received a downward departure on her federal sentence because she cooperated with the federal authorities in the

200

investigation of her co-defendants (even though she testified that she was not a snitch). The gist of the motion is that the State knew about the potential for a benefit to Sullivan, but failed to disclose the information. [FN16]

[FN16. The motion is supported by affidavits and documents obtained from the Clerk of the Federal Court for the Western District of Oklahoma. The affidavit states that these documents were obtained on July 26, 2005.]

¶ 143 Sullivan testified that [Petitioner] confessed that she and James Pavatt killed Rob Andrew. Sullivan's attorney says in a letter written to the federal prosecutor that he had to explain to her that she might receive additional consideration on her federal sentence if she were called to testify against [Petitioner]. It appears that Sullivan provided information to the State (before testifying) with no understanding that she might receive a benefit. When she testified at trial, there were no guarantees that she would receive any benefit.

¶ 144 One document in particular states that Oklahoma City Police detectives contacted Sullivan at her place of federal confinement as part of their investigation (as well as others who where incarcerated with [Petitioner] at the Oklahoma County Jail). Sullivan provided information to the detectives before contacting, William P. Earley, the federal public defender who represented her in her federal case. The documents indicate that Earley filed the motion for a reduction of sentence after Sullivan testified as any effective advocate might have done. He stated that he would have filed this motion regardless of any input from the Oklahoma County District Attorney's office.

¶ 145 [Petitioner] has not presented a sufficient showing to be granted a new trial. Substantial additional evidence supports the conviction. We are further convinced that, were we to grant a new trial with this "newly discovered evidence" being introduced, the outcome of the trial would be the same.

¶ 146 Sullivan was thoroughly cross-examined regarding her motivation to testify against [Petitioner], with repeated attempts to show her bias. Defense counsel also called a witness to refute

> the possibility that [Petitioner] shared any information with
> Sullivan. The knowledge of the fact that Sullivan was the
> beneficiary of an act of grace by the federal courts would not
> change the outcome of this trial.

*Andrew*, 164 P.3d at 204-05.

The sole question here under AEPDA is whether the OCCA's rejection of this claim was reasonable. *See Matthews*, 577 F.3d at 1183. That is, was the OCCA's rejection of this claim either contrary to, or an unreasonable application of, clearly-established federal law, as determined by the Supreme Court's decisions or was it otherwise based on an unreasonable determination of the facts. *Id.* at 1180; 28 U.S.C. § 2254(d). The OCCA's rejection of Petitioner's *Brady/Giglio* claim was wholly reasonable. Initially, there can be no question that the State presented overwhelming evidence, separate and apart from Teresa Sullivan's testimony, to support this case. That evidence is detailed in Section I above and need not be repeated here. This mountain of circumstantial evidence supporting Petitioner's guilt for the conspiracy and murder, which has been rightly described as "overwhelming" by the judges of the OCCA, *see Andrew*, 164 P.3d at 192, 206 (Lumpkin, J., concurring in result) & 207 (A. Johnson, concurring in result in part and dissenting in part), makes clear that Teresa Sullivan's testimony was not the linchpin for the State's case.

The State's evidence, separate and apart from Sullivan's testimony, showed a conspiracy between her and Pavatt to murder the victim resulting in an attempt on his life, i.e., the brake line incident, shortly before the murder. This, along with statements by Petitioner confirming her vitriolic hatred for Rob, her obsession over the insurance policy

202

and custody of the Andrew children, plus threats made by Pavatt and Petitioner toward the victim, represents the "tip of the iceberg" of inculpatory circumstantial evidence establishing beyond any doubt Petitioner's guilt for the conspiracy and murder of Rob Andrew. This evidence does not even begin to address the physical evidence recovered from the Gigstad's neighboring residence, testimony from the defense crime scene reconstruction expert that Petitioner's gunshot wound was evidence of staging or Petitioner's flight to Mexico with Pavatt and the Andrew children a few days after the murder. Suffice it to say, without going back through each and every piece of evidence presented during this lengthy trial, the State's evidence, separate and apart from Sullivan's testimony, eliminated any question as to Petitioner's guilt for the conspiracy and murder.

The OCCA correctly recognized that Sullivan's testimony was thoroughly impeached at trial regarding her motivation to testify. Sullivan, a prisoner in federal custody, was repeatedly badgered by defense counsel on cross examination. She accurately testified that she was made no promises by state prosecutors in exchange for her testimony against Petitioner (Tr. 2739-42, 2748). Defense counsel nonetheless played up the possibility of a deal by pointing out for the jury that Sullivan appeared for her testimony in prison garb and with her defense attorney (Tr. 2748-49). Defense counsel elicited that Sullivan had 22 more months on her federal conviction and that her conviction was for possession of methamphetamine with intent to distribute (Tr. 2749, 2752). Sullivan was forced to repeatedly deny defense counsel's claim on cross-examination that she was testifying in exchange for better medical treatment in the federal prison in which she was housed (Tr.

2751).  Defense counsel elicited that Sullivan was previously convicted of a bogus check crime–a crime which she denied involved dishonesty--and that she pled guilty to the federal charge because she was guilty (Tr. 2752, 2757).

Sullivan repeatedly denied defense counsel's claim on cross-examination that she was a "known snitch" at the Oklahoma County Jail and the Fort Worth Federal Correctional Facility (Tr. 2748-49).  Sullivan also denied telling anyone at the Oklahoma County Jail that she would get early release in exchange for her testimony (Tr. 2757).  Defense counsel established that Sullivan could not remember the exact time she was incarcerated at the Oklahoma County Jail (Tr. 2752-53).  Nor could she remember the specific dates she spoke with Petitioner (Tr. 2754).  Defense counsel also elicited that Sullivan had none of the notes she says were passed back and forth between herself and Petitioner and that she did not contact the police or prosecutors with this information when she had them in her possession (Tr. 2755-56).  Defense counsel confronted Sullivan with the possibility that her testimony was based simply upon newspaper accounts of the Andrew murder, something Sullivan also denied (Tr. 2759, 2761).

Defense counsel presented testimony from Angela Burk, who was housed in the same pod as Petitioner at the county jail, to refute Sullivan's testimony (Tr. 3487-91).  Burk testified that Sullivan "was a known jailhouse snitch throughout the jail for testifying against other people" (Tr. 3493, 3499), that Sullivan had access to newspapers and television news in the pod that reported on the Andrew murder case (Tr. 3495) and that Petitioner never talked to anyone on the pod about her case (Tr. 3496).  Indeed, Burk testified that Petitioner

was very shy and quiet while housed on the pod and that she did not talk much at all (Tr. 3491, 3498, 3504). Burk also testified that Sullivan told her she was testifying so she could get some benefit (Tr. 3498).

Based on the trial record, the OCCA could reasonably conclude two things: one, defense counsel's cross-examination gave Petitioner's jury a basis to question, and reject, Sullivan's testimony; and two, assuming *arguendo* the truth of the allegations contained in Petitioner's motion for new trial, omission of the impeachment evidence did not deprive Petitioner of a fair trial or otherwise undermine confidence in its outcome. *Kyles*, 514 U.S. at 434 (reciting standard). This conclusion is bolstered by the fact that Sullivan was approached by detectives at the federal correctional institute in Fort Worth, Texas (5/18/04 Tr. 106). Petitioner's own documentation confirms this fact. *See* 9/21/05 Motion for New Trial on Newly Discovered Evidence (D-2004-1010) at Exhibit 2-D (8/3/05 Letter by William P. Earley at 1). Sullivan did not know why detectives wanted to speak with her when they approached her at the Fort Worth federal prison (5/18/04 Tr. 111). This is because the detectives looked her up, not the other way around (Trial Tr. 2748).

Respondent has attached a copy of the audio taped interview of Teresa Sullivan by Detectives Damron and Carson. *See* Resp. Ex. 1. Review of that recording, which was disclosed to defense counsel prior to trial, (5/18/04 Tr. 107; O.R. 2269; Trial Tr. 2763), reveals that Sullivan provided at that time essentially the same version of events to detectives she recounted at trial (Tr. 2742-48). This is significant because the interview with detectives in Fort Worth occurred well before Sullivan ever spoke to prosecutor Fern Smith or even her

own defense attorney and thus, well before any motive for fabrication could possibly exist on Sullivan's part. *See* 9/21/05 Motion for New Trial on Newly Discovered Evidence (D-2004-1010) at Exhibit 2-D (8/3/05 Letter by William P. Earley at 1-2) (noting that Sullivan spoke to Earley in February 2004 *after* she spoke with Oklahoma City police detectives and that Earley spoke with prosecutor Fern Smith on or around April 28, 2004, at which time Earley says he told Smith "I might ask her to write a letter to the United States Attorney concerning Ms. Sullivan's testimony after the *Andrew* trial concluded").

Had Petitioner's trial counsel raised the issue of Sullivan's subsequent reduction of her federal sentence based on her testimony in Petitioner's case, the State would be free to present the above information in response to Petitioner's allegations of fabrication, motive or improper influence. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)) (federal confrontation clause does not bar use of testimonial statements for purposes other than establishing the truth of the matter asserted); *DeLozier v. State*, 991 P.2d 22, 27 (Okla. Crim. App. 1999) (prior consistent statement of witness admissible to rebut express or implied charge on cross-examination of recent fabrication, improper influence or motive); *Huckaby v. State*, 804 P.2d 447, 451 (Okla. Crim. App. 1990) (same); Okla. Stat. tit. 12, § 2801(B)(1)(b) (Supp. 2002). That fact, standing alone, dilutes the value of the impeachment testimony now embraced by Petitioner.

So too does the admission by Sullivan's defense attorney, in a letter written to the U.S. Attorney's Office, that Sullivan did not realize the significance of the information provided to her by Petitioner. *See* 9/21/05 Motion for New Trial on Newly Discovered Evidence (D-

206

2004-1010) at Exhibit 2-F (9/22/04 Letter by William P. Earley at 2).  Indeed, Mr. Earley

wrote in that letter that he "had to explain to Ms. Sullivan that she may be able to receive

additional consideration on her federal sentence if she were called to testify against

[Petitioner]."  *Id.*  Earley also described Fern Smith's role in the process as "practically

irrelevant" to the ultimate federal sentencing modification Sullivan received.  *See* 9/21/05

Motion for New Trial on Newly Discovered Evidence (D-2004-1010) at Exhibit 2-D (8/3/05

Letter by William P. Earley at 3).  Indeed, Earley states that he would have pursued the

sentencing modification with or without Fern Smith's input or assistance, that he could just

as easily have presented in federal court a transcript of Sullivan's testimony to achieve this

purpose and that the U.S. Attorney's Office would have contacted prosecutor Fern Smith in

any event about the importance of Sullivan's testimony.  *Id.*

The OCCA's observation that Teresa Sullivan testified for the State with no

understanding that she might receive a benefit and with absolutely no guarantees of any

benefit in exchange for her testimony is supported by the record and non-record evidence in

this case.  *Andrew*, 164 P.3d at 204.  Sullivan testified that she had been offered nothing by

the State of Oklahoma to testify against Petitioner (Tr. 2748).  Petitioner's non-record

materials, attached to her motion for new trial, do not show this to be false.  Combined with

Sullivan's previous consistent statements to the detectives, made well before there was any

possible motive to lie, the State submits that Petitioner fails to show that the omitted

information she now believes should have been presented to her jury was material.  Petitioner

fails to show a reasonable probability of a different outcome at trial had the circumstances

leading to reduction of her federal sentence--all of which occurred after the *Andrew* trial-- been presented to her jury. She wholly fails to show that the circumstances leading to modification of her federal sentence, which occurred nearly five months after her testimony at Petitioner's trial, undermines confidence in the jury's verdicts here. *See* 9/21/05 Motion for New Trial on Newly Discovered Evidence (D-2004-1010) at Exhibit 1-C (11/30/04 Judgment, *United States v. Teresa Sullivan*, No. CR-01-056-002-T).

On a final note, Respondent would advise that undersigned counsel has conferred with the lead prosecutor in Petitioner's case. Based on that conversation, Respondent denies the existence of any benefit being offered, or even suggested by state prosecutors, to Sullivan or her attorney prior to her testimony. Respondent denies that any benefit or possible letter in support of sentence reduction was ever discussed between state prosecutors and Sullivan or her counsel prior to Sullivan's testimony. If such a conversation had occurred, it would have been disclosed to Petitioner's trial counsel.

All things considered, the OCCA's rejection of this claim was wholly reasonable in light of the governing law and facts. Petitioner's Ground XVII claim should therefore be denied. Petitioner's passing request for an evidentiary hearing on this claim, Doc. 26 at 323, must also be denied. Considering the deferential AEDPA provisions that govern this claim, *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007), Petitioner is not entitled to a federal evidentiary hearing. Petitioner's allegations, if true and proven at the evidentiary hearing, would not entitle her to habeas relief for the reasons shown above. *Id.* at 474. Simply put, this claim is meritless. "[A]n evidentiary hearing is unnecessary if the claim can be resolved

on the record." *Sandoval v. Ulibarri*, 548 F.3d 902, 915 (10th Cir. 2008) (quoting *Anderson v. Att'y Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005)).  Petitioner's request for a federal evidentiary hearing on this claim should therefore be denied along with her substantive request for relief.

## XVIII.

### PETITIONER IS NOT ENTITLED TO A FEDERAL EVIDENTIARY HEARING ON ANY CLAIM IN HER § 2254 PETITION.

Petitioner's Ground XVIII claim amounts to a general request for evidentiary hearing. Petitioner provides no specifics in Ground XVIII to support this claim but does reference the motion for evidentiary hearing she indicates will be filed at a later date in accordance with the scheduling orders previously entered.  Respondent has shown above, in connection with her response to Petitioner's substantive claims, why an evidentiary hearing is unwarranted.  Respondent will therefore save additional discussion of this issue for the response to Petitioner's motion for evidentiary hearing.

In response to Petitioner's claim in this ground for relief that "the OCCA did not use the proper state law test in deciding to grant an evidentiary hearing", Doc. 26 at 324, Respondent submits that, even if this were true (Respondent denies this claim), it would still not entitle Petitioner to any form of relief, a more favorable standard of review or, for that matter, an evidentiary hearing in federal court.  *See Gardner v. Galetka*, 568 F.3d 862, 878 (10th Cir. 2009) ("[f]ederal habeas review is confined to denials of federal rights, see 28 U.S.C. § 2254(a), and it is therefore irrelevant at this stage whether or not [the habeas

petitioner] was denied the rights to which he may have been entitled under state law"); *Boyle v. McKune*, 544 F.3d 1132, 1135-36 (10th Cir. 2008) ("[t]he state courts are, of course, the final arbiters of when and how a state prisoner can obtain an evidentiary hearing in their courts").

All things considered, Petitioner is not entitled to a federal evidentiary hearing on any ground contained in this petition.  The petition can be resolved on the existing record.  Respondent will provide further response on this issue when Petitioner files her formal motion for federal evidentiary hearing.

## RESPONSE TO "PRELIMINARY STATEMENT REGARDING EXHAUSTION"

Respondent incorporates here by reference her previous discussions of the exhaustion status for each ground of relief set forth in Petitioner's § 2254 petition.

## RESPONSE TO "PRELIMINARY STATEMENT CONCERNING PROCEDURAL DEFAULT"

Respondent incorporates here by reference her previous discussions of the adequacy and independence of the applicable procedural default rules for those procedurally barred claims arising in Petitioner's § 2254 petition.  Respondent disputes Petitioner's challenges to the independence and adequacy of the applicable procedural default rules.

## <u>CONCLUSION</u>

Based on the foregoing, federal habeas corpus relief is unwarranted.  Petitioner's § 2254 petition should be denied in its entirety.  Additionally, an evidentiary hearing is unwarranted in this case.

Respectfully submitted,

**W.A. DREW EDMONDSON**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ SETH S. BRANHAM**
**SETH S. BRANHAM, OBA #18019**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, OK  73105
(405) 521-3921 (Voice)
(405) 522-4534 (Fax)
Service email: fhc.docket@oag.state.ok.us
**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

On this 4th day of November, 2009, I certify that a true and correct copy of the foregoing was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John M. Stuart
sfhpc@sfhpc.net
Jmssfhpc@sfhpc.net

Mark Henricksen
Henricksen & Henricksen
mark.henricksen@coxinet.net

**s/ SETH S. BRANHAM**
SETH S. BRANHAM

211