# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

BRENDA EVERS ANDREW,          )
                              )
            Petitioner,       )
                              )
v.                            )          Case No. CIV-08-832-R
                              )
RICKEY MOHAM, Warden,         )
Mabel Bassett Correctional Center,  )
                              )
            Respondent.       )

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

challenging her convictions in the District Court of Oklahoma County, Case No. CF-2001-

6189, of one count of first-degree malice aforethought murder and one count of conspiracy

to commit first-degree malice aforethought murder.   Respondent has responded to

Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter "Petition"),[1] and Petitioner has

replied.  The State court record has been supplied.[2]

## PROCEDURAL HISTORY

---

[1] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response in Opposition to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); and, Petitioner's *Reply Regarding Petition for Writ of Habeas Corpus* shall be cited as (Reply at __.).

[2] The trial court's original record shall be cited as (O.R. at __.).  The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

Petitioner was convicted by a jury in the District Court of Oklahoma County of one count of first-degree murder and one count of conspiracy to commit first-degree murder for the death of her husband, Robert Andrew. For the crime of first-degree malice aforethought murder, the jury recommended the imposition of a sentence of death, finding the existence of two aggravating circumstances: (1) the murder was committed for remuneration or the promise of remuneration; and (2) the murder was especially heinous, atrocious, or cruel. She was also sentenced on the conspiracy count to ten years imprisonment and a $5000.00 fine.

Petitioner appealed her convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed Petitioner's convictions and sentence of death in a published opinion dated June 21, 2007. Andrew v. State, 164 P.3d 176 (Okla. Crim. App. 2007). Petitioner's petition for rehearing was denied. At the same time the OCCA corrected its earlier opinion. Andrew v. State, 168 P.3d 1150 (Okla. Crim. App. 2007). Certiorari was denied on April 14, 2008. Andrew v. Oklahoma, 552 U.S. 1319, 128 S.Ct. 1889 (2008). Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished opinion. Andrew v. State, No. PCD-2005-176 (Okla. Crim. App. Jun. 17, 2008).

## FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). For the purposes of consideration of the present Petition, the Court

2

provides and relies upon the following synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial. Following review of the record, trial transcripts, and the admitted exhibits, the Court finds this summary by the OCCA to be adequate and accurate. The Court therefore adopts the following summary of the facts as its own:

Appellant's husband Robert ("Rob") Andrew was shot to death at their Oklahoma City home sometime around 7:00 p.m. on November 20, 2001. Appellant was also shot in the arm during this incident.

The Andrews were separated at the time and Rob Andrew was at the home to pickup the two minor children for visitation over the Thanksgiving holiday. The custom was that Appellant would bring the children out to the car and Rob would take them from there. However, on this night, Appellant asked Rob Andrew to come into the garage to light the pilot light on the furnace because it had gone out.

Appellant's version of the events from that point on was that as Rob was trying to light the furnace, two masked men entered the garage. Rob turned to face the men and was shot in the abdomen. He grabbed a bag of aluminum cans to defend himself and was shot again. Appellant was hit during this second shot.

Undisputed facts showed that after that, Appellant called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Appellant had also suffered a superficial gunshot wound to her arm. The Andrew children were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

Appellant was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.

Rob Andrew was shot twice with a shotgun. A spent 16–gauge shotgun shell was found in the garage on top of the family van. Rob Andrew owned a 16–gauge shotgun, but had told several friends that Appellant refused to let

him take it when they separated. Rob Andrew's shotgun was missing from the home. One witness testified to seeing Appellant at an area used for firearm target practice near her family's rural Garfield County home eight days before the murder and he later found several 16–gauge shotgun shells at the site.

Appellant's superficial wound was caused by a .22 caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance. About a week before the murder, Pavatt purchased a .22 caliber handgun from a local gun shop. Janna Larson, Pavatt's daughter testified that, on the day of the murder, Pavatt borrowed her car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but Larson found one round of .22 caliber rimfire ammunition on the floorboard. In a conversation later that day, Pavatt told Larson never to repeat that Appellant had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the .22 round she found in her car.

Police searched the home of Dean Gigstad, the Andrews' next-door neighbor, after the Gigstads reported finding suspicious things in their home. Police found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16 gauge shotgun shell was found on the bedroom floor, and several .22 caliber rounds were found in the attic itself. There were no signs of forced entry into the Gigstad home. Gigstad and his wife were out of town when the murder took place, but Appellant had a key to their home. The .22 caliber round found in Janna Larson's car was of the same brand as the three .22 caliber rounds found in the Gigstads' attic; the .22 caliber bullet fired at Appellant and retrieved from the Andrews' garage appeared consistent with bullets in these unfired rounds. These rounds were capable of being fired from the firearm that Pavatt purchased a few weeks before the murder; further testing was not possible because that gun was never found. The 16 gauge shotgun shell found in the Gigstads' home was of the same brand as the 16 gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun remains missing.

Within days after the shooting, before Rob Andrew's funeral, Appellant, James Pavatt and the two minor children left the State and crossed the border into Mexico. They were apprehended while attempting to re-enter the United States in late February 2002.

Appellant and Pavatt met while attending the same church. At some point they began teaching a Sunday school class together. Appellant and Pavatt began having a sexual relationship.[3] Around the same time, Pavatt, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy through Prudential worth approximately $800,000. In late September 2001, Rob Andrew moved out of the family home, and Appellant initiated divorce proceedings a short time later.

Janna Larson, Pavatt's adult daughter, testified that in late October, Pavatt told her that Appellant had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone cut the brake lines on Rob Andrew's automobile. The next morning, Pavatt persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Appellant was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police. The next day, Appellant told Rob that she read in the newspaper that someone cut his brakes, but no media coverage of this event had occurred.

One contentious issue in the Andrews' relationship was control over the insurance policy on Rob Andrew's life. After his brake lines were cut, Rob Andrew inquired about removing Appellant as beneficiary of his life insurance policy. Rob Andrew spoke with Pavatt's supervisor about changing the beneficiary. He also related his suspicions that Pavatt and Appellant were trying to kill him. At trial, the State presented evidence that in the months preceding the murder, Appellant and Pavatt actually attempted to transfer ownership of the insurance policy to Appellant without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.[4]

---

[3] The State presented evidence that the Andrews' marriage had been strained for several years, and that Appellant had had a number of extramarital affairs. (footnote 3 in original)

[4] According to one witness, Appellant had told her husband that she could sign his name "better than he could." Among other evidence, the State presented recordings of telephone conversations from Appellant and Pavatt to the insurance company's home office, inquiring about the status of the policy and attempting to persuade them that a legitimate ownership change had been made. (footnote 4 in original)

In the days following the murder, Pavatt obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Appellant and Pavatt asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for his children to travel with Appellant out of the country. Appellant also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson might wire them money after they left town.

Appellant did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

After her apprehension, Appellant came into contact with Teresa Sullivan, who was a federal inmate at the Oklahoma County jail. Sullivan testified that Appellant told her that she and Pavatt killed her husband for the money, the kids, and each other. Appellant also told her that Pavatt shot her in the arm to make it look as if she was a victim.

Expert testimony opined that the wound to Appellant's arm was not self-inflicted, but was part of a scheme to stage the scene to make it look like she was a victim, just like her husband. Additional facts will be discussed as relevant to Appellant's propositions of error.

Andrew, 164 P.3d at 184-87.

Additional facts and testimony were submitted to the jury at trial but are not contained in the OCCA's summary. Additional facts necessary for a determination of Petitioner's claims will be set forth in detail throughout this Opinion where applicable.

## PETITIONER'S CLAIMS FOR RELIEF

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a State court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The Supreme Court has defined "contrary to" as a State court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. In ascertaining clearly established federal law, this Court must look to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams, 529 at 412.

The "AEDPA's purpose [is] to further the principles of comity, finality, and

federalism. There is no doubt Congress intended AEDPA to advance these doctrines." Williams v. Taylor, 529 U.S. 420, 436 (2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011)(citation omitted).

GROUNDS FOR RELIEF

Ground 1:     Exclusion of Witnesses.

In the first stage of trial, the trial court excluded the testimony of six defense witnesses because it found that defense counsel had failed to provide adequate notice of their testimony prior to the discovery deadline as they had been previously instructed. Petitioner claims the trial court's actions deprived her of a right to present a defense in violation of the Sixth, Eighth and Fourteenth Amendments.

When considering Petitioner's claim on appeal, the OCCA noted that Oklahoma law permits exclusion of evidence for failure to comply with discovery rules, Andrew, 164 P.3d at 196 (citing 22 O.S. Supp. 2002, § 2002), and stated that such a sanction may be appropriate in the most severe cases, "where the violation is 'willful and motivated by a desire to obtain a tactical advantage.'" The state court further stated that alternative sanctions are appropriate in other cases. Id. (citations omitted).

"'[C]riminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" Taylor v. Illinois, 484 U.S. 400, 408 (1988)(quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Id. (citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973)). "In the exercise of [the right to present witnesses], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302.

"The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." Taylor, 484 U.S. at 410. "The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance. Id. at 414-15.

On habeas review, this Court must determine whether the OCCA's rejection of Petitioner's claims was objectively unreasonable, not whether it was correct. See Mitchell v. Gibson, 262 F.3d 1036, 1045 (10th Cir. 2001). As a condition for obtaining relief in this Court, Petitioner must demonstrate that the state court's ruling "was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

Larry Northcutt and Roger Frost

Petitioner claims error in the exclusion of testimony from Larry Northcutt[5] and Roger Frost. Both men were Oklahoma City police officers who also engaged in off-duty work as neighborhood patrols for Petitioner's homeowner's association. Both men were offered by the defense to show that Petitioner had requested additional police patrols in the neighborhood because she was afraid of Rob Andrew taking possessions from the house and that it was unlikely, knowing of the increased patrols, that she would have used her residence as the location to murder her husband.

On appeal, the OCCA rejected Petitioner's claims, reasoning:

> First, Appellant claims that she was not allowed to present the testimony from Sergeant Larry Northcutt and Officer Roger Frost, both of whom worked during their off duty hours patrolling the Lansbrook neighborhood where the Andrews lived. Counsel asked Northcutt whether Appellant requested extra patrols around her house. Trial court ruled that the information had not been provided in discovery; therefore, Northcutt could not answer the question. Not until the day that Northcutt was to testify, did Appellant provide a summary of his testimony. No good reason existed for this other than to attempt to gain a tactical advantage; therefore, the trial court did not abuse its discretion in precluding this testimony.

> Counsel asked Frost, in many different ways, whether Northcutt told him that Appellant requested extra patrols at her residence. The trial court sustained each objection based on hearsay. What was evident from the testimony was that the off-duty officers were providing extra patrol near the

---

[5] Petitioner admits the anticipated testimony from Larry Northcutt was not specific information with which the State would have been familiar. (Pet. at 38)

residence. On appeal, Appellant argues that the testimony is not hearsay, it is provided to show why the officers provided extra patrol. On the contrary, counsel wanted to elicit this testimony to show that Appellant requested extra patrols in order to show that she was not a calculating murderer. This testimony was hearsay and the trial court did not abuse its discretion.

Furthermore, the jury was well aware that extra patrols were requested. The only information that was kept from the jury was that Appellant had requested those patrols. The failure to give this information to the jury did not prejudice Appellant. The jury might have believed that her request for extra patrols took place during the planning stage of this murder, and the request was just another method of deflecting suspicion away from her.

Andrew, 164 P.3d at 196-97.

Petitioner argues the anticipated testimony was relevant and necessary to show that not only would she have not used her house as the site of the murder knowing of the extra patrols, but also would also have provided the jury with a reason for her to have kept the shotgun other than the State's theory she kept it to use it on her husband. The OCCA found the trial court did not abuse its discretion precluding the testimony and that the failure to give this information did not prejudice Petitioner as the jury was aware of the extra patrols. Habeas relief for constitutional error is appropriate only when the error "had substantial and injurious effect or influence in determining the jury's verdict" and the petitioner can establish that it resulted in "actual prejudice". Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(citations omitted). The only information not presented was Petitioner's request to the officers. The OCCA's determination that Petitioner was not prejudiced is not unreasonable considering the other evidence presented throughout the trial. Should, as Petitioner claims, the OCCA's determination on the propriety of the trial court's rulings be error, Petitioner has

not demonstrated the exclusion of this limited testimony had a substantial and injurious effect or influence on the jury's determination.

Lisa Gisler and Carol Shadid

Petitioner attempted to present testimony from two of her neighbors regarding what they heard at the time of the homicide in an effort to support her version of the events and to rebut the version presented by the State.

Next, Appellant cites to her attempts to present the testimony of Lisa Gisler and Carol Shadid, who were neighbors of Appellant, regarding what they heard on the night of the murder. These witnesses heard noises, which Appellant describes as a "loud noise" (Gisler) or "three shotgun blasts" and a scream (Shadid). Appellant claims this testimony would corroborate her story of the events and rebut the staging theory espoused by the State.

Defense counsel provided the State with a list of witnesses which included these two witnesses; however, no summary of their expected testimony was provided. Nevertheless, both of these witnesses provided statements to the police. Their statements were contained in police reports that were in the custody of the State. Defense counsel made an offer of proof indicating that their testimony would be consistent with their statements to police. Preclusion of this testimony, under the circumstances was too harsh a sanction, thus there was an abuse of discretion here. The trial court had at its disposal the possibility of a short continuance, if necessary, so the State could prepare for cross-examination of these two witnesses, especially considering the limited nature of their testimony. The trial court abused its discretion in using the preclusion sanction.

Even though an abuse of discretion occurred, we find that the error was harmless beyond a reasonable doubt. See Hooks v. State, 2001 OK CR 1, ¶ 14, 19 P.3d 294, 307. Despite Appellant's claim, evidence that there were three shots is consistent with the State's theory of two shots fired from a shotgun and one fired from a .22 caliber handgun. The testimony is inconsistent with Appellant's story that she heard only two shots fired. Furthermore, both reconstruction experts, prosecution and defense, testified that Appellant's gunshot wound was evidence of a staged event.

Id. at 197.

Petitioner has not demonstrated the OCCA's determination of harmlessness was unreasonable. Implicit in the state court's determination was that the testimony was cumulative of other evidence presented at trial – even evidence of Petitioner's statements that Rob Andrew was shot twice and Petitioner once. Further, reconstruction experts on behalf of the state and Petitioner testified the gunshot wound to Petitioner was staged. It is not unreasonable to conclude that neighbors hearing screams and shots fired in rapid succession would not sufficiently rebut the testimony of two expert witnesses. Considering all the evidence in its entirety, the exclusion of this limited testimony did not have a substantial and injurious effect or influence on the jury's determination and was harmless.

Officer Ronald Warren

Petitioner claims the exclusion of testimony of Officer Ronald Warren was also error. Officer Warren was one of the first officers on the scene. Petitioner contends Officer Warren's testimony was critical because he would have testified when he entered the garage Petitioner was kneeling at Rob Andrew's side, that she asked him to help her husband, and that she was ignoring or not drawing attention to her own wound. Petitioner claims Warren's testimony was necessary to show her great concern for her husband.

Next, Appellant claims that exclusion of Officer Ronald Warren's testimony was error. The testimony was excluded, because of a lack of pre-trial notice. This officer made a written report, which was in the custody of the State. The report spells out his expected testimony. Like the above witnesses, the exclusion of the testimony constituted an abuse of discretion. However, defense counsel was able, through another witness, to elicit the same evidence; evidence that Appellant was kneeling over obviously deceased Rob

13

Andrew attempting to aid him, while disregarding her own gunshot injury. This excluded evidence was largely cumulative; therefore, the exclusion was harmless beyond a reasonable doubt.

Id. at 197.

The OCCA's determination the exclusion of this evidence was harmless is reasonable. As the state court correctly recognized, the evidence was cumulative of other evidence admitted at trial. Officer James Ramsey was also one of the first responders to the scene and testified he observed Rob Andrew laying on the ground and Petitioner kneeling over him while on the phone talking to the police. Additionally, evidence was admitted regarding Petitioner's 911 calls and an ambulance report documented that Petitioner asked at the scene about the status of her husband. The evidence admitted at trial was available to show the jury Petitioner had concern over her husband's status after being shot. The exclusion of this cumulative evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.

### Donna Tyra

Lastly, Appellant claims that the exclusion of testimony from Donna Tyra was error. Donna Tyra was a detention officer at the County jail. Defense counsel listed Tyra as a second stage witness who would offer testimony about Appellant's good character while incarcerated at the County jail (the State did not list Tyra as a witness or have a report from her, unlike the above witnesses)[.] However, defense counsel wished her to testify to rebut witness Teresa Sullivan's testimony regarding Appellant's confession.

An offer of proof indicated that Tyra would have testified that Sullivan was a known snitch, known as the "mouth of the south;" Sullivan and Appellant could not have contacted each other, either verbally or through notes; and that there were newspapers available to the inmates on the pod, so that Sullivan could have learned the facts of the case through news reports.

Discovery of this testimony was not presented to the State.

> Defense counsel was allowed to produce the testimony of Angela Burk, who testified that Sullivan was a known snitch. She testified that she communicated to Sullivan through the cell doors, and she testified that inmates were sometimes out in the pod together. Any error in the failure to allow Tyra to testify was harmless beyond a reasonable doubt.

Id. at 197-98.

Angela Burk was housed in the protective unit with Petitioner and Sullivan and was called as a witness on behalf of the defense. Disregarding witness Burk's testimony that Sullivan was a known snitch and that inmates were able to communicate at times, Petitioner claims exclusion of Donna Tyra's testimony during the first stage of trial demands relief because her testimony that inmates could not communicate with each other would have provided evidence that Petitioner could not have confessed to Sullivan. Burk's testimony was supportive of Sullivan's reputation in the protective unit. It was, however, contradictory to the proposed testimony of Tyra regarding the ability of inmates to communicate with each other. Considered together with the defense's cross-examination of Sullivan and the evidence presented at trial, Petitioner has not demonstrated the trial court's exclusion of Tyra's testimony on this issue was so unfairly prejudicial that it had a substantial and injurious effect or influence on the jury or it's verdict.

The OCCA found some of the exclusions by the trial court to have been error, but determined any such errors to have been harmless. Petitioner has not demonstrated the OCCA's determination is unreasonable or that the trial errors rise to the level of requiring relief under Brecht and progeny. Accordingly, this ground for relief is denied.

<u>Ground 2:</u>     <u>Hearsay Statements of the Deceased</u>.

Petitioner claims the trial court allowed inadmissable hearsay statements of the deceased before his death that improperly permeated the entire trial in violation of the Confrontation Clause, Due Process Clause, and in violation of Oklahoma's hearsay rules. The complained of testimony consists of the decedent's statements to law enforcement officers about the brake lines on his vehicle being intentionally cut, similar statements regarding his brake lines to non-law enforcement individuals, his statements regarding attempts to obtain his 16 guage shotgun from Petitioner, his statements pertaining to attempts to change the beneficiary of his life insurance policy, his statements regarding James Pavatt, other statements made by Rob Andrew to others regarding Petitioner's infidelity, allegations made about him by Petitioner, and their separation and divorce proceedings. Petitioner also complains of the admission of Rob Andrew's computer journal recovered by police in their investigation of his death.

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Fourteenth Amendment renders the Clause binding on the States. <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965). In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme Court examined the common-law history of the confrontation right, noting that in England, pretrial examinations of suspects and witnesses by governmental officials "were sometimes read in court in lieu of live testimony". <u>Id.</u> at 43. The Court cited the definition of "testimony" as "'[a] solemn declaration or affirmation made for the purpose of

16

establishing or proving some fact." Id. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)), and stated:

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Id.

Only Rob Andrew's statements to law enforcement about his belief that Petitioner and James Pavatt were responsible for the brake lines being cut on his car are considered testimonial evidence under Crawford and protected by the Confrontation Clause.[6] As explained in Giles v. California, 554 U.S. 353 (2008):

> [O]nly testimonial statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing.

Id. at 376. The Confrontation Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See Tennessee v. Street, 471 U.S. 409, 414 (1985)(non-hearsay aspect of testimony raises no Confrontation Clause concerns).

The OCCA applied Crawford and denied this portion of Petitioner's claim on direct appeal:

---

[6] Petitioner concedes this determination in her Reply brief at page 11.

Appellant also claims that Rob's statements to the police that he believed that Appellant and Pavatt were responsible were testimonial in nature, and thus, in violation of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford held that testimonial hearsay violates the confrontation clause. Id. at 51–52, 124 S.Ct. at 1364. Rob's belief was supported by the evidence in this case. The jury would have reached the same conclusion absent this testimony. The introduction of this testimony was harmless beyond a reasonable doubt, considering the mountain of evidence leading to the conclusion that Appellant was responsible, in part, for the brake line incident. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967). The inclusion of this evidence also showed the inadequacy of the police in their ability to stop Appellant and Pavatt before they actually carried out their plan to kill Rob Andrew. Crawford does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. Crawford, 541 U.S. at 59, fn. 9, 124 S.Ct. at 1369, fn. 9, citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985). The inclusion of this testimony does not require reversal.

Andrew, 164 P.3d at 189.

Petitioner has not demonstrated that the OCCA's determination the testimony was presented for a non-hearsay purpose was unreasonable. The evidence was important to show how the police investigation procedures into the incident differed and why there was a delay between Rob Andrew's report and the subsequent interview by law enforcement weeks later. It was also explanatory regarding his frame of mind and his actions in the weeks leading up to his murder.

Nor has Petitioner demonstrated the state court's determination of harmlessness was unreasonable. Habeas relief for constitutional error is appropriate only when the error "had substantial and injurious effect or influence in determining the jury's verdict" and the petitioner can establish that it resulted in "actual prejudice". Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(citations omitted).

Of the remaining statements complained of by Petitioner, their primary purpose was not testimonial and, as such, their admissibility "is the concern of state and federal rules of evidence, not the Confrontation Clause." Ohio v. Clark, ___ U.S. ___, 135 S.Ct. 2173, 2180 (2015)(citation omitted). The state court's determination that the evidence was properly admitted is a matter of state evidentiary law and not proper for habeas review. Estelle v. McGuire, 502 U.S. 62, 67 (1991). Petitioner argues the admission of this evidence denied her due process and a fundamentally fair trial.

Testimony found to be properly admitted.

Each of Petitioner's claims of error found by the state court to have been properly admitted are set forth below, along with the OCCA's reasons for its determination. First, the OCCA determined that the statements made regarding the victim's shotgun were relevant to several different aspects of the state's case:

> Appellant's claim is broken down into different subject matters. We start with testimony concerning Rob Andrew's 16 gauge shotgun. The fact that Rob Andrew owned a 16 gauge shotgun was not in dispute. The fact that he was killed by a 16 gauge shotgun was also undisputed. This fact is significant given the fact that the 16 gauge is less common than the 12 or 20 gauge shotgun and the fact that Rob Andrew's shotgun and the murder weapon were never recovered. The statements revolve around Rob Andrew's desires, expressed to witness Ron Stump, to get his shotgun out of the marital home, after Appellant had changed the locks and security codes. Rob told Ron that Appellant would not let him have the shotgun. The statement was made just a week prior to the murder. However, the statement was introduced to show that Rob did not have the shotgun; inferring that it was still in Appellant's control.

> The State admits that statements made by Rob regarding Appellant's refusal to allow him into the house to retrieve his shotgun went beyond the state-of-mind exception. They did not address whether the statement was offered for the truth of the matter asserted. Nevertheless, any error in the

admission of these statements was harmless given the fact that there was a substantial amount of evidence that the shotgun was in the possession of Appellant and not in the possession of Rob Andrew. Appellant told police that, if the shotgun were still at the house, it was in the hall or bedroom closet. Also during the first part of September, 2001, as Rob was moving out of the home, witness James Higgins saw the shotgun in the bedroom closet.

Andrew, 164 P.3d at 188.

Next, Petitioner does not specifically provide argument against the admission of Rob Andrew's statement to Ron Stump that he believed Petitioner finally found someone to kill him, other than it was inadmissible hearsay and rendered her trial fundamentally unfair. The OCCA determined the statement was evidence of Rob Andrew's state of mind and admissible:

Coupled with this claim is an argument regarding Rob's statement to Ron Stump that Appellant had finally found someone to kill him (referring to Pavatt). This statement was made just shortly after Rob had moved out of the house. This statement is clearly a statement showing Rob's state-of-mind at the time. "Such antecedent declarations by a decedent are admissible in a homicide case to show the decedent's state of mind toward the defendant or to supply the motive for killing." Welch v. State, 2000 OK CR 8, ¶ 28, 2 P.3d 356, 370.

Testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is relevant and statements by the deceased expressing fear of a spouse are admissible under the state of mind exception to the hearsay rule.

Washington v. State, 1999 OK CR 22, ¶ 36, 989 P.2d 960, 973.

Id. at 188-89.

Petitioner claims, citing to state law cases, that statements made by Rob Andrew of his belief that Pavatt and Petitioner tried to kill him by cutting the brake lines on his car were irrelevant, invaded the province of the jury and were inadmissible. The OCCA found the evidence to be proper as state of mind, motive and relevant to the actions of the insurance

company:

> Appellant next claims that hearsay evidence concerning Rob Andrew's belief that Appellant and James Pavatt tried to kill him by cutting the brake lines to his car, were inadmissible. These taped statements were introduced through Prudential employees. Again this evidence was introduced to show Rob Andrew's state-of-mind. His fear of Appellant and Pavatt, and the motive for this killing: the insurance money. The conversations Rob had with the insurance company were introduced to show why Appellant had a motive to kill Rob. He was trying to keep Appellant from being the primary beneficiary to the life insurance policy. The conversation shows why he would try to change the beneficiary to his brother. The phone calls were also introduced to show why the insurance company would not change the beneficiary over the phone at Appellant's request—increasing her anger and resentment of Rob Andrew.

Id. at 189.

The State introduced evidence of logs taken from Rob Andrew's work computer which contained descriptions of various incidents between he and Petitioner. Petitioner claims this evidence was both inadmissible hearsay and cumulative.[7]

> Appellant next challenges the admission of Rob's computer journal. This was admitted as part of a police report admitted as State's exhibit 205, over defense objection. The State points out that defense counsel referred to the journal long before it was admitted into evidence by referring to portions which say that Appellant was a good mom and the spiritual leader of the home. Defense counsel asked questions about entries in the journal and actually read portions of the journal before it was admitted. The inclusion of this evidence was made relevant to rebut defense counsel's use of the same evidence to show Appellant was a good mom. Appellant cannot now complain about the use of the journal. See Malicoat v. State, 2000 OK CR 1, ¶ 40, 992 P.2d 383, 403–04.

Id. at 190.

Habeas relief is possible only if Petitioner can demonstrate such undue prejudice from

---

[7] Several of the activities and incidents described in the computer journal were admitted elsewhere at trial and are the subject of other claims for relief by Petitioner.

the evidence that the entire trial is rendered fundamentally unfair:

> "[T]he Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair. . . ." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)); see also Estelle v. McGuire, 502 U.S. 62, 69-70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Knighton v. Mullin, 293 F.3d 1165, 1170 (10th Cir.2002) (applying similar principles in federal habeas proceeding). We have held that this standard will be satisfied only if "the probative value of [the challenged] evidence is . . . greatly outweighed by the prejudice flowing from its admission. . . ." Knighton, 293 F.3d at 1171 (internal quotation marks omitted).

Welch v. Sirmons, 451 F.3d 675, 688 (10th Cir. 2006).

In each sub-claim above, the OCCA thoroughly detailed the probative value of the testimony and evidence when determining the admissibility of the evidence. Although much of the evidence is not favorable to her, Petitioner has not demonstrated the probative value is greatly outweighed by any prejudice to her or, more importantly on habeas review, that it was so unduly prejudicial as to render her trial fundamentally unfair.

> Evidence found to be inadmissible hearsay but harmless error.

The following instances involve statements admitted at trial that were determined by the OCCA to be in whole or in part inadmissible hearsay, but found to be harmless error. The first involves testimony of statements by Rob Andrew to his attorney and others expressing his belief that Petitioner had attempted to kill him and conveying the difficulty he was experiencing regarding attempting to change the beneficiary on his life insurance policies.

> One of Appellant's main complaints concerns the testimony of attorney Craig Box. Rob Andrew hired Box to represent him in divorce proceedings against Appellant. Box testified that Andrew told him about a series of calls

from Appellant and Pavatt, which led him to believe that they were responsible for the brake line incident and attempt on his life. The State agrees that the statements constituted inadmissible hearsay, but were harmless, nonetheless.

These statements supported the conspiracy charge by showing when an agreement may have been consummated. They also support the theory that the motive for murder was the insurance money. Thus the possibility exists that they were not introduced for the truth of the matter asserted. Nevertheless, if inadmissible, overwhelming admissible evidence was introduced to support these claims, including statements by Appellant confirming her vitriolic hatred for Rob and her desire to be the beneficiary of the insurance policy. Furthermore, tape recordings of Pavatt trying to change the ownership of the insurance policy with Prudential; his threats toward Rob; and statements he made concerning Appellant's request that he kill Rob were properly admitted.

The same can be said of other statements Rob made to others about the trouble he was having in changing the beneficiary of the policy. This is especially true in light of the evidence of falsified change of ownership papers, and Appellant's statements that she could sign Rob's name as well as he could and the fact that she routinely signed his name on employment related items.

Andrews, 164 P.3d at 189.

The OCCA also determined various other statements were improper but harmless:

The remainder of the statements Rob made to others about being kicked out of the house; Appellant hiding money; Rob's statements regarding Appellant's belief that he was having a homosexual affair; his statements about Appellant's affair with Nunley; and Rob's statements regarding the changing of the locks and Appellant's refusal to let him see the children, constituted inadmissible hearsay, for which no exception existed; however, they were also harmless considering the amount of admissible evidence on these issues.

Id. at 190.

A trial error is harmless unless it is found to have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Under this standard, habeas petitioners are not entitled to relief based on the trial error unless they can establish

that it resulted in actual prejudice. Id. Petitioner has not demonstrated the OCCA's harmlessness determination was contrary to, or an unreasonable application of, Brecht and its progeny. As identified and described by the OCCA throughout its opinion, considerable evidence was properly admitted to support the state's case and the jury's verdict. After thorough review of the trial record, the Court finds Petitioner has not demonstrated these various isolated statements made over the course of a lengthy trial, even when considered together, resulted in actual prejudice that had a substantial and injurious effect or influence in determining the jury's verdict. Petitioners ground for relief is denied.

Ground 3:    Other Crimes and Bad Acts.

Petitioner claims evidence was admitted at her trial of other crimes and bad acts that were not relevant to the crimes for which she was charged, denying her a fair trial in violation of due process. Petitioner identifies twelve (12) instances of testimony or evidence she claims the admission of which was error. The OCCA separately identified each one in its consideration on Petitioner's appeal. Although lengthy, the OCCA's consideration is included in its entirety here to both identify Petitioner's claims and to set out the rationale for the state court's determination:

> In proposition three, Appellant claims that the trial court erred by allowing the State to introduce evidence of other crimes and bad acts which were not relevant. The admission of this evidence, as with all evidence, is reviewed under the abuse of that discretion standard spelled out above.
>
> Evidence that a defendant committed other crimes is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. 12 O.S.2001, § 2404(B); Lott, 2004 OK CR 27, ¶ 40, 98 P.3d at 334–35. Proof of "other crimes" must be clear and convincing. Id.

24

The State argues that nearly all of this "other crimes" evidence was res gestae evidence, which is evidence that is (a) so closely connected to the charged offense as to form part of the entire transaction, (b) necessary to give the jury a complete understanding of the crime, or (c) central to the chain of events. See Rogers v. State, 1995 OK CR 8, ¶ 21, 890 P.2d 959, 971 (and cases cited therein).

The issue here boils down to whether the complained of evidence was relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or whether the evidence is improper character evidence, which is generally prohibited. See 12 O.S.2001, § 2404. Specific instances of conduct to prove a person's character or a trait of character are admissible when the character is part of a claim or defense. 12 O.S.2001, § 2405(B).

Initially, Appellant attacks evidence concerning the cutting of the brake lines of Rob Andrew's car. Appellant claims that there was insufficient evidence which tied her to this crime under a clear and convincing standard, not that the evidence was otherwise inadmissible.

Sometime around the end of October, 2001, Appellant asked Pavatt to kill Rob Andrew. About this same time, on October 26, the brake lines to Rob Andrew's vehicle were cut. Pavatt asked his daughter to call Rob and tell him that he needed to come to Norman to pick up Appellant at the hospital; in an obvious attempt to get Rob to drive some distance from his northwest Oklahoma City home with faulty brake lines. Appellant claims that there was insufficient evidence linking her to this incident.

Appellant claims that the only particular piece of evidence linking her to the crime was inadmissible hearsay evidence concerning the fact that Appellant knew about the brake lines being cut before she could have innocently acquired the information. However, the State introduced evidence of an enormous amount of phone calls between Pavatt and Appellant on October 25 and October 26. Appellant attempts to give alternative meaning to phone calls made on October 26 by stating these are the calls during the time Rob Andrew was trying to change the beneficiary to his policy after learning that his brake lines had been cut. However, Appellant does not try to explain the number of phone calls made on October 25 and the morning of October 26.

Other evidence, furthermore, links Appellant to this attempt on Rob

Andrew's life. Appellant appeared at the bank where Janna Larson was working in Norman shortly after Larson called Rob Andrew, in an attempt to get him to drive to Norman. During this visit, Appellant asked Larson about phone calls she made to Rob Andrew. This evidence, coupled again with evidence about Brenda's hatred of Rob and her threats, show by clear and convincing evidence a link between Appellant and the attempt on Rob Andrew's life.

Certainly this evidence was relevant to the charged crime of conspiracy to commit first degree murder, which the State alleged started on September 1, 2001. The cutting of the brake lines, though not alleged as an overt act in the conspiracy was relevant to show an agreement existed between Appellant and Pavatt at the time the brake lines were cut. This evidence was also "inextricably intertwined" with the murder offense, thus it was admissible intrinsic evidence. See United States v. Viefhaus, 168 F.3d 392, 397–98 (10th Cir. 1999) evidence[sic] is similar to the res gestae exception used by this Court.

Next, Appellant complains about evidence that she had extramarital sexual affairs with two other men. Appellant claims that this evidence, although not criminal, was evidence of bad acts, only introduced to show her bad character. This evidence was relevant to show motive.

The first affair, with Rick Nunley, started in 1997 and ended probably about four years prior to this murder; however, Appellant and Nunley kept in contact through phone conversations. Nunley met Appellant in downtown Oklahoma City around the first of October, 2001. Appellant told Nunley about the divorce proceedings. At some point between then and the murder, Appellant expressed to Nunley that she was upset about Rob trying to change the beneficiary on the life insurance policy. Cell phone records indicated eighty-seven phone calls between Appellant and Nunley during the months of September, October and November, 2001. Appellant also called Nunley from jail when she was arrested, while returning to the United States from Mexico. Evidence of their sexual affair was limited to one question during his testimony. Thus, even though, the evidence of a sexual affair between Nunley and Appellant was remote, its significance was a minimal part of the relationship, and the mention of it was harmless in this case.

The second affair, this with James Higgins, started in 1999 and ended in May 2001, just six months prior to Rob's murder. Evidence of this affair was more detailed. This sexual affair started when Appellant handed Higgins a key

to a motel room and they met that afternoon at the motel room. These types of meetings occurred several times a week during those two years. They also had sex at the Andrew home and in the car. All during this time, Appellant kept telling Higgins how much she hated Rob Andrew. She also told Higgins that she wished Rob Andrew was dead.

This Court has allowed evidence of an affair for the purpose of establishing motive. In Allen v. State, 1993 OK CR 49, 862 P.2d 487, this Court held that evidence that the defendant had a sexual relationship with his secretary, which ended six months prior to the murder of his wife, was relevant to show motive. Id. ¶ 17, at 491. This Court reasoned that evidence of a close personal relationship, where intimate details of the defendant's marriage were shared, was relevant.

This case is no different; Appellant shared with both of these men her hatred for Rob Andrew and her wish that he was dead. Her co-defendant was just the last in a long line of men that she seduced; however, this last man shared the same hatred of Rob and was willing to kill for Appellant. The evidence of Appellant's affairs proved motive and intent in this case. The trial court did not abuse its discretion in admitting this evidence.

Appellant further complains about a litany of evidence under this "other crimes evidence" claim. The complaints cover the following evidence: testimony from Rob Andrew's co-worker, Barbara Murcer–Green, concerning confrontations at the workplace between Appellant and Rob Andrew and Appellant's threats to her personally, which was met with a contemporaneous objection. This evidence was relevant to show Appellant's hatred and rage, and possible resentment toward Rob Andrew, thus it was relevant.

Other evidence included Higgins' testimony that Appellant had "come on to" his two adult sons when they were building a deck for the Andrews; David Ostrowe's testimony that she was dressed provocatively when the Andrews and the Ostrowes went to dinner together (6–8 weeks before the murder), someone in the restaurant called Appellant a "hoochie," and inappropriate talk about a trip to Mexico; Ron Stump's testimony that Appellant changed her hair color after learning what color of hair Ron liked; and David Head's testimony, over objection, about Appellant threatening to kill him.

This Court is struggling to find any relevance to this evidence, other than

to show Appellant's character. The State agrees that most of this evidence was irrelevant to any issue in this case; however, even so, the introduction of this evidence was harmless due to the overwhelming evidence in this case.

Additional evidence included William Burleson's testimony about Appellant's demeanor at the funeral home; Cynthia Balding's testimony about Appellant hiding money; testimony regarding Appellant's attempt to influence the children with a puppy; Janna Larson's testimony that she told her father, James Pavatt, that she thought Appellant lied when she told him she had not slept with any other men other than her husband and Pavatt; and testimony that Pavatt told Larson that the Andrew children were well trained and would not tell of the affair between he and Appellant.

First, out of this evidence, the evidence of Appellant's demeanor at the funeral home was relevant to show a consciousness of guilt, and as such is not considered "other crimes" evidence. See Anderson v. State, 1999 OK CR 44, ¶ 15, 992 P.2d 409, 416. The witness testified that in all of his long experience, her flat, cold, and unemotional demeanor was the most bizarre demeanor he had ever seen from a grieving spouse.

The remaining evidence was relevant to show the relationship between Appellant and Pavatt and the relationship between Appellant and Rob Andrew, Appellant's ability to lie and influence Pavatt, and her desire to keep their sexual affair a secret from the children and others. The evidence concerning the money was relevant to show motive, and the money provided the source which Appellant was to utilize while on the run in Mexico, thus it was relevant as part of this criminal episode.

This proposition would have even less merit had the trial court instructed on the limited use of "other crimes" evidence. We shall discuss this refusal in our discussion of instructional error below.

Andrew, 164 P.3d at 190-93 (footnotes omitted).

Petitioner first contends the OCCA addressed her claims only under state law and that this Court owes no deference to the state court's determination. This Court's analysis, however, is whether the state court's determination was contrary to, or an unreasonable application of, clearly established Supreme Court law. It is the decision of the state court that

28

is reviewed to determine whether this standard is met:

> As we have said before, § 2254(d) dictates a " 'highly deferential standard for evaluating state-court rulings,' <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which demands that state-court decisions be given the benefit of the doubt." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(per curiam). To the extent that the Court of Appeals rested its decision on the state court's failure to cite <u>Dicks</u>, it was mistaken. Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation. <u>See</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003)(per curiam); <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002)(per curiam).

<u>Bell v. Cone</u>, 543 U.S. 447, 455 (2005).

The state court's determination that the evidence was properly admitted is a matter of state evidentiary law and not proper for habeas review. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). Habeas relief is possible only if Petitioner can demonstrate such undue prejudice from the evidence that the entire trial is rendered fundamentally unfair:

> "[T]he Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair. . . ." <u>Payne v. Tennessee</u>, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (<u>citing</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)); <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 69-70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); <u>Knighton v. Mullin</u>, 293 F.3d 1165, 1170 (10th Cir.2002) (applying similar principles in federal habeas proceeding). We have held that this standard will be satisfied only if "the probative value of [the challenged] evidence is . . . greatly outweighed by the prejudice flowing from its admission. . . ." Knighton, 293 F.3d at 1171 (internal quotation marks omitted).

<u>Welch v. Sirmons</u>, 451 F.3d 675, 688 (10th Cir. 2006)(overruled on other grounds). The Tenth Circuit has held that the Oklahoma cases and statutes applied by the OCCA are consistent with the constitutional principles set forth above as they acknowledge the prejudice

associated with the admission of other crimes evidence and place strict limitations on the admission of such evidence. Id. Absent any clearly established Supreme Court precedent regarding the admission of other crimes and bad acts evidence, this Court is bound to apply deference to the OCCA's determination provided it was not unreasonable.

Petitioner has not demonstrated the state court's determination to be unreasonable. In almost every instance complained of by Petitioner, the OCCA determined the evidence was relevant to prove either motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or part of a claim or defense. Petitioner's arguments aside, it is not this Court's charge to determine on habeas review if it would rule differently. Rather, this Court must determine if the state court's determination was objectively unreasonable. "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'" House v. Hatch, 527 F.3d 1010, 1019 (10th Cir. 2008)(citations omitted). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations". Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The OCCA applied state law and statutes to make its determination of the correctness on the admissibility of the evidence at Petitioner's trial regarding other crimes and bad acts of the Petitioner. That consideration encompassed comparing that evidence to the evidence presented throughout the case to determine relevance and any resulting unfair prejudice – an analysis recognized by the Tenth Circuit to be consistent with a due process analysis. After

review of Petitioner's trial and the OCCA's decision on this claim, the Court does not find the OCCA's determination to be unreasonable. Petitioner has not shown the determination to be contrary to, or an unreasonable application of, the general standard for a due process violation articulated by the Supreme Court.

The OCCA also noted that it struggled to find the relevance of the testimony that Petitioner had "come on to" witness Higgins' two adult sons, that she had once dressed provocatively and had been called a "hoochie", her inappropriate talk about a trip to Mexico, the changing of her hair color to apparently please a married man, and witness David Head's testimony about Petitioner's threat to kill him. Despite the irrelevance of this testimony, the OCCA found the error to be harmless due to the overwhelming evidence in the case. It bears repeating that a trial error is harmless unless it is found to have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Under this standard, habeas petitioners are not entitled to relief based on the trial error unless they can establish that it resulted in actual prejudice. Id. Petitioner has not demonstrated the OCCA's harmlessness determination was contrary to, or an unreasonable application of, Brecht and its progeny. No actual prejudice has been demonstrated by the admission of the testimony regarding Petitioner's prior bad acts or that the state court's reasoning and determination is unreasonable. Accordingly, this ground for relief is denied.

Ground 4:    Opinion Testimony.

Petitioner claims both lay witness and expert witness opinion testimony was improperly admitted at her trial which violated state law and her federal due process guarantee

31

of a fundamentally fair trial. Petitioner's claim can be separated into two categories, expert opinion by law enforcement officers and opinion testimony by lay and law enforcement witnesses pertaining to Petitioner's guilt.

Expert opinion by law enforcement officers.

Petitioner claims testimony of law enforcement officers were improper personal opinion and not proper subjects of expert testimony. Officer Roger Frost testified regarding Petitioner's demeanor and inability to remember statements allegedly made by the perpetrators, characterizing them as "strange". Officer Teresa Bunn testified to similar opinions regarding Petitioner's demeanor and her inability to relate the distance between herself and the shooter. Officer Klinka testified Petitioner was involved in the brake cutting incident on Rob Andrew's vehicle.

Next, Appellant claims that other witnesses were allowed to give "expert" opinion evidence without being qualified to do so. An expert witness is one who possesses scientific or specialized knowledge acquired by study or practice or by both, and is, ordinarily, a person who has experience and knowledge in relation to matters which are not generally known. Kennedy v. State, 1982 OK CR 11, ¶ 27, 640 P.2d 971, 977.

The witnesses Appellant complains about here are police officers. Police officers are allowed to give opinion testimony based on their training and experience. Berry v. State, 1988 OK CR 83, ¶ 6, 753 P.2d 926, 929–30; McCoy v. State, 1985 OK CR 49, ¶ 14, 699 P.2d 663, 665–66.

Sgt. Frost testified that it was "very strange" that Appellant could not remember the words spoken by her alleged attackers. He also testified that she was unusually calm and he felt it unusual that she did not ask about her husband while at the hospital. Technical Investigator Teresa Bunn testified similarly. We find that the trial court did not abuse its discretion in allowing this testimony as it was properly based on their perceptions in conjunction with their training and experience.

Frost was also allowed to testify that it was significant that Appellant was shot at close range, without explanation. Any error in relation to this testimony was harmless due to the overwhelming evidence that she was indeed shot at close range. Officer Klinka was allowed to testify that he believed that Appellant was involved in the cutting of Rob Andrew's brake lines. Appellant failed to object to this testimony, thus we review for plain error only. We find that this testimony does not rise to the level of plain error based on the context of the testimony as rebuttal to defense counsel's cross-examination regarding a link between Appellant and the brake line incident.

Andrew, 164 F.3d at 195-96.

In United States v. Garza, 566 F.3d 1194 (10th Cir. 2009), the Tenth Circuit held that a police officer can acquire specialized knowledge in criminal practices and, thus, the expertise to opine on such matters, and the reliability criteria for gate-keeping purposes enumerated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), need not be applied "woodenly" in all circumstances. Garza, 566 U.S. at 1199. Frost testified he had served almost eighteen years as a police officer, had specialized training and experience in dealing with victims of violent crimes, and had worked on several hundred cases in which he had come into contact with victims of violent crimes. Bunn testified she had processed several hundred crime scenes and had also received specialized training through the Army every year on dealing with people who are in shock. The testimony of these officers was found to be proper under state evidentiary law. Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law.

Officer Klinka's testimony regarding Petitioner's involvement in the incident regarding the cutting of her husband's brake line was reviewed for plain error and found to have been

33

rebuttal testimony to defense counsel's questions pertaining to the connection between Petitioner and the brake line incident. Petitioner has not demonstrated this determination to be error, or to be contrary to clearly established Supreme Court law.

Petitioner also claims improper the testimony of Detective Garrett that he believed on the day of the murder Pavatt was moving into Petitioner's home. It is difficult to ascertain whether Petitioner claims this to be improper expert opinion or law enforcement's opinion of her guilt.

> Appellant claims that Detective Garrett was allowed to testify that he believed that Pavatt was preparing to move into the Andrew home. The questioning regarded what Pavatt was doing the day of the murder. Garrett testified that Pavatt was moving his washer and dryer into the Andrew home. The prosecutor asked, "Moving in?" Garrett answered "Yes." An objection to this testimony was sustained, but the trial court did not admonish the jury as requested. Defense counsel objected that the answer was speculation and the trial court announced that it was speculation, but the trial court denied counsel's request to have the jury admonished. We find that the trial court's actions cured this error as an admonishment would have merely magnified the possibility of prejudice. See Ferguson v. State, 1984 OK CR 32, ¶ 10, 675 P.2d 1023, 1027.

Andrew, 164 F.3d at 196.

Citing only to state law, Petitioner asserts opinions such as this invade the province of the jury and are improper. Whether the statement was improper, or the trial court's failure to admonish the jury trial error, Petitioner has not demonstrated the state court's determination is contrary to clearly established federal law or that the "error" had a substantial and injurious effect and influence on the jury's verdict.

Lay and law enforcement opinion as to guilt.

Petitioner next claims testimony from various witnesses expressing opinion as to Petitioner's guilt invaded the province of the jury and was improper.

> Next, in proposition four, Appellant claims that the trial was infected with improper and inadmissible opinion testimony. The admissibility of lay witness' opinions is a determination within the sound discretion of the trial court whose decision will not be disturbed unless clearly erroneous or a clear result of an abuse of discretion. Washington v. State, 1999 OK CR 22, ¶ 21, 989 P.2d 960, 970. Opinion testimony of a lay witness is permissible under 12 O.S.2001, § 2701 when it is rationally based on the perception of the witness and is helpful to the determination of a fact in issue.

> * * *

> Ron Stump and Rod Lott both gave testimony indicating that they believed that Appellant was responsible for killing Rob Andrew. Officer Mike Klinka, Michael Fetters and Mark Sinor testified that Rob Andrew relayed to them that he believed that Appellant was trying to kill him.

> The questioning of Rod Lott came during re-direct after defense counsel was allowed to ask if Rod Lott liked Appellant, and defense counsel's questioning of Lott's motivation for testifying. The prosecutor asked why he did not like her. Rod Lott answered, "I believe she's responsible for his death." This testimony was properly admitted because Appellant opened the door on cross-examination, so that the prosecution could delve into Lott's motivation.

> Stump's initial opinion, that Appellant and Pavatt killed Rob Andrew, and his testimony that he knew of no one that had a motive to kill Rob Andrew other than Appellant and Pavatt was not met with an objection. We review for plain error here, and we find none.

> Mike Klinka's, Michael Fetters' and Mark Sinor's testimony was admitted to show Rob Andrew's state-of-mind as explained above. There is no reason to rehash this argument here.

Id. at 195.

Rod Lott's testimony was in response on re-direct examination to defense counsel's cross-examination questioning as to whether he liked Petitioner. The testimony of Mike

Klinka, Michael Fetters and Mike Sinor was found to have been admitted to show Rob Andrew's state of mind. The instances were not found to have been error and Petitioner has provided nothing to the contrary. Ron Stump's testimony was not objected to. It was reviewed for plain error by the OCCA and found that none existed.[8] Whether or not it was trial error to admit this testimony, Petitioner presents no clearly established federal law to demonstrate the state court's determination to be unreasonable, nor has she demonstrated the "errors" had a substantial and injurious effect or influence on the jury's verdict warranting relief. Petitioner's ground for relief is denied.

Ground 5:     Co-conspirator Testimony.

At trial, and over defense counsel's objections, the State presented through Jana Larson (James Pavatt's daughter) statements made to her by Mr. Pavatt regarding Petitioner's request to help murder her husband. The testimony was allowed under the co-conspirator exception to the rule against hearsay. Petitioner claims the testimony regarding the statements was inadmissable hearsay because the requirements for the co-conspirator exception were not met, depriving her of her rights of confrontation and cross-examination in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Petitioner raised this claim on direct appeal and it was denied by the OCCA:

> In proposition five, Appellant claims that hearsay was improperly admitted under the guise of "co-conspirator hearsay." This claim relates to

---

[8] Mr. Stump's testimony may only be loosely characterized as opinion. His testimony was offered to explain why he traveled immediately to the crime scene and told detectives they should consider Petitioner and Pavatt as suspects.

Pavatt's statement to Janna Larson. Larson was allowed to testify that Pavatt said, "[Y]ou're never going to believe what that nuttier than a fruit cake woman asked me to do. And then he told me that she asked him if he would kill her husband or if he knew someone that could do it. . . ." Defense counsel objected that the statement was hearsay within hearsay, the statement was not corroborated, and there was no evidence of an agreement.

The record indicates that this conversation occurred around the end of October, 2001. About the same time that Pavatt asked Larson to call Rob Andrew and tell him to drive to Norman, Oklahoma to pickup Appellant, after the brake lines to his vehicle had been cut.

Circumstantially, looking at the totality of the evidence introduced to that point, it could reasonably be concluded that Pavatt had entered into an agreement with Appellant to kill Rob Andrew. The conversation with Larson was meant to get her reaction to the idea. He needed Larson to make a call to get Rob Andrew to drive a long distance with faulty brakes. This conversation furthered the conspiracy by allowing Pavatt to know what tactic to take with Larson in involving her in the scheme. The trial court did not abuse its discretion in allowing this evidence in as non-hearsay under the co-conspirator theory. See 12 O.S.Supp.2002, § 2801.

Andrew, 164 P.3d at 190.

Petitioner provides considerable argument and authority to convince the Court that the state court improperly and erroneously determined the testimony was a statement by a co-conspirator and excepted from the state rules of hearsay. She argues the state court determined without factual support the date of the initiation of the conspiracy between Petitioner and Mr. Pavatt, allowing the prosecutors leeway to ensure the statement was made during the period of the conspiracy. She further argues there was no evidence to prove the existence of any agreement to commit a crime. Her purpose for these arguments is to demonstrate the State "has gotten away with introducing this highly incriminating statement but highly unreliable hearsay evidence by dressing it up as a co-conspirator statement" (Pet.

at 117), depriving her of her confrontation rights.

It is the Confrontation Clause, however, that is the basis of Petitioner's constitutional challenge in this Court. As addressed earlier in Ground 2, only testimonial statements are excluded by the Confrontation Clause. <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). Later Supreme Court cases attempted to flesh out the definition of "testimonial", developing what was to become known as the primary purpose test. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." <u>Michigan v. Bryant</u>, 562 U.S. 344, 358 (2011). "Thus, under our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" <u>Ohio v. Clark</u>, ___ U.S. ___, 135 S.Ct. 2173, 2180, (2015)(quoting <u>Bryant</u>, 562 U.S. at 359 (2011)). "We have never suggested, however, that the Confrontation Clause bars the introduction of all out-of-court statements that support the prosecution's case. Instead, we ask whether a statement was given with the "primary purpose of creating an out-of-court substitute for trial testimony." <u>Clark</u>, 135 S.Ct. at 2183 (<u>quoting</u> <u>Bryant</u>, 562 U.S. at 358).

<u>Crawford</u> and progeny apply to Petitioner's claim. There is no valid argument, as indeed there cannot be, that the primary purpose of Pavatt's statement was to create an out-of-court substitute for trial testimony. As such, the statement and conversation were non-testimonial and state law evidentiary rules apply. As expressed throughout this opinion,

habeas relief does not lie for errors of state law. <u>Estelle</u>, 502 U.S. at 67. Petitioner has not

demonstrated the OCCA's determination to be contrary to, or an unreasonable application of,

clearly established Supreme Court precedent, nor when compared to the evidence presented

at trial has she demonstrated any possible state evidentiary error to have risen to such a level

as to be considered a denial of her due process rights. Accordingly, Petitioner's fifth ground

for relief is denied.

<u>Ground 6:</u>    <u>Ineffective Assistance of Counsel</u>.

In her sixth ground for relief, Petitioner raises a plethora of claims that she was denied

effective assistance of counsel at trial and on appeal. The claims made here encompass claims

previously raised on direct appeal, in her application for post-conviction relief, and in motions

for an evidentiary hearing.

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment,

Petitioner must first show that her counsel "committed serious errors in light of 'prevailing

professional norms'" in that the representation fell below an objective standard of

reasonableness. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984). In so doing,

Petitioner must overcome the "strong presumption" that her counsel's conduct fell within the

"wide range of reasonable professional assistance" that "'might be considered sound trial

strategy,'" <u>Strickland</u>, 466 U.S. at 689, <u>quoting</u> <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955).

She must, in other words, overcome the presumption that her counsel's conduct was

constitutionally effective. <u>United States v. Haddock</u>, 12 F.3d 950, 955 (10th Cir. 1993). A

claim of ineffective assistance "must be reviewed from the perspective of counsel at the time,"

Porter v. Singletary, 14 F.3d 554, 558 (11th Cir.), cert. denied, 513 U.S. 1009 (1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'" Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987), quoting Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those errors not occurred." Haddock, 12 F.3d at 955; citing Strickland, 466 U.S. at 688, 694; Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied, 507 U.S. 929 (1993). Petitioner carries the burden of establishing both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced her defense. Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993). In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'" Welch v. Workman, 639 F.3d 980, 1011 (10th Cir. 2011)(quoting Hoxsie v.Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997)). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356,

371, 130 S.Ct. 1473, 1485 (2010).

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," [<u>Strickland</u>] at 689, 104 S.Ct. 2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, <u>Knowles</u>, 556 U.S., at 123, 129 S.Ct. at 1420. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

<u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011).

Claims raised on direct appeal.

Petitioner first claims trial counsel were ineffective in failing to provide pre-trial summaries of various witnesses' testimony, resulting in those witnesses being precluded by the trial court from testifying. These witnesses are the individuals identified in Petitioner's first ground for relief. On appeal, the OCCA applied <u>Strickland</u> and determined that any error that arose from the exclusion of the witnesses was harmless, that Petitioner had not been prejudiced by the inactions of trial counsel and, therefore, counsel were not ineffective. <u>Andrew</u>, 164 P.3d at 198. Petitioner has not demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, <u>Strickland</u> and its progeny. For the reasons set forth in Ground 1, supra, the Court finds the OCCA's determination of lack of prejudice to be reasonable.

Petitioner next claims trial counsel's failure to make contemporaneous objections to

41

"many damaging hearsay statements and opinion testimony" constitutes ineffective assistance of counsel. The instances complained of are the subject of Petitioner's second and fourth grounds for relief.[9] The OCCA found the majority of the evidence was properly admitted and determined no resulting prejudice from counsels' failure to contemporaneously object. Id. To demonstrate prejudice, Petitioner merely re-urges her claims that the testimony and statements were improper and incorporates her arguments from Grounds 2 and 4. As discussed above, almost all of the complained of statements were non-testimonial. If found to have been improper, the testimony was determined to have been harmless and the state court's determination to have been reasonable. Petitioner has, therefore, failed to demonstrate resulting prejudice from trial counsel's failure to contemporaneously object as she has not shown a "reasonable probability" the outcome would have been different.

Claims raised on direct appeal and State's Rule 3.11

On appeal, Petitioner raised ineffective assistance of counsel claims in conjunction with an application for an evidentiary hearing. She claims the OCCA did not adjudicate these claims on the merits, but rather under the state rule for evidentiary hearing on appeal, Rule 3.11, Okla. Stat. Tit. 22, Ch. 18 App. Considerable argument is presented that the OCCA's determination is not entitled to deference because the state court utilized Rule 3.11's standard for an evidentiary hearing rather than the standard for determining counsel ineffectiveness

---

[9] Petitioner's claim is for the failure to make contemporaneous objections. Petitioner admits trial counsel filed pre-trial motions in limine, renewed objections at the pre-trial hearing and again on the first day that testimony was taken. (Pet. at 144-45)

under <u>Strickland</u>. In <u>Glossip v. Trammell</u>, 530 Fed. Appx. 708 (10th Cir. 2013), the Tenth Circuit discussed the lengthy history of this issue and held "<u>Lott</u> makes clear, then, that even assuming the OCCA resolved Glossip's claim of ineffective assistance pursuant to Rule 3.11, that resolution is nonetheless an 'adjudicat[ion] on the merits' subject to the heightened AEDPA standards set out in 28 U.S.C. § 2254(d)(1)". <u>Id.</u> at 736.

Petitioner contends trial counsel was ineffective for failing to adequately investigate and present evidence regarding blood on the jeans worn by her at the time of the shooting. She claims trial counsel should have followed the advice of his own expert witness to have the blood tested to determine its source in order to contradict the prosecution's argument that she fired the second shot into Rob Andrew. On appeal, the OCCA determined the prosecutor could have made the same argument knowing the source of the blood:

> The blood pattern evidence deals with the defense expert who testified that Appellant had high velocity blood spatter on her jeans. In closing the prosecution turned this evidence against Appellant by arguing that she received this spatter by firing the second shot and getting blow back blood spatter from Rob. However, this blood spatter had never been tested to determine its source. Now, during the pendency of this Appeal, Appellant provides DNA analysis which she argues shows that the blood stains were from her alone. The State's response points out that the blood is a mixture: the major component from Appellant and the minor component being from an unknown male (arguably the victim because the tester cannot exclude the victim as the source of the blood). Appellant claims that utilizing a defense expert without first determining the source of these stains led to the theory that she fired the second shot, making her more culpable and allowing the jury to more easily give her the death penalty. The prosecutor could have made this argument by stating that the unknown (minor component) blood spatter came from the victim, forming the basis for the same argument.

> This evidence does not show by clear and convincing evidence that the outcome would have been different; consequently, no evidentiary hearing is

necessary.

Andrew, 164 F.3d at 198-99.

Multiple blood stains patterns were on the front of Petitioner's jeans. Prior to trial, DNA testing was done on one of the patterns – a spot labeled by the experts as pattern #3. That testing determined it was not the blood of Rob Andrew. At the time the DNA profile of Petitioner was not available and the identification of the donor could not be established. At trial, defense expert Garner testified in order to explain through crime scene reconstruction Petitioner's version of the event. During his testimony, he opined that two spots he believed to be blood spatter, patterns #2 and #5, could not have resulted from Petitioner's gun shot wound. Petitioner claims that testimony was damaging to her in both stages of trial as it opened the door for the prosecutor to argue that the blood must have been spatter from Rob Andrew when Petitioner shot him, and that it characterized her as a cold blooded murderer. She argues that had the blood been tested beforehand as it was post trial, the prosecutor could not have made the argument because it would have been known that the blood belonged to her.

To demonstrate ineffective assistance of counsel, both deficient performance and prejudice must be shown. On habeas review, Petitioner must demonstrate the state court's determination to have been unreasonable. Petitioner's reliance on Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002), and Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002), for comparison to support her claims of ineffective assistance for failure to investigate is misplaced. Petitioner's claim does not rise to the level of the facts in Hooper or Fisher. In

44

Hooper, defense counsel made the strategic decision to present as mitigating evidence the possibility that the petitioner might have brain damage and other psychological problems, but then presented evidence without any further investigation in an unprepared and ill-informed manner. Counsel presented experts without ever speaking to them prior to their testimony and was totally unaware what they would say on the witness stand. Hooper, 314 F.3d at 1171. In Fisher, the Tenth Circuit found that defense counsel had failed to view the crime scene, filed no discovery motions, failed prior to trial to discover witnesses the state was to present, was unfamiliar with his client's version of the events, and failed to review prior transcripts of his client's extradition hearing containing potentially exculpatory evidence. The Tenth Circuit stated the nature of the trial indicated a singular lack of preparation and that through most of counsel's examination of witnesses, including his own, he had no idea what answers he would receive to his questions. Fisher, 282 F.3d at 1293-94.

Here, Petitioner does not claim counsel was ineffective for hiring a crime scene reconstruction expert to assist with her trial, only that counsel was ineffective for failing to have additional blood testing on her jeans. She claims that without the additional testing as that done post-trial, counsel's presentation of her expert provided the state with an argument that she was the shooter of the second shotgun blast into her husband. The OCCA's determination of Petitioner's claim was contained in the section of its opinion addressing ineffective assistance of counsel claims. By finding the prosecutor could have made the same argument by stating the blood spatter came from the victim, the OCCA implicitly determined the prejudice component of Strickland was not met.

In addition to the state court's reasoning, it is also not unreasonable to not find prejudice considering the evidence presented at trial to support that the murder was staged (with Petitioner's involvement), that the murder was for remuneration, and the evidence supporting the especially heinous, atrocious and cruel aggravating circumstance. Petitioner has failed to demonstrate the determination of the OCCA is unreasonable.

Next, Petitioner claims counsel was ineffective for failing to present three neighbors, her sister, and her brother-in-law as witnesses who could have corroborated her version of the events on the night of the murder. The OCCA denied Petitioner's request for an evidentiary hearing and her claim of inefffective assistance of counsel on appeal:

> Lastly, Appellant claims that additional witnesses exist who could have corroborated Appellant's story, could have bolstered Pavatt's confessional letter, and could have rebutted some of the State evidence.
>
> Appellant provides, in the application for evidentiary hearing, an affidavit from a neighbor who would have testified that she heard two shots, she heard screaming, and she saw someone bending over in the front yard after the shots. Appellant claims that this bolsters her story that the final two shots were simultaneous, sounding like one shot, and the story that there were two assailants as the person this neighbor saw outside could have been the second assailant. This witness testified at Pavatt's trial but did not testify at the present trial.
>
> Another witness regards the letter from Pavatt, introduced at trial, wherein he stated that he and another assailant were responsible, and Appellant was not involved. He stated that he shot Appellant and the other assailant shot Rob Andrew. To this day, Pavatt has not named the second assailant. Appellant now provides an affidavit from Appellant's brother-in-law, James Bowlin, who states that Pavatt told him the same story when he met them in Mexico, just days prior to their arrest.
>
> The last witness, not utilized at trial, was Appellant's sister, Kimberly Bowlin who states that it was her, not Appellant, who was present near the

46

target practice area just days prior to the murder.

> Appellant's application for evidentiary hearing shall be denied. She has not presented clear and convincing proof to this Court that counsel was ineffective for failing to present this evidence, thus entitling her to an evidentiary hearing on this extra-record evidence and to have the record supplemented with the evidence. See Rule 3.11 ("the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective.")

Andrew, 164 P.3d at 199.

Petitioner claims the three neighbors collectively would have testified they heard two shots[10], screaming, and one neighbor would testify he saw someone bending up and down and heard them saying "Oh, oh".  It is not unreasonable for the OCCA to find this evidence insufficient to demonstrate counsel's ineffectiveness.  Although Petitioner contends this testimony would have bolstered her version of the events, it is reasonable to find it insufficient to overcome the testimony of both experts that the crime scene was staged.

Nor was it unreasonable for the state court to have denied Petitioner's claim of ineffectiveness as to witnesses James and Kimberly Bowlin (Petitioner's sister and brother-in-law).  Mr. Bowlin would have testified Pavatt told him in Mexico the same version of the events as set out in Pavatt's confession letter.  Ms. Bowlin would have testified it was her, and not Petitioner, at the area of the family farm where shotguns were being discharged days prior to the murder. The confession letter was presented to the jury and Mr. Bowlin's testimony

---

[10] Petitioner asserts that "upon reflection, Ms. [Lisa] Gisler now says in an Affidavit that the loud noise she heard was in fact two fairly concurrent shots." (Pet. at 176)  Review of Ms. Gisler's affidavit reveals her statement to be that she heard "at least two shots". (Attachment 5, Appendix to Petition)

would have been cumulative to the information contained in it.  In addition to potentially opening up further issues regarding Petitioner's flight to Mexico and of witness bias, the Bowlin's testimony would not have exonerated Petitioner on the conspiracy and murder counts, lessened the impression of Petitioner's control over Pavatt, or contradicted the expert testimony of the murder as a staged event.

Petitioner's last claim of ineffective assistance of counsel presented on appeal and in a motion for evidentiary hearing concerns trial counsel's failure to present testimony from her handwriting expert regarding the change of beneficiary document to Rob Andrew's $800,00.00 life insurance policy.  Petitioner claims counsel was ineffective for failing to present testimony that all the signatures – both Rob Andrew's and Petitoner's – found on the change of beneficiary form were "cut and pasted" from two forms of annuity applications with the insurance company.  Petitioner claims this evidence would have undermined the state's theory that she forged her husband's signature on the change of beneficiary form.

> Next, Appellant claims that new evidence regarding the signatures on a change of ownership application (State's exhibit 24) for the $800,000.00 life insurance police shows that she did not forge the signature of Rob Andrew, but that Pavatt could have copied the signatures from other documents and pasted them to this document; a "cut and paste" theory of forgery.

> Appellant had retained an expert in this area for trial, Ernie Smith.  He told counsel of his "cut and paste" theory regarding Robert D. Andrew's signature.  He was not called to testify.  This was a sound strategic decision, based on the evidence.

> Appellant maintained that the change of ownership document was genuine in conversations with the judge handling the divorce, a close friend, and the Prudential Insurance Agency.  Appellant and Pavatt were working together to find some way that Appellant would receive the proceeds of the life

48

insurance policy. No clear and convincing evidence exists for the holding of an evidentiary hearing, because in any event the documents were forged by Appellant and Pavatt working together.

Id. at 199.

As the OCCA recognized, this evidence was in direct conflict to Petitioner's earlier representations to the judge handling her divorce, to her friend Rick Nunley, and to her statements and arguments to Prudential Insurance employees made while attempting to force the change of ownership of the policy into her name. It further would have bolstered the state's theory that the document was a forgery and undermined her position of its authenticity. Petitioner has not demonstrated the OCCA's determination that counsel's actions were a sound trial strategy is contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Claims contained in post-conviction proceedings.

In her application for post-conviction relief, Petitioner claimed trial counsel was ineffective for failing to advise her while she was in Mexico to surrender to the Mexican authorities in order to avoid, pursuant to a treaty between the United States and Mexico, the death penalty and a sentence of life without the possibility of parole. The treaty contains a provision regarding Mexico's policy that it may not extradite a person to a country if that person will be subjected to those sentences. Petitioner claims that in her many conversations with Greg McCracken he never advised her of the treaty and for her to surrender herself to

the Mexican authorities.[11]  Petitioner further claims appellate counsel was ineffective for failing to raise this issue on direct appeal.

The OCCA determined that the language of the treaty regarding extradition was not mandatory and that Mexico was under no obligation to refuse extradition.  Without a specific statement from the Mexican authorities that they would have refused extradition in her case, the OCCA determined Petitioner had not shown a prejudicial result as required by Strickland. Andrew v. State, No. PCD-2005-176, slip op at 3-4 (Okla. Crim. App. Jun. 17, 2008).

Petitioner argues the OCCA did not make an adjudication on the merits of her Strickland claim and that this court must review her claim de novo.  The Court disagrees with this argument.  The OCCA began its analysis with a citation to Strickland and set forth the Supreme Court's requirements necessary to demonstrate counsel was ineffective. Id. at 2-3. The OCCA's determination is entitled to a deferential review from this Court.  Of primary importance is that the state court's determination – that Petitioner did not demonstrate counsel's failure to advise constituted ineffective assistance – is entitled to deference. Regardless whether this claim is reviewed deferentially or de novo, the Court finds the OCCA's determination both reasonable and correct.

Ordinarily, to establish a claim of ineffective assistance of counsel, Petitioner must demonstrate that counsel's performance was deficient, and that counsel's deficient performance prejudiced Petitioner's defense. See Strickland, 466 U.S. at 687.  However,

---

[11] Mr. McCracken represented Petitioner in her divorce proceeding prior to the murder and later represented her at her trial.

50

where there is no constitutional right to counsel, there can be no deprivation of effective assistance. Wainwright v. Torna, 455 U.S. 586, 587-88 (1982); Coleman v. Thompson, 501 U.S. 722, 752 (1991); see also McMann v. Richardon, 397 U.S. 759, 771, n. 14 (1970)("[T]he right to counsel is the right to the effective assistance of counsel."). The Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him." Kirby v. Illinois, 405 U.S. 682, 688 (1972). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." Rothgery v. Gillespie County, 554 U.S. 191, 213 (2008). The Sixth Amendment right to counsel is meant to ensure "fairness in the adversary criminal process." United States v. Morrison, 449 U.S. 361, 364 (1981).

Petitioner is not entitled to relief even if she were able to establish Mr. McCraken failed to properly advise her to surrender to Mexican authorities as she asserts, because her Sixth Amendment right to effective counsel had not yet attached as no adversarial judicial proceedings had begun. Petitioner fled for Mexico on November 26, 2001. The State filed charges on November 29, 2001 and Petitioner was arrested upon her return to the United States on February 28, 2002. At the time of the alleged telephone conversations, sometime between her flight to Mexico and return to the United States, Petitioner was actively evading the very judicial proceedings necessary for the Sixth Amendment right to counsel to attach. Petitioner has cited no authority which supports a constitutional right to counsel for actively fleeing fugitives avoiding criminal prosecution.

As there was no right to counsel, counsel's "failure" to advise Petitioner to surrender to the Mexican authorities cannot constitute ineffective assistance. Nor can appellate counsel be deemed ineffective for failing to raise this non-claim on appeal.

For the foregoing reasons, Petitioner has failed to demonstrate the determinations of the OCCA to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's sixth ground for relief is denied in its entirety.

Ground 7:       Evidentiary Rulings.

Petitioner claims evidence was introduced at trial that cast a veil of suspicion over her, served no purpose other than to arouse sympathy for the victim, and was cumulative to evidence of the relationship between her and James Pavatt – all irrelevant and highly prejudicial in violation of her due process rights. Each of the evidentiary errors complained of here by Petitioner was raised on appeal to the OCCA and individually addressed and found to have been properly admitted under the State's evidentiary rules:

> In proposition seven, Appellant raises a series of claims attacking the introduction of certain evidence which she claims was irrelevant or at least more prejudicial than probative. We restate the general rules of evidence here. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.2001, § 2401. Relevant evidence is admissible unless it is prohibited under the evidence code. One prohibition against admission is that the relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. See 12 O.S.Supp.2002, § 2403. Again, introduction is judged under an abuse of discretion standard.
>
> First, Appellant claims, in the first section of this proposition, that

evidence was introduced which was used to cast an unwarranted veil of suspicion over Appellant and distract and confuse the jury. This evidence included documents showing that Pavatt made Appellant the primary beneficiary of two life-insurance polices. Appellant claims that there is no evidence that these policies were still valid. Next, Appellant cites to evidence consisting of a tape recording of conversations between Appellant and Rob Andrew recorded in the days before the murder. These recordings include conversations between Tricity[12] and Rob Andrew. Appellant next cites evidence of two Agatha Christie mystery books entitled <u>Murder is Easy</u> and <u>Sparkling Cyanide</u>. Appellant also complains about the introduction of a title and registration to the Bowlins' vehicle, which was found in the 1992 Chevrolet Beretta Appellant and Pavatt used to drive to Mexico. Appellant claims that this could have been caused by a mix-up in the inventory of both vehicles by the Hidalgo police before the search warrant was served.

All of this evidence was relevant to some aspect of this case. Appellant being named as beneficiary of Pavatt's insurance, whether valid or not, was evidence of the extent of their relationship and provided support for the fact that, at least Pavatt, intended to make their relationship permanent at some point. The tape recordings of the conversations show the way Appellant used Tricity to get Rob Andrew to come over to the house alone. The evidence of the books, considering all of the circumstances, was just one more piece of the puzzle, relevant to show Appellant's role in the children's life to rebut the claim that she was a "good mother." The relevance of these books was slight, but not substantially outweighed by the dangers found in Section 2403.

The relevance of the car ownership papers was relevant to support the State's theory that Pavatt and Appellant intended to switch cars with the Bowlins at some point in order to avoid detection while in the United States (after returning from Mexico). The admissibility was not dependent on the fact that the papers may have never made it into the Beretta while in the possession of Appellant. The Bowlins took these documents with them so that a vehicle exchange could be made.

Appellant claims the next group of evidence was cumulative of the relationship between Appellant and Pavatt. Relevant evidence may be excluded if the probative value is substantially outweighed by the danger of needless

---

[12] Tricity is the daughter of Rob Andrew and Petitioner.

presentation of cumulative evidence. 12 O.S. Supp.2002, § 2403. Appellant complains about a birthday card to Pavatt from Appellant; photographs of Appellant, Pavatt, and the Andrew children taken while on a trip to Six–Flags over Texas; evidence of Pavatt's infatuation with Appellant; and finally the contents of Appellant's luggage, including her thong underwear. All of this evidence was introduced to show the extent and the nature of the relationship between Pavatt and Appellant, and their intentions in fleeing to Mexico—not as a grieving widow, but as a free fugitive living large on a Mexico beach. As this trial was primarily about the motive and intent of Appellant to kill her husband with the aid of Pavatt, this evidence was highly relevant and its probative value was not outweighed by any dangers.

The final group of evidence attacked here includes a letter written by the victim to witness Ron Stump. This evidence, like the hearsay evidence cited above, was relevant to show the victim's state-of-mind and to provide a explanation of the motive. <u>Welch</u>, 2000 OK CR 8, ¶ 28, 2 P.3d at 370. Appellant also complains about the introduction of audio tape recordings of phone conversations between herself and the victim. These tapes were relevant to show the type of relationship these two people had, which would cause Appellant to kill her own husband. They were relevant to show her level of hostility, rage and hatred toward her husband, all which provide a motive for the killing. Although she did not kill in a fit of rage, she did use her hatred as a possible "I'll be better off with him dead" self justification for the murder. The relevance of this evidence was not outweighed by any dangers.

Lastly, Appellant urges this Court to consider the hearsay evidence complained of above as an attempt to introduce irrelevant evidence, only for the purpose of eliciting sympathy for the victim. We find that the trial court did not abuse its discretion in allowing the admission of any of the evidence raised in the proposition.

<u>Andrew</u>, 164 P.3d at 193-94.

Petitioner directs this Court to one Supreme Court case in support of her contention that her due process rights were violated by the admission of evidence she claims was irrelevant, cumulative and prejudicial. Petitioner's reliance on that case is misplaced. In

<u>Lisenba v. California</u>, 314 U.S. 219 (1941), two snakes were brought into the trial court to be

identified by a witness to further the charge of a conspiracy involving the defendant.  The

petitioner claimed the sole purpose of the snakes was to prejudice the jury against him and

that those in the courtroom – including the jury – were in a panic as a result.  In consideration

of this claim, the Supreme Court held:

> We do not sit to review state court action on questions of the propriety of the
> trial judge's action in the admission of evidence.  We cannot hold, as petitioner
> urges, that the introduction and identification of the snakes so infused the trial
> with unfairness as to deny due process of law.  The fact that evidence admitted
> as relevant by a court is shocking to the sensibilities of those in the courtroom
> cannot, for that reason alone, render its reception a violation of due process.

Lisenba, 314 U.S. 219, 228-29 (1941).

As has been often stated by the Supreme Court, "federal habeas corpus relief does not

lie for errors of state law." Estelle, supra.  The Supreme Court in Estelle held that the

admission of prior injury evidence admitted in the case did not violate the petitioner's due

process rights.  In so holding, the Court referenced Spencer v. Texas, 385 U.S. 554, 563–564

(1967), and included a parenthetical quotation from that case in support of the Court's

decision: "Cases in this Court have long proceeded on the premise that the Due Process

Clause guarantees the fundamental elements of fairness in a criminal trial. . . .  But it has

never been thought that such cases establish this Court as a rulemaking organ for the

promulgation of state rules of criminal procedure". Estelle, 502 U.S. at 70.

Here, Petitioner does not cite to any Supreme Court law directly on point, but relies

instead on the general principle that the Due Process Clause of the Fourteenth Amendment

provides an avenue for relief when evidence is introduced that is so unduly prejudicial that

it renders the trial fundamentally unfair.  The Tenth Circuit, in <u>Welch v. Sirmons</u>, 451 F.3d

675 (10th Cir. 2006), held that the cases and statutes applied by the OCCA in determining

evidentiary issues are consistent with the constitutional principle of due process and a

fundamental fairness evaluation. <u>Id.</u> at 688.  The OCCA thoroughly reviewed and considered

each of Petitioner's claims and found the evidence complained of to have been relevant to

some aspect of the case and its probative value not outweighed by any dangers of unfair

prejudice.  As no clearly established federal law supports Petitioner's claims, habeas relief on

this ground is denied.

<u>Ground 8:</u>      <u>Admission into Evidence of Audio Tape Recordings</u>.

Petitioner claims the trial court failed to properly authenticate audio tape recordings

of her, James Pavatt and Robert Andrew's telephone calls to the customer service department

of Prudential Insurance Company prior to admitting the recordings into evidence.  The

recordings were of conversations with various employees of Prudential regarding the

ownership of a life insurance policy taken out on behalf of Robert Andrew.  The exhibits were

sponsored by the manager of Prudential's financial corporate and investigative division as the

custodian of the recordings.  He testified that recording phone calls regarding insurance

policies was the policy of Prudential, that the recordings were kept in the ordinary course of

business, and that he had previously heard them at the trial of James Pavatt.

On appeal, the OCCA found the audio tapes sufficiently authenticated and properly

admitted:

In proposition eight, Appellant claims that the trial court abused its

56

discretion when it allowed the admission of audio cassette tapes without the proper authentication. "Authentication may be proved by direct or circumstantial evidence, and is sufficient if evidence supports a finding that the matter in question is what its proponent claims it to be." Hooper v. State, 1997 OK CR 64, ¶ 29, 947 P.2d 1090, 1102. A voice on a recording may be authenticated if the witness's opinion is based on hearing the voice at any time in circumstances which connect the voice with the alleged speaker. Id. See 12 O.S.2001, § 2901.

Craig Box, Rob Andrew's divorce attorney, listened to all of the tapes and testified that the voice on the tapes was that of Appellant. Furthermore, Appellant gives her name, address and policy number over the phone. Appellant also allows Pavatt to converse with the Prudential Insurance office, and she identifies Pavatt as her insurance agent. Pavatt's voice was authenticated by his actions during the call. He gave his company authentication code.

Rob Andrew's voice was identified by Ron Stump on other tapes introduced earlier in the trial. Although Stump did not identify the voice on these particular tapes as those of Rob Andrew, the jury had similarly authenticated tapes from which to determine the voice was that of Rob Andrew.

The audio tapes in this case were sufficiently authenticated and the trial court did not abuse its discretion in allowing these tapes into evidence.

Andrew, 164 P.3d at 194.

Here, Petitioner relies on state law to argue improper authentication and admission, save for a cursory claim that she was denied due process of law and the error had a substantial and injurious effect or influence in determining the jury's verdict. Habeas corpus relief does not lie for errors of state law: "Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67-68.

Petitioner also does not present clearly established federal law as determined by the

Supreme Court regarding her due process claim. Petitioner's reliance on <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980), is misplaced. In <u>Hicks</u>, the Oklahoma Court of Criminal Appeals affirmed the appellant's conviction under a habitual offender statute previously declared unconstitutional by that court, holding that the appellant was not prejudiced by the impact of the invalid statute setting a minimum sentence of years because his sentence was within the range of punishment that a jury could have imposed under the proper statute. The Supreme Court held:

> In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law.

<u>Id.</u> at 346.

<u>Hicks</u> is not clearly established federal law regarding federal review of state court evidentiary rulings. The due process rights infringed upon in <u>Hicks</u> involved an arbitrary disregard of the petitioner's right to liberty by the state appellate court. Such is not the case here. It is not this Court's province to engage in supervisory review of a state court's evidentiary rulings. Relief is only available if Petitioner can demonstrate the state court determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. This Petitioner has not done and this ground for relief is denied.

<u>Ground 9:</u>     <u>Petitioner's Statements to Law Enforcement</u>.

After her husband was shot, Petitioner was taken by law enforcement to the hospital

58

to treat her wound. At the hospital, forensic evidence was gathered from her and her clothing.

Afterwards, Petitioner was taken to the police station where she was questioned regarding

both her and husband being shot, as she was the only witness to the event. Petitioner claims

the trial court erred in admitting a videotape of her statement to the police, arguing she was

in custody when she was interrogated without being advised of, or waiving, her constitutional

rights as mandated by Miranda v. Arizona, 384 U.S. 368 (1964).

Petitioner raised this claim on direct appeal.

> In proposition nine, Appellant argues that her statements to police were
> the result of custodial interrogation, thus their introduction was unconstitutional
> because she had not been advised of her Miranda rights. During the Jackson
> v. Denno hearing, Appellant admitted that she agreed to speak with the police
> because she wanted to help the police catch those responsible for shooting her
> husband. Appellant was taken to the police station to be questioned by
> detectives. The detective interviewing her considered her to be a witness, not
> a suspect. She was taken to a friend's house after the interview. She was not
> "arrested" at any time. She was not handcuffed, shackled or placed in any type
> of restraint. Eye-witnesses are routinely taken to the police station for
> interviews. Appellant was the only living eye-witness to this crime. Under the
> circumstances of this case, a reasonable person in the same position would not
> conclude that he or she was in custody. See Berkemer v. McCarty, 468 U.S.
> 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)(the relevant inquiry is
> how a reasonable man under the circumstances would understand the situation.)
> Warnings are not required "simply because the questioning takes place in the
> station house, or because the questioned person is one whom the police
> suspect." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50
> L.Ed.2d 714 (1977). The trial court did not abuse its discretion in allowing the
> admission of Appellant's statements.

Andrew, 164 P.3d 194-95 (footnotes omitted).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that a person

questioned by law enforcement after being taken into custody or deprived of his freedom of

action in any significant way must first be warned that he has a right to remain silent, that any statement made may be used against him as evidence, and that he has the right to the presence of either a retained or appointed attorney. Id. at 444. Statements made not in compliance with this rule may not be admitted at trial. "An officer's obligation to administer Miranda warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" Stansbury v. California, 511 U.S. 318, 322 (1994)(quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)).

> In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting Mathiason, supra, 429 U.S., at 495, 97 S.Ct., at 714).

Id.

The determination of whether a person is in custody depends on the objective circumstances of the interrogation, not the subjective views of either the interrogating officers or the person being questioned. Id. at 323. Miranda warnings are required only when there has been such a restriction on a person's freedom as to render him in custody, Mathiason, 429 at 495, and the fact an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings. Minnesota v. Murphy, 465 U.S. 420, 431 (1984).

Petitioner claims the fact she was watched by police at the hospital, that the police checked her out of the hospital and took her to the police station in a police car, that she was

wearing only hospital gowns[13], and that she was taken to a closed room with no windows to be questioned shows that any reasonable person would have considered herself to be in custody. Respondent responds that additional evidence was presented at the pre-trial hearing on the issue that objectively demonstrates Petitioner was not in custody. Such evidence consisted of the collection of her clothing at the hospital for evidence, Petitioner freely signing search waivers because "she was trying to help", Petitioner never stating she did not want to go to the police station for an interview, never being handcuffed or placed under arrest that night, never being told she was a suspect, and at the conclusion of the interview, being transported by police to a friend's house where her children were located. Most importantly, Petitioner testified at the pre-trial hearing that she spoke with the officers because she wanted to tell them what happened and because she wanted to help the police catch the people who shot her husband.

Based upon the review of the pre-trial hearing testimony, Petitioner has not demonstrated the OCCA's objective determination that a reasonable person in the same situation would understand she was not in custody is contrary to, or an unreasonable application of, clearly established federal law.

Ground 10:   Trial Venue.

Petitioner claims pervasive publicity before and during trial entitled her to a change

_____

[13] At the time of the interview and after Petitioner had been transported to a friend's house, her residence was still being processed by police as a crime scene and a search of the house for evidence was still ongoing.

of venue, and that the trial court's denial of her pre-trial motion and the OCCA's determination upholding the trial court's decision to retain venue denied her Sixth, Eighth, and Fourteenth Amendment rights.

Prior to trial, the trial court held a hearing on Petitioner's motion for change of venue. Petitioner's counsel presented extensive material in the form of affidavits from local citizens and lists of material and local media accounts of the murder and subsequent events. The trial court stated the issue was whether jurors summoned could set aside any exposure to the media coverage and base a verdict on the evidence presented at trial. Denying Petitioner's motion, the trial court noted that the only way to know whether pre-trial publicity was prejudicial was through voir dire. Thereafter, the trial court and counsel conducted extensive individual voir dire of each potential juror to determine the extent of pre-trial knowledge about the case and any potential bias or predetermination of responsibility.

On appeal, the OCCA upheld the trial court's decision to deny the change of venue motion:

> In proposition ten, Appellant claims the trial court erred in not granting her request for a change of venue. Prior to trial, Appellant filed a motion for a change of venue. The trial court held a hearing on the motion January 9 and 21, 2003. The defense presented evidence of the extensive coverage of the case in the local media, as well as polling data showing that a substantial number of Oklahoma County residents were somewhat familiar with the case and had opinions about the case. After considering this evidence, the trial court denied the motion, stating:
>
>> I don't think we're going to know [whether unbiased jurors can be seated] until such time as we bring in a large panel, put them up in the jury box and voir dire them. It's unfortunate but that's actually the only way . . . that you can make that determination.

We review the trial court's denial of Appellant's motion for change of venue for an abuse of discretion. <u>DeRosa v. State</u>, 2004 OK CR 19, ¶ 21, 89 P.3d 1124, 1135–36. Pretrial publicity alone does not warrant a change of venue. <u>United States v. McVeigh</u>, 918 F.Supp. 1467, 1473 (W.D.Okl.1996)( "Extensive publicity before trial does not, in itself, preclude fairness"). The influence of the news media must be shown to have actually pervaded the trial proceedings. <u>Hain v. State</u>, 1996 OK CR 26, ¶ 8, 919 P.2d 1130, 1136. We consider all relevant evidence to determine whether a fair trial was possible at that particular place and time, keeping in mind the ultimate issue: whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused. <u>DeRosa</u>, 2004 OK CR 19, ¶ 19, 89 P.3d at 1135 ("if a trial court denies a defendant's change of venue motion and the defendant is then tried and convicted, the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial").

From the beginning, this case received considerable attention in the local media. That fact cannot be disputed. Appellant refers us generally to the record of the hearing on her change-of-venue motion, but she does claim that air of prejudice pervaded the trial proceedings themselves. Again, our chief concern is not how, or how often, the case played in the media, but whether, at the end of the day, the trial court was able to empanel twelve fair and impartial jurors.

The trial court is entitled to considerable discretion on issues involving jury selection, because it personally conducts voir dire and has the opportunity to observe the demeanor of the panelists—so much of which is lost in the transcription of the proceedings. <u>Harris v. State</u>, 2004 OK CR 1, ¶ 11, 84 P.3d 731, 741. Nowhere in her brief does Appellant claim, much less demonstrate, that any juror actually seated was biased against her due to adverse pretrial publicity. Instead, Appellant invites this Court to hold that, because of extensive media coverage, prejudice should be presumed. We decline that invitation and hold that the trial court did not abuse its discretion in denying a change of venue.

<u>Andrew</u>, 164 P.3d at 187.

It is axiomatic that the constitutional right to a jury includes the empanelment of

impartial jurors. However, as the Supreme Court acknowledged in <u>Irvin v. Dowd</u>, 366 U.S.

717, 722 (1961), impartiality does not require a juror to be "totally ignorant of the facts and issues involved."

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 722-23 (citations omitted).

Supreme Court precedent establishes two avenues of relief for pretrial publicity. The first is presumed prejudice. Presumed prejudice cases are rare, found in only three Supreme Court cases dating back to the 1960s. Goss v. Nelson, 439 F.3d 621, 628 (10th Cir. 2006). In those cases, prejudice was presumed because "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." Murphy v. Florida, 421 U.S. 794, 799 (1975). In Rideau v. Louisiana, 373 U.S. 723, 726 (1963), prejudice was presumed because the pretrial publicity created such a "spectacle" that Rideau's subsequent trial was all "but a hollow formality." In Estes v. Texas, 381 U.S. 532, 550-52 (1965), the Court applied Rideau to find a due process violation in the televising and broadcasting of a defendant's trial. In Estes, the press overran the courtroom imposing "a circus atmosphere." Murphy, 421 U.S. at 799; Estes, 381 U.S. at 535-38. Finally, in Sheppard v. Maxwell, 384 U.S. 333, 353-54 (1966), the "massive and pervasive" media attention

greatly exceeded the circumstances in <u>Estes</u>. In addition to "extremely inflammatory publicity," the "courthouse was given over to accommodate the public appetite for carnival." <u>Murphy</u>, 421 U.S. at 799. "The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." <u>Sheppard</u>, 384 U.S. at 355. The Supreme Court found that these circumstances deprived Sheppard "of that 'judicial serenity and calm to which [he] was entitled.'" <u>Id.</u> (quoting <u>Estes</u>, 381 U.S. at 536).

As the Supreme Court in <u>Murphy</u> explicitly acknowledged, <u>Rideau</u>, <u>Estes</u>, and <u>Sheppard</u> do not "stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." <u>Murphy</u>, 421 U.S. at 799. Prejudice was presumed in <u>Rideau</u>, <u>Estes</u>, and <u>Sheppard</u> because "[t]he proceedings in [those] cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." <u>Murphy</u>, 421 U.S. at 799. Accordingly, the Tenth Circuit, in applying this precedent, has "held that prejudice will only be presumed where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'" <u>Goss</u>, 439 F.3d at 628 (quoting <u>Hale v. Gibson</u>, 227 F.3d 1298, 1332 (10th Cir. 2000)).

> In order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community." <u>Id.</u> at 1567. "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." <u>Id.</u> Presumed prejudice

65

is "rarely invoked and only in extreme circumstances." Id.

Hale, 227 F.3d at 1332 (quoting Stafford v. Saffle, 34 F.3d 1557, 1567 (10th Cir. 1994)).

While Petitioner has shown that the pretrial publicity in her case was significant, she has not shown that her case is one of the rare and extreme cases where the media attention fostered "an irrepressibly hostile attitude." Stafford, 343 F.3d at 1567. Petitioner argues that prejudice should be presumed because of the frequency and nature of the publicity, and the demonstrated impact this publicity had upon the pool from which the jury was drawn. However, just as she failed to do on direct appeal, Petitioner has not made a connection between the publicity and the fairness of her trial. Supreme Court precedent requires a showing of more than mere exposure, even if that exposure is substantial. To find a presumption of prejudice, the media must have overwhelmingly influenced the community to the point where it was simply impossible to receive a fair trial. Petitioner details the media content and then based on its "frequency and nature," argues for a presumption of prejudice; however, her argument amounts to no more than an assumption of prejudice.

In denying Petitioner's claim, the OCCA acknowledged that a change of venue is warranted when "[t]he influence of the news media must be shown to have actually pervaded the trial proceedings." Andrew, 164 P.3d at 187. The OCCA denied relief, however, because Petitioner did not claim or demonstrate "that any juror actually seated was biased against her due to adverse pretrial publicity." Id. For the reasons set forth above, the Court finds that the OCCA's decision is in accord with Supreme Court precedent on presumed prejudice. Petitioner is therefore not entitled to relief on this portion of her claim because she has failed

to show that the OCCA's decision is contrary to, or an unreasonable application of, Supreme Court law.

Beyond presumed prejudice, the Supreme Court has held that a defendant may obtain relief when pretrial publicity causes actual prejudice. <u>Irvin</u> is an actual prejudice case. In <u>Irvin</u>, voir dire spanned four weeks. <u>Irvin</u>, 366 U.S. at 720. From the panel consisting of 430 potential jurors, 370 expressed an opinion about Irvin's guilt, and 268 of the 370 were excused for cause because their opinions were fixed. Of the twelve jurors who actually sat on the jury, eight believed Irvin was guilty before trial even began. <u>Id.</u> at 727. In these circumstances, the Supreme Court held as follows:

> With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. Where one's life is at stake—and accounting for the frailties of human nature—we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards.

<u>Id.</u> at 727-28 (citation omitted). The Court continued:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.' With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.

<u>Id.</u> at 728 (citations omitted).

Petitioner's case is far removed from the circumstances found in <u>Irvin</u>. Of the twelve

jurors ultimately selected to serve, ten had heard something about the case in varying degrees through the media but none had formed an opinion as to guilt. All affirmed they could be impartial. Although Petitioner presents selected passages expressing varying knowledge of the pre-trial media coverage by her jurors related in voir dire, a complete review of the voir dire does not demonstrate any juror had predisposed beliefs regarding her guilt or an appropriate sentence. Most importantly, Petitioner has not demonstrated any juror was biased against her due to pre-trial publicity.

In conclusion, the Court finds that Petitioner is not entitled to relief on this ground. Because Petitioner has not demonstrated that the OCCA's ruling on the issue of pretrial publicity is contrary to or an unreasonable application of Supreme Court law, Petitioner's claim is denied.

Ground 11:    Challenges to Instructions.

Petitioner claims her due process rights to a properly instructed jury were denied when the trial court erroneously denied requested instructions regarding jailhouse informant testimony, improperly instructed the jury on "flight", and failed to instruct the jury on the lesser offense of accessory after the fact and the proper use of "other crimes" evidence.

Jailhouse informant instruction.

Petitioner claims the trial court was required under Oklahoma law to give an instruction requested by the defense when the State relied in part on the testimony of Theresa Sullivan involving statements made to her by Petitioner while they were both in custody in the county jail. The OCCA rejected this claim on appeal:

First, Appellant claims that the trial court erred in failing to give cautionary instructions on jailhouse informant testimony. The instruction was requested in response to witness Teresa Sullivan's testimony. Sullivan testified that Appellant confessed that she and Pavatt killed Rob Andrew for the money, house, kids and each other. Sullivan was an inmate in the Oklahoma County Jail when Appellant confided in her.

This instruction is to be given when a witness is a "professional jailhouse informant." Wright v. State, 2001 OK CR 19, ¶ 21, 30 P.3d 1148, 1152. Sullivan was in federal custody while at the county jail. She was not facing any State charges, and she testified that she did not expect any benefit from testifying. She did not seek out authorities with which to share her story. She, as well as others incarcerated in the county jail with Appellant, were contacted to determine whether they had information relevant to this case. The possibility that Sullivan was a jailhouse informant was not supported by the evidence presented to the trial court. The trial court did not err in failing to give this instruction.

Andrew, 164 P.3d at 200 (footnotes omitted).

A petitioner seeking collaterally to attack a state court conviction based on an erroneous set of jury instructions "bears a heavy burden of proof." Shafer v. Stratton, 906 F.2d 506, 508 (10th Cir.1990). "Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense," Shafer, 906 F.2d at 508 (quotation omitted), or "so infected the entire trial that the resulting conviction violates due process," Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Moreover, the burden on a petitioner attacking a state court judgment based on a failure to give a requested jury instruction is especially great because "'[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" Tyler v. Nelson, 163 F.3d 1222, 1227 (10th Cir.1999)(quoting

Maes v. Thomas, 46 F.3d 979, 984 (10th Cir.1995))(additional citations omitted).

Although Ms. Sullivan was at the Oklahoma County jail along with Petitioner, she was in federal custody and testified that no promises had been made to her by state prosecutors for her testimony. She denied accusations by defense counsel on cross-examination that she was a "known snitch" and that she was testifying in exchange for favors of any kind. For these and other reasons, the OCCA determined she was not a "professional jailhouse informant" as required by state law in order to require the jailhouse informant jury instruction. Petitioner does nothing more that cite to general Supreme Court law to assert she was denied due process and a fair trial.[14] Without clearly established federal law to the contrary, or an unreasonable application of the same by the state court, Petitioner's claim lacks merit and must be denied.

"Flight" instruction.

Petitioner next claims giving the flight instruction burdened the presumption of innocence and denied her a fair trial. She further asserts that the instruction should be discontinued by the state court as it relates to consciousness of guilt. Both of these claims were considered and denied by the OCCA:

> Next, Appellant claims that the trial court erred in instructing the jury on the doctrine of flight. Along with this claim, Appellant urges this Court to eliminate and discontinue the jury instructions on the doctrine of flight as it relates to consciousness of guilt. Appellant explained to Sullivan that she left for Mexico to get the kids away from everything, for a little vacation. Her

---

[14] Petitioner does not deny that her counsel addressed these and other issues on Ms. Sullivan's cross-examination.

statement explaining her act of departure warranted the giving of the flight instructions. See Mitchell v. State, 1993 OK CR 56, ¶¶ 7–8, 876 P.2d 682, 684. Appellant's argument against the doctrine of flight does not persuade this Court to change its position on this issue. The trial court did not err in giving this instruction.

Andrew, 164 P.3d at 200.

Again, Petitioner does not direct this Court to any Supreme Court law demonstrating the OCCA's determination to be unreasonable. Instructive on these claims is the Tenth Circuit's decision in Robinson v. Gibson, 35 Fed. App'x. 715 (10th Cir. 2002). In Robinson, the Tenth Circuit considered whether the instruction on flight impermissibly infringed on the presumption of innocence and unconstitutionally shifted the State's burden of proof to the defendant. Citing Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997), the Court found the burden was not shifted by the instruction as the trial court also instructed the jury on the presumption and on the State's burden of proving each element of the offense beyond a reasonable doubt. Robinson, 35 Fed App'x. at 721. The Court further found the instuction did not deprive the defendant of due process or a fair trial. Id. at 722. In the instant case, the OCCA found no error in the trial court giving the instruction regarding flight. Petitioner has not demonstrated the challenged instruction was so fundamentally unfair as to deprive her of a fair trial and due process of law. Nor has she demonstrated the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Accessory after the fact.

Although not requested by the defense at trial, Petitioner claims the trial court should

71

have sua sponte instructed on a lesser-related offense of accessory after the fact, and that failure to do so denied her a fair trial and due process of law.

> Appellant next claims that the trial court failed in its duty to instruct on the lesser related offense of accessory after the fact. Instructions on this offense were not requested during trial. There was no evidence that Appellant was an accessory after the fact. Her defense was that she did not know who killed her husband. She did not claim that she knew Pavatt killed her husband, so she helped him flee to Mexico to avoid capture, which might be a basis for the instruction. Furthermore, the State's evidence did not support an instruction on this offense. Therefore, the trial court did not err in failing to give this instruction sua sponte.

Andrew, 164 P.3d at 200 (footnote omitted).

In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment sometimes requires a state charging a defendant with a capital offense to permit the jury to consider alternative, lesser included offenses that do not carry with them the prospect of a death sentence. Id. at 627; see also Schad v. Arizona, 501 U.S. 624, 647 (1991). Two problems with Petitioner's claim readily appear. First, Petitioner never requested the instruction regarding accessory after the fact. Petitioner may not prevail on a Beck claim on a lesser included offense instruction that she failed to request at trial. Grant v. Trammell, 727 F.3d 1006, 1011 (10th Cir. 2013) (citing Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir. 1999)). The second obstacle for Petitioner is that the due process clause "does not require a lesser included offense instruction to be given unless 'the evidence would ... support[ ] ... a verdict' on that lesser included offense." Id. at 1013 (quoting Beck, 447 U.S. at 627).

As the OCCA determined, there was no evidence presented to support that Petitioner

was an accessory after the fact – that she knew Pavatt killed her husband yet helped him flee to Mexico – and the State's evidence did not support such an instruction on the offense. Petitioner has failed to demonstrate the decision of the OCCA to be contrary to, or an unreasonable application of, clearly established federal law, or to be an unreasonable determination of the facts in light of the evidence presented at trial.

Instruction on other crimes evidence.

Petitioner lastly claims the trial court's failure to give the uniform instruction regarding evidence of other crimes and bad acts, when coupled with the circumstantial nature of the State's case, prejudiced her and denied her a fair trial. The OCCA found any error did not rise to a level requiring reversal:

> Appellant next complains about the trial court's refusal to give limiting instructions on the use of "other crimes" evidence (see discussion above regarding the evidence). We find that jury instructions on the use of other crimes evidence was warranted in this case, although some of the evidence indicating that Appellant committed other crimes or "bad acts" was part of the "res gestae," much of the evidence was presented as "other crimes" evidence for the specific purposes spelled out in 12 O.S.Supp.2002, § 2404. However, in spite of this error, we find that the error to give the requested instruction did not create the type of injury which requires reversal of this case. See 20 O.S.2001, § 3001.1; also see Anderson v. State, 1999 OK CR 44, ¶ 16, 992 P.2d 409, 416–17.

Andrew, 164 P.3d at 201.

Petitioner again fails to direct this Court to any federal law to demonstrate the unreasonableness of the state court's determination. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 63 (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Although the OCCA found

the requested instruction was warranted, it determined the error did not require reversal. When compared with the evidence the State presented against Petitioner, the trial court's failure to give the requested instruction was harmless. Petitioner has not shown the failure to give the limiting instruction had a substantial and injurious effect or influence on the jury's verdict, Brecht, 507 U.S. at 631, or that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's ground for relief is denied in its entirety.

Ground 12:    Challenges to Penalty Phase Instructions.

Petitioner claims she was denied her right to a fair trial when the trial court failed to give proper and pertinent second stage jury instructions stating the applicable law. Specifically, Petitioner challenges: (1) the Oklahoma uniform jury instruction on the murder for remuneration aggravator; (2) the trial court's supplemental instruction in response to a jury question regarding the meaning of the life without possibility of parole sentencing option; and (3) the Oklahoma uniform instruction defining mitigating circumstances.

Murder for remuneration instruction.

Petitioner complains the trial court erred by not giving adequate instructions when it refused to give her requested instruction defining "remuneration". The OCCA determined Petitoner's requested instruction did not adequately define the murder for remuneration aggravating circumstance and that the uniform instruction given by the trial court adequately stated the law:

Appellant claims, in proposition twelve, that the trial court failed to

properly instruct the jury during the second stage proceedings, thus depriving her of her right to fair sentencing proceeding. She first claims that the trial court failed to instruct on the necessary elements of murder for remuneration. This argument rests on the trial court's failure to give Appellant's requested instruction on the aggravating circumstance of murder for remuneration.

The trial court gave the uniform instructions on the murder for remuneration aggravating circumstance. The uniform instruction only states that "the person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration." OUJI–CR 4–72 (2000). No further defining instructions are included in the uniform instructions.

Appellant requested that the jury be instructed as follows:

The State has alleged that the defendant committed the murder for remuneration or the promise of remuneration. This aggravating circumstance is not established unless the State proves beyond a reasonable doubt that:

First: the murder was committed by the defendant for the purpose of her financial gain.

Second: the defendant was in a position to receive financial gain by the act of murder at the time the homicide occurred.

We initially note that this requested instruction does not fully describe or define the murder for remuneration aggravating circumstance, thus it does not accurately state the law. This Court has determined that the murder for remuneration instructions accurately state the law.

The traditional application of the "murder for remuneration" aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder. Plantz v. State, 1994 OK CR 33, ¶ 42, 876 P.2d 268, 281. Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy. Id. We find that the trial court did not abuse its discretion in refusing Appellant's proposed instruction.

Andrew, 164 P.3d at 201-02.

The Tenth Circuit has previously considered an almost identical claim and described the parameters on habeas review:

> We may set aside a state conviction on the basis of erroneous jury instructions when the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)(quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). On habeas review, however, "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." Id. at 71–72, 112 S.Ct. 475 (citations omitted). Furthermore, "the [state] courts' interpretation of the state . . . statute is a matter of state law binding on this court." Chapman v. LeMaster, 302 F.3d 1189, 1196 (10th Cir. 2002); see also Missouri v. Hunter, 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)("We are bound to accept the [state] court's construction of that State's statutes.")(citing O'Brien v. Skinner, 414 U.S. 524, 531, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974)); Hatch v. Oklahoma, 58 F.3d 1447, 1464 n. 11 (10th Cir.1995)("Even if petitioner were to challenge this construction of [the statute] directly, we would have to defer to the Oklahoma court's construction of a state statute.")(citations omitted).

Parker v. Scott, 394 F.3d 1302, 1319 (10th Cir. 2005).

Petitioner's reliance on Woodson v. North Carolina, 428 U.S. 280 (1976), is misplaced. Woodson involved the application of a statute making the death penalty mandatory in cases of first degree murder and that afforded no consideration of the offender's character, record, or the circumstance of the offense. Petitioner is arguing that an additional instruction of her choosing should have been given to the jury and not that her death sentence was statutorily mandated. Here, as in Parker, Oklahoma law, as interpreted by its state courts, does not include the additional element that Petitioner seeks. Parker, 394 at 1319. Petitioner has not demonstrated the OCCA's determination to be unreasonable.

Response to jury inquiry.

Petitioner claims the trial judge's response to a jury question about the life without the possibility of parole sentencing option was inadequate and that she is, therefore, entitled to a new sentencing proceeding.

> Appellant next claims that the trial court's answer to the jury's question about life without parole was inadequate. During second stage deliberations, the jury sent out a note asking, "Is [sic] life without parole mean incarceration in prison until her natural death?" The trial court answered that life without parole was self-explanatory. Trial counsel did not object to this answer, thus we review for plain error. This type of answer was one of the options recommended in Littlejohn v. State, 2004 OK CR 6, ¶ 11, 85 P.3d 287, 293–94, therefore, there is no plain error here.

Andrew, 164 P.3d at 202.

Petitioner offers only general Supreme Court law regarding cases involving erroneous jury instructions and the heightened standards of reliability in capital cases. An almost identical argument to Petitioner's claim was considered and rejected by the Tenth Circuit in Littlejohn v. Trammell, 704 F.3d 817 (10th Cir. 2013). In Littlejohn, the Tenth Circuit restated that Oklahoma's three-option sentencing scheme fulfills the Supreme Court's requirements that a jury be notified regarding the defendant's parole ineligibility. Id. at 827. Further, the Court found that the trial judge's response to the jury's questions regarding the life without possibility of parole sentencing option did not create a false choice, negate, or contradict the three sentencing choices. Id. at 831. Circuit precedent and Petitioner's failure to demonstrate the OCCA's determination to be contrary to federal law as determined by the Supreme Court dictate the denial of this claim.

Instruction regarding mitigating circumstances.

Oklahoma Uniform Jury Instruction (OUJI) CR2d 4-78 defines mitigating circumstances as factors which "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame". Petitioner argues this definition impermissibly narrows application of mitigation evidence to exclude evidence warranting a sentence less than death simply because such evidence does not lessen her moral culpability or blame for the crime of which she has been convicted." (Pet. at 273)

> Next, Appellant claims that the uniform instructions on mitigating circumstances, OUJI–CR 2d 4–78, ran afoul of <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978), as the prosecutor was allowed to use the language to fashion an argument which compared mitigation with culpability. The same argument made here was rejected in <u>Hogan v. State</u>, 2006 OK CR 19, ¶ 94, 139 P.3d 907, 936. We find no reason to revisit this issue, especially in light of the fact that the jury was instructed that they could decide what mitigating factors existed beyond those listed pursuant to OUJI–CR 4–79, and consider them as well. <u>See also</u> <u>Rojem v. State</u>, 2006 OK CR 7, ¶¶ 57–58, 130 P.3d 287, 299. Appellant's arguments regarding the second stage instructions must fail.

<u>Andrew</u>, 164 P.3d at 202.

> There is no Supreme Court precedent requiring a trial court to affirmatively instruct on the specific mitigating evidence the defendant wishes the jury to consider. Therefore, this claim fails under AEDPA. <u>See</u> <u>Smith v. Spisak</u>, [558] U.S. [139, 149], 130 S.Ct. 676, 684, 175 L.Ed.2d 595 (2010)(no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); <u>see also</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009)(legal rule must be "squarely established" by Supreme Court). In addition, the OCCA correctly noted <u>Penry 1</u> and its predecessors involved instructions "which improperly limit[ed] the jury's consideration of certain evidence [in addition to] the absence of an instruction specifically directing their consideration of certain evidence." <u>Welch</u>, 968 P.2d at 1244. Here, Welch's jury was not prevented from considering mitigating evidence and was specifically instructed it was limited only by its own judgment.

<u>Welch v. Workman</u>, 639 F.3d 980, 1008-09 (10th Cir. 2011).

Here, as in <u>Welch</u>, the jury was instructed on the meaning of mitigation, that it must unanimously find the existence of the aggravating factors beyond a reasonable doubt, and that it was authorized to consider the death penalty only if the aggravating circumstances outweighed the evidence of mitigating circumstances. <u>Id.</u> at 1009-10. Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. According, this claim is denied.

<u>Ground 13:</u>   <u>Prosecutorial Misconduct</u>.

Petitioner claims various comments by the prosecutor were improper and deprived her of her due process rights under the Fourteenth Amendment to the Constitution, rendering her death sentence unreliable. The OCCA reviewed each of Petitioner's individual instances of claimed prosecutorial misconduct and determined there to be no due process violations[15]:

> In proposition thirteen, Appellant alleges several instances of what she calls prosecutorial misconduct. We first note that no trial will be reversed on the allegations of prosecutorial misconduct unless the cumulative effect was such to deprive Appellant of a fair trial. <u>Garrison v. State</u>, 2004 OK CR 35, ¶ 128, 103 P.3d 590, 612. Many of the allegations here were not preserved at trial with contemporaneous objections, thus we review for plain error. We will not find plain error unless the error is plain on the record and the error goes to the foundation of the case, or takes from a defendant a right essential to his defense. <u>Simpson</u>, 1994 OK CR 40, ¶ 23, 876 P.2d at 698.

---

[15] The OCCA addressed in its Opinion each of the instances claimed in the Petition to have been improper. Rather than be duplicative and list each instance again, the Court refers to the OCCA's Opinion to identify Petitioner's claimed errors.

Appellant first claims that the prosecutor intentionally misled the jury by pointing out to them that Tricity Andrew did not beg for her mother's life. Defense counsel had planned and had informed the Court that he intended to ask Tricity if she wanted her mother to get the death penalty, but the question was never asked, possibly due to Tricity's emotional state on the witness stand. Appellant also claims that the prosecution attacked defense counsel's choice to use Appellant's fifteen-year-old niece to ask to spare Appellant's life by asking the jury, "would you put your 15–year–old niece on the stand to do that? I wouldn't." There was no objection to either of these comments.

While these comments were "low blows" and may have constituted improper argument and casting aspersions on defense counsel, we can confidently say that they did not rise to the level of plain error.

Appellant next claims that the prosecutor improperly attacked her by stating in response to mitigating evidence indicating she was a good mother, "Would she bring men into her house with her children there and her husband at work?" This comment was not met with an objection. The comment was properly based on the evidence, and it was in response to the list of mitigating evidence, thus did not constitute error. See Selsor v. State, 2000 OK CR 9, ¶ 35, 2 P.3d 344, 354.

Appellant, next points us to the prosecutors comment that, "Rob Andrew's parents would like to visit him in prison.... The only place they get to visit is his grave." The prosecutor used this comment to rebut mitigating evidence that Appellant "has many relatives who would visit her in prison if given the opportunity." Again, no objection was lodged. This comment is similar to the ones condemned in Duckett v. State, 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19. However, as in Duckett, we find that the comment did not rise to the level of plain error.

Appellant next claims that the prosecutor attempted to elicit sympathy for the victim by pointing out that Appellant murdered a man with admirable attributes, noting specific aspects of his life. Again, there was no objection. This argument did not rise to the level of plain error.

Next, Appellant complains that the prosecutor, during second closing, attacked defense counsel's argument. The prosecutor pointed out that defense counsel argued that Rob would ask for forgiveness just as Jesus did on the cross, then later told them that Appellant was "a cold-blooded, heartless killer." These comments were separated by nearly fourteen pages of transcript and were

in direct response to defense counsel's argument. There was no error here. See DeRosa, 2004 OK CR 19, ¶ 70, 89 P.3d at 1149.

Next, Appellant claims the prosecutor argued facts not in evidence by trying to get the jury to imagine what Rob's last word[s] were, "Was it goodbye, I love you, Brenda? Was it I forgive you? Was it, take care of my children?" No objection to these comments was lodged. This was also, arguably, in response to defense counsel's argument regarding Rob's belief in forgiveness and argument regarding the aggravating circumstance of heinous, atrocious or cruel. No plain error occurred here.

Appellant claims that the prosecutor's argument that Rob's mother could not make it to the witness stand was arguing facts not in evidence. Defense Counsel objected, and the trial court interrupted the argument, allowed the prosecutor to rephrase, then, just a few lines later, after an objection to other comments, reminded the jury, in no uncertain terms, that "nothing that the attorneys say is evidence." We find that any error in these comments was cured, due to the later instruction by the court.

Appellant claims that the prosecutor misstated the evidence by inferring that the victim impact witnesses wanted the death penalty through their testimony, even though Rob's father testified that "all of our family will do everything in our power to assist for convictions and punishment for all of those who are involved in this and responsible for the murder of my son and that they will never ever walk free again." These arguments were in direct response to the defense argument that the victim impact witnesses didn't ask for the death penalty. The prosecutor informed the jury that, by law, the victim impact witnesses could not ask for a specific punishment during their victim impact testimony. There was no objection and the comments do not rise to the level of plain error.

Appellant claims that the prosecutor argued that she deserved the death penalty for things that are not "aggravating circumstances." Appellant points out that the prosecutor argued that "she killed [Rob] because she wanted the money; she wanted the custody of the children." The prosecutor also argued that she deserved the death penalty for the way she treated Rob after "[h]e had forgiven her time and time again." There was no objection here. Remember that one of the aggravating circumstances alleged was continuing threat—this argument was to establish that her motive and callousness caused her to be a continuing threat. There is no error here.

Appellant has failed to show either that her trial was so infected by misconduct as to violate due process, or that her death sentence was improperly or unconstitutionally obtained. DeRosa, 2004 OK CR 19, ¶ 70, 89 P.3d at 1149. Appellant was convicted and sentenced to death based upon the facts and circumstances of this case, rather than any improper remarks by the prosecutor. Id.

Andrew, 164 P.3d at 202-04.

The deferential standard of review under 28 U.S.C. § 2254(d) is required since the OCCA adjudicated Petitioner's prosecutorial misconduct claim on the merits. See Walker v. Gibson, 228 F.3d 1217, 1241 (10th Cir. 2000), abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner does not demonstrate that the prosecutor's misconduct denied her a specific constitutional right. The appropriate standard for a prosecutorial misconduct habeas claim, therefore, is "'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). Accordingly, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (citation omitted). A prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643, 645 (1974). The fundamental fairness inquiry requires an examination of the entire proceedings and the strength of the evidence against the petitioner, both as to the guilt stage and the sentencing phase. Id. at 643. "Any cautionary steps – such as instructions to the jury – offered by the court to counteract improper remarks may also be considered. Counsel's failure to object to

the comments, while not dispositive, is also relevant to a fundamental fairness assessment." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002) (citations omitted).

Petitioner has not demonstrated her due process rights were violated by any or all of the prosecutor's statements. See Thornburg v. Mullin, 422 F.3d 1113, 1124-25 (10th Cir. 2005) (holding that the OCCA had adjudicated the merits of a due process claim because the OCCA's analysis of plain error involved the same test used to determine whether there was a denial of due process). Upon review of the entire proceedings, rather than parsing out individual statements, the Court determines that considered alone or together the prosecutor's remarks did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Many of the prosecutor's statements were not objected to by defense counsel. As identified by the OCCA, many of the statements were proper argument and/or reasonable comments on the evidence and law. A few others, if improper, were cured with admonishments by the trial court. Petitioner has not demonstrated that the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is denied.

Ground 14:    The Especially Heinous, Atrocious, or Cruel Aggravating Circumstance.

Petitioner claims the evidence presented to show that the murder was especially heinous, atrocious or cruel was insufficient to prove the existence of the aggravating circumstance beyond a reasonable doubt, resulting in a death sentence lacking the reliability required by the Eighth Amendment.

To find a murder heinous, atrocious or cruel, the State must prove the victim suffered

torture or serious physical abuse. Serious physical abuse requires a showing the victim was subjected to "great physical anguish" or "extreme mental cruelty." <u>Neill v. State</u>, 896 P.2d 537, 555 (Okla. Crim. App. 1994). "Evidence that a victim was conscious and aware of the attack supports a finding of torture." <u>Davis v. State</u>, 103 P.3d 70, 81 (Okla. Crim. App. 2004). "Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering." <u>Hooker v. Mullin</u>, 293 F.3d 1232 (10th Cir. 2002)(<u>quoting</u> <u>Romano v. Gibson</u>, 239 F.3d 1156, 1176 (10th Cir. 2001)).

"When reviewing the sufficiency of the evidence on a habeas corpus petition, the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1197 (10th Cir. 2004)(<u>quoting</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

> "This standard reflects our system's longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1197 (10th Cir. 2004). Our review is "sharply limited," and when there are conflicting facts in the record that permit disparate inferences, the Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 1197 (<u>quoting</u> <u>Messer v. Roberts</u>, 74 F.3d 1009, 1013 (10th Cir.1996)).

<u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1105 (10th Cir. 2008).

The OCCA concluded the following facts supported the heinous, atrocious or cruel aggravating factor:

Appellant, in her phone call to police told the emergency operator, during her second 911 call, that her husband was breathing, conscious and was trying to talk, even after being shot twice. This conversation occurred at around five minutes after Rob Andrew was shot. The medical examiner testified that Rob was shot twice. The medical examiner also testified that death would not have been instantaneous.

Although the murder weapon was never found, circumstantial evidence showed that Rob was shot with a single-shot shotgun, which would have required manual reloading between the shots. The evidence supported the fact that Rob was conscious during this time and even after being shot the second time. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to shield himself from being shot, or attempted to ward off his attacker. All of these facts tend to show that Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes.

Andrew, 164 P.3d at 201.

Petitioner has offered little more to support her claim than a general statement that "the record does not reflect the intentional, drawn out, mental cruelty present in cases where this aspect of the aggravator has been found." (Pet. at 287) The OCCA detailed several facts developed at trial demonstrating that Rob Andrew was conscious and aware of the attack that took his life and that would have caused him great physical anguish and suffering. Petitioner has failed to demonstrate the OCCA's conclusion is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or is an unreasonable determination of the facts in light of the evidence presented at trial.

Ground 15:    Cumulative Errors.

Petitioner claims in the event that any individual error in her case is deemed insufficient to warrant relief, the accumulation of errors so infected the trial and sentencing

proceedings with unfairness that she was denied due process of law and a reliable sentencing proceeding. The OCCA considered this claim on direct appeal:

> In proposition fifteen, Appellant urges this Court to view the alleged errors in a cumulative fashion, should we hold that no individual error rises to the level of reversible error. We have reviewed the case to determine the effect, if any, of Appellant's alleged accumulation of error. We find, even viewed in a cumulative fashion, the errors we identified do not require relief. Stouffer v. State, 2006 OK CR 46, ¶ 205–06, 147 P.3d 245, 280.

> We found error, although harmless, in the admission of some State's evidence and exclusion of some defense evidence. We also found error in the failure to include an instruction on "other crimes" evidence. We find that even viewed in a cumulative fashion, these errors do not require relief. Furthermore, these errors combined with alleged and unpreserved error which did not rise to the level of plain error did not cause Appellant to receive an unfair trial.

Andrew, 164 P.3d at 205.

It is true as a general principle of law that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998)(quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990)). However, "'[a] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.' The analysis, however, 'should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.'" Id. (quoting Rivera, 900 F.2d at 1470-71); See also Newsted v. Gibson, 158 F.3d 1085, 1097 (10th Cir. 1998); Castro v. Ward, 138 F.3d 810, 832-33 (10th Cir. 1998); United States v. Trujillo, 136 F.3d 1388, 1398

(10th Cir. 1998).

Upon review of the entire trial transcript and the evidence and testimony presented, the Court does not find the cumulation of those errors determined to be harmless had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Because this Court has concluded that no additional error occurred during either stage of trial, the only matters considered here are the errors found by the OCCA. Each of the errors identified had minor significance. See Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir. 2000)("[c]ourts must be careful not to magnify the significance of errors which had little importance"). As expressed by the OCCA, the errors were not so egregious or numerous as to prejudice Petitioner to the same extent as a single reversible error. Although this was a circumstantial evidence case, the cumulative effect of the errors, when compared with the evidence and testimony presented at trial, did not significantly strengthen the State's case or diminish Petitioner's case. No reasonable probability exists the jury would have acquitted Petitioner absent the errors. Additionally, the cumulative effect of the errors was insufficient to undermine the aggravating circumstances found by the jury. Accordingly, Petitioner's fifteenth ground for relief is denied.

Ground 16:    Constitutionality of Sentence.

In Anderson v. State, 130 P.3d 273 (Okla. Crim. App. 2006), the OCCA determined that juries should be instructed that a person convicted of certain crimes is subject to Oklahoma's eighty-five percent (85%) rule – that is, the person would actually serve 85% of their sentence before becoming eligible for parole or good time credits. Petitioner claims that

failure to instruct her jury on the rule violated her Eighth Amendment rights pursuant to

<u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994), and progeny, and the failure of the OCCA

to apply <u>Anderson</u>'s rule to her case violates her due process rights.

Petitioner filed her appeal brief the day before the OCCA handed down the <u>Anderson</u>

opinion. While the direct appeal was pending, Petitioner filed her application for post-

conviction relief, raising the above issue in a claim of ineffective assistance of appellate

counsel. The OCCA considered Petitioner's claim in determining the prejudice prong of an

ineffective assistance of counsel claim:

> In proposition three, Andrew claims that a new rule of law announced after her direct appeal brief was filed renders her sentence unconstitutionally unreliable and a violation of due process of law. The new rule of law she refers to is our pronouncement in <u>Anderson v. State</u>, 2006 OK 6, 130 P.3d 273, that juries should be informed that a person convicted of an enumerated crime would be required to serve eighty-five percent of their sentence before becoming eligible for parole. <u>See</u> 21 O.S. 2001, §§ 12.1 & 13.1. Andrew also claims that, should this Court determine that this issue was waived on direct appeal; direct appeal counsel was ineffective for failing to raise it in the original brief or in a supplemental brief, as required by the Court's rules. <u>See</u> Rule 3.4(F), <u>Rules of the Oklahoma Court of Criminal Appeals</u>, Title 22, Ch. 18, App. (2007). Thus, in order to prevail on this issue, Andrew must show ineffective assistance of appellate counsel. This she cannot do.

> The jury had three sentencing options: death, life without the possibility of parole, and life with the possibility of parole. There is no indication that the jury was deciding between life and life without parole. Andrew cannot show that the outcome would have been different had an 85% instruction been given. <u>See</u> <u>Cole v. State</u>, 2007 OK 27, ¶ 65, fn. 15, 164 P.3d 1089. Thus the second prong of <u>Strickland</u> cannot be met.

<u>Andrew v. State</u>, No. PCD-2005-176, slip op. at 5-6 (Okla. Crim. App. Jun. 17,

2008)(footnote omitted).

To obtain relief under the AEDPA, Petitioner must show the OCCA's decision is contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "That statutory phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). "[F]ederal courts may no longer extract clearly established law from the general legal principles developed in factually distinct contexts." House v. Hatch, 527 F.3d 1010, 1017 n. 5 (10th Cir.2008). Petitioner's ability to obtain relief hinges on his ability to point to "Supreme Court precedent clearly establishing the legal right on which [his] claim is premised." Lambert v. Workman, 594 F.3d 1260, 1263 (10th Cir.2010).

Petitioner seeks relief from the OCCA's decision by asserting it is in conflict with several Supreme Court decisions. In support of her due process claim, Petitioner cites Simmons v. South Carolina, 512 U.S. 154 (1994), as well as related cases, Shafer v. South Carolina, 532 U.S. 36 (2001), and Caldwell v. Mississippi, 472 U.S. 320 (1985). In Simmons, a plurality opinion, the Supreme Court held "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156. Because the jury in Simmons may have reasonably believed that Simmons could be paroled if given a life sentence, the Court found that an unacceptable "misunderstanding pervaded the jury's deliberations" — one which "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of

incarceration." Id. at 161.

Simmons and its progeny are inapplicable to Petitioner's claim. As discussed above, Simmons protects against the "false choice." Its holding requires jury notification of a capital defendant's parole ineligibility when the State has alleged that he is a continuing threat. This notification prevents "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 161. See Ramdass v. Angelone, 530 U.S. 156, 166 (2000) (noting that "Simmons created a workable [and limited] rule."). In Petitioner's case, the jury was not faced with this false choice, but was given three sentencing options: life, life without the possibility of parole, and death (O.R.VI, 1039). This in and of itself is Simmons compliant

Beyond the limited circumstances of Simmons, the Supreme Court has not mandated a jury be told about a defendant's parole eligibility. In fact, the Supreme Court has specifically acknowledged that the States have discretion in this area. Simmons, 512 U.S. at 168 (citing California v. Ramos, 463 U.S. 992, 1014 (1983), "for the broad proposition that [the Supreme Court] generally will defer to a State's determination as to what a jury should and should not be told about sentencing."); see also Ramdass, 530 U.S. at 165 (acknowledging that O'Dell v. Netherland, 521 U.S. 151, 166 (1997), "reaffirmed that the States have some discretion in determining the extent to which a sentencing jury should be advised of probable future custody and parole status in a future dangerousness case, subject to the rule of Simmons."); O'Dell, 521 U.S. at 166 (noting that Simmons "carved out an exception to the general rule described in Ramos . . . for the first time ever"). Under these circumstances,

90

Petitioner's claim is nothing more than a state law claim and outside the province of a federal court to reexamine. <u>Estelle</u>, 502 U.S. at 67–68. <u>See also</u> <u>Parker v. Sirmons</u>, 384 F. App'x 750, 752 (10th Cir. 2010) (unpublished) (finding no due process violation for <u>Anderson</u> error); <u>Gardner v. Jones</u>, 315 F. App'x 87, 91–92 (10th Cir. 2009) (unpublished) (acknowledging the limited holding of <u>Simmons</u> and finding that a petitioner was not denied a fundamentally fair trial "in a constitutional sense" by the trial court's failure to instruct the jury on the 85% Rule); <u>Taylor v. Parker</u>, 276 F. App'x 772, 775–76 (10th Cir. 2008) (unpublished) (failure to instruct on the 85% Rule did not result in a fundamentally unfair trial).

The Eighth Amendment aspect of Petitioner's claim does not enhance her ability to obtain relief. For this portion of his claim, Petitioner cites the Supreme Court's decision in <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1990), asserting the failure of the OCCA to apply the rule to Petitioner's case violates her right to due process as guaranteed by the Fourteenth Amendment. This argument fails at the threshold because it is premised not on clearly established federal law, but on "general legal principles developed in factually distinct contexts." <u>House</u>, 527 F.3d at 1017 n. 5; <u>see</u> <u>Littlejohn v. Trammell</u>, 704 F.3d 817, 830 n. 5 (10th Cir. 2013) (rejecting a similar argument based on general principles drawn from several Supreme Court cases interpreting the Eighth Amendment).

The trial court's instructions were compliant with <u>Simmons</u> and before the OCCA's announcement regarding the 85% rule in <u>Anderson</u>. The OCCA's consideration on post-conviction of Petitioner's claim, included as a ground for ineffective assistance of counsel, reasonably recognized that the failure to give the instruction did not create any false choices,

and as such, did not satisfy the necessary prejudice prong of an ineffective assistance of counsel claim. For the foregoing reasons, the Court finds that Petitioner has failed to show the OCCA's decision is contrary to, or an unreasonable application of, Supreme Court law. Petitioner's ground for relief is, therefore, denied.

Ground 17:    Claim of Non-disclosed Evidence by Prosecution.

Petitioner claims the prosecutor in her case withheld material and exculpatory evidence regarding the testimony of Teresa Sullivan. Ms. Sullivan was housed with Petitioner in the Oklahoma County jail prior to trial and testified Petitioner told her she and Pavatt killed her husband for money, the kids and each other; that Pavatt shot her in the arm to make her appear to be a victim; and that they fled to Mexico because they believed they would be caught. Petitioner claims that contrary to the testimony of Ms. Sullivan and the closing arguments of the prosecutor, Ms. Sullivan's defense attorney had a conversation with the prosecutor prior to trial and stated he might ask her to write a letter to federal prosecutors regarding Sullivan's testimony. He stated he planned to file a motion in her federal case for a reduction of her sentence if Ms. Sullivan indeed testified in Petitioner's case.

Petitioner presented this and other newly discovered evidence to the OCCA in her motion for a new trial. The OCCA's determination detailed, along with its reasoning, the new evidence and Petitioner's arguments. It is included here in its entirety and incorporated by the Court to further describe the substance of Petitioner's claim:

> Appellant filed a motion for new trial with this Court on September 21, 2005. Appellant's motion is brought pursuant to 22 O.S.2001, §§ 952 and 953, alleging newly discovered evidence. The State filed a response on June 21,

2006.

> The test for whether a motion for a new trial should be granted based upon newly discovered evidence is: (1) whether the evidence is material; (2) whether the evidence could not have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome.

Ellis v. State, 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303.

The motion contains information that Teresa Sullivan, who testified against Appellant, received a reduction of her federal sentence due to her cooperation with the Oklahoma County District Attorney's office in this case. Sullivan testified that she had twenty-two (22) months left on her sentence; however, a new sentence was given by the federal court after she testified, which basically allowed her release just five (5) months after testifying. The documents indicate that Sullivan was granted the early release because of her cooperation in this case.

Information attached to the motion also indicates that Sullivan received a downward departure on her federal sentence because she cooperated with the federal authorities in the investigation of her co-defendants (even though she testified that she was not a snitch). The gist of the motion is that the State knew about the potential for a benefit to Sullivan, but failed to disclose the information.

Sullivan testified that Appellant confessed that she and James Pavatt killed Rob Andrew. Sullivan's attorney says in a letter written to the federal prosecutor that he had to explain to her that she might receive additional consideration on her federal sentence if she were called to testify against Appellant. It appears that Sullivan provided information to the State (before testifying) with no understanding that she might receive a benefit. When she testified at trial, there were no guarantees that she would receive any benefit.

One document in particular states that Oklahoma City Police detectives contacted Sullivan at her place of federal confinement as part of their investigation (as well as others who where incarcerated with Appellant at the Oklahoma County Jail). Sullivan provided information to the detectives before contacting, William P. Earley, the federal public defender who represented her

in her federal case. The documents indicate that Earley filed the motion for a reduction of sentence after Sullivan testified as any effective advocate might have done. He stated that he would have filed this motion regardless of any input from the Oklahoma County District Attorney's office.

Appellant has not presented a sufficient showing to be granted a new trial. Substantial additional evidence supports the conviction. We are further convinced that, were we to grant a new trial with this "newly discovered evidence" being introduced, the outcome of the trial would be the same.

Sullivan was thoroughly cross-examined regarding her motivation to testify against Appellant, with repeated attempts to show her bias. Defense counsel also called a witness to refute the possibility that Appellant shared any information with Sullivan. The knowledge of the fact that Sullivan was the beneficiary of an act of grace by the federal courts would not change the outcome of this trial.

Andrew, 164 P.3d at 204-05 (footnote omitted).

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that suppression of favorable evidence by the prosecution after request by the accused violates due process, irrespective of the good faith or bad faith of the prosecution, where the evidence is material to either guilt or to punishment. Id. at 87. That duty of disclosure was extended even when the accused had not made a request, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). The evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682.

In Kyles v. Whitley, 514 U.S. 419 (1995), the Supreme Court explained that "favorable evidence is material, and constitutional error results from its suppression by the government,

'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 433 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  The Supreme Court emphasized four aspects of materiality under Bagley.  First, the touchstone of materiality is a "reasonable probability" of a different result.  The question is "whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Id. at 434.  Second, it is not a sufficiency of evidence test, but a showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 434-45.  Third, "once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review." Id. at 435.  The fourth and final aspect of Bagley materiality "is its definition in terms of suppressed evidence considered collectively, not item by item." Id. at 436.

In Strickler v. Greene, 527 U.S. 263 (1999), the Supreme Court explained the standards and components of a Brady violation:

> There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

Id. at 280-82.

"[W]hen 'the reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of Brady]." Scott v. Mullin, 303 F.3d 1222, 1231-32 (10th Cir. 2002), quoting Giglio v. United

States, 405 U.S. 150, 154 (1972). "[I]mpeachment Brady material will only require a new trial 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Id. at 1232 (quotation omitted). "As we stressed in Kyles: '[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Strickler at 289-90 (quoting Kyles).

By determining the results of her trial would have been the same with the additional evidence that Teresa Sullivan may have testified with expectations of benefits in her federal case, the OCCA determined Petitioner received a fair trial resulting in a verdict worthy of confidence. The issue here is whether that determination was unreasonable.[16] The State presented evidence of a conspiracy between Petitioner and Pavatt to kill her husband starting prior to the incident of the cut brake lines and continuing through their flight to Mexico. Evidence was also received that Petitioner hated her husband, of her attempt to remain the beneficiary of his life insurance policy, that she loaned Pavatt money to pay for his wife to return overseas, and expert testimony that the shooting of Petitioner in the arm was staged. The new evidence of possible assistance with Sullivan's federal sentence in exchange for her testimony is minimal in its prejudicial impact when compared to the above evidence and a

---

[16] The Court does not consider the veracity of Petitioner's claim that the new evidence demonstrates the prosecutor withheld this evidence from defense counsel and the jury. Instead, this Court adopts the reasoning that the OCCA considered the claim to be valid when it made its determination and reviews this determination for unreasonableness.

plethora of other circumstantial evidence presented throughout a lengthy trial. This is especially true in light of defense counsel's stringent cross-examination and questioning Sullivan regarding her motives to testify and about a bogus check crime for which she had been previously convicted. Further, evidence was presented to cast doubt on Ms. Sullivan's testimony and her motive for testifying. Angela Burk was presented by defense counsel to rebut Ms. Sullivan's testimony. She testified Sullivan was a "known snitch", that she had access to television and newspapers reporting on Petitioner's case, that Petitioner was shy, quiet, and never talked to anyone about her case, and that Sullivan was testifying in order to get some benefit.

The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable. The state court determined that even with the inclusion of this information the outcome of the trial would have been the same – that is, that even in its absence Petitioner received a fair trial, understood as one resulting in a verdict worthy of confidence. Petitioner has not demonstrated the OCCA's determination to be unreasonable. Petitioner's seventeenth ground for relief is denied.

Ground 18:     Evidentiary Hearing.

Throughout her Petition and more generally in this ground for relief, Petitioner claims she is entitled to an evidentiary hearing on various claims. Petitioner filed a Motion for Evidentiary Hearing specifically setting forth the grounds for relief on which she believes she is entitled to present additional evidence. For the reasons set forth throughout this

Memorandum Opinion and in the Order on her Motion for Evidentiary Hearing, Petitioner's request for an evidentiary hearing is denied.

## CONCLUSION

After a complete review of the transcripts, trial record, appellate record, record on post-conviction proceedings, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in her *Petition For Writ of Habeas Corpus* (Dkt. No. 26) should be denied. ACCORDINGLY, habeas relief is DENIED on all grounds. An appropriate judgment will be entered.

IT IS SO ORDERED this 9th day of September, 2015.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE